## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

STEVEN SCHMALZ, on behalf of himself and all others similarly situated,

Plaintiff,

v.

MBIA, INC., GARY C. DUNTON and C. EDWARD CHAPLIN,

Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Steven Schmalz ("Plaintiff"), by his undersigned counsel, brings this action on behalf of himself and all other similarly situated persons (the "Class"), other than Defendants and their affiliates (as described herein), who purchased or otherwise acquired securities of MBIA, Inc. ("MBIA" or the "Company"), between January 30, 2007, through and including January 9, 2008 (the "Class Period"), for violations of the federal securities laws.   Plaintiff seeks to recover damages caused to the Class by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").   The allegations of this Complaint are based on Plaintiff's personal knowledge as to himself and on information and belief (including the investigation of counsel and review of publicly available information) as to all other matters.

## SUMMARY OF THE ACTION

1.   After the close of trading on December 19, 2007, MBIA – one of the country's largest insurers of credit risk and a company whose reputation for conservative

risk management and ability to maintain its AAA credit rating is the lynchpin of its survival – dropped a bombshell on investors. That day, the Company disclosed for the first time that it faced an additional $8.1 billion of exposure from insuring some of the riskiest securities in the marketplace – collateralized debt obligations ("CDOs") comprised of other CDOs (so called "CDO-squared securities"), whose underlying collateral included residential mortgage backed securities ("RMBS").

2.      The investing public promptly realized that the true risk of investing in MBIA was far higher than previously understood and securities analysts expressed "shock" and "dismay" that "management withheld this information for as long as it did." Losses arising from RMBS securities have already caused other financial institutions to suffer billions in write-downs and increased loss reserves amidst the mortgage meltdown wreaking havoc throughout the economy and could easily wipe out MBIA's already dwindling capital cushion. Investors recognized that MBIA's AAA-credit rating would disappear if its capital became depleted due to these previously hidden obligations, and its insurance business would evaporate along with the rating.

3.      Despite months of specific investor questions to MBIA's senior executives regarding the Company's exposure to assets of this sort, Defendants continually assured the market that its risk exposure was materially lower and safer than it actually was. When the Company finally was forced to admit the true state of affairs because of heightened credit rating agency scrutiny, the price of MBIA stock immediately declined by 26 percent in one trading day, wiping out hundreds of millions of dollars in investor value.

4.      But the Company's December 20 disclosure was just the beginning.  Just a few weeks after this partial disclosure, on January 8, 2008, MBIA's stock price plummeted again as market analysts downgraded MBIA in light of its far-worse than previously disclosed financial condition.

5.      The next day, MBIA stock declined again when the Company disclosed extensive steps necessary to improve its deteriorating capital position and disclosed write-downs arising from mortgage-backed securities and CDOs.  After discussions with the SEC, the Company also revised the disclosures from its 2006 annual report to include more details about the risks it faces from credit-rating downgrades and the reduction in credit quality of the types of debt it insures.  During this two day flurry of news, MBIA's stock price declined from $18.07 per share at the opening on January 8, to $13.40 at the close on January 9, with an intraday trading low of $11.11 per share, reflecting the market's realization of the truth about MBIA's financial weakness and its prior misleading actions.

## JURISDICTION AND VENUE

6.      The claims asserted herein on behalf of the Class arise under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated by the SEC.

7.      This Court has jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. §§ 1331 and 1337.

8.      Venue is proper in this district pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this district.

9.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities market.

## PARTIES

10.   Plaintiff Steven Schmalz purchased shares of MBIA during the Class Period and was injured thereby.

11.   Defendant MBIA, Inc. ("MBIA" or "the Company") is a Connecticut corporation with its principal executive offices located at 113 King Street, Armonk, New York 10504.   MBIA, through its subsidiaries, describes itself as a leading financial guarantor and provider of specialized financial services intended to meet the credit enhancement, financial and investment needs of public and private sector clients, domestically and internationally.   MBIA trades on the New York Stock Exchange under the ticker symbol MBI and has more than 125 million shares outstanding.

12.   Defendant Gary C. Dunton ("Dunton") served at all relevant times as Chief Executive Officer, President and Chairman of the Board of Directors of MBIA.

13.   Defendant C. Edward Chaplin ("Chaplin") served at all relevant times as Chief Financial Officer and Vice-Chairman of the Board of Directors of MBIA.

14.   Dunton and Chaplin are referred to collectively herein as the "Individual Defendants," and, together with MBIA, are referred to as the "Defendants."

## FACTUAL ALLEGATIONS

**A.    BACKGROUND ON MBIA'S BUSINESS**

15.   MBIA is the nation's largest monoline guarantor of financial risk, insuring over $650 billion in municipal bonds and other debt instruments.   Nearly all of the

Company's revenue and net income are generated by its financial guarantee business through its wholly owned subsidiary MBIA Insurance Corporation (referred to collectively with MBIA, Inc. as "MBIA" or the "Company").

16.     The Company's core business is quite simple: a bond issuer, most often a municipality whose independent debt ratings are below investment grade (and whose stand-alone borrowing costs reflect below investment-grade interest rates), pays a premium to have its bonds insured by a triple-A-rated guarantor like MBIA.

17.     This insurance or guarantee allows the bonds to be sold based on MBIA's triple-A rating rather than the municipality's rating, thus lowering the municipality's interest expense.  In industry parlance, MBIA "wraps" the bond issue by agreeing to pay all principal and interest payments in the event the issuer cannot meet its obligations.

18.     MBIA then recognizes the insurance premium as income over the life of the insurance.  Owing to the benefit to bond issuers of lowering their interest expense, MBIA has reported steady and predictable earnings.  Market analysts have highlighted these attributes when recommending the stock.

19.     The Company has repeatedly observed that maintaining its triple-A credit rating is vital to the continued success of its business, referring to it as MBIA's "Good Housekeeping Seal of Approval."  As described by MBIA CEO Gary Dunton, "MBIA's true constant – our North Star, if you will – is our commitment to protecting our triple-A ratings."  MBIA touts its long history with a triple-A rating in its SEC Form 10-K's, noting: "MBIA Corp. has triple-A financial strength ratings from Standard and Poor's Corporation ("S&P"), which the Association received in 1974; from Moody's Investors

Service, Inc. ("Moody's"), which the Association received in 1984; from Fitch, Inc. ("Fitch"), which MBIA Corp. received in 1995."

20.     Maintaining the highest credit rating possible is essential to MBIA's guaranty business – the ability of MBIA's clients to reduce their interest rates depends on the market's absolute faith in MBIA's ability to step in and make good on its client's obligations should their client default in any way. In effect, MBIA's only "product" that it sells is the lower interest expense it can offer by virtue of its credit rating. Defendants (as well as investors) have long understood that losing its AAA-rating would leave MBIA without any legitimate means of income.

21.     Of all the criteria examined by the rating agencies, capital cushion– the Company's capacity to pay claims if needed – is a primary consideration in securing MBIA's triple-A rating. In assessing capital adequacy, reports of loss reserves and of exposure to especially risky insured products are particularly important to the rating agencies and the investing community, since MBIA's capital cushion depends on payouts on insurance obligations remaining relatively close to the Company's expectations. A sharp increase in losses beyond reserves would threaten MBIA's capital cushion and its investment grade rating.

22.     As of the end of 2006, MBIA reported excess capital of $1.5 billion. Thus, if MBIA's insurance losses exceeded its various loss reserves by that amount, its capital would be wiped out and its investment grade rating jeopardized. Even if over 90% of MBIA's insured portfolio were comprised of the safest municipal bond obligations (and as described below, municipal bonds represented a far lower percentage during the Class Period), if the remaining 10% of the $650 billion insured portfolio were

risky or unstable securities, MBIA's excess capital would face a very significant risk of evaporation due to losses.

23.     As a result, it was imperative for MBIA to inform investors of the "tails" of its portfolio as well as the averages, *i.e.*, since the riskiest portions of the portfolio were potentially sufficient to wipe out MBIA's capital, investors focused on understanding these risks.  In other words, MBIA's business necessarily left it virtually no room for error in accounting for risk or losses, and a sudden increase in risk or loss would be likely to cause investors to flee.

24.     Historically, MBIA has maintained low reserves, which it justified by citing its "rigorous underwriting and pricing discipline."  MBIA assured investors that each deal it guarantees undergoes a thorough screening and risk analysis to ensure the highest credit quality standards before the Company agrees to provide its "wrap."

25.     MBIA established two separate loss reserves each quarter.  The first, "case loss" reserves, are tied to specific credit defaults where the default was both reasonably certain and estimable.

26.     The second, "unallocated loss" reserves, were reserves taken based on the assumption that in any given portfolio of loans, a certain percentage of those loans will go into default and result in claims on MBIA for all or part of the defaulted obligations. MBIA used a "formula-based" approach, taking into consideration factors such as "the composition of the Company's insured portfolio by municipal sector, structured asset class, remaining maturity and credit quality, along with the latest industry data, including historical default and recovery experience for the relevant sectors of the fixed-income market in order to determine if a trend is developing that indicates the loss factor should

be increased or decreased." The Company states that it also "considers its own historical loss activity and how those losses develop over time."

27.     MBIA's claimed expertise in assessing the risk of municipal and other bond issuers was a key factor in supporting the low reserves that MBIA took when issuing its wrap.  Indeed, for most of its history, MBIA received virtually all of its earnings by insuring municipal bonds.  Although each municipality has its unique characteristics, MBIA's long experience underwriting risk in this field allowed it to report exceptionally small write-offs and reserves for future losses on its guaranty business.  Investors credited MBIA's low loss reserves as a function of its extensive experience and knowledge of the risk in the products it insured.

28.     After determining this "formula-based" expected loss rate, a fixed rate of each quarter's insurance premiums are set aside as unallocated loss reserves.  Throughout the Class Period – indeed, since 2002 – MBIA maintained a constant rate of reserving 12% of new insurance premium income.  This indicated to the public that MBIA believed the credit risk associated with its overall insured portfolio had remained constant *i.e.*, MBIA led investors to believe that nothing had changed in its insured portfolio to warrant applying a different loss reserve formula.

**B.     MBIA MOVES AWAY FROM ITS TRADITIONAL BUSINESS IN SEARCH OF GROWTH**

29.     MBIA sought increased profits and growth opportunities by moving away from lower risk/lower return municipal bond insurance business and by aggressively expanding into structured finance, which doubled as a percentage of the Company's overall business in the past 10 years, from 16 to 32 percent.  In fact, whereas MBIA

provided essentially no structured finance-related guarantees in 1990, structured finance guarantees comprised 32% of MBIA's insured portfolio by year end 2006.

30.    Of MBIA's $225 billion structured finance portfolio, $114 billion comprises guarantees of complex financial instruments known as Collateralized Debt Obligations ("CDOs"). A CDO is an investment vehicle in which various forms of debt, such as bonds, mortgages, loans or other assets backed by collateral are packaged (or repackaged) and the cash flows from the bundle of assets are divided among tranches of securities, which are then sold to investors.

31.    These CDOs contain varying levels of credit risk and corresponding rates of return, as represented by the credit ratings assigned to the varying tranches. Investors buying more senior CDO "tranches" receive lower yields but bear lower risk, while more junior "tranches" offer higher yields and greater risk.

32.    As CDOs became increasingly prevalent in the past several years, MBIA began providing credit protection to the more senior layers of many CDOs' capital structure.

33.    In the typical CDO issuance, bond insurers like MBIA would not insure the lower tranches – those bearing ratings of BBB or below – and investors in those lower tranches would take losses before losses would be triggered for the higher tranches.

34.    However, despite the lower tranches suffering losses first, the extent of defaults of the underlying collateral necessary to wipe out the lower tranches and to cause defaults on the higher tranches was often only 10%. Thus, even a relatively nominal increase in defaults of the underlying collateral could trigger the insurance obligations that MBIA provided to support the higher tranches.

35.     Throughout the Company's involvement in the structured finance business, MBIA has continued to promise investors the strictest of underwriting standards to ensure its new credit products maintain the integrity and security of its traditional bond guarantees.  Further, even as its exposure to structured finance securities ballooned in recent years, its loss reserves as a percentage of its total par outstanding obligations declined from a range of 6.2 to 5.4 basis points during the period from 2000 through 2004, to as low as 3.5 basis points at year 2006, and only 3.2 basis points in the first quarter of 2007.

## C.     DEFENDANTS MISLEAD INVESTORS REGARDING MBIA'S CDO-SQUARED AND RMBS RELATED EXPOSURE

36.     On January 30, 2007, the first day of the Class Period, MBIA announced its fourth quarter and year-end 2006 results.  The announcement noted an 81 percent increase in total premiums earned on structured finance insurance (as opposed to public finance), and in particular, noted strong production from the CDO sector.  Consistent with the Company's statements that it used the strictest of underwriting standards, the announcement represented to investors:

> Overall credit quality in the insured portfolio remained high, with 81 percent of the total book of business rated A or better, unchanged from the end of 2005.  The percentage of the portfolio rated non-investment grade decreased to 1.9 percent from 2.1 percent in 2005, with about half of the reduction resulting from a decrease in the par amount of non-investment grade rated credits and the other half resulting from the growth of the outstanding book of business.

The Company also told investors it was increasing unallocated loss adjustments reserves and expenses by $80.9 million based on the 12% "formula-based" default risk determination.

37. Although MBIA touted its underwriting skills and maintained the same formula it had applied to its municipal bond insurance, in reality, MBIA had a very limited history and ability to assess the actual risk of default on CDO products whose underlying collateral was comprised of residential mortgage-backed securities, since CDOs of this sort only became prevalent in the few years leading up to the Class Period. Thus, the Company could not realistically predict the way CDOs backed by residential mortgages would behave in the event of downturns in the housing industry.

38. Despite MBIA's increasing reliance on CDOs, including those backed by residential mortgage-related securities, MBIA maintained its reserves at exceptionally low levels – about 3 basis points as compared with 70-150 basis points for other large financial institutions with significant mortgage or CDO related exposure.

39. On April 26, 2007, MBIA announced its earnings for the first quarter of 2007. Once again, MBIA reported a significant increase – 672% – in U.S.-based structured finance insurance over the prior year. Nonetheless, the loan loss formula remained unchanged at a 12% reserve, and the Company represented that the credit quality of its portfolio actually *improved* over the prior quarter:

> The overall credit quality in the insured portfolio remained high with 82 percent of the total book of business rated A or better compared with 81 percent in the first quarter of 2006 [and the prior quarter]. The percentage of the portfolio rated below-investment grade decreased to 1.9 percent from 2.1 percent in the same period-end last year.

In announcing these results, Defendant Dunton, MBIA's CEO, remarked: "We remain committed to our rigorous risk management practices with the goal of building shareholder value for the long term."

40.     As concerns over exposure to CDOs and RMBS spread throughout the financial community, MBIA held a conference call presentation August 2, 2007 "to answer questions concerning MBIA's subprime RMBS exposure, CDO exposure and related topics." In connection with that presentation, MBIA produced a book of slides called "MBIA's Selective Approach to Subprime RMBS and Multi-Sector CDOs." MBIA used this presentation to tout its limited risk exposure in the potentially volatile mortgage-backed securities market.

41.     In the August 2 presentation, MBIA informed investors that the total amount of the CDOs underwritten by the Company with some exposure to RMBS was $15.9 billion.   As set forth below, this figure was materially understated, false and misleading.

42.     During the conference call, one investor specifically asked about the composition of MBIA's exposure to "CDO-squared" securities, an investment that is particularly risky because it is a CDO whose sole collateral is other CDOs. These are considered among the most risky of investments because the instruments are at least twice removed from the assets and borrowers that support the underlying cash flows, and thus the insurer has little or no ability to assess the adequacy of the underlying collateral and other default risk metrics.   (Notably, when the Fitch rating service calculated MBIA's excess capital as of year end 2006, it recognized $15.3 billion of CDO exposure, but unlike MBIA's competitors, which held "CDO-Squared" securities, Fitch reported that MBIA held no CDO-Squared assets.)  In response to the investor question on August 2, 2007, Defendant Chaplin stated that MBIA had approximately $6.1 billion in net par exposure to CDO-squared securities, and that 60% of the underlying collateral consisted

of CDOs and Collateralized Loan Obligations (CLOs).  The Company further stated that 22% of the underlying collateral was comprised of CDOs of Asset-Backed Securities (ABSs).

43.     However, the Company never mentioned that any part of the $6.1 billion in CDO-squareds contained RMBS exposure.  Investors were particularly concerned at the time about RMBS exposure because of the ongoing and worsening mortgage market meltdown that was causing billions of dollars in losses for other financial institutions. Indeed, within a short time of this conference call, major financial institutions began disclosing writedowns of their own CDO holdings, including supposedly "Super Senior AAA" securities and securities insured by MBIA.  Nevertheless, MBIA did not disclose the full extent of its risk exposure.

44.     On October 25, 2007, the Company reported its third quarter results. According to Dunton: "From an Adjusted Direct Premium production standpoint, the third quarter was outstanding – the Company's second best quarter ever and the best quarter for our structured finance business.  Pricing was strong across many sectors, and the credit quality of our new business was very high."  In fact, structured finance business was up more than 200% overall, and up 294% for U.S.-based business.  Despite this marked increase in riskier structured finance insurance, the Company continued to reserve for unallocated losses at the same 12% rate.  MBIA once again represented to investors that the credit quality of its portfolio was improving:

> The overall credit quality of the insured portfolio remained high with 82 percent of the total book of business rated A or better as of September 30, 2007.  The percentage of the portfolio rated below investment grade on an S&P priority basis decreased to 1.4 percent as of September 30, 2007 from 2.2 percent as of September 30, 2006. . . .

45.     In an investor conference call later that day, MBIA CFO Chuck Chaplin falsely and misleadingly told investors that the total amount of all of the Company's CDOs that contained some RMBS had increased to $19 billion at the end of the third quarter due to additional RMBS-related transactions during the quarter.  Chaplin also reiterated that "we think it is critical as a AAA rated company for our balance sheet strength to be unquestioned and at this point, it is unquestioned."  The reality was far worse.

## D.     MBIA'S HIDDEN EXPOSURE TO CDO-SQUARED SECURITIES BACKED IN PART BY RMBS STUNS INVESTORS

46.     On December 19, 2007, S&P issued a report analyzing MBIA's credit situation.  The result was that MBIA's AAA rating was placed on negative watch.  This intra-day news caused the stock to drift slightly lower, from $28.04 to $27.02, or 3.6%.

47.     It was not until after market close that investors realized the MBIA had been materially under-reporting its total RMBS exposure.  Contained within the S&P report was an analysis of information provided by MBIA to S&P (but not previously to investors) that showed the Company's total CDOs with RMBS exposure was $30.4 billion.  This was nearly twice the figure report in the August 2 analyst presentation and more than $11 billion more than the Company reported in its earnings call on October 25.

48.     At 6:38 p.m. the evening of December 19, the Company issued a press release saying it had put an analysis of its CDO portfolio on its website that was consistent with the information given to S&P (but never previously disclosed to investors).  The new analysis disclosed for the first time that $8.1 billion of MBIA's Multi-Sector CDOs were exposed to a significant amount of RMBS risk.  In addition, over $5.1 billion of that insurance was written in 2006 and 2007, a time when it was clear

that the housing market was deteriorating, interest rates were rising and foreclosures were increasing at an exponential rate. With this disclosure, investors learned for the first time that Defendants had placed their triple-A rating in serious jeopardy.

49. The market's reaction the very next trading day was as rapid as it was harsh. In response to the December 19 announcement, MBIA shares plunged over 26% on extremely heavy trading volume – from $27.02 at the close on December 19, to $19.95 per share by the close on December 20 – dipping to as low as $18.84 per share intraday, its lowest level in over a decade. This was the biggest one-day decline in the Company's history, leaving the stock price a fraction of the stock's record high of $73.02 per share posted less than a year before. The Company's total market capitalization has declined by about $6.7 billion during this time period.

50. As explained herein, MBIA's $8.1 billion CDO-squared portfolio – which represents almost a third of the Company's overall $30.6 billion exposure to structured finance collateralized debt obligations – is particularly distressing because of the potential impact on the Company's "North Star" triple-A credit rating. The disclosure of the CDO-squared portfolio indicates that MBIA's reserves are wholly inadequate for the risk MBIA faces and its capital is likely insufficient to withstand a likely level of expected guarantee-related losses. If downgraded from triple-A, MBIA will not be able to write insurance policies on bonds that have a lower rating than it does, a segment that makes up the vast majority of the Company's business.

51. The market was quick to condemn this deceit. Shortly after MBIA's revelation, Morgan Stanley analyst Ken Zerbe issued a report the same evening stating:

> **What's New:** MBIA published an updated list of its CDO exposures. It disclosed that it has a massive $8.1 billion of

exposure to CDO-squared transactions (where the underlying collateral is more than 75% CDOs *and the remainder is mostly RMBS*). Of the total, $5.1 billion was written in 2006 and 2007. *We are shocked that management withheld this information for as long as it did.*

(emphasis supplied) The analyst went on to note that "MBIA simply did not disclose arguably the riskiest parts of its CDO portfolio to investors: $8.1 billion of CDO-squareds."

52.     Kathleen Shanley, an analyst with Gimme Credit, said the "eleventh-hour" disclosure by MBIA "ignites concerns all over again about the prospect for future losses." Shanley said that prior to the disclosure, outside investors lacked information about the Company's exposure to CDO-squareds, which she called the riskiest type of CDO.

53.     "It's surprising," said Piper Jaffray analyst Michael Grasher, "considering others have disclosed their CDO-squared for a couple of months now."

54.     "It questions my confidence about how upfront the company is being and has been," Robert Haines, an analyst at the research firm CreditSights, said of MBIA. "That's the asset class that everyone has been scrambling about."

55.     The following day, S&P equity analyst Catherine Seifert cut her rating on the Company from hold to sell, noting: "We share the market's dismay that this revelation changes the risk profile of MBI as compared with its financial guaranty peers."

56.     The full extent of the Company's concealed risk unfolded over the next several weeks. On December 21, 2007, MBIA announced that Fitch had informed the Company that it would lose its AAA credit rating as a result of its high-risk insurance practices unless it could raise $1 billion in additional capital to cover anticipated claims. Fitch notified the company that failure to do so within the next several weeks would result in a loss of the MBIA's "North Star" AAA credit rating.

57.     Notwithstanding MBIA's insistence that its insurance portfolio consisted of only the highest credits, the hidden risks in its portfolio continued to damage the Company.

58.     On January 8, 2008, MBIA shares declined an additional 21 percent, from an opening price of $18.07 per share to a closing price of $13.98 after hitting an intraday low of $13.02 per share.  This drop was attributed, in part, to analyst comments regarding MBIA's worsening financial condition and its desperate need to shore up its flagging capital condition.   According to a report on Bloomberg, Morgan Stanley analyst Ken Zerbe "cut his fourth-quarter estimate to a loss of $2.09 per share, from $1.63.

59.     On January 9, 2008 a series of stunning announcements further shook the market's trust in the Company's operations and management's integrity.  It announced that:

> The Company has recently had discussions with and has provided information on a voluntary basis to the New York Insurance Department ("Department") and the Securities and Exchange Commission ("SEC") in response to informal inquiries with respect to certain matters, including the Warburg Pincus transaction, the Company's announcement of preliminary loss reserve estimates on December 10, 2007 related to MBIA's residential mortgage-backed securities exposure and disclosures regarding MBIA's CDO exposure.

60.     Further confirming that its prior disclosures to investors were materially false and misleading, MBIA revised its 2006 annual report to include additional disclosure of the potential risk it faces from credit-rating downgrades and the reduction in credit quality of the debt it insures.  Specifically, the Company's Form 8-K stated as follows:

> The Company has revised certain risk factors it previously disclosed in its Form 10-K for the year ended December 31, 2006. The updated risk factors are listed below. References in the risk factors to the "Company" are to MBIA Inc., together with its domestic and international subsidiaries.

References to "we," "our" and "us" are to MBIA Inc. or the Company, as the context requires.

***A reduction in MBIA's financial strength ratings from any of the major rating agencies would materially and adversely affect our financial condition, results of operations and future business***

MBIA's ability to attract new business and to compete with other triple-A rated financial guarantors is largely dependent on the triple-A financial strength ratings assigned to it by the major rating agencies and the financial enhancement rating assigned by S&P. MBIA intends to comply with the requirements imposed by the rating agencies to maintain such ratings; however, no assurance can be given that MBIA will successfully comply with these requirements, that these requirements will not change or that, even if MBIA complies with these requirements, one or more of such rating agencies will not lower or withdraw its financial strength ratings of MBIA or place MBIA on "negative outlook" or "rating watch negative" status indicating that a downgrade may be considered in the future. On December 14, 2007, Moody's changed MBIA's outlook to "negative" from "stable," while confirming the outlook of three of MBIA's competitors as "stable," on December 19, 2007, S&P changed MBIA's outlook to "negative" from "stable" while confirming the outlook of two of MBIA's competitors as "stable" and on December 20, 2007, Fitch placed MBIA Inc. and MBIA on rating watch negative. MBIA's ability to attract new business and to compete with other triple-A rated financial guarantors, and its results of operations and financial condition, would be materially adversely affected by any reduction, or suggested possibility of reduction, in its ratings.

Requirements imposed by the rating agencies to maintain our triple-A rating are outside of our control, and such requirements oblige us to raise additional capital or take other remedial actions in a relatively short timeframe. We are implementing a capital plan in order to raise sufficient funds to meet the rating agency capital requirements to maintain our triple-A rating and obtain a "stable" outlook from S&P, Moody's and Fitch. The capital plan consists of the previously announced Warburg Pincus investment, indebtedness, and capital formation and risk reduction from operations. However, there can be no assurance that we will successfully complete all or any of these transactions, and there can be no assurance that the rating agencies, in particular S&P, will change our outlook to "stable" even if we successfully implement our capital plan. The Warburg Pincus investment is subject to closing conditions, including performance of specified covenants, receipt of Hart-Scott-Rodino approval, as well as the approvals of the various regulatory authorities (including insurance regulatory approvals in New York, Illinois and the United Kingdom), and the absence of any injunction or other legal prohibition on closing. Each element of the capital plan is subject to

conditions and delays, during which new economic developments could adversely affect rating agency capital requirements or our ability to successfully implement the capital plan. If we are unable to successfully implement all or any portion of the capital plan, our financial strength ratings may be downgraded, which would materially adversely affect our financial condition, results of operations and future business.

***Recent adverse developments in the credit markets and any potential negative impact on MBIA's insured portfolio may materially and adversely affect our financial condition, results of operations and future business***

MBIA is exposed to credit risks in its portfolio that may arise from deterioration in the credit markets, wherein such deterioration in credit performance could lead to potential erosion in the quality of assets and also the collection of cash flows from such assets within structured securities that it has guaranteed. While MBIA has sought to underwrite direct residential mortgage-backed securities ("RMBS"), structured pools of commercial mortgage-backed securities ("CMBS") and collateralized debt obligations ("CDOs") of asset-backed securities ("ABS") with levels of subordination and other credit enhancements designed to protect it from loss in the event of poor performance on the underlying assets collateralizing the securities in the insured portfolio, ***as of January 8, 2008, we estimated that we would establish case basis loss reserves of $614 million under GAAP and $814 million under SAP and a special increase to unallocated loss reserves of $100 million under GAAP due to projected inadequacies of such credit enhancements in securities it has guaranteed. The special increase to unallocated loss reserve is in addition to MBIA's regular quarterly addition of 12% of scheduled earned premiums, or approximately $23 million in the fourth quarter of 2007. We expect the after-tax effect of the establishment of such SAP reserves to eliminate MBIA's net income and produce a loss for the fourth quarter and possibly for 2007 under SAP***. No assurance can be given that such credit enhancements will prove to be adequate to protect MBIA from incurring additional material losses in view of the current significantly higher rates of delinquency, foreclosure and loss rates being observed among residential homeowners. The extent and duration of any future continued deterioration of the credit markets is unknown, as is the impact, if any, on potential claim payments and ultimate losses of the securities within MBIA's portfolios. In addition, there can be no assurance that any of the governmental or private sector initiatives designed to address such credit deterioration in the markets will be implemented, and there is no way to know the effect that any such initiatives could have on the credit performance over time of the actual securities that MBIA insures.

In addition, there can be no assurance that we would be successful, or that we would not be delayed, in enforcing the subordination provisions, credit enhancements or other contractual provisions of the RMBS, CMBS and CDOs of ABS MBIA insures in the event of litigation or the bankruptcy of other transaction parties. *Many of the subordination provisions, credit enhancements and other contractual provisions of the RMBS, CMBS and CDOs of ABS MBIA insures are untested in the market and, therefore, it is uncertain how such subordination provisions, credit enhancements and other contractual provisions will be interpreted in the event of an action for enforcement.*

Individual credits in MBIA's insured portfolio (including potential new credits) are assessed a rating agency "capital charge" based on a variety of factors, including the nature of the credits, their underlying ratings, their tenor and their expected and actual performance. In the event of an actual or perceived deterioration in creditworthiness, a reduction in the underlying rating or a change in the rating agency capital methodology, MBIA may be required to hold more of its capital in reserve against credits in its insured portfolio, regardless of whether losses actually occur, or against potential new business. Significant reductions in underlying ratings of credits in MBIA's insured portfolio can produce significant increases in assessed "capital charges." There can be no assurance that MBIA's capital position will be adequate to meet such increased reserve requirements or that MBIA will be able to secure additional capital, especially at a time of actual or perceived deterioration in creditworthiness of new or existing credits. Unless MBIA was able to increase its amount of available capital, an increase in capital charges could reduce the amount of capital available to pay claims and support MBIA's triple-A ratings and could have an adverse effect on MBIA's ability to write new business.

In recent weeks and months Fitch, Moody's and S&P have announced the downgrade of, or other negative ratings actions with respect to, a large number of structured finance transactions, including certain transactions that MBIA insures. While less than 5% of MBIA's insured portfolio as of September 30, 2007 has been downgraded as of January 8, 2008 in connection with the rating agencies' recent downgrades of structured finance transactions, there can be no assurance that additional securities in MBIA's insured portfolio will not be reviewed and downgraded in the future. Moreover, we do not know what portion of the securities in MBIA's insured portfolio already have been reviewed by the rating agencies and if, and when, the rating agencies might review additional securities in MBIA's insured portfolio or review again securities that have already been reviewed and/or downgraded. Downgrades of credits that MBIA insures will result in higher capital charges to MBIA under the relevant rating agency model or models. If the additional amount of capital required to support such exposures is significant, MBIA could be required to raise additional capital, if available, on terms and conditions that may

not be favorable to MBIA, curtail current business writings, or pay to transfer a portion of its in-force business to generate capital for ratings purposes with the goal of maintaining its triple-A ratings. Among other things, such events or goal may not be obtainable, and such events or actions could adversely affect the results of operations and financial condition of MBIA going forward.

\*   \*   \*

***We are required to report credit derivatives at fair value in accordance with generally accepted accounting principles, which subjects our results of operations to volatility and losses***

Any event causing credit spreads on an underlying security referenced in a credit derivative insured by MBIA to either widen or tighten will affect the fair value of the credit derivative and may increase the volatility of our earnings under GAAP. In our GAAP financial statements, we apply fair value accounting for the portion of our business executed in credit derivative form as required by Statement of Financial Accounting Standards No. 133 ("SFAS 133") and changes in fair value are recognized immediately in earnings. Therefore, any increases or decreases in the fair value of these credit derivatives have an immediate corresponding impact on reported earnings under GAAP. As changes in fair value can be caused by factors unrelated to the performance of MBIA's business and credit portfolio, including general market conditions and perceptions of credit risk, as well as market use of credit derivatives for hedging purposes unrelated to the specific referenced credits in addition to events that affect particular credit derivative exposure, the application of fair value accounting may cause our earnings to be more volatile than would be suggested by the actual performance of MBIA's business operations and credit portfolio. In addition, due to the complexity of fair value accounting and the application of SFAS 133, future amendments or interpretations of SFAS 133 may cause us to modify our accounting methodology in a manner which may have an adverse impact on our financial results.

In the fourth quarter of 2007, we observed a further widening of market spreads and credit ratings downgrades of collateral underlying certain MBIA-insured CDO tranches. ***As of January 8, 2008, the pre-tax change in fair value of insured derivatives ("mark-to-market") from September 30, 2007 to December 31, 2007 was estimated to be approximately $3.3 billion under GAAP, or approximately $2.1 billion on an after-tax basis, and is subject to change, which could be material. We are in the process of finalizing our evaluation and analysis of the mark-to-market for the quarter ended December 31, 2007. This increase in our mark-to-market loss in the fourth quarter of 2007 compared to the $342 million mark-to-market loss for the third quarter is a consequence of continued spread volatility, including a substantial***

*widening in CMBS spreads and the deterioration of credit ratings in collateral underlying multi-sector CDOs*. The mark-to-market amount disclosed above reflects a refinement to MBIA's valuation modeling techniques that was implemented in the fourth quarter. Specifically, in light of extraordinary widening of the market spreads for the asset-backed security portion of the collateral underlying certain insured CDO tranches, for purposes of its valuation model, MBIA revised its approach and treated that ABS collateral as if it were in default.

*   *   *

### *Market and other factors may cause investors and/or issuers to decrease demand for MBIA's products*

The demand for financial guarantee insurance depends upon many factors, some of which are beyond the control of MBIA. While all the major financial guarantee insurers have triple-A financial strength ratings from the major rating agencies, Moody's and S&P have recently changed the ratings outlook for some financial guarantee insurers, including MBIA, to "negative," placed other financial guarantee insurers on review for a possible downgrade, and affirmed a "stable" outlook for other major financial guarantee insurers. In addition, Fitch has placed the insurer financial strength ratings of several financial guarantee insurers, including MBIA on rating watch negative and affirmed a "stable" outlook for other major financial guarantee insurers. Investors from time to time distinguish among financial guarantors on the basis of various factors, including rating agency assessment, size, insured portfolio concentration and financial performance. These distinctions may result in differentials in trading levels for securities insured by particular financial guarantors which, in turn, may provide a competitive advantage to those financial guarantors with better trading characteristics. In addition, various investors may, due to regulatory or internal guidelines, lack additional capacity to purchase securities insured by certain financial guarantors, which may provide a competitive advantage to guarantors with fewer insured obligations outstanding. Distinctions in trading values or investor capacity constraints that do not favor MBIA would have an adverse effect on MBIA's ability to attract new business at appropriate pricing levels.

Additionally, in the face of the disruption in the credit markets and the recent announcements by Fitch, Moody's and S&P concerning financial guarantee insurers generally and MBIA in particular, the price of our common stock has experienced a significant decline and there has been a widening of spreads on our credit default swaps. This recent widening of spreads on our credit default swaps could impact the perception of our financial condition by MBIA's insured bondholders and counterparties and could affect their willingness to purchase MBIA's insured bonds and to continue to enter into transactions with MBIA.

22

*A reduction in the financial strength ratings of or a default by one or more of MBIA's key reinsurers could adversely impact our capital position, financial strength rating and ability to write new business*

MBIA uses reinsurance to cede exposure for purposes of syndicating risk and increasing its capacity to write new business while complying with its single risk and credit guidelines. When a reinsurer is downgraded by one or more of the rating agencies, less capital credit is given to MBIA under rating agency models. Over the past several years, most of MBIA's reinsurers have been downgraded and others remain under review. The downgrade of one of MBIA's key reinsurers could adversely impact MBIA's capital position under rating agency models, and affect MBIA's financial strength rating and ability to write new business accordingly.

MBIA generally retains the right to recapture the business ceded to reinsurers under certain circumstances, including rating downgrades of its reinsurers. Additionally, reinsurers and counterparties under other reimbursement agreements may default on their obligations to us due to bankruptcy, insolvency, lack of liquidity, adverse economic conditions, operational failure, fraud or other reasons. Such defaults could have a material adverse effect on our business or profitability or require us to raise additional capital. MBIA remains liable on a primary basis for all reinsured risk, and although MBIA believes that its reinsurers remain capable of meeting their obligations, there can be no assurance of such in the future.

61.     Also on January 9, 2008, MBIA announced it would report a loss of $737 million for the fourth quarter as a result of securities backed by residential home equity loans.  The Company also announced it estimated that it would take a $3.3 billion loss in the fourth quarter related to due to MBIA's CDO portfolio and that it would write off $200 million of permanent impairment losses on three of the CDO-squared transactions it had previously misrepresented to the market, admitting that it now expected to incur actual claims as the underlying assets defaulted.

62.     The Company also announced its plan to raise $1 billion through a debt offering of "surplus notes."  However, it soon became clear the Company would have problems finding buyers for the notes, even at the very expensive coupon rate of 12%. MBIA ultimately had to pay 14% to place the notes.

63.     In a supplement attached to a Form 8-K on January 9, 2008, MBIA also admitted that even its stunning December 19 disclosure of $8.1 billion of CDO-squared exposure was not complete.  Specifically, the Company's supplement disclosed that it actually held $9 billion of these risky securities, that nearly 60% of these securities were originated in 2006 or later (which was material because recent vintages are defaulting with greater consistency) and that the portfolio had already caused a $200 million impairment.

64.     In a final shot to investors, the Company announced on January 9 that it was slashing its quarterly dividend from 34 cents to 13 cents in an attempt to preserve capital and salvage its coveted AAA rating.

## RELIANCE: APPLICABILITY OF FRAUD ON THE MARKET PRESUMPTION

65.     At all relevant times, the market for MBIA's common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.  Through the Class Period:

(a)     MBIA's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, MBIA filed periodic public reports with the SEC and the NYSE;

(c)     MBIA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Securities analysts and the business press followed and published research reports regarding MBIA that were publicly available to investors;

(e)     The market price of MBIA securities reacted promptly to the dissemination of public information regarding the Company;

(f)     The average weekly trading volume for MBIA stock during the Class Period was approximately 21 million; and

(g)     The Company's market capitalization was approximately $9.75 billion on January 30, 2007 (at the beginning of the Class Period), and $3.52 billion as of the close of market trading on December 18, 2007.

66.     As a result of the misconduct alleged herein (including Defendants' misstatements and omissions), the market for MBIA securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.

67.     Plaintiff and the other Class members relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of MBIA securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

68.     Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements and omissions, they would not have purchased MBIA securities at inflated prices.

69.     Plaintiff is also entitled to the *Affiliate Ute* presumption of reliance to the extent that Defendants failed to disclose material facts concerning the composition of

MBIA's insured structured finance portfolio, which information Plaintiff would have wanted to have known and which would have caused investors to not have purchased shares of MBIA at the prices at which they traded during the Class Period.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities (the "Class") who purchased or acquired MBIA common stock during the period from January 30, 2007 through and including January 9, 2008 ("the Class Period") and suffered damages as a result.

71.     Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of each of the Defendants; (iii) any person who was an executive officer and/or director of MBIA during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

72.     The members of the Class, purchasers of MBIA securities, are so numerous that joinder of all members is impracticable.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, if not higher.  As of October 31, 2007, MBIA reported 125,394,150 shares of common stock outstanding.

73.     Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and all members of the Class sustained damages as a result of the conduct complained of herein.

74.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained court-appointed counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class that Plaintiff seeks to represent.

75.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

76.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether documents, including the Company's SEC filings, press releases and other public statements made by Defendants, during the Class Period contained misstatements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)     whether the market price of MBIA stock during the Class Period was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

(d)     with respect to Plaintiffs' claims under Section 10(b) of the Exchange Act, whether Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

(f)     with respect to Plaintiffs' claims pursuant to Section 20(a) of the Exchange Act, whether the Defendants named in those counts are controlling persons of the Company; and

(g)     whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure thereof.

77.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

78.     The names and addresses of the record owners of MBIA shares purchased during the Class Period, are obtainable from information in the possession of the Company's transfer agent(s).  Notice can be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## INAPPLICABILITY OF SAFE HARBOR FOR FORWARD LOOKING STATEMENTS

79.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking when made, and there were no meaningful

cautionary statements identifying facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission

### (Against All Defendants)

80.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

81.     This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Plaintiff and all other members of the Class, against all Defendants.

82.     Throughout the Class Period, Defendants individually, and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated a fraud and deceit upon Class

members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

83.    Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiff and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause Plaintiff and the other members of the Class to purchase MBIA's securities at inflated prices.

84.    By failing to inform the market of the true risk to MBIA's credit rating as a result of exposure to CDO-squareds and RMBS, and making other false statements and material omissions, these Defendants presented a misleading picture of MBIA's prospects.  This caused and maintained artificial inflation in the trading prices of MBIA's publicly traded securities throughout the Class Period and until the truth came out.

85.    Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading and/or making direct statements to the investing public on the conference calls detailed herein.

86.    During the Class Period, Defendants occupied executive-level positions at MBIA and were privy to non-public information concerning the Company.  Each of them knew or recklessly disregarded the adverse facts specified herein and omitted to disclose those facts.

87.     As described herein, Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the Class who purchased MBIA securities during the Class Period.  Throughout the Class Period, Defendants had a duty to disclose new, material information that came to their attention, which rendered their prior statements to the market materially false and misleading.   There is a substantial likelihood that the disclosure of these omitted facts would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available about the prospects of the Company.

88.     Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

89.     In ignorance of the false and misleading nature of Defendants' statements and/or upon the integrity of the market price for MBIA securities, Plaintiff and the other members of the Class purchased MBIA securities at artificially inflated prices during the Class Period.   But for the fraud, they would not have purchased the securities at artificially inflated prices.

90.     The market price for MBIA securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Defendants, as described above.

91.     Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of MBIA securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

92.     This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

93.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiff and the members of the Class, each of whom has been damaged as a result of such violation.

## COUNT II

### Violation of Section 20(a) of the Exchange Act

### (Against Defendants Dunton and Chaplin)

94.     Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.  This Claim is brought pursuant to Section 20(a) of the Exchange Act against the individual defendants on behalf of Plaintiff and all members of the Class who purchased MBIA securities during the Class Period.

95.     As alleged herein, MBIA is liable to Plaintiff and the members of the Class who purchased MBIA securities based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

96.     Throughout the Class Period, the Section 20(a) Defendants were controlling persons of MBIA within the meaning of Section 20(a) of the Exchange Act, and culpable participants in the MBIA fraud, as detailed herein.

97.     Each of the Section 20(a) Defendants exercised control over MBIA during the Class Period by virtue of, among other things, their executive positions with the Company, the key roles they played in the Company's management, and their direct

involvement in its day to day operations, including its financial reporting and accounting functions.

98.     In addition to the allegations set forth above, the following allegations demonstrate the Section 20(a) Defendants' control over MBIA during the Class Period.

99.     Given their individual and collective responsibilities for managing MBIA throughout the Class Period, the Section 20(a) Defendants were regularly presented to the market as the individuals who were responsible for MBIA's day-to-day business and operations, as well as the Company's strategic direction.  These Section 20(a) Defendants accepted responsibility for presenting quarterly and annual results, setting guidance for future periods and assuring the market about the state of, and prospects for the Company. No one else at MBIA exercised that degree of responsibility for, or control over, the Company's activities and public statements.

100.    As a result of the false and misleading statements and omissions alleged herein, the market price of MBIA securities was artificially inflated during the Class Period.  Under such circumstances, the presumption of reliance available under the "fraud on the market" theory applies, as more particularly set forth above.  Plaintiff and the members of the Class relied upon either the integrity of the market or upon the statements and reports of the Section 20(a) Defendants in purchasing MBIA securities at artificially inflated prices.

101.    This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

102.     By virtue of the forgoing, each of the Section 20(a) Defendants are liable to Plaintiff and the Class, each of whom has been damaged as a result of MBIA's underlying violations.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding Plaintiff and the members of the Class compensatory damages and/or rescission;

C.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.     Awarding such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury in this action for all issues so triable.

Dated:  January 11, 2008

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

Salvatore J. Graziano (SG-6854)
Mark Lebovitch (ML-6654)
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444

**ABRAHAM FRUCHTER
& TWERSKY LLP**
Jeffrey Abraham (JA-2946)
One Penn Plaza
Suite 1910
New York, NY 10119
Telephone: (212) 279-5050
Facsimile:  (212) 279-3655

*Attorneys for Plaintiff Steven Schmalz*

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Steven Schmalz, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed a class action complaint asserting securities claims against MBIA Inc. and wish to join as a plaintiff, retaining Bernstein Litowitz Berger & Grossmann LLP and Abraham Fruchter & Twersky LLP as my counsel.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      My transactions in MBIA Inc. during the Class Period of January 30, 2007 to January 9, 2008 are attached.

5.      During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in any action under the federal securities laws except as follows:

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing are true and correct.

Executed this 11th day of January, 2008.

Steven Schmalz

**Transactions in MBIA Inc.**

Class Period: 01/30/07 – 01/09/08

| Transaction Type (buy or sell) | Transaction Date | Number of Shares | Price Per Share |
|---|---|---|---|
| Buy | 12/26/07 | 200 | $21.72 |