# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x

STEVEN SCHMALZ, Individually, and On
Behalf of All Others Similarly Situated,          :

                                                                  :     Electronically Filed

                 Plaintiff,          :

                                                                  :     Civil Action No.: 7:08-cv-0264-KMK
          v.                                        :     (ECF Case)

                                                                  :
MBIA INC., GARY C. DUNTON and C.          :     Hon. Kenneth M. Karas
EDWARD CHAPLIN,

                                                                  :
             Defendants.          :

                                                                  :
--------------------------------------------------------- x

*(Additional Captions on the Following Page)*


## DECLARATION OF ALAN I. ELLMAN IN SUPPORT
## OF THE MOTION OF THE PLYMOUTH COUNTY RETIREMENT SYSTEM FOR
## CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF
## <u>SELECTION OF LEAD COUNSEL</u>

```
-------------------------------------------------- x
TEAMSTERS LOCAL 807 LABOR            :
MANAGEMENT PENSION FUND,             :
Individually, and On Behalf of All Others   :    Electronically Filed
Similarly Situated,                  :
                                     :
                                     :    Civil Action No.: 1:08-cv-01845-UA
                 Plaintiff,          :    (ECF Case)
                                     :
                                     :
         v.                          :
                                     :
MBIA INC., GARY C. DUNTON, C.        :
EDWARD CHAPLIN and JOSEPH W.         :
BROWN,                               :
                                     :
                 Defendants.         :
-------------------------------------------------- x
GARY KOSSEFF, Individually, and On Behalf  :
of All Others Similarly Situated,    :
                                     :
                                     :    Electronically Filed
                 Plaintiff,          :
                                     :    Civil Action No.: 7:08-cv-02362-UA
         v.                          :    (ECF Case)
                                     :
MBIA INC., GARY C. DUNTON and C.     :
EDWARD CHAPLIN,                      :
                                     :
                 Defendants.         :
                                     :
                                     :
                                     :
                                     :
                                     :
-------------------------------------------------- x
```

Alan I. Ellman declares under penalty of perjury this 11th day of March, 2008:

1.    I am an attorney with the law firm of Labaton Sucharow LLP.  I submit this declaration in support of the motion of the Plymouth County Retirement System ("Plymouth County") for consolidation, appointment as lead plaintiff, and for approval of selection of lead counsel.

2.    Attached hereto as Exhibit A is a true and correct copy of the signed certification of Plymouth County pursuant to the requirements of the Private Securities Litigation Reform Act of 1995.  15 U.S.C. §78u-4(a)(2).

3.    Attached hereto as Exhibit B is a true and correct copy of a chart of Plymouth County's transactions and approximate losses in MBIA, Inc. ("MBIA") securities.

4.    Attached hereto as Exhibit C is a true and correct copy of the notice to class members concerning the first-filed of the above-captioned actions that was published on January 11, 2008 on *Market Wire,* advising the public of the pendency of a class action filed on behalf of shareholders of MBIA.

5.    Attached hereto as Exhibit D is a true and correct copy of the firm resume of Labaton Sucharow LLP.

6.    Attached hereto as Exhibit E is a true and correct copy of the complaint filed in the action *Schmalz v. MBIA, Inc., et al.*, No. 7:08-cv-0264-KMK (S.D.N.Y. filed Jan. 11, 2008).

I hereby declare under penalty of perjury that the foregoing is true and correct.

ALAN I. ELLMAN (AE-7347)

# Exhibit A

## CERTIFICATION

I, William R. Farmer, as Executive Director of Plymouth County Retirement System ("Plymouth County"), hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of Plymouth County. I have reviewed a complaint prepared against MBIA, Inc. ("MBIA") alleging violations of the federal securities laws;

2.    Plymouth County did not purchase securities of MBIA at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.    Plymouth County is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.    Plymouth County's transactions in MBIA during the class period are reflected in Exhibit A, attached hereto;

5.    Plymouth County has sought to serve as a lead plaintiff in the following class actions under the federal securities laws during the last three years, but either withdrew its motion for lead plaintiff or was not appointed as lead plaintiff;

*Holzwasser v. Staktek Holdings, In, et al,* No. 05-cv-239 (W.D. Tex.)
*In Re SFBC International, Inc. Securities & Derivative Litigation,* No. 06-cv-165 (D.N.J.)

6.    Plymouth County is currently serving as lead plaintiff in the following class action under the federal securities laws.

*Police and Fire Retirement System of Detroit v. SafeNet, Inc., et al,* No. 06-cv-5797 (S.D.N.Y.)
*In re HCC Insurance Holdings, Inc. Securities Litigation,* No. 07-cv-801 (S.D. Tex.)
*City of Westland Police and Fire Retirement System v. Sonic Solutions et al,* No. 07-cv-5111 (N.D. Cal.)

7.    Beyond its pro rata share of any recovery, Plymouth County will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 23 $^{RD}$ day of January, 2008.

William R. Farmer
Executive Director of Plymouth County Retirement System

EXHIBIT A

TRANSACTIONS IN
MBIA, INC.

| Transaction Type | Trade Date | Settle Date | Shares | Price Per Share | Cost/ Proceeds |
|---|---|---|---|---|---|
| Purchase | 07/24/07 | 07/27/07 | 100.00 | $ 57.68 | ($5,769.22) |
| Purchase | 07/24/07 | 07/27/07 | 1,000.00 | $ 57.67 | ($57,713.00) |
| Purchase | 07/24/07 | 07/27/07 | 2,000.00 | $ 57.60 | ($115,277.00) |
| Purchase | 07/24/07 | 07/27/07 | 700.00 | $ 57.57 | ($40,326.58) |
| Purchase | 07/25/07 | 07/30/07 | 1,700.00 | $ 58.54 | ($99,583.11) |
| Purchase | 07/26/07 | 07/31/07 | 1,100.00 | $ 59.04 | ($64,992.84) |
| Purchase | 07/27/07 | 08/01/07 | 700.00 | $ 58.00 | ($40,627.23) |
| Purchase | 07/30/07 | 08/02/07 | 700.00 | $ 58.75 | ($41,155.31) |
| Purchase | 07/31/07 | 08/03/07 | 800.00 | $ 57.60 | ($46,109.04) |
| Purchase | 08/07/07 | 08/10/07 | 700.00 | $ 58.35 | ($40,875.59) |
| Purchase | 08/08/07 | 08/13/07 | 700.00 | $ 60.56 | ($42,420.07) |
| Purchase | 10/11/07 | 10/16/07 | 800.00 | $ 67.00 | ($53,640.00) |
| Purchase | 10/22/07 | 10/25/07 | 700.00 | $ 58.00 | ($40,628.00) |
| Purchase | 10/25/07 | 10/30/07 | 400.00 | $ 55.56 | ($22,229.00) |
| Purchase | 10/25/07 | 10/30/07 | 1,000.00 | $ 55.09 | ($55,128.80) |
| Purchase | 10/25/07 | 10/30/07 | 900.00 | $ 51.86 | ($46,682.10) |
| Purchase | 10/25/07 | 10/30/07 | 400.00 | $ 55.16 | ($22,070.00) |
| Purchase | 10/25/07 | 10/30/07 | 1,000.00 | $ 51.43 | ($51,450.00) |
| Purchase | 10/26/07 | 10/31/07 | 1,000.00 | $ 45.74 | ($45,778.10) |
| Purchase | 11/05/07 | 11/08/07 | 500.00 | $ 34.89 | ($17,466.35) |
| Purchase | 11/09/07 | 11/15/07 | 800.00 | $ 33.89 | ($27,143.68) |
| Purchase | 11/12/07 | 11/15/07 | 600.00 | $ 35.35 | ($21,215.76) |
| Purchase | 11/27/07 | 11/30/07 | 900.00 | $ 30.06 | ($27,102.96) |
| Purchase | 11/30/07 | 12/05/07 | 600.00 | $ 36.32 | ($21,814.62) |
| Purchase | 12/04/07 | 12/07/07 | 200.00 | $ 33.26 | ($6,654.06) |
| Purchase | 12/07/07 | 12/12/07 | 900.00 | $ 29.87 | ($26,895.60) |
| Sale | 12/10/07 | 12/13/07 | -1,100.00 | $ 36.00 | $39,589.27 |
| Purchase | 12/19/07 | 12/24/07 | 800.00 | $ 28.09 | ($22,484.00) |
| Purchase | 12/19/07 | 12/24/07 | 700.00 | $ 28.12 | ($19,709.55) |
| Purchase | 12/20/07 | 12/26/07 | 900.00 | $ 20.69 | ($18,655.02) |
| Sale | 01/08/08 | 01/11/08 | -1,100.00 | $ 16.53 | $18,169.63 |

**Exhibit B**

**Plymouth County Retirement System**

Class Period: 10/26/2006 to 1/9/2008

**MBIA INC**

| | Ticker | CUSIP | SEDOL | ISIN | Valoren | WKN | Lookback Price* |
|---|---|---|---|---|---|---|---|
| | MBI | 55262C100 | 2547044 | US55262C1009 | 950231 | 874020 | $13.56 |

| Trans Type | Trade Date | Settle Date | Shares | Price Per Share | Cost/ Proceeds | Currency |
|---|---|---|---|---|---|---|
| Open | 10/26/06 | | 0.00 | | | |
| None | | | | | | |
| *Sales (matched to pre-class period purchases):* | | | *0.00* | | *$0.00* | |
| Purchase | 07/24/07 | 07/27/07 | 100.00 | $ 57.68 | ($5,769.22) | USD |
| Purchase | 07/24/07 | 07/27/07 | 1,000.00 | $ 57.67 | ($57,713.00) | USD |
| Purchase | 07/24/07 | 07/27/07 | 2,000.00 | $ 57.60 | ($115,277.00) | USD |
| Purchase | 07/24/07 | 07/27/07 | 700.00 | $ 57.57 | ($40,326.58) | USD |
| Purchase | 07/25/07 | 07/30/07 | 1,700.00 | $ 58.54 | ($99,583.11) | USD |
| Purchase | 07/26/07 | 07/31/07 | 1,100.00 | $ 59.04 | ($64,992.84) | USD |
| Purchase | 07/27/07 | 08/01/07 | 700.00 | $ 58.00 | ($40,627.23) | USD |
| Purchase | 07/30/07 | 08/02/07 | 700.00 | $ 58.75 | ($41,155.31) | USD |
| Purchase | 07/31/07 | 08/03/07 | 800.00 | $ 57.60 | ($46,109.04) | USD |
| Purchase | 08/07/07 | 08/10/07 | 700.00 | $ 58.35 | ($40,875.59) | USD |
| Purchase | 08/08/07 | 08/13/07 | 700.00 | $ 60.56 | ($42,420.07) | USD |
| Purchase | 10/11/07 | 10/16/07 | 800.00 | $ 67.00 | ($53,640.00) | USD |
| Purchase | 10/22/07 | 10/25/07 | 700.00 | $ 58.00 | ($40,628.00) | USD |
| Purchase | 10/25/07 | 10/30/07 | 400.00 | $ 55.56 | ($22,229.00) | USD |
| Purchase | 10/25/07 | 10/30/07 | 1,000.00 | $ 55.09 | ($55,128.80) | USD |
| Purchase | 10/25/07 | 10/30/07 | 900.00 | $ 51.86 | ($46,682.10) | USD |
| Purchase | 10/25/07 | 10/30/07 | 400.00 | $ 55.16 | ($22,070.00) | USD |
| Purchase | 10/25/07 | 10/30/07 | 1,000.00 | $ 51.43 | ($51,450.00) | USD |
| Purchase | 10/26/07 | 10/31/07 | 1,000.00 | $ 45.74 | ($45,778.10) | USD |
| Purchase | 11/05/07 | 11/08/07 | 500.00 | $ 34.89 | ($17,466.35) | USD |
| Purchase | 11/09/07 | 11/15/07 | 800.00 | $ 33.89 | ($27,143.68) | USD |
| Purchase | 11/12/07 | 11/15/07 | 600.00 | $ 35.35 | ($21,215.76) | USD |
| Purchase | 11/27/07 | 11/30/07 | 900.00 | $ 30.06 | ($27,102.96) | USD |
| Purchase | 11/30/07 | 12/05/07 | 600.00 | $ 36.32 | ($21,814.62) | USD |
| Purchase | 12/04/07 | 12/07/07 | 200.00 | $ 33.26 | ($6,654.06) | USD |
| Purchase | 12/07/07 | 12/12/07 | 900.00 | $ 29.87 | ($26,895.60) | USD |
| Purchase | 12/19/07 | 12/24/07 | 800.00 | $ 28.09 | ($22,484.00) | USD |
| Purchase | 12/19/07 | 12/24/07 | 700.00 | $ 28.12 | ($19,709.55) | USD |
| Purchase | 12/20/07 | 12/26/07 | 900.00 | $ 20.69 | ($18,655.02) | USD |
| | | *Class period purchases:* | *23,300.00* | | *($1,141,596.59)* | |
| Sale | 12/10/07 | 12/13/07 | -1,100.00 | $ 36.00 | $39,589.27 | USD |
| Sale | 01/08/08 | 01/11/08 | -1,100.00 | $ 16.53 | $18,169.63 | USD |
| | *Class period sales (matched to class period purchases):* | | *-2,200.00* | | *$57,758.90* | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sale** | 01/18/08 | 01/24/08 | -2,400.00 | $ | 13.92 | $33,408.00 | USD |
| Sale** | 01/22/08 | 01/25/08 | -700.00 | $ | 14.07 | $8,242.86 | USD |
| Sale** | 01/23/08 | 01/28/08 | -1,200.00 | $ | 14.08 | $16,886.38 | USD |
| Sale** | 01/23/08 | 01/28/08 | -1,100.00 | $ | 16.32 | $17,945.89 | USD |
| Sale** | 02/08/08 | 02/13/08 | -1,300.00 | $ | 14.36 | $18,650.50 | USD |
| Sale** | 02/25/08 | 02/28/08 | -1,400.00 | $ | 13.88 | $19,393.56 | USD |
| Sale** | 02/25/08 | 02/28/08 | -1,300.00 | $ | 14.93 | $19,374.33 | USD |
| Sale** | 02/26/08 | 02/29/08 | -1,600.00 | $ | 14.39 | $23,022.46 | USD |
| **Post-Class period sales (matched to class period purchases):** | | | **-11,000.00** | | | **$156,923.98** | |
| | | | | | | | |
| **FIFO Retained purchases:** | | | **10,100.00** | | $13.56 | **$136,963.21** | |
| | | | | | | | |
| **LIFO Retained purchases:** | | | **10,100.00** | | $13.56 | **$136,963.21** | |

|  |  |
|---|---|
| **FIFO Gain/(Loss):** | **($789,950.50)** |
| **LIFO Gain/(Loss):** | **($789,950.50)** |

*Value of retained purchases is the mean trading price from 1/9/2008 to 3/10/2008.

**Pursuant to the PSLRA, the values for shares sold during the 90-day lookback period are either the actual sale price or the average price up to the date of sale, whichever is higher.

**Exhibit C**

MWR          Bernstein Litowitz Berger & Grossmann LLP Announces Filing of
             Jan 11 2008  17:22

Bernstein Litowitz Berger & Grossmann LLP Announces Filing of Class
Action Suit Against MBIA, Inc. and Certain of Its Senior Officers and
Directors

NEW YORK, NY -- (MARKET WIRE) -- 01/11/08 --  Bernstein Litowitz
Berger & Grossmann LLP ("BLB&G") today announced that a class action
lawsuit has been commenced in the United States District Court for
the Southern District of New York on behalf of purchasers of the
common stock of MBIA, Inc. ("MBIA" or the "Company") (NYSE: MBI)
during the period between January 30, 2007 through and including
January 9, 2008 (the "Class Period").  The case is captioned Schmalz
v. MBIA, Inc., et al., Case No., 08-CV-0264.

The Complaint alleges that during the Class Period, MBIA and the
individual defendants, Chief Executive Officer Gary C. Dunton and
Chief Financial Officer C. Edward Chaplin, violated the federal
securities laws by issuing false and misleading press releases,
financial statements, filings with the SEC and statements during
investor conference calls.  The Complaint alleges that, throughout
the Class Period, Defendants misrepresented and/or failed to disclose
the true extent of MBIA's exposure to losses stemming from MBIA's
insurance of residential mortgage-backed securities ("RMBS"),
including in particular its exposure to so-called "CDO-squared"
securities that are backed by RMBS. This highly risky exposure was
belatedly disclosed in a series of public statements beginning on
December 19, 2007 and ending on January 9, 2008, the last day of the
Class Period.  One analyst observed that MBIA had withheld from the
public the riskiest parts of its insured portfolio, while others
expressed similar dismay at MBIA's failure to apprise investors of
these risks in a timely manner.

The Complaint alleges that the Defendants violated Section 10(b) of
the Securities Exchange Act of 1934 (the "Exchange Act") and Rule
10b-5 promulgated thereunder and that Defendants Gary C. Dunton and C.
Edward Chaplin violated Section 20(a) of the Exchange Act.

If you wish to serve as lead plaintiff, you must move the Court no
later than 60 days from January 11, 2008.  If you wish to discuss this
action or have any questions concerning this notice or your rights or
interests, please contact Plaintiff's counsel, Salvatore J. Graziano
or Gerald H. Silk or of Bernstein Litowitz at 212-554-1400, or via
e-mail at sgraziano@blbglaw.com or jerry@blbglaw.com, respectively.
You can view a copy of the Complaint as filed online at
http://www.blbglaw.com. Any member of the proposed class may move the
Court to serve as lead plaintiff through counsel of their choice, or
may choose to do nothing and remain a member of the proposed class.

Copyright (c) 2008

MWR        Bernstein Litowitz Berger & Grossmann LLP Announces Filing of
           Jan 11 2008  17:22


Plaintiff is represented by BLB&G, a firm of 50 attorneys with
offices in New York, California, Louisiana and New Jersey, which has
extensive expertise in prosecuting investor class actions involving
financial fraud. Since its founding in 1983, BLB&G has built an
international reputation for excellence and integrity.  Specializing
in securities fraud, corporate governance, shareholders' rights,
employment discrimination and civil rights litigation, among other
practice areas, BLB&G prosecutes class and private actions on behalf
of institutional and individual clients worldwide.  Unique among its
peers, BLB&G has obtained six of the ten largest and most significant
securities recoveries in history, recovering nearly $20 billion on
behalf of defrauded investors.

The MBIA action has been investigated and is being prosecuted by
BLB&G's subprime litigation group, which is also representing
investors in class and derivative subprime related actions against
Citigroup, Washington Mutual, Inc., American Home Mortgage Investment
Corp., New Century Financial Corporation, Countrywide Financial
Corporation and State Street, among others.

More information about Bernstein Litowitz Berger & Grossmann LLP can
be found online at www.blbglaw.com.


CONTACT:
Bernstein Litowitz Berger & Grossmann LLP
New York, N.Y.

Salvatore J. Graziano
212-554-1400

Gerald H. Silk
212-554-1400
-0- Jan/11/2008 22:22 GMT

Copyright (c) 2008

**Exhibit D**



# LABATON SUCHAROW LLP

## INVESTOR PROTECTION LITIGATION

# THE FIRM AND ITS ACHIEVEMENTS

## Table of Contents

OVERVIEW ............................................................................................................. 1

CORPORATE GOVERNANCE ............................................................................. 2

NOTABLE LEAD COUNSEL APPOINTMENTS ................................................ 5

TRIAL EXPERIENCE ........................................................................................... 6

NOTABLE SUCCESSES ....................................................................................... 6

NOTABLE SUCCESSES IN OPTIONS BACKDATING CASES ........................ 13

COMMENTS ABOUT OUR FIRM BY THE COURTS ....................................... 14

PRO BONO ACTIVITIES ..................................................................................... 16

ATTORNEYS .......................................................................................................... 16

    EDWARD LABATON, PARTNER ................................................................. 17

    LAWRENCE A. SUCHAROW, CHAIRMAN ................................................ 18

    MARK S. ARISOHN, PARTNER .................................................................. 20

    ERIC J. BELFI, PARTNER ........................................................................... 21

    JOEL H. BERNSTEIN, SENIOR PARTNER ................................................ 22

    THOMAS A. DUBBS, SENIOR PARTNER .................................................. 24

    LOUIS GOTTLIEB, PARTNER ..................................................................... 25

    RUSSEL N. JACOBSON, PARTNER ............................................................ 27

    JAMES W. JOHNSON, PARTNER ............................................................... 28

    CHRISTOPHER J. KELLER, PARTNER ...................................................... 29

    CHRISTOPHER J. MCDONALD, PARTNER ............................................... 30

    JONATHAN M. PLASSE, SENIOR PARTNER ........................................... 31

HOLLIS L. SALZMAN, PARTNER ....................................................................................32

IRA A. SCHOCHET, PARTNER ......................................................................................33

JOSEPH V. STERNBERG, PARTNER ...............................................................................35

MARTIS ALEX, OF COUNSEL .......................................................................................35

JONATHAN GARDNER, OF COUNSEL ...........................................................................37

DAVID J. GOLDSMITH, OF COUNSEL ...........................................................................38

ANTHONY J. HARWOOD, OF COUNSEL ........................................................................39

RICHARD T. JOFFE, OF COUNSEL ................................................................................40

ZACHARY M. RATZMAN, OF COUNSEL ........................................................................42

NICOLE M. ZEISS, OF COUNSEL ..................................................................................43

KELSO ANDERSON, ASSOCIATE ...................................................................................43

JAVIER BLEICHMAR, ASSOCIATE .................................................................................44

AYA BOUCHEDID, ASSOCIATE .....................................................................................45

PETER W. BRUEGGEN, ASSOCIATE ..............................................................................45

DONALD P. DELANEY, ASSOCIATE ..............................................................................46

ALAN I. ELLMAN, ASSOCIATE .....................................................................................47

JOSEPH A. FONTI, ASSOCIATE .....................................................................................48

ANN E. GITTLEMAN, ASSOCIATE .................................................................................49

JULIE HWANG, ASSOCIATE ..........................................................................................50

RENU KRIPALANI, ASSOCIATE .....................................................................................51

CRAIG A. MARTIN, ASSOCIATE ...................................................................................51

BARRY M. OKUN, ASSOCIATE .....................................................................................53

ANDREI V. RADO, ASSOCIATE .....................................................................................53

SERENA RICHARDSON, ASSOCIATE ..............................................................................54

MICHAEL H. ROGERS, ASSOCIATE ...............................................................................54

KRISTA ROSEN, ASSOCIATE ........................................................................................................55

MICHAEL W. STOCKER, ASSOCIATE ......................................................................................56

JESSE STRAUSS, ASSOCIATE ....................................................................................................57

STEFANIE J. SUNDEL, ASSOCIATE ..........................................................................................58

STEPHEN W. TOUNTAS, ASSOCIATE ......................................................................................58

ETHAN D. WOHL, ASSOCIATE ..................................................................................................59

Founded in 1963, Labaton Sucharow LLP ("Labaton Sucharow") is an internationally respected law firm based in New York City and has relationships throughout the U.S., Europe and the world. The Firm consists of more than 60 attorneys and a professional support staff that includes certified public accountants, licensed private investigators, resident securities analysts and 10 paralegals. The Firm prosecutes major complex litigation in the United States, and has successfully conducted a wide array of representative actions (principally class, mass and derivative) in the areas of securities, antitrust, merger/ acquisition, limited partnership, ERISA, product liability, and consumer litigation. Labaton Sucharow's Investor Protection Litigation Group offers comprehensive services for our institutional investor clients and has recovered, through trial and settlement, more than $3 billion for the benefit of investors who have been victimized by such diverse schemes as stock price manipulation, mismanagement, and fraudulent offerings of securities. Through its efforts, the litigation group has also obtained meaningful corporate governance reforms to minimize the likelihood of repetitive wrongful conduct. Visit our website at **www.labaton.com** for more information about our dynamic firm.

# CORPORATE GOVERNANCE

Labaton Sucharow is committed to corporate governance reform. The Firm is a patron of the John L. Weinberg Center for Corporate Governance of the University of Delaware ("The Center"). The Center provides a forum for business leaders, directors of corporate boards, the legal community, academics, practitioners, graduate and undergraduate students, and others interested in corporate governance issues to meet and exchange ideas. One of Labaton Sucharow's senior partners, Edward Labaton, is a member of the Advisory Committee of The Center. Additionally, Mr. Labaton has for more than 10 years served as a member of the Program Planning Committee for the annual ALI-ABA Corporate Governance Institute, and serves on the Task Force on the Role of Lawyers in Corporate Governance of the Association of the Bar of the City of New York.

On behalf of its institutional and individual investor clients, Labaton Sucharow has achieved some of the largest precedent-setting settlements since the enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and has helped avert future instances of securities fraud by negotiating substantial corporate governance reforms as conditions of many of its largest settlements.

Because of the depth of their experience and deep commitment to the principles of corporate governance, many Labaton Sucharow partners have served as featured speakers on topics relating to corporate governance and reform at various symposia and lectures.

As a result of Labaton Sucharow's extensive experience and commitment to corporate governance reform, the Firm's clients have secured meaningful reforms, in addition to substantial monetary recoveries, in significant settlements such as:

- ***In re Waste Management, Inc. Securities Litigation***, Civ. No. H-99-2183 (S.D. Tex.):  Labaton Sucharow, acting as Lead Counsel for the State of Connecticut Retirement Plans & Trust Funds, caused the Company to present a binding resolution to declassify its board of directors, which was approved by its shareholders.  As a consequence of Labaton Sucharow's efforts, the Company further agreed to amend its Audit Committee charter, which led to its enhanced effectiveness.

- ***In re Vesta Insurance Group Securities Litigation***, Civ. No. CV-98-W-1407-S (N.D. Ala.):  Labaton Sucharow, acting as Lead Counsel for the Florida State Board of Administration, caused the Company to adopt provisions requiring that:  (i) a majority of its Board members be independent; (ii) at least one independent director be experienced in corporate governance; (iii) the audit, nominating and compensation committees be comprised entirely of independent directors; and (iv) the audit committee comply with the recommendations of the Blue Ribbon Panel on the effectiveness of audit committees.

- ***In re Orbital Sciences Corporation Securities Litigation***, Civ. No. 99-197-A (E.D. Va.):  Labaton Sucharow, acting as Lead Counsel for the New York City Pension Funds, negotiated the implementation of measures concerning the Company's quarterly review of its financial results, the composition, role and responsibilities of its Audit and Finance committee, and the adoption of a Board resolution providing guidelines regarding senior executives' exercise and sale of vested stock options.

- ***In re Bristol-Myers Squibb Securities Litigation***, Civ. No. 00-1990 (D.N.J.): Labaton Sucharow, acting as Lead Counsel for the LongView Collective Investment Fund of the Amalgamated Bank, negotiated noteworthy corporate governance reforms.  Bristol-Myers Squibb ("BMS") has agreed to publicly disclose the following information concerning all of its drugs marketed for at least one indication:  a description of the clinical study design and methodology; results of the clinical trials; and safety results, including the reporting of adverse events seen during the clinical trials.  The disclosures will be posted on BMS's website, *www.BMS.com*, as well as an industry website, *www.clinicalstudyresults.org*.  BMS has agreed to post these disclosures for a 10-year period following approval of the settlement, and has further agreed that any modifications to the disclosure protocol must be approved by the Court, at the request of Labaton Sucharow as Lead Counsel, unless the modifications increase the scope of the disclosures.  The corporate reform measures obtained in this case exceed the scope of reforms obtained by New York State Attorney General Eliot Spitzer in his settlement of an action against GlaxoSmithKline ("GSK") arising from the sale of Paxil, an antidepressant.  The Paxil settlement is limited to drugs sold in the United States, whereas as a result of the BMS settlement, the company must post the clinical trial results of drugs marketed in any country throughout the world.

- ***The Boeing Company,*** Civ. No. 03 CH 15039 and Civ. No. 03 CH 16301 (Cook Co., Ill, Ch. Div.):  In 2006, Labaton Sucharow, acting as Lead Counsel for Plaintiffs in a derivative class action against the directors of The Boeing Company ("Boeing"), achieved a landmark settlement establishing unique and far-reaching

corporate governance standards relating to ethics compliance, provisions that

obligated Boeing to contribute significant funds over and above base compliance

spending to implement the various prescribed initiatives.  The terms were well

designed to provide for early detection and prevention of corporate misconduct.

They were comprehensive and integrated, enhancing effectiveness by providing

for top-down oversight, direction and planning; and buttressed by extensive and

coordinated bottom-up and horizontal reporting.  They were also designed to

enhance Board independence and effectiveness and, by creating a direct reporting

role to the Board, the independence of the management level oversight functions.

## NOTABLE LEAD COUNSEL APPOINTMENTS

Labaton Sucharow's institutional and individual investor clients are regularly appointed

by federal courts to serve as lead plaintiffs in prominent securities litigations brought under the

PSLRA.  Since January 2003, dozens of state, city and county public pension funds and union

funds have selected Labaton Sucharow to represent them in federal securities class actions and

advise them as securities litigation/investigation counsel.  Listed below are a few of our current

notable Lead Counsel appointments.

*IN RE AMERICAN INTERNATIONAL GROUP, INC. SECURITIES LITIGATION*,
*No. 04 Civ. 8141 (JES) (S.D.N.Y.)*
Representing the State of Ohio as Lead Plaintiff.

*IN RE HEALTHSOUTH CORPORATION SECURITIES LITIGATION*,
*Consolidated Case No. CV-03-BE-1501-S (N.D. Ala.)*
Representing New Mexico State Investment Counsel,
the Educational Retirement Board of New Mexico,
and the State of Michigan Retirement System
as Co-Lead Plaintiffs.

*IN RE AMGEN INC. SECURITIES LITIGATION*
*NO. CV 07-2356 PSG (C.D. CAL.)*

Representing Connecticut Retirement Plans and Trust Funds

*PAPPAS V. COUNTRYWIDE FINANCIAL CORP.*
*NO. C 07-5295 MRP (MANX) (C.D. CAL.)*

Representing the State of New York and the New York City Pension Funds

# TRIAL EXPERIENCE

Few securities class action cases go to trial.  But when it is in the best interests of its clients and the class, Labaton Sucharow repeatedly has demonstrated its willingness and ability to try these complex securities cases before a jury.

Labaton Sucharow's recognized willingness and ability to bring cases to trial significantly increases the ultimate settlement value for shareholders.  For example, in *In re Real Estate Associates Limited Partnership Litigation*, when defendants were unwilling to settle for an amount Labaton Sucharow and its clients viewed as fair, we tried the case with co-counsel for six weeks and obtained a landmark $184 million jury verdict in November 2002.  The jury supported plaintiffs' position that defendants knowingly violated the federal securities laws, and that the general partner had breached his fiduciary duties to plaintiffs.  The $184 million award was one of the largest jury verdicts returned in any PSLRA action and one in which the plaintiff class, consisting of 18,000 investors, recovered 100% of their damages.

# NOTABLE SUCCESSES

Labaton Sucharow has achieved notable successes in major securities litigations on behalf of its clients and certified investor classes.

- Labaton Sucharow served as Lead Counsel to the Connecticut Retirement Plans and Trust Funds in *In re Waste Management, Inc. Securities Litigation*, Civ. No. H-99-2183 (S.D. Tex.). In 2002, Judge Melinda Harmon approved an extraordinary settlement that provided for recovery of $457 million in cash, plus an array of far-reaching corporate governance measures. At that time, this settlement was the largest common fund settlement of a securities action achieved in any court within the Fifth Circuit and the third-largest achieved in any federal court in the nation. Judge Harmon noted, among other things, that Labaton Sucharow "obtained an outstanding result by virtue of the quality of the work and vigorous representation of the Class."

- Labaton Sucharow served as Lead Counsel representing the class and Lead Plaintiff, the LongView Collective Investment Fund of the Amalgamated Bank, in *In re Bristol-Myers Squibb Securities Litigation*, Civ. No. 00-1990 (D.N.J.). After prosecuting securities fraud claims against BMS for more than five years, Labaton Sucharow reached an agreement to settle the claims for $185 million and significant corporate governance reforms. This settlement is the second largest recovery against a pharmaceutical company, and it is the largest recovery ever obtained against a pharmaceutical company in a securities fraud case involving the development of a new drug. Moreover, the settlement is the largest ever obtained against a pharmaceutical company in a securities fraud case that did not involve a restatement of financial results.

- Labaton Sucharow represented the Florida State Board of Administration as Lead Plaintiff in *In re Vesta Insurance Group, Inc. Securities Litigation*, Civ.

No. CV-98-AR-1407 (N.D. Ala.).  After years of protracted litigation, Labaton Sucharow secured a settlement of $78 million on the eve of trial.

- In *Abrams v. VanKampen Funds, Inc.*,  01 C 7538 (N.D. Ill.), in January 2006 Labaton Sucharow obtained final approval of a $31.5 million settlement in an innovative class action concerning VanKampen's senior loan mutual fund, alleging that the fund overpriced certain senior loan interests where market quotations were readily available.  The gross settlement fund constitutes a recovery of about 70% of the class's damages as determined by plaintiffs' counsel.

- Labaton Sucharow represented the named New York City pension funds as Lead Plaintiff in *In re Orbital Sciences Corp. Securities Litigation*, Civ. No. 99-197-A (E.D. Va.).  After cross-motions for summary judgment were fully briefed, defendants (and Orbital's auditor in a related proceeding) agreed to a $23.5 million cash settlement, warrants, and substantial corporate governance measures.

- In *In re CapRock Communications Corp. Securities Litigation*, Civ. No. 3-00-CV-1613-R (N.D. Tex.), Labaton Sucharow represented a prominent Louisiana-based investment adviser in claims alleging violations of the federal securities laws.  The case settled for $11 million in 2003.

- In the well-known *In re Prudential Securities Inc. Limited Partnership Litigation*, Civ. No. M-21-67 (S.D.N.Y.), the late Judge Milton Pollack cited the "Herculean" efforts of Labaton Sucharow and its Co-Lead Counsel and, in approving a $110 million partial settlement, stated that "this case represents a

unique recovery – a recovery that does honor to every one of the lawyers on your side of the case."

- In ***In re PaineWebber Limited Partnerships Litigation***, Master File No. 94 Civ. 832/7 (SHS) (S.D.N.Y.), Judge Sidney H. Stein approved a settlement valued at $200 million and found "that Class Counsel's representation of the Class has been of high caliber in conferences, in oral arguments and in work product."

- In ***Rosengarten v. International Telephone & Telegraph Corp.***, Civ. No. 76-1249 (N.D.N.Y.), Judge Morris Lasker noted that the Firm "served the corporation and its stockholders with professional competence as well as admirable intelligence, imagination and tenacity."

- In ***In re Prudential-Bache Energy Income Partnerships Securities Litigation***, MDL No. 888, an action in which Labaton Sucharow served on the Executive Committee of Plaintiffs' Counsel, Judge Marcel Livaudais, Jr., of the United States District Court for the Eastern District of Louisiana, observed that:

  > Counsel were all experienced, possessed high professional reputations and were known for their abilities. Their cooperative effort in efficiently bringing this litigation to a successful conclusion is the best indicator of their experience and ability . . . .

  > The Executive Committee is comprised of law firms with national reputations in the prosecution of securities class action and derivative litigation. The biographical summaries submitted by each member of the Executive Committee attest to the accumulated experience and record of success these firms have compiled.

- In ***New York City Employees' Retirement System v. Adelphia Communications Corp.***, Civ. No. 02-CV-3778 (E.D. Pa.), Labaton Sucharow is prosecuting two individual securities actions on behalf of certain New York City

Pension Funds and on behalf of the New Jersey Division of Investment, each against Adelphia Communications Corp., its directors, officers, underwriters and auditors. To date, the Court has issued several decisions resolving aspects of the motions to dismiss made by defendants. One of those decisions upheld the standing of the New Jersey Division to sue on behalf of the pension and retirement funds of certain New Jersey State agencies. In addition, the New York City Funds and the New Jersey Division have moved for partial summary judgment against three individual defendants, including John and Timothy Rigas, based upon those defendants' convictions in related criminal proceedings.

- In ***STI Classic Funds v. Bollinger Industries, Inc.***, No. 96-CV-0823-R (N.D. Tex.), Labaton Sucharow commenced related suits in both state and federal courts in Texas on behalf of STI Classic Funds and STI Classic Sunbelt Equity Fund, affiliates of the SunTrust Bank, the fifth-largest bank in the United States. As a result of Labaton Sucharow's efforts, the class of Bollinger Industries, Inc. investors on whose behalf the bank sued obtained the maximum recovery possible from the individual defendants and a substantial recovery from the underwriter defendants. Notwithstanding a strongly unfavorable trend in the law in the State of Texas, and strong opposition by the remaining accountant firm defendant, Labaton Sucharow has obtained class certification and continues to prosecute the case against that firm.

- In ***In re Just for Feet Noteholder Litigation***, Civ. No. CV-00-C-1404-S (N.D. Ala.), Labaton Sucharow, as Lead Counsel, represents Lead Plaintiff Delaware Management and the Aid Association for Lutherans with respect to claims

brought on behalf of noteholders.  On October 21, 2005, Chief Judge Clemon of
the U.S. District Court for the Northern District of Alabama preliminarily
approved Plaintiffs' settlement with Banc of America Securities LLC, the sole
remaining defendant in the case, for $17.75 million.  During the course of the
litigation, Labaton Sucharow obtained certification for a class of corporate bond
purchasers in a ground-breaking decision, *AAL High Yield Bond Fund v.
Ruttenberg*, 229 F.R.D. 676 (N.D. Ala. 2005), which is the first decision by a
federal court to explicitly hold that the market for high-yield bonds such as those
at issue in the action was efficient.

- In ***In re InterMune Securities Litigation***, Master File No. 03-2454 SI (N.D.
  Cal. 2005), Labaton Sucharow commenced an action on behalf of its client, a
  substantial investor, against InterMune, a biopharmaceutical firm, and certain of
  its officers, alleging securities fraud in connection with InterMune's sales and
  marketing of a drug for off-label purposes.  Notwithstanding higher pleading and
  proof standards in the jurisdiction in which the action had been filed, Labaton
  Sucharow utilized its substantial investigative resources and creative alternative
  theories of liability to successfully obtain an early, pre-discovery settlement of
  $10.4 million.  The Court complimented Labaton Sucharow on its ability to obtain
  a substantial benefit for the Class in such an effective manner.

- In ***In re St. Paul Travelers Securities Litigation***, 04-CV-3801 (D. Minn.),
  Labaton Sucharow was able to successfully negotiate the creation of an all cash
  settlement fund to compensate investors in the amount of $67.5 million in
  November 2005.  This settlement represents the third-largest securities class action

settlement in the Eighth Circuit and one of the top 100 largest settlements of all time.

- In ***In re El Paso Corporation Securities Litigation***, Civ. No. H-02-2717 (S.D. Tex.), Labaton Sucharow secured a $285 million class action settlement against the El Paso Corporation.  The case involved a securities fraud stemming from the Company's inflated earnings statements, which cost shareholders hundreds of millions of dollars during a four-year span.  The settlement was approved by the Court on March 6, 2007.

- Labaton Sucharow serves as Co-Lead Counsel in ***In re HealthSouth Securities Litigation***, Civ. No CV-03-BE-1500-S (N.D. Ala.), a case stemming from the largest fraud ever perpetrated in the healthcare industry.  In early 2006, Lead Plaintiffs negotiated a settlement of $445 million with Defendant HealthSouth. This partial settlement, comprised of cash and HealthSouth securities to be distributed to the class, is one of the largest in history.  Lead Plaintiffs continue their prosecution of the litigation against Richard Scrushy, Healthsouth's former CEO, Ernst & Young, and UBS, among others.

- In ***Desert Orchid Partners, L.L.C. v. Transactions Systems Architects, Inc.***, Civ. No. 02 CV 533 (D. Neb.), Labaton Sucharow represented the Genesee Employees' Retirement System as Lead Plaintiff in claims alleging violations of the federal securities laws.  On March 2, 2007, the Court granted final approval to the settlement of this action for $24.5 million in cash.

- In ***In re SupportSoft Securities Litigation***, Civ. No. C 04-5222 SI (N.D. Cal.), Labaton Sucharow secured a $10.7 million settlement on October 2, 2007 against

SupportSoft, Inc.  The action alleged that the Defendants had artificially inflated the price of the Company's securities by re-working previously entered into license agreements for the Company's software in order to accelerate the recognition of revenue from those contracts.

- *In re St. Paul Traveler's II Securities Litigation*, Civ. No. 04-4697 (JRT/FLN) (D. Minn.), the second of two cases filed against St. Paul Travelers by Labaton Sucharow LLP, arose from the industry-wide insurance scandal involving American International Group, Marsh McClennan, the St. Paul Companies and numerous other insurance providers and brokers.  On January 31, 2008, the Court preliminary approved a $77 million settlement.

## NOTABLE SUCCESSES IN OPTIONS BACKDATING CASES

- In *In re Mercury Interactive Corp. Securities Litigation*, Civ. No. 5:05-CV-3395 (N.D. Cal.), Labaton Sucharow reached an agreement to settle for $117.5 million, which is currently the largest settlement agreement to date in an options backdating case.  The allegations in *Mercury* concern backdated option grants used to compensate employees and officers of the Company.  Mercury's former CEO, CFO, and General Counsel actively participated in and benefited from the options backdating scheme, which came at the expense of Mercury shareholders and the investing public.  The settlement is subject to Court approval.

- In *In re American Tower Corporation Securities Litigation*, Civ. No. 06 CV 10933 (MLW) (D. Mass.), Labaton Sucharow represented the Steamship Trade Association-International Longshoreman's Association Pension Fund (STA-ILA)

in claims alleging that certain of American Tower Corporation's current and former officers and directors improperly backdated the Company's stock option grants and made materially false and misleading statements to the public concerning the Company's financial results and option grant policies and accounting, causing damages to investors. On December 14, 2007, Labaton Sucharow reached an agreement to settle for $14 million.

- Labaton Sucharow serves as Lead Counsel in *In re HCC Insurance Holdings, Inc. Securities Litigation*, Civ. No. 4:07-cv-801 (S.D. Tex.), a case alleging that certain of HCC's current and former officers and directors improperly backdated the Company's stock option grants and made materially false and misleading statements to the public concerning the Company's financial results and option grant policies and accounting, causing damages to investors. On February 11, 2008, Labaton Sucharow reached an agreement to settle for $10 million.

Among the institutional investor clients Labaton Sucharow represents and advises are:

Academy Capital Management
Arkansas Carpenters Pension Fund
Asbestos Workers Local 24
Baltimore County Retirement System
State-Boston Retirement System
California Public Employees' Retirement System
Central Laborers' Pension Fund
Connecticut Retirement Plans and Trust Funds
Genesse County Employees' Retirement System
Iron Workers Local 16
Town of Jupiter Police Officer's Retirement Fund
Lawndale Capital Management

- 14 -

LongView Collective Investment Fund of the Amalgamated Bank

City of Macon

Commonwealth of Massachusetts Pension Reserves Investment Trust

Metropolitan Atlanta Rapid Transit Authority

Michigan Retirement Systems

Mississippi Public Employees' Retirement System

Division of Investment of the New Jersey Department of the Treasury

Office of the New Mexico Attorney General and several of its Retirement Systems

City of New Orleans Employees' Retirement System

Norfolk County Retirement System

Office of the Ohio Attorney General and several of its Retirement Systems

Pirate Capital LLC

Robino Stortini Holdings LLC

San Francisco Employees' Retirement System

St. Denis J. Villere & Co.

Steamship Trade Association/International Longshoremen's Association

SunTrust Banks, Inc.

## COMMENTS ABOUT OUR FIRM BY THE COURTS

Many federal judges have commented favorably on the Firm's expertise and results achieved in securities class action litigation.  Judge John E. Sprizzo complimented the Firm's work in *In re Revlon Pension Plan Litigation*, Civ. No. 91-4996 (JES) (S.D.N.Y.).  In granting final approval to the settlement, Judge Sprizzo stated that "[t]he recovery is all they could have gotten if they had been successful.  I have probably never seen a better result for the class than you have gotten here."

Labaton Sucharow was a member of the Executive Committee of Plaintiffs' Counsel in *In re PaineWebber Limited Partnerships Litigation*, Master File No. 94 Civ. 8547 (SHS).  In approving a class-wide settlement valued at $200 million, Judge Sidney H. Stein of the Southern District of New York stated:

> The Court, having had the opportunity to observe first hand the
> quality of Class Counsel's representation during this litigation,
> finds that Class Counsel's representation of the Class has been of
> high caliber in conferences, in oral arguments and in work product.

Judge Lechner, presiding over the $15 million settlement in *In re Computron Software*

*Inc. Securities Class Action Litigation*, Civ. No. 96-1911 (AJL) (D.N.J.), where Labaton

Sucharow served as Co-Lead Counsel, commented that

> I think it's a terrific effort in all of the parties involved . . . , and the
> co-lead firms . . . I think just did a terrific job.
>
> You [co-lead counsel and] Mr. Plasse, just did terrific work in the
> case, in putting it all together . . . .

In *Middlesex County Retirement System v. Monster Worldwide, Inc.*, No. 07-cv-2237

(S.D.N.Y.), Judge Rakoff appointed Labaton Sucharow as lead counsel, stating that "the Labaton

firm is very well known to courts for the excellence of its representation."

## *PRO BONO* ACTIVITIES

Our attorneys devote substantial time to *pro bono* activities.  Many of our attorneys

participated in the Election Protection Program sponsored in 2004 by the Lawyers Committee

for Civil Rights Under the Law to ensure that every voter could vote and every vote would count.

In addition, the Firm's attorneys devote their time to *pro bono* activities in the fields of the arts,

foundations, education, and health and welfare issues.

## ATTORNEYS

Among the attorneys at Labaton Sucharow who are involved in the prosecution of

securities actions are partners Edward Labaton, Lawrence A. Sucharow, Mark S. Arisohn, Eric J.

Belfi, Joel H. Bernstein, Thomas A. Dubbs, Louis Gottlieb, Russel N. Jacobson, James W.

Johnson, Christopher J. Keller, Christopher J. McDonald, Jonathan M. Plasse, Hollis L. Salzman, Ira A. Schochet, Joseph V. Sternberg; of counsel attorneys Martis Alex, Jonathan Gardner, David J. Goldsmith, Anthony J. Harwood, Richard T. Joffe, Zachary M. Ratzman, and Nicole M. Zeiss; and associates Kelso Anderson, Aya Bouchedid, Javier Bleichmar, Peter W. Brueggen, Donald P. Delaney, Alan I. Ellman, Joseph A. Fonti, Ann E. Gittleman, Julie Hwang, Renu Kripalani, Craig A. Martin, Barry M. Okun, Andrei V. Rado, Serena Richardson, Michael H. Rogers, Krista Rosen, Michael W. Stocker, Stefanie J. Sundel, Stephen W. Tountas, and Ethan D. Wohl. A short description of the qualifications and accomplishments of each follows.

### EDWARD LABATON, PARTNER                                    elabaton@labaton.com

An accomplished trial lawyer and Senior Partner with the Firm, Edward Labaton has devoted his 50 years of practice to representing a full range of clients in class action and complex litigation matters in state and federal court. Mr. Labaton has played a lead role as plaintiffs' class counsel in a number of successfully prosecuted high profile cases, involving companies such as PepsiCo, Dun & Bradstreet, Financial Corporation of America, ZZZZ Best, Revlon, GAF Co., American Brands, Petro Lewis and Jim Walter, as well as several Big Eight (now Four) accounting firms. He has also argued appeals in state and federal courts, achieving results with important precedential value.

Mr. Labaton has been President of the Institute for Law and Economic Policy since its founding in 1996. The Institute co-sponsors at least one annual symposium with a major law school dealing with issues relating to the civil justice system. He is also a member of the Advisory Committee of the Weinberg Center for Corporate Governance of the University of Delaware, a Director of the Lawyers' Committee for Civil Rights under Law, a member of the American Law Institute, and a life member of the ABA Foundation. In addition, Mr. Labaton

has served on the Executive Committee and has been an officer of the Ovarian Cancer Research Fund since its inception in 1996.

Mr. Labaton is the past Chairman of the Federal Courts Committee of the New York County Lawyers Association, and was a member of the Board of Directors of that organization. He is an active member of the Association of the Bar of the City of New York, where he was Chair of the Senior Lawyers' Committee and served on its Task Force on the Role of Lawyers in Corporate Governance. He has also served on its Federal Courts, Federal Legislation, Securities Regulation, International Human Rights and Corporation Law Committees. He also served as Chair of the Legal Referral Service Committee, a joint committee of the New York County Lawyers' Association and the Association of the Bar of the City of New York. He has been an active member of the American Bar Association, the Federal Bar Council and the New York State Bar Association, where he has served as a member of the House of Delegates.

For more than 30 years, he has lectured in the areas of federal civil litigation, securities litigation and corporate governance. Mr. Labaton graduated *cum laude* with a B.B.A. from Baruch College, City College of New York in 1952 and earned his LL.B. from Yale University in 1955. He is admitted to practice in New York and the United States Supreme Court.

## LAWRENCE A. SUCHAROW, CHAIRMAN                    lsucharow@labaton.com

Lawrence A. Sucharow, a nationally recognized leader of the securities class action bar, is the Chairman of Labaton Sucharow. In this capacity, he participates in developing the litigation and settlement strategies for virtually all of the class action cases Labaton Sucharow prosecutes.

For more than three decades, Mr. Sucharow has devoted his practice to counseling clients and prosecuting cases on complex issues involving securities, antitrust, business transaction,

product liability, and other class actions.  Mr. Sucharow has successfully recovered more than $1 billion on behalf of institutional investors such as state, city, county and union pension funds, shareholders of public companies, bondholders, purchasers of limited partnership interests, purchasers of consumer products and individual investors.

Mr. Sucharow recently obtained $225 million in savings for the class of *In re CNL Resorts, Inc. Securities Litigation*.  In other recently settled actions, Mr. Sucharow undertook a lead role in obtaining benefits for class members of $200 million (*In re Paine Webber Incorporated Limited Partnerships Litigation*); $110 million partial settlement (*In re Prudential Securities Incorporated Limited Partnerships Litigation*); $91 million (*In re Prudential Bache Energy Income Partnerships Securities Litigation*; and more than $92 million (*Shea v. New York Life Insurance Company*).  In approving the *Prudential* settlement, Judge Milton Pollack referred to the efforts of plaintiffs' counsel as "Herculean," stating: "…this case represents a unique recovery – a recovery that does honor to every one of the lawyers on your side of the case."

In addition, in 2002 Mr. Sucharow served as Co-Trial Counsel in a six-week trial of a federal securities law claim on behalf of 18,000 passive investors in the Real Estate Associates limited partnerships.  That trial resulted in an unprecedented $182 million jury verdict.

Mr. Sucharow is a member of the Federal Bar Council's Committee on Second Circuit Courts, and the Federal Courts Committee of the New York County Lawyers' Association.  He is also a member of the Securities Law Committee of the New Jersey State Bar Association and was the founding chairman of the Class Action Committee of the Commercial and Federal Litigation Section of the New York State Bar Association from 1988-1994.  He was honored by his peers by his election to serve as President of the National Association of Shareholder and

Consumer Attorneys (NASCAT), a membership organization of approximately 100 law firms which practice complex civil litigation including class actions.

Mr. Sucharow earned a B.B.A., *cum laude*, from Baruch School of the City College of the City University of New York in 1971 and a J.D., *cum laude*, from Brooklyn Law School in 1975.

Mr. Sucharow is admitted to practice in New York and New Jersey and the United States Supreme Court.

### MARK S. ARISOHN, PARTNER                                   marisohn@labaton.com

Mark S. Arisohn focuses his practice on securities class action litigation.

For the past 33 years, Mr. Arisohn specialized in complex criminal and civil litigation with an emphasis on white collar criminal matters. He has appeared in the state and federal courts nationwide, and appeared before the United States Supreme Court in the landmark insider trading case of *Chiarella v. United States.*

Mr. Arisohn brings his extensive trial experience to the prosecution of securities class actions. He has defended individuals and corporations accused of bank fraud, mail and wire fraud, securities fraud and RICO violations. He has represented public officials, individuals and companies in the construction and securities industries as well as professionals accused of regulatory offenses and professional misconduct. He also has appeared as trial counsel for both plaintiffs and defendants in civil fraud matters and corporate and business commercial matters, including shareholder litigation, breach of contract claims, and cases involving such business torts as unfair competition and misappropriation of trade secrets.

A prominent trial lawyer, Mr. Arisohn has also authored numerous articles including "Electronic Eavesdropping," *New York Criminal Practice*, LEXIS - Matthew Bender, 2005;

"Criminal Evidence," *New York Criminal Practice*, Matthew Bender, 1986; and "Evidence," *New York Criminal Practice*, Matthew Bender, 1987.  He was a contributing author of *Business Crime*, Matthew Bender, 1981.

Mr. Arisohn is an active member of the Association of the Bar of the City of New York and has served on its Judiciary Committee, the Committee on Criminal Courts, Law and Procedure, the Committee on Superior Courts and the Committee on Professional Discipline.  He serves as a mediator for the Complaint Mediation Panel of the Association of the Bar of the City of New York and as a hearing examiner for the New York State Commission on Judicial Conduct.

He earned his B.S. and M.S. degrees from Cornell University in 1968 and 1969 and received his J.D. from Columbia University School of Law in 1972.

Mr. Arisohn is admitted to practice in New York and the District of Columbia as well as the following federal courts: the United States Supreme Court; the United States Court of Appeals for the Second Circuit; and the United States District Courts for the Southern, Eastern and Northern Districts of New York; the Northern District of Texas; and the Northern District of California.

## ERIC J. BELFI, PARTNER                                         ebelfi@labaton.com

Eric J. Belfi, a partner in the New York office of Labaton Sucharow, is an accomplished litigator in a broad range of commercial matters.  He concentrates his practice in the investigation and initiation of securities and shareholder class actions, with an emphasis on the representation of major international and domestic pension funds and other institutional investors.

Prior to entering private practice, Mr. Belfi served as an Assistant Attorney General for the State of New York and an Assistant District Attorney for the County of Westchester.  As a prosecutor, Mr. Belfi investigated and prosecuted numerous white-collar criminal cases, including securities law violations.  In this capacity, he presented hundreds of cases to the grand jury and obtained numerous felony convictions after jury trials.

Mr. Belfi is a regular speaker and author on issues involving shareholder litigation, particularly as it relates to international institutional investors.  He recently co-authored "The Proportionate Trading Model: Real Science or Junk Science?" 52 *Cleveland St. L. Rev.* 391 (2004-05) and "International Strategic Partnerships to Prosecute Securities Class Actions, Investment & Pensions Europe."  In 2005, he was a panelist at a program on U.S. class actions in Vicenzia, Italy.  Mr. Belfi has given presentations on the topics of investors' rights and U.S. class actions in Milan, Italy in May of 2006 and April of 2007, respectively.

He received a B.A. from Georgetown University in 1992 and a J.D. from St. John's University School of Law in 1995.  Mr. Belfi is an associate prosecutor for the Village of New Hyde Park, and is also a member of the Federal Bar Council and the Association of the Bar of the City of New York.

Mr. Belfi is admitted to practice in the State of New York as well as the United States District Courts for the Southern and Eastern Districts of New York, the Eastern District of Michigan, the District of Colorado, and the District of Nebraska.

### JOEL H. BERNSTEIN, SENIOR PARTNER                    *jbernstein@labaton.com*

With more than 30 years' experience in the area of complex litigation, Joel H. Bernstein concentrates his practice in the protection of investors who have been victimized by securities

fraud and breach of fiduciary duty. His expertise in the area of shareholder litigation has resulted in the recovery of hundred of millions of dollars in damages to wronged investors.

Mr. Bernstein advises numerous large public pension funds, hedge funds, other institutional investors and individual investors with respect to securities litigation in the federal and state courts as well as in arbitration proceedings before the New York Stock Exchange, the National Association of Securities Dealers and other self-regulatory organizations.

Mr. Bernstein has played a central role in numerous high profile cases, including *In re Paine Webber Incorporated Limited Partnerships Litigation*, $200 million settlement; *In re Prudential Securities Incorporated Limited Partnerships Litigation*, $130 million settlement; *In re Prudential Bache Energy Income Partnerships Securities Litigation*, $91 million settlement; *Shea v. New York Life Insurance Company*, $92 million settlement; and, *Saunders et al. v. Gardner*, $10 million -- then the largest punitive damage award in the history of the NASD. Most recently, Mr. Bernstein was instrumental in securing a $117.5 million settlement in *In Re Mercury Interactive Securities Litigation*, which as of October 2007 was the largest settlement agreement to date in an options-backdating case.

A leading figure in his area of practice, Mr. Bernstein is frequently sought out by the press to comment on securities law and also has authored numerous articles on related issues, including "Stand Up to Your Stockbroker, Your Rights As An Investor." He is a member of the American Bar Association and the New York County Lawyers' Association.

Mr. Bernstein earned a J.D. from Brooklyn Law School in 1975 and received his undergraduate degree from Queens College in 1971.

He is admitted to practice in New York and the following federal courts: the United

States Court of Appeals for the Second Circuit, the United States Court of Appeals for the Third

Circuit, and the United States District Court for the Southern and Eastern Districts of New York.

### THOMAS A. DUBBS, SENIOR PARTNER                    tdubbs@labaton.com

Thomas A. Dubbs specializes in the representation of institutional investors including

pension funds in securities fraud and other types of litigation.  A recognized leader in the field,

Mr. Dubbs represented the first major private institutional investor to become a lead plaintiff in a

class action under the Private Securities Litigation Reform Act.

Mr. Dubbs currently serves as Lead Counsel in the federal securities fraud class actions

brought against AIG on behalf of Lead Plaintiff Ohio (comprised of several of Ohio's retirement

systems) as well as Lead Counsel for the class and Lead Plaintiff New Mexico (comprised of

several of New Mexico's retirement systems) in the securities class actions against St. Paul

Travelers Companies, Inc. in relation to the merger between The St. Paul Companies and

Travelers Property Casualty Corporation.

A Labaton Sucharow team led by Mr. Dubbs successfully litigated a class action against

Bristol-Myers Squibb, which resulted in a settlement of $185 million and major corporate

governance reforms.

Mr. Dubbs also led the team of Labaton Sucharow attorneys that represented the Lead

Plaintiff, the Florida State Board of Administrators, in the *Vesta Insurance Group* class action.

To date, settlements with the Company and its auditor, KPMG, total more than $79 million,

which represents more than 37% of the damages sustained by the class.

Most recently, Mr. Dubbs leads the team prosecuting the *In re HealthSouth Securities

Litigation* on behalf of the New Mexico State Investment Council, the Educational Retirement

Board of New Mexico, and the Michigan Pension Funds, the Court appointed Co-Lead Plaintiffs for stockholders of HealthSouth Corporation.  Mr. Dubbs secured a partial settlement of $445 million from HealthSouth over the massive fraud that led to the healthcare provider's collapse and conviction of numerous former employees.

Prior to joining Labaton Sucharow, Mr. Dubbs was Senior Vice President & Senior Litigation Counsel for Kidder, Peabody & Co. where he represented the firm in many class actions, including the *First Executive* and *Orange County* litigations.  Before joining Kidder, Mr. Dubbs was head of the litigation department at Hall, McNicol, Hamilton & Clark, where he was the principal partner representing Thomson McKinnon Securities Inc. in litigation matters including class actions such as the *Petro Lewis* and *Baldwin* United litigations.

He frequently lectures to institutional investors and other groups such as the Government Finance Officers Association, the National Conference on Public Employee Retirement Systems and the Council of Institutional Investors.  Most recently, he spoke at the Ohio Forum on Public Retirement.

Mr. Dubbs received a B.A. and a J.D. from the University of Wisconsin in 1969 and 1974, respectively.  In 1971, he earned an M.A. from the Fletcher School of Law and Diplomacy of Tufts University.  Mr. Dubbs is a member of the New York State Bar Association and the Association of the Bar of the City of New York.  He is admitted to practice in New York.

### LOUIS GOTTLIEB, PARTNER                         lgottlieb@labaton.com

Lou Gottlieb has successfully represented institutional and individual investors in numerous securities and consumer class action cases, resulting in cumulative settlements well in excess of $500 million.

Mr. Gottlieb was an integral part of the Firm's representation of the Connecticut Retirement Plans and Trust Funds in *In re Waste Management, Inc. Securities Litigation*, which resulted in a $457 million settlement, one of the largest settlements ever achieved in a securities class action. The settlement also included corporate governance enhancements, including an agreement by management to support a campaign to obtain shareholder approval of a resolution to declassify its board of directors, and a resolution to encourage and safeguard whistleblowers among the company's employees.

In *In re JDS Uniphase Corporation Securities Litigation*, Mr. Gottlieb successfully argued that draconian confidentiality agreements, which hampered the ability to conduct an investigation of the company's alleged wrongdoing, must be severely limited in scope. As a result, counsel obtained statements from more than 50 former JDS employees related to the allegations in the Second Amended Complaint, which the Court sustained.

Mr. Gottlieb has led litigation teams in the Metromedia Fiber Networks, Maxim Pharmaceuticals, and PriceSmart securities fraud class action litigations as well as a consumer breach of contract class action against New York Life Annuities. He is also helping to lead major class action cases against AIG and related defendants in *In re American International Group Inc. Securities Litigation*, as well as against the company, its top officers and its outside auditor in *In re Mercury Interactive Corp. Securities Litigation*.

Mr. Gottlieb has made presentations on punitive damages at Federal Bar Association meetings and has often spoken on securities class actions for institutional investors.

Mr. Gottlieb graduated first in his class from St. John's School of Law in 1990. Prior to joining Labaton Sucharow, he clerked for the Hon. Leonard B. Wexler of the Eastern District of New York, and he was a litigation associate with Skadden Arps Slate Meagher & Flom.

Mr. Gottlieb is admitted in New York and Connecticut as well as before the United States Court of Appeals for the Fifth Circuit and the United States District Courts for the Southern and Eastern Districts of New York.

### RUSSEL N. JACOBSON, PARTNER                     rjacobson@labaton.com

Russel N. Jacobson is a seasoned litigator with a depth of experience in securities and complex business cases.

Before returning to private practice, Mr. Jacobson served as a federal prosecutor for more than a decade.  From 1997 through 2003, Mr. Jacobson served as an Assistant United States Attorney with the United States Attorney's Office for the District of New Jersey.  While there, he investigated and prosecuted diverse federal criminal cases, including international money laundering offenses, frauds, and additional federal crimes.

From 1991 through 1997, Mr. Jacobson was a trial attorney with the Fraud Section of the Criminal Division at the United States Department of Justice in Washington, D.C.  While at the Fraud Section, Mr. Jacobson investigated and prosecuted complex business crimes, including financial institution fraud, securities fraud, and other white-collar offenses.

During his service as a federal prosecutor, Mr. Jacobson conducted numerous trials and received many awards in recognition of the excellence of his work.

Mr. Jacobson began his legal career by serving as a law clerk to then Judge (now Justice) Anthony M. Kennedy on the United States Court of Appeals for the Ninth Circuit.

Mr. Jacobson earned an A.B., *magna cum laude*, from Harvard College in 1984 and a J.D., *magna cum laude*, from Harvard Law School in 1987.

Prior to joining Labaton Sucharow, Mr. Jacobson was a partner specializing in securities litigation at another well-known plaintiffs' law firm.  Earlier in his career, Mr. Jacobson was a litigation associate at a major Washington, D.C. law firm.

Mr. Jacobson is admitted to practice in New York, the District of Columbia, and Massachusetts, and before the following federal courts: the United States District Courts for the Southern and Eastern Districts of New York, the United States District Court for the District of Massachusetts, and the United States Court of Appeals for the Fourth Circuit.

### JAMES W. JOHNSON, PARTNER                    jjohnson@labaton.com

James W. Johnson specializes in complex litigation, with primary emphasis on class actions involving securities fraud.

Mr. Johnson has successfully litigated a number of high profile securities and RICO class actions, including: *In re Bristol-Myers Squibb Co. Securities Litigation*, in which the Court, after approving a settlement of $185 million coupled with significant corporate governance reforms, recognized Plaintiff's counsel as "extremely skilled and efficient"; *In re HealthSouth Corp. Securities Litigation*, which resulted in a partial settlement of $445 million; *In re Vesta Insurance Group, Inc. Securities Litigation*, which resulted in a partial recovery of $78 million for the Plaintiff class; and Murphy v. Perelman, which, along with a companion federal action, *In re National Health Laboratories, Inc. Securities Litigation*, brought by Co-Counsel, resulted in a recovery of $80 million. In *County of Suffolk v. Long Island Lightning Co.*, Mr. Johnson represented the Plaintiff in a RICO class action, securing a jury verdict after a two-month trial, which resulted in a $400 million settlement.  The Second Circuit, in awarding attorneys' fees to Plaintiff, quoted the trial judge, Honorable Jack B. Weinstein, as stating "counsel [has] done a superb job [and] tried this case as well as I have ever seen any case tried."

Mr. Johnson also assisted in prosecuting environmental damage claims on behalf of Native Americans resulting from the Exxon Valdez oil spill.

Mr. Johnson is the co-author of "RICO: Judiciary Devises New Theories In Effort To Dismiss Civil Suits," *The National Law Journal*, Feb. 12, 1990, and "Special Trial Issues In RICO Actions," *Civil RICO 1989*, Practicing Law Institute 1989. He is a member of the American Bar Association and the Association of the Bar of the City of New York, where he served on the Federal Courts Committee.

Mr. Johnson received a B.A. from Fairfield University in 1977 and a J.D. from New York University School of Law in 1980, where he was the recipient of the Ann Petluck Poses Memorial Award.

### CHRISTOPHER J. KELLER, PARTNER                    ckeller@labaton.com

Christopher J. Keller concentrates his practice in sophisticated securities class action litigation in federal courts throughout the country. Mr. Keller was a member of the trial team that successfully litigated the *In re Real Estate Associates Limited Partnership Litigation* in the United States District Court for the Central District of California. The six-week jury trial resulted in a landmark $184 million plaintiffs' verdict, which is one of the largest jury verdicts since the passage of the Private Securities Litigation Reform Act of 1995.

Mr. Keller is very active in investigating and initiating securities and shareholder class actions. He also concentrates his efforts on educating institutional investors on developing trends in the law and new case theories. Mr. Keller is a regular speaker at institutional investor gatherings as well as a frequent speaker at continuing legal education seminars relating to securities class action litigation.

Mr. Keller is the co-author of an article entitled "Tellabs:  PSLRA Pleading Test Comparative, Not Absolute," *New York Law Journal*, October 3, 2007.

Mr. Keller received a B.S. from Adelphi University in 1993 and a J.D. from St. John's University School of Law in 1997.  He is admitted to practice in New York and the United States District Courts for the Southern and Eastern Districts of New York.  He is a member of several professional groups, including the New York State Bar Association and the New York County Lawyers' Association.

### CHRISTOPHER J. MCDONALD, PARTNER                    cmcdonald@labaton.com

Christopher J. McDonald, a member of the Firm's Antitrust Practice Group, represents businesses, associations and individuals injured by anticompetitive activities.  Mr. McDonald's practice also involves representing institutional investors in securities fraud cases.

Mr. McDonald was part of the team that successfully litigated *In re Bristol-Myers Squibb Securities Litigation*, in which Labaton Sucharow secured a $185 million settlement on behalf of Bristol-Myers Squibb shareholders, as well as meaningful corporate governance reforms.  He has also worked on *In re Natural Gas Commodity Litigation*, a still active case that to date has generated almost $73 million in settlement funds for a class of traders who purchased, sold or settled New York Mercantile Exchange contracts.

In an ongoing case, *In re TriCor Indirect Purchaser Antitrust Litigation*, Mr. McDonald represents end-payors of the prescription drug TriCor (e.g., union health and welfare funds and consumers), who claim that the drug's manufacturer and U.S. marketer unlawfully impeded the introduction of lower-priced generic alternatives to TriCor.  Other cases in which Mr. McDonald is currently involved include the *Air Cargo Shipping Services* and *Foundry Resins* antitrust cases.

A litigator for most of his career, Mr. McDonald also has in-house and regulatory experience.  As a senior attorney with a telecommunications company he regularly addressed legal, economic and public policy issues before state public utility commissions.

Mr. McDonald received his undergraduate degree, *cum laude*, from Manhattan College in 1985 and a J.D. from Fordham University School of Law in 1992, where he was on the Law Review.

Mr. McDonald is admitted to practice in New York and before the United States Court of Appeals for the Second Circuit and the United States District Courts for the Southern and Eastern Districts of New York.

## JONATHAN M. PLASSE, SENIOR PARTNER                    *jplasse@labaton.com*

An accomplished litigator, Jonathan M. Plasse has devoted over 25 years of his practice to the prosecution of complex cases involving securities class action, derivative, transactional, and consumer litigation.  His most recent successes include serving as Co-Lead Counsel, where a $285 million settlement was just recently announced in the securities class action, *In re El Paso Corporation Securities Litigation*, and as Lead Counsel in *In re Waste Management Inc. Securities Litigation*, where he represented the Connecticut Retirement Plans and Trusts Funds, and obtained a settlement of $457 million.  He also served as Lead Counsel in *Orbital Sciences Corporation Securities Litigation*, where he represented the New York City Pension Funds and secured a $23.5 million settlement on the eve of trial.

Mr. Plasse is a member of the New York State Bar Association and the Association of the Bar of the City of New York.  He is admitted to practice in New York.

Mr. Plasse received a B.A. degree, *magna cum laude*, from the State University of New York in Binghamton in 1972. He received a J.D. from Brooklyn Law School in 1976, where he served as a member of the *Brooklyn Journal of International Law.*

### HOLLIS L. SALZMAN, PARTNER                    hsalzman@labaton.com

Hollis L. Salzman is a partner in the Firm's Antitrust Practice Group. She represents businesses and consumers in cases involving federal and state antitrust law violations. She is also involved in the Firm's securities litigation practice group where she represents institutional investors in portfolio monitoring and securities litigation. Some of Ms. Salzman's clients include MARTA and the City of Macon, Georgia.

Ms. Salzman is actively engaged in the prosecution of major antitrust class actions pending throughout the United States. She is presently Co-Lead Counsel in many antitrust cases, including *In re Abbott Labs Norvir Antitrust Litigation* which is set for trial in June 2008, *In re OxyContin Antitrust Litigation*, *In re Air Cargo Shipping Services Antitrust Litigation* and *Plavix Antitrust Litigation*. She is also actively involved in other pending major antitrust litigations, including *In re Funeral Antitrust Litigation*, *In re Pineapple Antitrust Litigation*, *In re New Motor Vehicles Canadian Export Antitrust Litigation*, *In re Marine Hoses Antitrust Litigation* and *In re Live Rock Concert Antitrust Litigation.*

She also served as Co-Lead Counsel in several antitrust class actions which resulted in extraordinary settlements for consumers and third-party payors: *In re Buspirone Antitrust Litigation* ($90 million settlement); *In re Lorazepam & Clorazepate Antitrust Litigation* ($135.4 million on behalf of third-party payors, and $100 million on behalf of consumers in conjunction with the Federal Trade Commission and State Attorneys General actions); also *In re Maltol Antitrust Litigation*, and *Continental Seasonings Inc. v. Pfizer, Inc., et al.*, ($18.45 million on

behalf of direct purchasers of chemical food additives).  Additionally, she was principally responsible for administering a $65 million settlement with certain brand-name prescription drug manufacturers where their conduct allegedly caused retail pharmacy customers to overpay for their prescription drugs.

Ms. Salzman is a Co-Chair of the New York State Bar Association, Commercial & Federal Litigation Section — Antitrust Committee and is co-author of an article entitled "The State of State Antitrust Enforcement," NYSBA *NYLitigator*, Winter 2003, Vol. 8, No. 1.  She is also a member of the Association of the Bar of the City of New York Antitrust Committee and Women's Antitrust Bar Association.  Ms. Salzman also provides *pro bono* representation to indigent and working-poor women in matrimonial and family law matters.

Ms. Salzman earned a B.A. from Boston University in 1987 and a J.D. from Nova University School of Law in 1992.  She is admitted to practice in New York, New Jersey and Florida as well as before the United States District Courts for the Southern and Middle Districts of Florida; the United States District Courts for the Southern and Eastern Districts of New York; and the United States Court of Appeals for the Eleventh Circuit.

## IRA A. SCHOCHET, PARTNER                    ischochet@labaton.com

Ira A. Schochet has 15 years' experience in commercial litigation, with primary emphasis on class actions involving securities fraud.

Mr. Schochet has played a leading role in litigation resulting in multimillion-dollar recoveries for class members in cases against Caterpillar, Inc., Spectrum Information Technologies, Inc. and InterMune, Inc.  In *Kamarasy v. Coopers & Lybrand*, a securities fraud class action, Mr. Schochet led a team that won a settlement equal to approximately 75% of the

highest possible damages that class members could have recovered.  The Court in that case

complimented him for "the superior quality of the representation provided to the class."

Mr. Schochet represented one of the first institutional investors acting as a Lead Plaintiff

in a post-Private Securities Litigation Reform Act case, *STI Classic Funds v. Bollinger, Inc.*, and

obtained one of the first favorable rulings interpreting that statute's intent provision.

Most recently, Mr. Schochet negotiated a settlement on behalf of investors in the

*InterMune* litigation.  In approving the settlement, the Court complimented Mr. Schochet's

ability to obtain a significant cash benefit for the class in a very efficient manner, saving the class

from additional years of time, expense and substantial risk.

Since 1996, Mr. Schochet has acted as chairman of the Class Action Committee of the

Commercial and Federal Litigation Section of the New York State Bar Association.  In that

capacity, he has served on the Executive Committee of the Section and was the primary author of

articles and reports on a wide variety of issues relating to class action procedure.  Such issues

include revisions to that procedure proposed over the years by both houses of the United States

Congress and the Advisory Committee on Civil Procedure of the United States Judicial

Conference.  Examples include "Proposed Changes in Federal Class Action Procedure, Opting

Out On Opting In," and "The Interstate Class Action Jurisdiction Act of 1999."  He also has

lectured extensively on securities litigation at continuing legal education seminars.

Mr. Schochet earned a J.D. from Duke University School of Law in 1981 and received a

B.A., *summa cum laude*, from the State University of New York at Binghamton in 1977.  He is

admitted to practice in New York, before the United States District Courts for the Southern and

Eastern Districts of New York and the United States Court of Appeals for the Second Circuit.

### JOSEPH V. STERNBERG, PARTNER                    jsternberg@labaton.com

Joseph V. Sternberg is a trial and appellate lawyer with more than 35 years of experience in the areas of civil and class action litigation.  He has prosecuted cases that have resulted in the return of hundreds of millions of dollars to class members.  Among the numerous landmark cases in which Mr. Sternberg has participated are *Limmer v. Medallion Group, Inc.*, *Koppel v. Wien*, *In re Energy Systems Equipment Leasing Securities Litigation*, *Koppel v. 4987 Corp.*, *Gunter v. Ridgewood Energy Corp.*, and *In re Real Estate Associates Limited Partnership Litigation*.

Mr. Sternberg authored "Using and Protecting Against Rule 12(b) and 9(b) Motions," *The Practical Litigator*, September 1993.

Mr. Sternberg earned a B.A. from Hofstra University in 1963 and a J.D. from New York University School of Law in 1966.  He is admitted to practice in New York, before the United States District Courts for the Southern and Eastern Districts of New York, and before the United States Courts of Appeals for the Second and Third Circuit.  He has received a rating of AV from the publishers of the Martindale-Hubble Directory.

### MARTIS ALEX, OF COUNSEL                    malex@labaton.com

Martis Alex concentrates her practice on prosecuting complex securities fraud cases on behalf of institutional investors.  She was a partner at Labaton Sucharow for more than 15 years, and Chair of the Firm's Mass Tort Litigation practice group.  Ms. Alex has extensive experience managing complex nationwide litigation, including securities class actions as well as product liability and consumer fraud litigation.  She has successfully represented investors and consumers in cases that achieved cumulative recoveries of hundreds of millions of dollars for plaintiffs.  After a brief retirement, Ms. Alex rejoined Labaton Sucharow in 2006 as Of Counsel.

Ms. Alex was an integral part of the team that successfully litigated *In re Bristol Myers Squibb Securities Litigation*, where Labaton Sucharow was able to secure a $185 million settlement on behalf of investors, as well as meaningful corporate governance reforms that will affect future consumers and investors alike.  She is currently litigating *In re American International Group, Inc. Securities Litigation*, a major securities class action brought by Lead Plaintiff Ohio (comprised of several of Ohio's retirement systems).  Ms. Alex was Lead Trial Counsel and Chair of the Executive Committee in *Zenith Laboratories Securities Litigation*, a federal securities fraud class action which settled during trial, and achieved a significant recovery for investors.  She also was Chair of the Plaintiffs' Steering Committee in *Napp Technologies Litigation*, where Labaton Sucharow won substantial recoveries for families and firefighters injured in a chemical plant explosion.

Ms. Alex served as Co-Lead Counsel or in a leadership role in several securities class actions that achieved substantial awards for investors, including *Cadence Design Securities Litigation*, *Halsey Drug Securities Litigation*, *Slavin v. Morgan Stanley, Lubliner v. Maxtor Corp.* and *Baden v. Northwestern Steel and Wire*.  She also served on the Executive Committee or in other leadership roles in national product liability actions against the manufacturers of breast implants, orthopedic bone screws, and atrial pacemakers, and was a member of the Plaintiffs' Legal Committee in the national litigation against the tobacco companies.

Ms. Alex successfully tried more than 20 criminal jury trials as a former Assistant District Attorney in Sacramento, California.  She is a frequent speaker at national conferences on product liability and securities fraud litigation, and is a recipient of the American College of Trial Lawyers' Award for Excellence in Advocacy.

Ms. Alex earned a J.D. from McGeorge Law School and a Masters Degree in Psychology from California State College.  She is admitted to practice in New York and California and in Federal Courts in several jurisdictions.

## JONATHAN GARDNER, OF COUNSEL                            jgardner@labaton.com

Jonathan Gardner focuses his practice on securities class action litigation.  Mr. Gardner currently represents the Successor Liquidating Trustee of Lipper Convertibles, a convertible bond hedge fund, in an action against the Fund's former independent auditor and a member of the Fund's general partner as well as numerous former limited partners who received excess distributions.  He has successfully recovered over $2 million for the Successor Liquidating Trustee to date.

Recently Mr. Gardner has worked on a number of significant cases including *In re Mercury Interactive Corp. Securities Litigation*, *In re Just for Feet Securities Litigation*, *In re St. Paul Travelers Securities Litigation*, and *In re Escala Group, Inc. Securities Litigation*.

Mr. Gardner recently litigated claims of securities fraud, common law fraud, breach of contract, defamation, and civil RICO violations against CFI Mortgage Inc. and its principals in federal court.  Following a five-day jury trial, Mr. Gardner secured a verdict of over $50 million. In April 2005, he participated in the successful trial of a books and records action captioned *Forsythe, et. al. v. CIBC Private Equity Fund*.

For the past 15 years, Mr. Gardner was actively involved in litigating all aspects of commercial and business disputes from pre-dispute investigation and settlement to trials and appeals before state and federal courts, as well as arbitration and mediation forums.

Mr. Gardner earned a B.S.B.A. from American University in 1987 and a J.D. from St. John's University Law School in 1990.  He is a member of the New York State Bar Association and the Association of the Bar of the City of New York.

Mr. Gardner is admitted to practice in New York and before the United States District Courts for the Southern and Eastern Districts of New York.

### DAVID J. GOLDSMITH, OF COUNSEL                    dgoldsmith@labaton.com

David J. Goldsmith represents institutional and individual investors in securities fraud and corporate governance litigation, and has achieved substantial recoveries for the Firm's clients and certified investor classes.

Mr. Goldsmith has played a key role in many high-profile securities litigations, including a series of cases alleging that mutual funds sold by Van Kampen, Morgan Stanley and Eaton Vance defrauded investors by overpricing senior loan interests.  Mr. Goldsmith was instrumental in obtaining a decision in one of these actions, excluding before trial certain opinions of a nationally recognized economist who regularly serves as a defense expert in such cases.

Mr. Goldsmith currently represents plaintiffs in numerous securities litigations, including an action brought on behalf of the Genesee County (Mich.) Employees' Retirement System as Lead Plaintiff against Transaction Systems Architects, Inc., premised on a restatement of previously reported financial results.  Recently, Mr. Goldsmith assisted in achieving a substantial settlement in a securities class action against former officers and directors of Metromedia Fiber Network, Inc.

Mr. Goldsmith also assisted in the representation of a number of state pension funds as Lead Plaintiff in the *Waste Management* securities litigation.  In 2002, the Court approved a settlement of $457 million, the third-largest common fund settlement ever achieved up to that

time.  Mr. Goldsmith was a member of the Firm's Lead Counsel team representing several New York City pension funds in a class action against Orbital Sciences Corporation, which resulted in a $22.5 million settlement on the eve of trial.  In 2001, Mr. Goldsmith obtained one of the earliest decisions finding that a class action had been improperly removed under the Securities Litigation Uniform Standards Act of 1998.

Mr. Goldsmith frequently lectures on class actions and securities litigation for continuing legal education programs and investment symposia.  He is a member of the American Bar Association, the New York State Bar Association, the Association of the Bar of the City of New York, and New York County Lawyers' Association.

Mr. Goldsmith earned B.A. and M.A. degrees from the University of Pennsylvania.  He received a J.D. from the Benjamin N. Cardozo School of Law, where he was managing editor of the *Cardozo Arts & Entertainment Law Journal*.  During law school, Mr. Goldsmith served as a judicial intern to the Honorable Michael B. Mukasey, United States District Judge for the Southern District of New York.

He is admitted to practice in New York and New Jersey and before the following federal courts: the United States Courts of Appeals for the First, Second, Fifth and Eighth Circuits; the United States District Court for the District of New Jersey; and the United States District Courts for the Southern and Eastern Districts of New York.

### ANTHONY J. HARWOOD, OF COUNSEL                    aharwood@labaton.com

Tony Harwood is an accomplished trial lawyer focusing on class action litigation on behalf of investors and consumers who have been injured by violations of federal securities and antitrust laws.  He also has significant experience in white-collar criminal defense and disputes involving intellectual property.

Mr. Harwood's white-collar criminal defense practice has involved several high profile investigations, including Enron's accounting fraud, market timing in the mutual fund industry and public corruption. He has represented clients in federal and state criminal matters and in securities fraud matters before the Securities and Exchange Commission.

Mr. Harwood is a frequent author and presenter on such topics as securities and trademark litigation, alternative dispute resolution and international litigation.

Mr. Harwood is a member of the New York State Bar Association, where he serves on the Executive Committee of the Litigation Section as co-chair of the Committee on Ethics and Professionalism, and is a member of the Securities Litigation Committee. He is also a member of the American Bar Association, where he has served as the vice-chair of the Membership Committee for the Section of International Law and Practice, the chair of the International Law Committee of the Young Lawyers Division and on the Executive Committee of the Young Lawyers Division.

Mr. Harwood earned a B.A. from Cornell University in 1983 and a J.D. from Fordham University in 1987, where he was a member of the *Law Review*. From 1987 to 1988, he served as a law clerk to the Honorable William C. Conner, U.S. District Judge, Southern District of New York.

Mr. Harwood is admitted to practice in New York, the U.S. Courts of Appeals for the Second, Fifth and Federal Circuits, and the U.S. District Courts for the Southern and Eastern Districts of New York.

### RICHARD T. JOFFE, OF COUNSEL                    rjoffe@labaton.com

Richard Joffe's practice focuses on class action litigation, including securities fraud, antitrust and consumer fraud cases. Since joining the Firm, Mr. Joffe has represented such

varied clients as institutional purchasers of corporate bonds, Wisconsin dairy farmers, and consumers who alleged they were defrauded when they purchased annuities.

Prior to joining Labaton Sucharow, Mr. Joffe was an associate at Gibson, Dunn & Crutcher LLP, where he played a key role in obtaining a dismissal of claims against Merrill Lynch & Co. and a dozen other of America's largest investment banks and brokerage firms, who, in *Friedman v. Salomon/Smith Barney, Inc.*, were alleged to have conspired to fix the prices of initial public offerings.

Mr. Joffe also worked as an associate at Fried, Frank, Harris, Shriver & Jacobson where he defended Goldman Sachs & Co. against allegations of securities fraud and professional negligence. In addition, he obtained a successful settlement for several older women who alleged they were victims of age and sex discrimination when they were selected for termination by New York City's Health and Hospitals Corporation during a citywide reduction in force.

He co-authored "Protection Against Contribution and Indemnification Claims in Settlement Agreements in Commercial Disputes" (Aspen Law & Business, 2000). He is admitted to practice in New York and is a member of the Association of the Bar of the City of New York and the American Bar Association.

Mr. Joffe received a J.D. from Columbia Law School in 1993. He earned a Ph.D. from Harvard University in 1984. He earned a B.A., *summa cum laude*, from Columbia University in 1972.

Long before becoming a lawyer, Mr. Joffe was a founding member of the internationally famous rock and roll group, Sha Na Na.

## ZACHARY M. RATZMAN, OF COUNSEL                    zratzman@labaton.com

Zachary M. Ratzman concentrates his practice in the area of securities fraud litigation. Since early 2005, he has litigated the case *In re American International Group, Inc. Securities Litigation*, on behalf of three Ohio pension funds and a class of defrauded investors, and has played key roles in other noteworthy actions, including *In re Bristol-Myers Squibb Securities Litigation*.

Prior to joining Labaton Sucharow, Mr. Ratzman practiced white-collar criminal defense and complex commercial litigation as an associate in the New York offices of Skadden Arps Slate Meagher & Flom LLP and Patterson Belknap Webb & Tyler LLP.  Prior to that, he served as a law clerk to the Honorable Harold Baer, Jr., U.S. District Judge in the U.S. District Court for the Southern District of New York.

Mr. Ratzman maintains a strong commitment to *pro bono* work.  He served as a non-partisan election monitor in Cleveland, Ohio during the 2004 presidential election, and has represented indigent criminal defendants throughout the appellate process in the New York state courts.

Mr. Ratzman received a B.A. from Ohio University, where he graduated *summa cum laude* and with Phi Beta Kappa honors.  He earned a J.D. from the University of Michigan Law School, where he graduated *magna cum laude* and as a member of the Order of the Coif.  While in law school, he was co-chair of the local chapter of the National Lawyers Guild and served as a teaching assistant in the University's Department of Communications Studies.

Mr. Ratzman is admitted to practice in New York and before the United States District Courts for the Southern and Eastern Districts of New York.

## NICOLE M. ZEISS, OF COUNSEL                                    nzeiss@labaton.com

Nicole M. Zeiss works principally in the area of securities class action litigation.  Before joining Labaton Sucharow, Ms. Zeiss worked for MFY Legal Services, practicing in the area of poverty law and at Gaynor & Bass doing general complex civil litigation, particularly representing the rights of freelance writers seeking copyright enforcement.

Ms. Zeiss was part of the team that successfully litigated *In re Bristol-Myers Squibb Securities Litigation*.  Labaton Sucharow was able to secure a $185 million settlement on behalf of investors, as well as meaningful corporate governance reforms that will affect future consumers and investors alike.  She has also litigated on behalf of investors who have been damaged by fraud in telecommunications and banking industries.

Ms. Zeiss maintains a commitment to *pro bono* legal services by continuing to assist mentally ill clients in a variety of matters—from eviction proceedings to trust administration.

Ms. Zeiss earned a B.A. from Barnard College in 1991 and a J.D. from Benjamin N. Cardozo School of Law in 1995.  She is admitted to practice in New York.

## KELSO ANDERSON, ASSOCIATE                                  kanderson@labaton.com

Kelso L. Anderson concentrates his practice on prosecuting complex securities litigations on behalf of institutional investors.  Since joining the Firm, he has been a member of the Co-Lead Counsel team prosecuting the *In re HealthSouth Securities Litigation* on behalf of the New Mexico State Investment Council, the Educational Retirement Board of New Mexico and the Michigan Pension Funds.

Prior to joining Labaton Sucharow, Mr. Anderson served as an associate at Clifford Chance US LLP, where he focused on securities and banking litigation.  Mr. Anderson began his

career at Chadbourne & Parke LLP, where he worked as an associate in general commercial litigation trained in all phases of litigation before federal and state courts.

Mr. Anderson earned a B.A. from Rutgers College in 1998, where he graduated with honors and with Phi Beta Kappa honors.  He earned a J.D. from Rutgers University School of Law in 2002.  During law school, he was the Articles Editor of the *Rutgers Law Review* and also served as a teaching associate for Legal Research & Writing.  After law school, Mr. Anderson clerked for the Honorable Peter G. Verniero, New Jersey Supreme Court, and the Honorable Eric L. Clay, U.S. Court of Appeals, Sixth Circuit.

Mr. Anderson is admitted to practice in New York and New Jersey, as well as before the United States District Courts for the Southern and Eastern Districts of New York and the United States Court of Appeals for the Sixth Circuit.

Mr. Anderson is proficient in Japanese.

## JAVIER BLEICHMAR, ASSOCIATE                    jbleichmar@labaton.com

Javier Bleichmar concentrates his practice in the area of securities class action litigation. Since joining Labaton Sucharow, he has been a member of the team prosecuting the *In re St. Paul Travelers Securities Litigation II* on behalf of the Lead Plaintiff, the Educational Retirement Board of New Mexico.

Mr. Bleichmar earned a B.A. from the University of Pennsylvania in 1992 and a J.D. from Columbia University Law School in 1998.  During law school, he was the managing editor of the *Journal of Law and Social Problems*.  Additionally, he was awarded the Harlan Fiske Stone Scholar.  After law school, Mr. Bleichmar authored the article, "Deportation As Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law," 14 *Georgetown Immigration Law Journal* 115 (1999).

Mr. Bleichmar is admitted to practice in New York and the United States District Courts for the Southern and Eastern Districts of New York.

Mr. Bleichmar is a native Spanish speaker, and he is fluent in French.

### AYA BOUCHEDID, ASSOCIATE                   abouchedid@labaton.com

Aya Bouchedid concentrates her practice on prosecuting complex securities litigations on behalf of institutional investors.  Since joining the Firm, she has been a member of the team serving as Lead Counsel in *In re Amgen Inc. Securities Litigation.*

Prior to joining Labaton Sucharow, Ms. Bouchedid served as an associate at Wolf Haldenstein Adler Freeman & Herz LLP, where she was involved in all aspects of complex securities litigation and antitrust litigation, including depositions, as well as participation in mediations and settlement negotiations.  Ms. Bouchedid began her career at Shearman & Sterling LLP as an associate in the litigation and international arbitration team.

Ms. Bouchedid earned a B.A. in 1998 from the Université de Montréal and a LL.B. & B.C.L., *magna cum laude* (J.D. Equ.) from McGill University Faculty of Law in Montreal. During law school, she was an assistant editor for *Global Governance, Economy & Law: Waiting for Justice* (Taylor and Francis, Inc. 2003).  Ms. Bouchedid received the W.R. Jackett Prize in Taxation and was co-chair of the Orientation Committee.

Ms. Bouchedid is admitted to practice in New York.

She is fluent in French and conversational Arabic.

### PETER W. BRUEGGEN, ASSOCIATE               pbrueggen@labaton.com

Peter W. Brueggen concentrates his practice on complex litigation, with a particular emphasis on class actions involving antitrust violations and securities fraud.  He is a member of

the team working on the class action against AIG, a case brought following the company's disclosure of fraud that resulted in a series of stock drops that wiped out more than $40 billion.

Other high profile matters in which he has been involved include *In re El Paso Corporation Securities Litigation*, which recently settled for $285 million and *In re Bristol-Myers Squibb Securities Litigation*, which resulted in a $185 million settlement as well as sweeping changes to the company's drug development process.

Earlier in his career, Mr. Brueggen played a key role in litigation against the tobacco industry, representing smokers who were deceived by the tobacco industry with regard to the addictive properties of cigarettes. He also represented numerous residents and firefighters who were injured as a result of a chemical plant explosion in New Jersey, which sent harmful toxins into the air of a surrounding community.

Prior to entering law school, Mr. Brueggen worked in research and production positions with ABC News.

Mr. Brueggen earned a B.A. from New York University in 1987 and a J.D. from Albany Law School in 1996. He is admitted to practice law in New York and New Jersey. He is a member of the American Bar Association, the New York State Bar Association and the New York County Lawyers' Association.

Mr. Brueggen is proficient in German.

### DONALD P. DELANEY, ASSOCIATE                    ddelaney@labaton.com

Don Delaney concentrates his practice on prosecuting complex securities litigations on behalf of institutional investors. Since joining the Firm, he has been a member of the team serving as Lead Counsel in the *In re American International Group, Inc. Securities Litigation*.

Mr. Delaney is an experienced trial lawyer having successfully first-chaired several jury trials, both civil and criminal, in federal and state court.  Prior to joining Labaton Sucharow, Mr. Delaney was an Assistant Attorney General for the State of New York, serving under Eliot Spitzer.  In that capacity, he obtained substantial civil litigation experience in the Southern and Eastern Districts of New York.  Mr. Delaney also has significant litigation experience through his work as a public defender at Legal Aid.  He began his legal career as an associate with a major international law firm in New York.

Mr. Delaney earned a B.S. from New York University's Leonard N. Stern School of Business and a J.D. from the University of Michigan Law School, where he was an editor of the *Michigan Journal of Race and Law*.  Prior to attending law school, Mr. Delaney was a Research Analyst in the Mergers and Acquisitions department of a preeminent U.S. investment bank.

Mr. Delaney is admitted to practice in the State of New York, as well as the United States District Court for the Southern and Eastern Districts of New York, and the United States Court of Appeals for the Second Circuit.

### ALAN I. ELLMAN, ASSOCIATE                                     aellman@labaton.com

Alan I. Ellman is a litigation associate in the Firm's New York office.  Mr. Ellman concentrates his practice in securities fraud class actions, working primarily in the Firm's Case Development Group.  This select team analyzes potential liability of issuer companies, their officers and directors, and third-party defendants on behalf of individual and institutional investors, as well as beneficiaries of retirement plans.

Prior to joining Labaton Sucharow, Mr. Ellman practiced securities litigation and regulatory enforcement defense as an associate in the New York office of Chadbourne & Parke LLP.

In September 2006, Mr. Ellman received a Volunteer and Leadership Award from the Housing Conservation Coordinators (HCC) for his *pro bono* service.  While at Chadbourne & Parke, he partnered with the HCC to defend a client in Housing Court against a non-payment action, argue an appeal before the Appellate Term concerning an illegal apartment, and staff HCC's housing clinic.

Mr. Ellman received B.S. and B.A. degrees, *cum laude*, from Binghamton University in 1999, and a J.D. degree from Georgetown University Law Center in 2003.  Mr. Ellman is admitted to practice in the State of New York and the United States District Courts for the Southern and Eastern Districts of New York.

## JOSEPH A. FONTI, ASSOCIATE                                           *jfonti@labaton.com*

Joseph A. Fonti focuses his practice on securities class action litigation.  Since joining Labaton Sucharow, he has been a member of the team prosecuting the *In re HealthSouth Securities Litigation* on behalf of the Co-Lead Plaintiff, the New Mexico State Investment Council and the Educational Retirement Board of New Mexico.

Mr. Fonti has successfully litigated complex civil and regulatory securities matters, including obtaining a favorable judgment after trial.  Prior to joining Labaton Sucharow, Mr. Fonti was an attorney at Bernstein Litowitz Berger & Grossmann LLP, where he prosecuted securities class actions on behalf of institutional investors, including class actions involving WorldCom, Bristol-Myers, Omnicom, Biovail, and the mutual fund industry scandal.  Mr. Fonti's work on these cases contributed to historic recoveries for shareholders, including the $6.15 billion recovery in the WorldCom litigation and the $300 million recovery in the Bristol-Myers litigation, alleging accounting fraud and improper inventory practices.

Mr. Fonti began his legal career at Sullivan & Cromwell, where he represented several Fortune 500 corporations, focusing on securities matters and domestic and international commercial law.  Mr. Fonti also represented clients in complex investigations conducted by federal regulators, including the U.S. Securities and Exchange Commission.

Over the past several years, he has represented victims of domestic violence in affiliation with inMotion, an organization that provides *pro bono* legal services to indigent women.

Mr. Fonti earned a B.A., *cum laude*, from New York University in 1996 and a J.D. from New York University School of Law in 1999, where he was active in the Marden Moot Court Competition and served as a Student Senator-at-Large of the NYU Senate.  As a law student, he served as a law clerk to the Honorable David Trager, United States District Court Judge for the Eastern District of New York.

Mr. Fonti is admitted to practice in New York, as well as the United States District Courts for the Southern and Eastern Districts of New York, the United States Court of Appeals for the Ninth Circuit and the United States Supreme Court.

## ANN E. GITTLEMAN, ASSOCIATE                          agittleman@labaton.com

Ann E. Gittleman concentrates her practice on prosecuting complex securities litigations on behalf of institutional investors.

Prior to joining Labaton Sucharow, Ms. Gittleman, a Certified Public Accountant, practiced securities class action litigation as an associate at another New York-based securities class action firm.  Ms. Gittleman began her career at Schiavetti, Corgan, Soscia, Diedwards & Nicholson LLP, where she worked as a litigation associate in professional liability matters before federal and state courts.

Ms. Gittleman earned a B.S. and a B.A., both *magna cum laude*, from Bryant University in 1999, and received her J.D. from Brooklyn Law School in 2004, where she was a member of both the Moot Court Honor Society and the Securities Law Association. She was also the recipient of the Alexander and Emily Mehr Memorial Prize for Excellence in Oral Advocacy. During law school, Ms. Gittleman worked as a Legal Assistant with the Office of the General Counsel at Pricewaterhouse-Coopers LLP where she interacted with governmental organizations, such as the SEC, IRS and Attorney General Office, in coordinating and facilitating investigations of the firm.

Ms. Gittleman is admitted to practice in New York and The Commonwealth of Massachusetts, and before the following federal courts: the United States District Court for the Southern and Eastern Districts of New York, the United States District Court for the District of Massachusetts, and the United States District Court for the District of Connecticut.

### JULIE HWANG, ASSOCIATE                                    jhwang@labaton.com

Julie Hwang focuses her practice primarily on securities fraud litigation. Since joining the Firm, she has been a member of the team serving as Lead Counsel in the *In re General Motors Corp. Securities Litigation*.

Ms. Hwang earned a B.A. from the University of California, Los Angeles in 2003 and a J.D. from Brooklyn Law School in 2007.

During law school, she served as a summer associate at Labaton Sucharow, where she researched and drafted memoranda in the areas of securities law, antitrust, civil procedure and professional responsibility. Ms. Hwang also served as a student law clerk for the Honorable Joseph M. McLaughlin, U.S. Court of Appeals, Second Circuit, and was a legal intern for the King's County District Attorney.

Ms. Hwang is proficient in Korean.

### RENU KRIPALANI, ASSOCIATE                    rkripalani@labaton.com

Renu Kripalani focuses her practice primarily on securities fraud litigation.  Currently, Ms. Kripalani is part of the Co-Lead Counsel team prosecuting the *In re HealthSouth Securities Litigation* on behalf of the New Mexico State Investment Council, the Educational Retirement Board of New Mexico and the Michigan Pension Funds.

Prior to joining Labaton Sucharow, Ms. Kripalani, a Certified Public Accountant, was a Sarbanes-Oxley Compliance Manager for the Corporate Governance Team at AT&T.  Ms. Kripalani also worked at Avon Products, Inc. as a Senior Auditor, where she led financial and operational audits in manufacturing and distribution locations throughout Asia, Europe, Latin and Central America.  Ms. Kripalani's previous business experience adds further depth to the Labaton Sucharow team in assessing, asserting and litigating securities claims.

Ms. Kripalani earned a B.A. from Monmouth University in 1992 and was a member of Phi Eta Sigma honor society.  She earned a J.D. from New York Law School in 1998 and interned for the New York City Civil and Human Rights Clinic, where she represented plaintiffs in housing discrimination and political asylum actions.  She also provided forensic accounting and litigation support at the corporate and securities law firm Folkenflik & McGerity while in law school.

Ms. Kripalani is admitted to practice in New York and is a member of the American Institute of Certified Public Accountants.

### CRAIG A. MARTIN, ASSOCIATE                    cmartin@labaton.com

Craig A. Martin focuses his practice in the area of securities and investor protection litigation.  Mr. Martin is a member of the Labaton Sucharow team representing the Successor

Liquidating Trustee of Lipper Convertibles, L.P. and Lipper Fixed Income Fund, L.P., failed convertible hedge funds, in actions against the Fund's former independent auditors and members of the Fund's management team. He is also a member of the Labaton Sucharow team actively litigating *In re American International Group, Inc. Securities Litigation*.

Prior to practicing law, Mr. Martin, a Certified Public Accountant, worked in finance, accounting and auditing positions. At Marsh & McLennan Companies, he developed and implemented working capital metrics, and valued and analyzed potential M&A transactions. In addition, he worked for a Fortune 500 pharmaceutical company, where he was responsible for analyzing the monthly performance of the pharmaceutical operations. Mr. Martin began his professional career at Deloitte & Touche, where, for almost five years, he specialized in auditing financial services companies. Mr. Martin's previous business experience adds further depth to the Labaton Sucharow team in assessing, asserting and litigating securities claims.

Mr. Martin earned a B.S. in Accounting from Ithaca College in 1990. He earned a J.D. in 2004 from Seton Hall University's School of Law. While in law school, Mr. Martin was a participant in the Eugene Gressman Moot Court Competition, was appointed a member of the Appellate Advocacy Moot Court Board, and was awarded Best Brief and Best Oralist in his Appellate Advocacy class. In 2004, Mr. Martin earned an M.B.A. from New York University's Leonard N. Stern School of Business.

Mr. Martin is admitted to practice in New York, New Jersey and the U.S. District Court of New Jersey. He is a member of the American Institute of Certified Public Accountants, New Jersey Society of Certified Public Accountants and the American Bar Association.

## BARRY M. OKUN, ASSOCIATE                    *bokun@labaton.com*

Barry Michael Okun is a seasoned trial and appellate lawyer with more than 20 years' experience in a broad range of commercial litigation.  Mr. Okun has litigated several leading commercial law cases, including the first case in which the United States Supreme Court ruled on issues relating to products liability.

Mr. Okun has argued appeals before the United States Court of Appeals for the Second Circuit and the Appellate Divisions of three out of the four judicial departments in New York State.  He has appeared in numerous trial courts throughout the country.

Mr. Okun received a B.A. from the State University of New York at Binghamton and is a *cum laude* graduate of the Boston University School of Law, where he was Articles Editor of the *Law Review*.

He is admitted to practice in New York and before the United States Supreme Court, the United States Court of Appeals for the First, Second, Seventh and Eleventh Circuits, and the United States District Courts for the Southern and Eastern Districts of New York.

## ANDREI V. RADO, ASSOCIATE                    *arado@labaton.com*

Andrei V. Rado joined Labaton Sucharow's New York office as an associate in the summer of 2006.  His practice focuses primarily on securities class action litigation.

Mr. Rado previously served as an in-house attorney at a large New York-based investment bank, where he focused on issues relating to the resale of restricted and control securities.  Mr. Rado also practiced securities and consumer class action litigation as an associate at another New York-based securities class action firm.

He earned a B.A., *summa cum laude*, from the State University of New York at Buffalo in 1996 and a J.D. from St. John's University School of Law in 1999, graduating *cum laude*.

During law school, he served as a senior member of the *New York International Law Review* and published a case comment regarding international arbitration (12 N.Y. Int'l. L. Rev. 97).

Mr. Rado is admitted to practice in New York and the United States District Courts for the Southern and Eastern Districts of New York. He is a member of the American Bar Association and the New York State Bar Association.

## SERENA RICHARDSON, ASSOCIATE                    srichardson@labaton.com

Serena Richardson focuses her practice on securities class action litigation.

Prior to joining Labaton Sucharow, Ms. Richardson was an attorney at Ohrenstein & Brown LLP, where she participated in various federal and state commercial litigation matters. During her time there, she also defended financial companies in regulatory proceedings and assisted in high-profile coverage litigation matters in connection with mutual funds trading investigations.

Ms. Richardson received a B.A. from Occidental College in 1999 and a J.D. from Boston University School of Law in 2003, where she served as the Note Editor for the *Journal of Science & Technology Law*.

She is admitted to practice in New York and the United States District Courts for the Southern and Eastern Districts of New York.

Ms. Richardson is conversational in Urdu/Hindi.

## MICHAEL H. ROGERS, ASSOCIATE                    mrogers@labaton.com

Michael H. Rogers focuses his practice on securities class action litigation. Currently, Mr. Rogers is actively involved in *In re HealthSouth Securities Litigation* and *In re Mercury Interactive Securities Litigation*.

Prior to joining Labaton Sucharow, Mr. Rogers was an attorney at Kasowitz, Benson, Torres & Friedman LLP, where he practiced securities and antitrust litigation.  During his time there, he represented international banking institutions in federal securities and other claims against major banks, auditing firms, ratings agencies and individuals in complex multidistrict litigation.  He also represented a major international chemical shipping firm in complex arbitration of antitrust and other claims against conspirator ship owners.  Mr. Rogers began his career as an attorney at Sullivan & Cromwell, where he was part of Microsoft's defense team against the "non-settling states" in the remedies phase of the Department of Justice antitrust action against the company.

Mr. Rogers received his B.A., *magna cum laude*, from Columbia University in 1995, and his J.D., *magna cum laude*, from the Benjamin N. Cardozo School of Law in 2001, where he was a member of the *Cardozo Law Review*.

He is admitted to practice in New York and the United States District Courts for the Southern and Eastern Districts of New York.

Mr. Rogers is proficient in Spanish

### KRISTA ROSEN, ASSOCIATE                              kthomas@labaton.com

Krista Rosen concentrates her practice in the area of securities class action litigation.

She is a member of the team litigating the federal securities fraud class action against AIG, representing as Lead Plaintiff several Ohio pension funds.

Ms. Rosen earned a B.A. from Bowdoin College in 2002 and a J.D. from the Benjamin N. Cardozo School of Law in 2006.  During law school, she was selected to participate in the Securities Arbitration Clinic, where she represented investors in arbitration actions against securities brokers.  Additionally, Ms. Rosen served as the Articles Editor of the *Cardozo Law*

*Review*.  In March 2006, she was awarded third place in the 2005-2006 national writing competition sponsored by the Association of Securities and Exchange Commission Alumni (ASECA) for her Note entitled "Staying in Court While Staying Discovery: Finding Exceptions for Government-Produced Documents Under the PSLRA."

Ms. Rosen is admitted to practice in Massachusetts.  She currently has an application for bar admission pending in New York.

## MICHAEL W. STOCKER, ASSOCIATE                    *mstocker@labaton.com*

Michael W. Stocker represents clients in commercial litigation, with a primary focus on sophisticated class action matters.

Prior to joining Labaton Sucharow, Mr. Stocker worked as a senior associate at Berman DeValerio Pease Tabacco Burt & Pucillo on securities and antitrust class action cases.

Earlier in his career, Mr. Stocker worked as a senior staff attorney with the United States Court of Appeals for the Ninth Circuit, and completed a legal externship with United States Magistrate Judge (now District Judge) Phyllis J. Hamilton of the Northern District of California.

Mr. Stocker is the co-author of an article entitled, "Tellabs: PSLRA Pleading Test Comparative, Not Absolute," *New York Law Journal*, October 3, 2007.

Mr. Stocker has served on the boards of the University of California San Francisco's AIDS Health Project and AIDS Benefits Counselors, and has worked for the Immigrant HIV Assistance Project and the Volunteer Legal Services Program in San Francisco as well as Legal Assistance for Seniors in Oakland, California.

Mr. Stocker earned a B.A. from the University of California, Berkeley, in 1989, a J.D. from the University of California, Hastings College of Law, in 1995, and a Master of Criminology degree from the Law Department of the University of Sydney in 2000.  He is

admitted to practice in California and New York as well as before the United States District Courts for the Northern and Central Districts of California, the Southern and Eastern Districts of New York, and the United States Court of Appeals for the Ninth Circuit.

### JESSE STRAUSS, ASSOCIATE                                    jstrauss@labaton.com

Jesse Strauss concentrates his practice on prosecuting complex securities litigations on behalf of institutional investors.

Prior to joining Labaton Sucharow, Mr. Strauss served as a law clerk for the Honorable Dora L. Irizarry, U.S. District Court for the Eastern District of New York.  He began his career at Blank Rome LLP, where he worked as a litigation associate.  During his time there, he assisted in the trial of three matters, with one resulting in a multi-million dollar verdict in New York State Supreme Court in a fraud case.

Mr. Strauss maintains a strong commitment to *pro bono* work.  Most recently, he traveled to Ghana for 10 weeks to assist an organization that mediates land disputes and works toward land reform.

Mr. Strauss earned a B.A. from The George Washington University in 1999, and received a J.D., *cum laude*, from Brooklyn Law School in 2003.  During law school, he was the co-chair of the Brooklyn Law Students for the Public Interest as well as a Note & Comments Editor for the *Journal of Law and Policy*.  In addition to being a Richardson Merit Scholar, he was also the recipient of the Edward V. Sparer Public Interest Fellowship where he was a student law clerk for the NAACP Legal Defense and Education Fund in Los Angeles, CA.

Mr. Strauss is admitted to practice in New York and the United States District Courts for the Southern and Eastern Districts of New York

### STEFANIE J. SUNDEL, ASSOCIATE                    *ssundel@labaton.com*

Stefanie J. Sundel focuses her practice primarily on securities fraud litigation.  Ms. Sundel is part of the Lead Counsel team representing the State of Connecticut's Retirement Plans and Trust Funds, which is seeking to recover billions of dollars in investment losses on behalf of its beneficiaries and a class of investors who purchased securities of JDS Uniphase.

Prior to joining Labaton Sucharow, Ms. Sundel was an associate at the law firm of Abbey Gardy LLP, where she concentrated on securities fraud litigation.  During her time at Abbey Gardy, she was a member of the team litigating *In re Adelphia Communications Corp. Securities & Derivative Litigation.*

Ms. Sundel obtained a B.A. from Franklin College Switzerland in 2001, where she graduated magna cum laude.  She received a J.D. from New York Law School with honors in 2004.

Ms. Sundel is admitted to practice in New York and before the United States District Court for the Southern District of New York.  She is a member of the American Bar Association, the New York State Bar Association, the Association of the Bar of the City of New York and the New York County Lawyers' Association.

She is fluent in Italian.

### STEPHEN W. TOUNTAS, ASSOCIATE                    *stountas@labaton.com*

Stephen W. Tountas concentrates his practice in the area of securities class action litigation.  Since joining Labaton Sucharow, Mr. Tountas has been responsible for prosecuting several of the Firm's options backdating cases, including *In re HCC Insurance Holdings, Inc. Securities Litigation* and *In re American Tower Corp. Securities Litigation.*  Among other

matters, Mr. Tountas is also a member of the team responsible for prosecuting *In re Celestica Inc. Securities Litigation*.

Prior to joining Labaton Sucharow, Mr. Tountas practiced securities litigation at Bernstein Litowitz Berger & Grossmann LLP, where he prosecuted securities class actions on behalf of institutional investors. During his time there, he prosecuted the *In re OM Group, Inc. Securities Litigation*, which resulted in a settlement of $92.4 million, as well as cases involving Biovail Corp., MasTec, Inc., Collins & Aikman Corp. and Scottish Re Group.

Mr. Tountas earned a B.A. from Union College in 2000 and a J.D. from Washington University School of Law in 2003. As a law student, he served as Editor-in-Chief of the *Journal of Law & Policy* and was a finalist in the Environmental Law Moot Court Competition. Additionally, Mr. Tountas worked as Research Assistant to Joel Seligman, one of the country's foremost experts on securities law. In May 2003, he received the Scribe's Award in recognition of his Note entitled, "Carnivore: Is the Regulation of Wireless Technology a Legally Viable Option to Curtail the Growth of Cybercrime?," 11 Wash. U. J.L. & Pol'y 351.

Mr. Tountas is admitted to practice in New York and New Jersey and before the United States District Court for the Southern District of New York, the United States District Court for the District of New Jersey, and the United States Court of Appeals for the Ninth Circuit.

## ETHAN D. WOHL, ASSOCIATE                                         ewohl@labaton.com

Ethan D. Wohl focuses his practice on securities class action litigation. Representative securities fraud actions in which Mr. Wohl has played an active role include *In re Star Gas Securities Litigation*, *In re Take-Two Interactive Securities Litigation* and *In re IBM Securities Litigation*. Mr. Wohl has also represented major U.S. and European institutional investors in

evaluating and prosecuting individual securities fraud cases, with a particular emphasis on claims involving misconduct outside of the United States.

Prior to joining Labaton Sucharow, Mr. Wohl served as the general counsel of the New York City Housing Partnership and served in management positions at New York City's housing and public assistance agencies.  He also established a community-based job-training program for ex-offenders in Brooklyn, New York.

Mr. Wohl received a B.A., with honors, from the University of Chicago in 1989 and received a J.D. from the New York University School of Law in 1993, where he graduated *magna cum laude* and was a member of the Order of the Coif.  Following law school, he served as law clerk to the Honorable Denis R. Hurley, United States District Judge, Eastern District of New York.

Mr. Wohl is admitted to practice in New York, New Jersey and Florida, in the United States Court of Appeals for the Second Circuit, and in the United States District Courts for the Southern and Eastern Districts of New York, the District of New Jersey and the Southern District of Florida.

**Exhibit E**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STEVEN SCHMALZ, on behalf of himself
and all others similarly situated,

      Plaintiff,

    v.

MBIA, INC., GARY C. DUNTON and C.
EDWARD CHAPLIN,

      Defendants.

Civil Action No.

JURY TRIAL DEMANDED

**CLASS ACTION COMPLAINT**

   Plaintiff Steven Schmalz ("Plaintiff"), by his undersigned counsel, brings this

action on behalf of himself and all other similarly situated persons (the "Class"), other

than Defendants and their affiliates (as described herein), who purchased or otherwise

acquired securities of MBIA, Inc. ("MBIA" or the "Company"), between January 30,

2007, through and including January 9, 2008 (the "Class Period"), for violations of the

federal securities laws.  Plaintiff seeks to recover damages caused to the Class by

Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of

1934 (the "Exchange Act").  The allegations of this Complaint are based on Plaintiff's

personal knowledge as to himself and on information and belief (including the

investigation of counsel and review of publicly available information) as to all other

matters.

**SUMMARY OF THE ACTION**

   1.   After the close of trading on December 19, 2007, MBIA – one of the

country's largest insurers of credit risk and a company whose reputation for conservative

risk management and ability to maintain its AAA credit rating is the lynchpin of its survival – dropped a bombshell on investors. That day, the Company disclosed for the first time that it faced an additional $8.1 billion of exposure from insuring some of the riskiest securities in the marketplace – collateralized debt obligations ("CDOs") comprised of other CDOs (so called "CDO-squared securities"), whose underlying collateral included residential mortgage backed securities ("RMBS").

2.      The investing public promptly realized that the true risk of investing in MBIA was far higher than previously understood and securities analysts expressed "shock" and "dismay" that "management withheld this information for as long as it did." Losses arising from RMBS securities have already caused other financial institutions to suffer billions in write-downs and increased loss reserves amidst the mortgage meltdown wreaking havoc throughout the economy and could easily wipe out MBIA's already dwindling capital cushion. Investors recognized that MBIA's AAA-credit rating would disappear if its capital became depleted due to these previously hidden obligations, and its insurance business would evaporate along with the rating.

3.      Despite months of specific investor questions to MBIA's senior executives regarding the Company's exposure to assets of this sort, Defendants continually assured the market that its risk exposure was materially lower and safer than it actually was. When the Company finally was forced to admit the true state of affairs because of heightened credit rating agency scrutiny, the price of MBIA stock immediately declined by 26 percent in one trading day, wiping out hundreds of millions of dollars in investor value.

4.      But the Company's December 20 disclosure was just the beginning.  Just a few weeks after this partial disclosure, on January 8, 2008, MBIA's stock price plummeted again as market analysts downgraded MBIA in light of its far-worse than previously disclosed financial condition.

5.      The next day, MBIA stock declined again when the Company disclosed extensive steps necessary to improve its deteriorating capital position and disclosed write-downs arising from mortgage-backed securities and CDOs.  After discussions with the SEC, the Company also revised the disclosures from its 2006 annual report to include more details about the risks it faces from credit-rating downgrades and the reduction in credit quality of the types of debt it insures.  During this two day flurry of news, MBIA's stock price declined from $18.07 per share at the opening on January 8, to $13.40 at the close on January 9, with an intraday trading low of $11.11 per share, reflecting the market's realization of the truth about MBIA's financial weakness and its prior misleading actions.

## JURISDICTION AND VENUE

6.      The claims asserted herein on behalf of the Class arise under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated by the SEC.

7.      This Court has jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. §§ 1331 and 1337.

8.      Venue is proper in this district pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this district.

3

9.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities market.

## PARTIES

10.     Plaintiff Steven Schmalz purchased shares of MBIA during the Class Period and was injured thereby.

11.     Defendant MBIA, Inc. ("MBIA" or "the Company") is a Connecticut corporation with its principal executive offices located at 113 King Street, Armonk, New York 10504.   MBIA, through its subsidiaries, describes itself as a leading financial guarantor and provider of specialized financial services intended to meet the credit enhancement, financial and investment needs of public and private sector clients, domestically and internationally.   MBIA trades on the New York Stock Exchange under the ticker symbol MBI and has more than 125 million shares outstanding.

12.     Defendant Gary C. Dunton ("Dunton") served at all relevant times as Chief Executive Officer, President and Chairman of the Board of Directors of MBIA.

13.     Defendant C. Edward Chaplin ("Chaplin") served at all relevant times as Chief Financial Officer and Vice-Chairman of the Board of Directors of MBIA.

14.     Dunton and Chaplin are referred to collectively herein as the "Individual Defendants," and, together with MBIA, are referred to as the "Defendants."

## FACTUAL ALLEGATIONS

### A.     BACKGROUND ON MBIA'S BUSINESS

15.     MBIA is the nation's largest monoline guarantor of financial risk, insuring over $650 billion in municipal bonds and other debt instruments.   Nearly all of the

4

Company's revenue and net income are generated by its financial guarantee business through its wholly owned subsidiary MBIA Insurance Corporation (referred to collectively with MBIA, Inc. as "MBIA" or the "Company").

16.    The Company's core business is quite simple: a bond issuer, most often a municipality whose independent debt ratings are below investment grade (and whose stand-alone borrowing costs reflect below investment-grade interest rates), pays a premium to have its bonds insured by a triple-A-rated guarantor like MBIA.

17.    This insurance or guarantee allows the bonds to be sold based on MBIA's triple-A rating rather than the municipality's rating, thus lowering the municipality's interest expense. In industry parlance, MBIA "wraps" the bond issue by agreeing to pay all principal and interest payments in the event the issuer cannot meet its obligations.

18.    MBIA then recognizes the insurance premium as income over the life of the insurance. Owing to the benefit to bond issuers of lowering their interest expense, MBIA has reported steady and predictable earnings. Market analysts have highlighted these attributes when recommending the stock.

19.    The Company has repeatedly observed that maintaining its triple-A credit rating is vital to the continued success of its business, referring to it as MBIA's "Good Housekeeping Seal of Approval." As described by MBIA CEO Gary Dunton, "MBIA's true constant – our North Star, if you will – is our commitment to protecting our triple-A ratings." MBIA touts its long history with a triple-A rating in its SEC Form 10-K's, noting: "MBIA Corp. has triple-A financial strength ratings from Standard and Poor's Corporation ("S&P"), which the Association received in 1974; from Moody's Investors

Service, Inc. ("Moody's"), which the Association received in 1984; from Fitch, Inc. ("Fitch"), which MBIA Corp. received in 1995."

20.     Maintaining the highest credit rating possible is essential to MBIA's guaranty business – the ability of MBIA's clients to reduce their interest rates depends on the market's absolute faith in MBIA's ability to step in and make good on its client's obligations should their client default in any way.  In effect, MBIA's only "product" that it sells is the lower interest expense it can offer by virtue of its credit rating.  Defendants (as well as investors) have long understood that losing its AAA-rating would leave MBIA without any legitimate means of income.

21.     Of all the criteria examined by the rating agencies, capital cushion– the Company's capacity to pay claims if needed – is a primary consideration in securing MBIA's triple-A rating.  In assessing capital adequacy, reports of loss reserves and of exposure to especially risky insured products are particularly important to the rating agencies and the investing community, since MBIA's capital cushion depends on payouts on insurance obligations remaining relatively close to the Company's expectations.  A sharp increase in losses beyond reserves would threaten MBIA's capital cushion and its investment grade rating.

22.     As of the end of 2006, MBIA reported excess capital of $1.5 billion. Thus, if MBIA's insurance losses exceeded its various loss reserves by that amount, its capital would be wiped out and its investment grade rating jeopardized.  Even if over 90% of MBIA's insured portfolio were comprised of the safest municipal bond obligations (and as described below, municipal bonds represented a far lower percentage during the Class Period), if the remaining 10% of the $650 billion insured portfolio were

6

risky or unstable securities, MBIA's excess capital would face a very significant risk of evaporation due to losses.

23.    As a result, it was imperative for MBIA to inform investors of the "tails" of its portfolio as well as the averages, *i.e.*, since the riskiest portions of the portfolio were potentially sufficient to wipe out MBIA's capital, investors focused on understanding these risks.  In other words, MBIA's business necessarily left it virtually no room for error in accounting for risk or losses, and a sudden increase in risk or loss would be likely to cause investors to flee.

24.    Historically, MBIA has maintained low reserves, which it justified by citing its "rigorous underwriting and pricing discipline."  MBIA assured investors that each deal it guarantees undergoes a thorough screening and risk analysis to ensure the highest credit quality standards before the Company agrees to provide its "wrap."

25.    MBIA established two separate loss reserves each quarter.  The first, "case loss" reserves, are tied to specific credit defaults where the default was both reasonably certain and estimable.

26.    The second, "unallocated loss" reserves, were reserves taken based on the assumption that in any given portfolio of loans, a certain percentage of those loans will go into default and result in claims on MBIA for all or part of the defaulted obligations. MBIA used a "formula-based" approach, taking into consideration factors such as "the composition of the Company's insured portfolio by municipal sector, structured asset class, remaining maturity and credit quality, along with the latest industry data, including historical default and recovery experience for the relevant sectors of the fixed-income market in order to determine if a trend is developing that indicates the loss factor should

7

be increased or decreased." The Company states that it also "considers its own historical loss activity and how those losses develop over time."

27.    MBIA's claimed expertise in assessing the risk of municipal and other bond issuers was a key factor in supporting the low reserves that MBIA took when issuing its wrap.   Indeed, for most of its history, MBIA received virtually all of its earnings by insuring municipal bonds.   Although each municipality has its unique characteristics, MBIA's long experience underwriting risk in this field allowed it to report exceptionally small write-offs and reserves for future losses on its guaranty business.   Investors credited MBIA's low loss reserves as a function of its extensive experience and knowledge of the risk in the products it insured.

28.    After determining this "formula-based" expected loss rate, a fixed rate of each quarter's insurance premiums are set aside as unallocated loss reserves.  Throughout the Class Period – indeed, since 2002 – MBIA maintained a constant rate of reserving 12% of new insurance premium income.  This indicated to the public that MBIA believed the credit risk associated with its overall insured portfolio had remained constant *i.e.*, MBIA led investors to believe that nothing had changed in its insured portfolio to warrant applying a different loss reserve formula.

## B.    MBIA MOVES AWAY FROM ITS TRADITIONAL BUSINESS IN SEARCH OF GROWTH

29.    MBIA sought increased profits and growth opportunities by moving away from lower risk/lower return municipal bond insurance business and by aggressively expanding into structured finance, which doubled as a percentage of the Company's overall business in the past 10 years, from 16 to 32 percent.  In fact, whereas MBIA

provided essentially no structured finance-related guarantees in 1990, structured finance guarantees comprised 32% of MBIA's insured portfolio by year end 2006.

30.    Of MBIA's $225 billion structured finance portfolio, $114 billion comprises guarantees of complex financial instruments known as Collateralized Debt Obligations ("CDOs"). A CDO is an investment vehicle in which various forms of debt, such as bonds, mortgages, loans or other assets backed by collateral are packaged (or repackaged) and the cash flows from the bundle of assets are divided among tranches of securities, which are then sold to investors.

31.    These CDOs contain varying levels of credit risk and corresponding rates of return, as represented by the credit ratings assigned to the varying tranches. Investors buying more senior CDO "tranches" receive lower yields but bear lower risk, while more junior "tranches" offer higher yields and greater risk.

32.    As CDOs became increasingly prevalent in the past several years, MBIA began providing credit protection to the more senior layers of many CDOs' capital structure.

33.    In the typical CDO issuance, bond insurers like MBIA would not insure the lower tranches – those bearing ratings of BBB or below – and investors in those lower tranches would take losses before losses would be triggered for the higher tranches.

34.    However, despite the lower tranches suffering losses first, the extent of defaults of the underlying collateral necessary to wipe out the lower tranches and to cause defaults on the higher tranches was often only 10%. Thus, even a relatively nominal increase in defaults of the underlying collateral could trigger the insurance obligations that MBIA provided to support the higher tranches.

9

35.    Throughout the Company's involvement in the structured finance business, MBIA has continued to promise investors the strictest of underwriting standards to ensure its new credit products maintain the integrity and security of its traditional bond guarantees.  Further, even as its exposure to structured finance securities ballooned in recent years, its loss reserves as a percentage of its total par outstanding obligations declined from a range of 6.2 to 5.4 basis points during the period from 2000 through 2004, to as low as 3.5 basis points at year 2006, and only 3.2 basis points in the first quarter of 2007.

## C.    DEFENDANTS MISLEAD INVESTORS REGARDING MBIA'S CDO-SQUARED AND RMBS RELATED EXPOSURE

36.    On January 30, 2007, the first day of the Class Period, MBIA announced its fourth quarter and year-end 2006 results.  The announcement noted an 81 percent increase in total premiums earned on structured finance insurance (as opposed to public finance), and in particular, noted strong production from the CDO sector.  Consistent with the Company's statements that it used the strictest of underwriting standards, the announcement represented to investors:

> Overall credit quality in the insured portfolio remained high, with 81 percent of the total book of business rated A or better, unchanged from the end of 2005.  The percentage of the portfolio rated non-investment grade decreased to 1.9 percent from 2.1 percent in 2005, with about half of the reduction resulting from a decrease in the par amount of non-investment grade rated credits and the other half resulting from the growth of the outstanding book of business.

The Company also told investors it was increasing unallocated loss adjustments reserves and expenses by $80.9 million based on the 12% "formula-based" default risk determination.

10

37.    Although MBIA touted its underwriting skills and maintained the same formula it had applied to its municipal bond insurance, in reality, MBIA had a very limited history and ability to assess the actual risk of default on CDO products whose underlying collateral was comprised of residential mortgage-backed securities, since CDOs of this sort only became prevalent in the few years leading up to the Class Period. Thus, the Company could not realistically predict the way CDOs backed by residential mortgages would behave in the event of downturns in the housing industry.

38.    Despite MBIA's increasing reliance on CDOs, including those backed by residential mortgage-related securities, MBIA maintained its reserves at exceptionally low levels – about 3 basis points as compared with 70-150 basis points for other large financial institutions with significant mortgage or CDO related exposure.

39.    On April 26, 2007, MBIA announced its earnings for the first quarter of 2007.  Once again, MBIA reported a significant increase – 672% – in U.S.-based structured finance insurance over the prior year.  Nonetheless, the loan loss formula remained unchanged at a 12% reserve, and the Company represented that the credit quality of its portfolio actually *improved* over the prior quarter:

> The overall credit quality in the insured portfolio remained high with 82 percent of the total book of business rated A or better compared with 81 percent in the first quarter of 2006 [and the prior quarter].  The percentage of the portfolio rated below-investment grade decreased to 1.9 percent from 2.1 percent in the same period-end last year.

In announcing these results, Defendant Dunton, MBIA's CEO, remarked: "We remain committed to our rigorous risk management practices with the goal of building shareholder value for the long term."

40.    As concerns over exposure to CDOs and RMBS spread throughout the financial community, MBIA held a conference call presentation August 2, 2007 "to answer questions concerning MBIA's subprime RMBS exposure, CDO exposure and related topics." In connection with that presentation, MBIA produced a book of slides called "MBIA's Selective Approach to Subprime RMBS and Multi-Sector CDOs." MBIA used this presentation to tout its limited risk exposure in the potentially volatile mortgage-backed securities market.

41.    In the August 2 presentation, MBIA informed investors that the total amount of the CDOs underwritten by the Company with some exposure to RMBS was $15.9 billion.  As set forth below, this figure was materially understated, false and misleading.

42.    During the conference call, one investor specifically asked about the composition of MBIA's exposure to "CDO-squared" securities, an investment that is particularly risky because it is a CDO whose sole collateral is other CDOs. These are considered among the most risky of investments because the instruments are at least twice removed from the assets and borrowers that support the underlying cash flows, and thus the insurer has little or no ability to assess the adequacy of the underlying collateral and other default risk metrics.  (Notably, when the Fitch rating service calculated MBIA's excess capital as of year end 2006, it recognized $15.3 billion of CDO exposure, but unlike MBIA's competitors, which held "CDO-Squared" securities, Fitch reported that MBIA held no CDO-Squared assets.)  In response to the investor question on August 2, 2007, Defendant Chaplin stated that MBIA had approximately $6.1 billion in net par exposure to CDO-squared securities, and that 60% of the underlying collateral consisted

of CDOs and Collateralized Loan Obligations (CLOs). The Company further stated that 22% of the underlying collateral was comprised of CDOs of Asset-Backed Securities (ABSs).

43.     However, the Company never mentioned that any part of the $6.1 billion in CDO-squareds contained RMBS exposure. Investors were particularly concerned at the time about RMBS exposure because of the ongoing and worsening mortgage market meltdown that was causing billions of dollars in losses for other financial institutions. Indeed, within a short time of this conference call, major financial institutions began disclosing writedowns of their own CDO holdings, including supposedly "Super Senior AAA" securities and securities insured by MBIA. Nevertheless, MBIA did not disclose the full extent of its risk exposure.

44.     On October 25, 2007, the Company reported its third quarter results. According to Dunton: "From an Adjusted Direct Premium production standpoint, the third quarter was outstanding – the Company's second best quarter ever and the best quarter for our structured finance business. Pricing was strong across many sectors, and the credit quality of our new business was very high." In fact, structured finance business was up more than 200% overall, and up 294% for U.S.-based business. Despite this marked increase in riskier structured finance insurance, the Company continued to reserve for unallocated losses at the same 12% rate. MBIA once again represented to investors that the credit quality of its portfolio was improving:

> The overall credit quality of the insured portfolio remained high with 82 percent of the total book of business rated A or better as of September 30, 2007. The percentage of the portfolio rated below investment grade on an S&P priority basis decreased to 1.4 percent as of September 30, 2007 from 2.2 percent as of September 30, 2006. . . .

13

45.    In an investor conference call later that day, MBIA CFO Chuck Chaplin falsely and misleadingly told investors that the total amount of all of the Company's CDOs that contained some RMBS had increased to $19 billion at the end of the third quarter due to additional RMBS-related transactions during the quarter.   Chaplin also reiterated that "we think it is critical as a AAA rated company for our balance sheet strength to be unquestioned and at this point, it is unquestioned."   The reality was far worse.

## D.    MBIA'S HIDDEN EXPOSURE TO CDO-SQUARED SECURITIES BACKED IN PART BY RMBS STUNS INVESTORS

46.    On December 19, 2007, S&P issued a report analyzing MBIA's credit situation.   The result was that MBIA's AAA rating was placed on negative watch.   This intra-day news caused the stock to drift slightly lower, from $28.04 to $27.02, or 3.6%.

47.    It was not until after market close that investors realized the MBIA had been materially under-reporting its total RMBS exposure.   Contained within the S&P report was an analysis of information provided by MBIA to S&P (but not previously to investors) that showed the Company's total CDOs with RMBS exposure was $30.4 billion.   This was nearly twice the figure report in the August 2 analyst presentation and more than $11 billion more than the Company reported in its earnings call on October 25.

48.    At 6:38 p.m. the evening of December 19, the Company issued a press release saying it had put an analysis of its CDO portfolio on its website that was consistent with the information given to S&P (but never previously disclosed to investors).   The new analysis disclosed for the first time that $8.1 billion of MBIA's Multi-Sector CDOs were exposed to a significant amount of RMBS risk.   In addition, over $5.1 billion of that insurance was written in 2006 and 2007, a time when it was clear

14

that the housing market was deteriorating, interest rates were rising and foreclosures were increasing at an exponential rate. With this disclosure, investors learned for the first time that Defendants had placed their triple-A rating in serious jeopardy.

49.    The market's reaction the very next trading day was as rapid as it was harsh. In response to the December 19 announcement, MBIA shares plunged over 26% on extremely heavy trading volume – from $27.02 at the close on December 19, to $19.95 per share by the close on December 20 – dipping to as low as $18.84 per share intraday, its lowest level in over a decade. This was the biggest one-day decline in the Company's history, leaving the stock price a fraction of the stock's record high of $73.02 per share posted less than a year before. The Company's total market capitalization has declined by about $6.7 billion during this time period.

50.    As explained herein, MBIA's $8.1 billion CDO-squared portfolio – which represents almost a third of the Company's overall $30.6 billion exposure to structured finance collateralized debt obligations – is particularly distressing because of the potential impact on the Company's "North Star" triple-A credit rating. The disclosure of the CDO-squared portfolio indicates that MBIA's reserves are wholly inadequate for the risk MBIA faces and its capital is likely insufficient to withstand a likely level of expected guarantee-related losses. If downgraded from triple-A, MBIA will not be able to write insurance policies on bonds that have a lower rating than it does, a segment that makes up the vast majority of the Company's business.

51.    The market was quick to condemn this deceit. Shortly after MBIA's revelation, Morgan Stanley analyst Ken Zerbe issued a report the same evening stating:

> **What's New:** MBIA published an updated list of its CDO exposures. It disclosed that it has a massive $8.1 billion of

15

> exposure to CDO-squared transactions (where the underlying collateral is more than 75% CDOs *and the remainder is mostly RMBS*). Of the total, $5.1 billion was written in 2006 and 2007. *We are shocked that management withheld this information for as long as it did.*

(emphasis supplied) The analyst went on to note that "MBIA simply did not disclose arguably the riskiest parts of its CDO portfolio to investors: $8.1 billion of CDO-squareds."

52.    Kathleen Shanley, an analyst with Gimme Credit, said the "eleventh-hour" disclosure by MBIA "ignites concerns all over again about the prospect for future losses." Shanley said that prior to the disclosure, outside investors lacked information about the Company's exposure to CDO-squareds, which she called the riskiest type of CDO.

53.    "It's surprising," said Piper Jaffray analyst Michael Grasher, "considering others have disclosed their CDO-squared for a couple of months now."

54.    "It questions my confidence about how upfront the company is being and has been," Robert Haines, an analyst at the research firm CreditSights, said of MBIA. "That's the asset class that everyone has been scrambling about."

55.    The following day, S&P equity analyst Catherine Seifert cut her rating on the Company from hold to sell, noting: "We share the market's dismay that this revelation changes the risk profile of MBI as compared with its financial guaranty peers."

56.    The full extent of the Company's concealed risk unfolded over the next several weeks. On December 21, 2007, MBIA announced that Fitch had informed the Company that it would lose its AAA credit rating as a result of its high-risk insurance practices unless it could raise $1 billion in additional capital to cover anticipated claims. Fitch notified the company that failure to do so within the next several weeks would result in a loss of the MBIA's "North Star" AAA credit rating.

16

57.    Notwithstanding MBIA's insistence that its insurance portfolio consisted of only the highest credits, the hidden risks in its portfolio continued to damage the Company.

58.    On January 8, 2008, MBIA shares declined an additional 21 percent, from an opening price of $18.07 per share to a closing price of $13.98 after hitting an intraday low of $13.02 per share. This drop was attributed, in part, to analyst comments regarding MBIA's worsening financial condition and its desperate need to shore up its flagging capital condition. According to a report on Bloomberg, Morgan Stanley analyst Ken Zerbe "cut his fourth-quarter estimate to a loss of $2.09 per share, from $1.63.

59.    On January 9, 2008 a series of stunning announcements further shook the market's trust in the Company's operations and management's integrity. It announced that:

> The Company has recently had discussions with and has provided information on a voluntary basis to the New York Insurance Department ("Department") and the Securities and Exchange Commission ("SEC") in response to informal inquiries with respect to certain matters, including the Warburg Pincus transaction, the Company's announcement of preliminary loss reserve estimates on December 10, 2007 related to MBIA's residential mortgage-backed securities exposure and disclosures regarding MBIA's CDO exposure.

60.    Further confirming that its prior disclosures to investors were materially false and misleading, MBIA revised its 2006 annual report to include additional disclosure of the potential risk it faces from credit-rating downgrades and the reduction in credit quality of the debt it insures. Specifically, the Company's Form 8-K stated as follows:

> The Company has revised certain risk factors it previously disclosed in its Form 10-K for the year ended December 31, 2006. The updated risk factors are listed below. References in the risk factors to the "Company" are to MBIA Inc., together with its domestic and international subsidiaries.

17

References to "we," "our" and "us" are to MBIA Inc. or the Company, as the context requires.

*A reduction in MBIA's financial strength ratings from any of the major rating agencies would materially and adversely affect our financial condition, results of operations and future business*

MBIA's ability to attract new business and to compete with other triple-A rated financial guarantors is largely dependent on the triple-A financial strength ratings assigned to it by the major rating agencies and the financial enhancement rating assigned by S&P. MBIA intends to comply with the requirements imposed by the rating agencies to maintain such ratings; however, no assurance can be given that MBIA will successfully comply with these requirements, that these requirements will not change or that, even if MBIA complies with these requirements, one or more of such rating agencies will not lower or withdraw its financial strength ratings of MBIA or place MBIA on "negative outlook" or "rating watch negative" status indicating that a downgrade may be considered in the future. On December 14, 2007, Moody's changed MBIA's outlook to "negative" from "stable," while confirming the outlook of three of MBIA's competitors as "stable," on December 19, 2007, S&P changed MBIA's outlook to "negative" from "stable" while confirming the outlook of two of MBIA's competitors as "stable" and on December 20, 2007, Fitch placed MBIA Inc. and MBIA on rating watch negative. MBIA's ability to attract new business and to compete with other triple-A rated financial guarantors, and its results of operations and financial condition, would be materially adversely affected by any reduction, or suggested possibility of reduction, in its ratings.

Requirements imposed by the rating agencies to maintain our triple-A rating are outside of our control, and such requirements oblige us to raise additional capital or take other remedial actions in a relatively short timeframe. We are implementing a capital plan in order to raise sufficient funds to meet the rating agency capital requirements to maintain our triple-A rating and obtain a "stable" outlook from S&P, Moody's and Fitch. The capital plan consists of the previously announced Warburg Pincus investment, indebtedness, and capital formation and risk reduction from operations. However, there can be no assurance that we will successfully complete all or any of these transactions, and there can be no assurance that the rating agencies, in particular S&P, will change our outlook to "stable" even if we successfully implement our capital plan. The Warburg Pincus investment is subject to closing conditions, including performance of specified covenants, receipt of Hart-Scott-Rodino approval, as well as the approvals of the various regulatory authorities (including insurance regulatory approvals in New York, Illinois and the United Kingdom), and the absence of any injunction or other legal prohibition on closing. Each element of the capital plan is subject to

conditions and delays, during which new economic developments could adversely affect rating agency capital requirements or our ability to successfully implement the capital plan. If we are unable to successfully implement all or any portion of the capital plan, our financial strength ratings may be downgraded, which would materially adversely affect our financial condition, results of operations and future business.

***Recent adverse developments in the credit markets and any potential negative impact on MBIA's insured portfolio may materially and adversely affect our financial condition, results of operations and future business***

MBIA is exposed to credit risks in its portfolio that may arise from deterioration in the credit markets, wherein such deterioration in credit performance could lead to potential erosion in the quality of assets and also the collection of cash flows from such assets within structured securities that it has guaranteed. While MBIA has sought to underwrite direct residential mortgage-backed securities ("RMBS"), structured pools of commercial mortgage-backed securities ("CMBS") and collateralized debt obligations ("CDOs") of asset-backed securities ("ABS") with levels of subordination and other credit enhancements designed to protect it from loss in the event of poor performance on the underlying assets collateralizing the securities in the insured portfolio, *as of January 8, 2008, we estimated that we would establish case basis loss reserves of $614 million under GAAP and $814 million under SAP and a special increase to unallocated loss reserves of $100 million under GAAP due to projected inadequacies of such credit enhancements in securities it has guaranteed. The special increase to unallocated loss reserve is in addition to MBIA's regular quarterly addition of 12% of scheduled earned premiums, or approximately $23 million in the fourth quarter of 2007. We expect the after-tax effect of the establishment of such SAP reserves to eliminate MBIA's net income and produce a loss for the fourth quarter and possibly for 2007 under SAP*. No assurance can be given that such credit enhancements will prove to be adequate to protect MBIA from incurring additional material losses in view of the current significantly higher rates of delinquency, foreclosure and loss rates being observed among residential homeowners. The extent and duration of any future continued deterioration of the credit markets is unknown, as is the impact, if any, on potential claim payments and ultimate losses of the securities within MBIA's portfolios. In addition, there can be no assurance that any of the governmental or private sector initiatives designed to address such credit deterioration in the markets will be implemented, and there is no way to know the effect that any such initiatives could have on the credit performance over time of the actual securities that MBIA insures.

In addition, there can be no assurance that we would be successful, or that we would not be delayed, in enforcing the subordination provisions, credit enhancements or other contractual provisions of the RMBS, CMBS and CDOs of ABS MBIA insures in the event of litigation or the bankruptcy of other transaction parties. *Many of the subordination provisions, credit enhancements and other contractual provisions of the RMBS, CMBS and CDOs of ABS MBIA insures are untested in the market and, therefore, it is uncertain how such subordination provisions, credit enhancements and other contractual provisions will be interpreted in the event of an action for enforcement.*

Individual credits in MBIA's insured portfolio (including potential new credits) are assessed a rating agency "capital charge" based on a variety of factors, including the nature of the credits, their underlying ratings, their tenor and their expected and actual performance. In the event of an actual or perceived deterioration in creditworthiness, a reduction in the underlying rating or a change in the rating agency capital methodology, MBIA may be required to hold more of its capital in reserve against credits in its insured portfolio, regardless of whether losses actually occur, or against potential new business. Significant reductions in underlying ratings of credits in MBIA's insured portfolio can produce significant increases in assessed "capital charges." There can be no assurance that MBIA's capital position will be adequate to meet such increased reserve requirements or that MBIA will be able to secure additional capital, especially at a time of actual or perceived deterioration in creditworthiness of new or existing credits. Unless MBIA was able to increase its amount of available capital, an increase in capital charges could reduce the amount of capital available to pay claims and support MBIA's triple-A ratings and could have an adverse effect on MBIA's ability to write new business.

In recent weeks and months Fitch, Moody's and S&P have announced the downgrade of, or other negative ratings actions with respect to, a large number of structured finance transactions, including certain transactions that MBIA insures. While less than 5% of MBIA's insured portfolio as of September 30, 2007 has been downgraded as of January 8, 2008 in connection with the rating agencies' recent downgrades of structured finance transactions, there can be no assurance that additional securities in MBIA's insured portfolio will not be reviewed and downgraded in the future. Moreover, we do not know what portion of the securities in MBIA's insured portfolio already have been reviewed by the rating agencies and if, and when, the rating agencies might review additional securities in MBIA's insured portfolio or review again securities that have already been reviewed and/or downgraded. Downgrades of credits that MBIA insures will result in higher capital charges to MBIA under the relevant rating agency model or models. If the additional amount of capital required to support such exposures is significant, MBIA could be required to raise additional capital, if available, on terms and conditions that may

not be favorable to MBIA, curtail current business writings, or pay to transfer a portion of its in-force business to generate capital for ratings purposes with the goal of maintaining its triple-A ratings. Among other things, such events or goal may not be obtainable, and such events or actions could adversely affect the results of operations and financial condition of MBIA going forward.

*   *   *

*We are required to report credit derivatives at fair value in accordance with generally accepted accounting principles, which subjects our results of operations to volatility and losses*

Any event causing credit spreads on an underlying security referenced in a credit derivative insured by MBIA to either widen or tighten will affect the fair value of the credit derivative and may increase the volatility of our earnings under GAAP. In our GAAP financial statements, we apply fair value accounting for the portion of our business executed in credit derivative form as required by Statement of Financial Accounting Standards No. 133 ("SFAS 133") and changes in fair value are recognized immediately in earnings. Therefore, any increases or decreases in the fair value of these credit derivatives have an immediate corresponding impact on reported earnings under GAAP. As changes in fair value can be caused by factors unrelated to the performance of MBIA's business and credit portfolio, including general market conditions and perceptions of credit risk, as well as market use of credit derivatives for hedging purposes unrelated to the specific referenced credits in addition to events that affect particular credit derivative exposure, the application of fair value accounting may cause our earnings to be more volatile than would be suggested by the actual performance of MBIA's business operations and credit portfolio. In addition, due to the complexity of fair value accounting and the application of SFAS 133, future amendments or interpretations of SFAS 133 may cause us to modify our accounting methodology in a manner which may have an adverse impact on our financial results.

In the fourth quarter of 2007, we observed a further widening of market spreads and credit ratings downgrades of collateral underlying certain MBIA-insured CDO tranches. *As of January 8, 2008, the pre-tax change in fair value of insured derivatives ("mark-to-market") from September 30, 2007 to December 31, 2007 was estimated to be approximately $3.3 billion under GAAP, or approximately $2.1 billion on an after-tax basis, and is subject to change, which could be material. We are in the process of finalizing our evaluation and analysis of the mark-to-market for the quarter ended December 31, 2007. This increase in our mark-to-market loss in the fourth quarter of 2007 compared to the $342 million mark-to-market loss for the third quarter is a consequence of continued spread volatility, including a substantial*

21

*widening in CMBS spreads and the deterioration of credit ratings in collateral underlying multi-sector CDOs.* The mark-to-market amount disclosed above reflects a refinement to MBIA's valuation modeling techniques that was implemented in the fourth quarter. Specifically, in light of extraordinary widening of the market spreads for the asset-backed security portion of the collateral underlying certain insured CDO tranches, for purposes of its valuation model, MBIA revised its approach and treated that ABS collateral as if it were in default.

*    *    *

*Market and other factors may cause investors and/or issuers to decrease demand for MBIA's products*

The demand for financial guarantee insurance depends upon many factors, some of which are beyond the control of MBIA. While all the major financial guarantee insurers have triple-A financial strength ratings from the major rating agencies, Moody's and S&P have recently changed the ratings outlook for some financial guarantee insurers, including MBIA, to "negative," placed other financial guarantee insurers on review for a possible downgrade, and affirmed a "stable" outlook for other major financial guarantee insurers. In addition, Fitch has placed the insurer financial strength ratings of several financial guarantee insurers, including MBIA on rating watch negative and affirmed a "stable" outlook for other major financial guarantee insurers. Investors from time to time distinguish among financial guarantors on the basis of various factors, including rating agency assessment, size, insured portfolio concentration and financial performance. These distinctions may result in differentials in trading levels for securities insured by particular financial guarantors which, in turn, may provide a competitive advantage to those financial guarantors with better trading characteristics. In addition, various investors may, due to regulatory or internal guidelines, lack additional capacity to purchase securities insured by certain financial guarantors, which may provide a competitive advantage to guarantors with fewer insured obligations outstanding. Distinctions in trading values or investor capacity constraints that do not favor MBIA would have an adverse effect on MBIA's ability to attract new business at appropriate pricing levels.

Additionally, in the face of the disruption in the credit markets and the recent announcements by Fitch, Moody's and S&P concerning financial guarantee insurers generally and MBIA in particular, the price of our common stock has experienced a significant decline and there has been a widening of spreads on our credit default swaps. This recent widening of spreads on our credit default swaps could impact the perception of our financial condition by MBIA's insured bondholders and counterparties and could affect their willingness to purchase MBIA's insured bonds and to continue to enter into transactions with MBIA.

22

*A reduction in the financial strength ratings of or a default by one or more of MBIA's key reinsurers could adversely impact our capital position, financial strength rating and ability to write new business*

MBIA uses reinsurance to cede exposure for purposes of syndicating risk and increasing its capacity to write new business while complying with its single risk and credit guidelines. When a reinsurer is downgraded by one or more of the rating agencies, less capital credit is given to MBIA under rating agency models. Over the past several years, most of MBIA's reinsurers have been downgraded and others remain under review. The downgrade of one of MBIA's key reinsurers could adversely impact MBIA's capital position under rating agency models, and affect MBIA's financial strength rating and ability to write new business accordingly.

MBIA generally retains the right to recapture the business ceded to reinsurers under certain circumstances, including rating downgrades of its reinsurers. Additionally, reinsurers and counterparties under other reimbursement agreements may default on their obligations to us due to bankruptcy, insolvency, lack of liquidity, adverse economic conditions, operational failure, fraud or other reasons. Such defaults could have a material adverse effect on our business or profitability or require us to raise additional capital. MBIA remains liable on a primary basis for all reinsured risk, and although MBIA believes that its reinsurers remain capable of meeting their obligations, there can be no assurance of such in the future.

61.    Also on January 9, 2008, MBIA announced it would report a loss of $737 million for the fourth quarter as a result of securities backed by residential home equity loans. The Company also announced it estimated that it would take a $3.3 billion loss in the fourth quarter related to due to MBIA's CDO portfolio and that it would write off $200 million of permanent impairment losses on three of the CDO-squared transactions it had previously misrepresented to the market, admitting that it now expected to incur actual claims as the underlying assets defaulted.

62.    The Company also announced its plan to raise $1 billion through a debt offering of "surplus notes." However, it soon became clear the Company would have problems finding buyers for the notes, even at the very expensive coupon rate of 12%. MBIA ultimately had to pay 14% to place the notes.

63.     In a supplement attached to a Form 8-K on January 9, 2008, MBIA also admitted that even its stunning December 19 disclosure of $8.1 billion of CDO-squared exposure was not complete. Specifically, the Company's supplement disclosed that it actually held $9 billion of these risky securities, that nearly 60% of these securities were originated in 2006 or later (which was material because recent vintages are defaulting with greater consistency) and that the portfolio had already caused a $200 million impairment.

64.     In a final shot to investors, the Company announced on January 9 that it was slashing its quarterly dividend from 34 cents to 13 cents in an attempt to preserve capital and salvage its coveted AAA rating.

## RELIANCE: APPLICABILITY OF FRAUD ON THE MARKET PRESUMPTION

65.     At all relevant times, the market for MBIA's common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities. Through the Class Period:

(a)     MBIA's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, MBIA filed periodic public reports with the SEC and the NYSE;

(c)     MBIA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

24

(d)    Securities analysts and the business press followed and published research reports regarding MBIA that were publicly available to investors;

(e)    The market price of MBIA securities reacted promptly to the dissemination of public information regarding the Company;

(f)    The average weekly trading volume for MBIA stock during the Class Period was approximately 21 million; and

(g)    The Company's market capitalization was approximately $9.75 billion on January 30, 2007 (at the beginning of the Class Period), and $3.52 billion as of the close of market trading on December 18, 2007.

66.    As a result of the misconduct alleged herein (including Defendants' misstatements and omissions), the market for MBIA securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.

67.    Plaintiff and the other Class members relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of MBIA securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

68.    Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements and omissions, they would not have purchased MBIA securities at inflated prices.

69.    Plaintiff is also entitled to the *Affiliate Ute* presumption of reliance to the extent that Defendants failed to disclose material facts concerning the composition of

25

MBIA's insured structured finance portfolio, which information Plaintiff would have wanted to have known and which would have caused investors to not have purchased shares of MBIA at the prices at which they traded during the Class Period.

## CLASS ACTION ALLEGATIONS

70.    Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities (the "Class") who purchased or acquired MBIA common stock during the period from January 30, 2007 through and including January 9, 2008 ("the Class Period") and suffered damages as a result.

71.    Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of each of the Defendants; (iii) any person who was an executive officer and/or director of MBIA during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

72.    The members of the Class, purchasers of MBIA securities, are so numerous that joinder of all members is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, if not higher. As of October 31, 2007, MBIA reported 125,394,150 shares of common stock outstanding.

73.    Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and all members of the Class sustained damages as a result of the conduct complained of herein.

74.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained court-appointed counsel competent and experienced in class and securities litigation. Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class that Plaintiff seeks to represent.

75.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

76.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether documents, including the Company's SEC filings, press releases and other public statements made by Defendants, during the Class Period contained misstatements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    whether the market price of MBIA stock during the Class Period was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

(d)     with respect to Plaintiffs' claims under Section 10(b) of the Exchange Act, whether Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

(f)     with respect to Plaintiffs' claims pursuant to Section 20(a) of the Exchange Act, whether the Defendants named in those counts are controlling persons of the Company; and

(g)     whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure thereof.

77.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

78.     The names and addresses of the record owners of MBIA shares purchased during the Class Period, are obtainable from information in the possession of the Company's transfer agent(s).  Notice can be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## INAPPLICABILITY OF SAFE HARBOR FOR FORWARD LOOKING STATEMENTS

79.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking when made, and there were no meaningful

cautionary statements identifying facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

### COUNT I

#### Violation of Section 10(b) of the Exchange Act and
#### Rule 10b-5 of the Securities and Exchange Commission

#### (Against All Defendants)

80.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

81.     This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Plaintiff and all other members of the Class, against all Defendants.

82.     Throughout the Class Period, Defendants individually, and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated a fraud and deceit upon Class

members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

83.     Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiff and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause Plaintiff and the other members of the Class to purchase MBIA's securities at inflated prices.

84.     By failing to inform the market of the true risk to MBIA's credit rating as a result of exposure to CDO-squareds and RMBS, and making other false statements and material omissions, these Defendants presented a misleading picture of MBIA's prospects. This caused and maintained artificial inflation in the trading prices of MBIA's publicly traded securities throughout the Class Period and until the truth came out.

85.     Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading and/or making direct statements to the investing public on the conference calls detailed herein.

86.     During the Class Period, Defendants occupied executive-level positions at MBIA and were privy to non-public information concerning the Company. Each of them knew or recklessly disregarded the adverse facts specified herein and omitted to disclose those facts.

87.    As described herein, Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the Class who purchased MBIA securities during the Class Period. Throughout the Class Period, Defendants had a duty to disclose new, material information that came to their attention, which rendered their prior statements to the market materially false and misleading. There is a substantial likelihood that the disclosure of these omitted facts would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available about the prospects of the Company.

88.    Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

89.    In ignorance of the false and misleading nature of Defendants' statements and/or upon the integrity of the market price for MBIA securities, Plaintiff and the other members of the Class purchased MBIA securities at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the securities at artificially inflated prices.

90.    The market price for MBIA securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Defendants, as described above.

91.    Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of MBIA securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

92.    This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

93.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiff and the members of the Class, each of whom has been damaged as a result of such violation.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act**

**(Against Defendants Dunton and Chaplin)**

94.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.  This Claim is brought pursuant to Section 20(a) of the Exchange Act against the individual defendants on behalf of Plaintiff and all members of the Class who purchased MBIA securities during the Class Period.

95.    As alleged herein, MBIA is liable to Plaintiff and the members of the Class who purchased MBIA securities based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

96.    Throughout the Class Period, the Section 20(a) Defendants were controlling persons of MBIA within the meaning of Section 20(a) of the Exchange Act, and culpable participants in the MBIA fraud, as detailed herein.

97.    Each of the Section 20(a) Defendants exercised control over MBIA during the Class Period by virtue of, among other things, their executive positions with the Company, the key roles they played in the Company's management, and their direct

involvement in its day to day operations, including its financial reporting and accounting functions.

98.    In addition to the allegations set forth above, the following allegations demonstrate the Section 20(a) Defendants' control over MBIA during the Class Period.

99.    Given their individual and collective responsibilities for managing MBIA throughout the Class Period, the Section 20(a) Defendants were regularly presented to the market as the individuals who were responsible for MBIA's day-to-day business and operations, as well as the Company's strategic direction. These Section 20(a) Defendants accepted responsibility for presenting quarterly and annual results, setting guidance for future periods and assuring the market about the state of, and prospects for the Company. No one else at MBIA exercised that degree of responsibility for, or control over, the Company's activities and public statements.

100.    As a result of the false and misleading statements and omissions alleged herein, the market price of MBIA securities was artificially inflated during the Class Period. Under such circumstances, the presumption of reliance available under the "fraud on the market" theory applies, as more particularly set forth above. Plaintiff and the members of the Class relied upon either the integrity of the market or upon the statements and reports of the Section 20(a) Defendants in purchasing MBIA securities at artificially inflated prices.

101.    This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

33

102.    By virtue of the forgoing, each of the Section 20(a) Defendants are liable to Plaintiff and the Class, each of whom has been damaged as a result of MBIA's underlying violations.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding Plaintiff and the members of the Class compensatory damages and/or rescission;

C.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.    Awarding such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury in this action for all issues so triable.

Dated: January 11, 2008

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Salvatore J. Graziano (SG-6854)
Mark Lebovitch (ML-6654)
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

**ABRAHAM FRUCHTER & TWERSKY LLP**
Jeffrey Abraham (JA-2946)
One Penn Plaza
Suite 1910
New York, NY 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655

*Attorneys for Plaintiff Steven Schmalz*

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Steven Schmalz, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed a class action complaint asserting securities claims against MBIA Inc. and wish to join as a plaintiff, retaining Bernstein Litowitz Berger & Grossmann LLP and Abraham Fruchter & Twersky LLP as my counsel.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    My transactions in MBIA Inc. during the Class Period of January 30, 2007 to January 9, 2008 are attached.

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in any action under the federal securities laws except as follows:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing are true and correct.

Executed this 11th day of January, 2008.

Steven Schmalz

**Transactions in MBIA Inc.**
Class Period: 01/30/07 – 01/09/08

| Transaction Type (buy or sell) | Transaction Date | Number of Shares | Price Per Share |
|---|---|---|---|
| Buy | 12/26/07 | 200 | $21.72 |