UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE MBIA, INC., SECURITIES LITIGATION

Case No. 08-CV-264 (KMK)

<u>OPINION AND ORDER</u>

<u>Appearances:</u>

Steven B. Singer, Esq.
Mark Lebovitch, Esq.
Kurt Michael Hunciker, Esq.
Jai Chandrasekhar, Esq.
John James Rizio-Hamilton, Esq.
Bernstein Litowitz Berger & Grossmann LLP
New York, NY
*Counsel for Lead Plaintiff*

Robert N. Shwartz, Esq.
Christopher John Hamilton, Esq.
Jeremy Feigelson, Esq.
Tatyana A. Trakht, Esq.
Debevoise & Plimpton, LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

This case arises out of the continuing fall-out from the collapse of the mortgage-backed

securities market.  Lead Plaintiff, the Teachers' Retirement System of Oklahoma ("Lead

Plaintiff" or "TRSO"), filed this putative class action on behalf of itself and other similarly

situated individuals who purchased shares of Defendant MBIA, Inc., from July 2, 2007 to

January 9, 2008 (the "Class Period").  Lead Plaintiff brings this action pursuant to § 10(b) of the

Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("§ 10(b)"), and Rule 10b-5, 17 C.F.R. §

240.10b-5 ("Rule 10b-5 "), promulgated thereunder.  Specifically, Lead Plaintiff alleges that

MBIA, and its subsidiary, MBIA Insurance Corporation (collectively "MBIA"), along with

MBIA's then-Chairman and Chief Executive Officer, Gary C. Dunton ("Dunton"), and current

Chief Financial Officer and Vice President, C. Edward Chaplin ("Chaplin"), violated § 10(b) and

Rule 10b-5 when they misrepresented MBIA's risk exposure to certain collateralized debt

obligations ("CDOs") containing residential mortgage-backed securities ("RMBS").

Defendants MBIA, Dunton, and Chaplin (collectively "Defendants") move to dismiss

Lead Plaintiff's Consolidated Amended Class Action Complaint ("CAC") pursuant to Fed. R.

Civ. P. 12(b)(6).  For the reasons stated herein, Defendants' Motion to Dismiss is granted in part

and denied in part.

## I. Background

### A. Factual Background

Except as otherwise noted, the following facts are taken from the CAC, and are presumed

true for the purposes of this motion.[1]

#### 1. RMBS, CDOs, and CDOs-Squared

RMBS, CDOs, and CDOs-squared are three types of structured finance securities that are

backed by an underlying pool of assets.  (CAC ¶ 29.)  CDOs are created by pooling a variety of

asset-backed securities ("ABS"), such as RMBS or commercial mortgage-backed securities

("CMBS").[2]  (*Id.* ¶ 31.)  CDOs-squared are created by pooling CDOs (called "inner-

---

[1] As explained in more detail below, the Court will also consider the full text of documents incorporated by reference by the CAC, documents legally required to be filed with the SEC, and certain publications of which the Court takes judicial notice.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[2] Investment banks create CDOs by purchasing and pooling a variety of securities and "selling securities that entitle the purchaser to a certain portion of the income generated by the

CDOs") and other types of ABS, such as RMBS or other kinds of structured finance securities, as

the underlying assets.  (*Id.* ¶ 32.)  Prior to the Class Period, investors and credit agencies were

increasingly concerned with the potential effects of residential mortgage defaults on RMBS and

CDOs backed by RMBS.  (*Id.* ¶¶ 36-37.)

     2. The Parties

     Lead Plaintiff provides retirement and disability benefits to public school teachers and

other staff in Oklahoma.  (*Id.* ¶ 9.)  MBIA is a publicly-traded company that provides insurance

to traditional bond or structured finance issuers in exchange for premium payments, which means

that MBIA "wraps" the bonds with its own credit rating by guaranteeing to pay "all principal and

interest payments in the event the issuer cannot meet its obligations."  (*Id.* ¶¶ 20-21.)  In many

such transactions, MBIA possesses "control rights," or the ability to liquidate underlying

collateral to pay its obligations.  (*Id.* ¶¶ 72, 79.)  In an event of default, MBIA is often

responsible for paying timely interest and principal over a large period of time.  (*Id.* ¶ 79.)

Essentially, the "'product' that MBIA sells is the lower interest expense it can offer by virtue of

its credit rating" (*id.* ¶ 23), and any reduction in MBIA's credit rating would have adverse effects

on MBIA's business, (*id.* ¶ 24).  Rating agencies considered MBIA's "capital adequacy," or its

capacity to pay claims when they came due, a primary factor in determining MBIA's credit

rating.  (*Id.* ¶ 25.)  As a result, even losses in smaller portions of MBIA's portfolio could affect

MBIA's capital adequacy if MBIA was unable to pay the losses as they came due.  (*Id.* ¶¶ 25-26.)

     Defendant Dunton was MBIA's Chairman, CEO, and President during the Class Period

---

underlying pool of securities."  (CAC ¶ 31.)  The investment bank's securities are divided into
"senior" and "junior" tranches; senior securities are entitled to be paid first and often receive
higher debt ratings.  (*Id.*)

and until his resignation in February 2008.  (*Id.* ¶ 11.)  According to MBIA's 10-K for 2006, Dunton was a member of the "Executive Credit Committee," which reviewed "larger, complex, or unique transactions."  (*Id.* ¶ 38; Decl. of Tatyana Trakht ("Trakht Decl.") Ex. 2, at 7.)[3]  A confidential witness ("CW"), who worked in MBIA's structured finance business from 1998 until March 2007, reported that the Executive Credit Committee received memoranda on all transactions over $250 million, which included all the transactions relevant to this case.  (*Id.* ¶¶ 39-41.)  According to the CW, these memoranda "detailed delinquency rates, loss rates, [and] shifts in underwriting standards," and "'definitely' provided sufficient information for Dunton to see the deteriorating quality" of the insured CDO transactions backed by RMBS.  (*Id.* ¶ 41.) Defendant Chaplin was MBIA's CFO, Vice President, and a member of its Executive Policy Committee during the Class Period.  (*Id.* ¶ 13.)  During the Class Period, Dunton and Chaplin signed MBIA's SEC filings and participated in creating or reviewing MBIA's press releases and web disclosures.  (*Id.* ¶¶ 12, 14.)  Both Dunton and Chaplin were members of MBIA's "Loss Reserve Committee," which reviewed transactions for impairments, and of the "Risk Oversight Committee," which reviewed risky or troubled transactions.  (*Id.* ¶ 38.)

### 3. Defendants' Disclosures and Alleged Misrepresentations and Omissions

The CAC alleges three categories of material misstatements and omissions:  (1) statements and charts regarding MBIA's total exposure to RMBS-backed CDOs that omitted CDOs-squared containing RMBS; (2) statements regarding MBIA's control rights that failed to

---

[3] Exhibit 2 to the hard-copy Trakht Declaration submitted to the Court is MBIA's 10-K for 2007.  This appears to be an error as Defendants refer to Exhibit 2 as MBIA's 10-K for 2006, and the Trakht Declaration states that Exhibit 2 is the 2006 10-K.  (Trakht Decl. ¶ 3.)  The Court will refer to the corresponding Exhibit 2 on the electronic brief submitted by Defendants, which is the correct 2006 10-K.

disclose MBIA's lack of control rights over the inner-CDOs of the CDOs-squared; and (3) statements regarding MBIA's payment obligations that did not disclose MBIA's obligation to pay for events of default as they occurred for the CDOs-squared.

In the first category of statements and omissions, Lead Plaintiff alleges that MBIA published a materially misleading quarterly disclosure document on its website. On July 2, 2007, the first day of the Class Period, MBIA issued a document entitled "MBIA's CDO Strategy, Portfolio Analysis and Subprime Exposure" ("First Quarter CDO Primer"). The document stated that MBIA's "Multi-Sector CDO Portfolio" consisted of $22.7 billion in net par exposure. (Trakht Decl. Ex. 4, at 5.) Multi-Sector CDOs were defined as "transactions that include a variety of structured finance asset classes . . . includ[ing] asset-backed securities (e.g. securitizations of auto receivables, credit cards, etc.), commercial mortgage-backed securities, CDOs, and various types of residential mortgage-backed securities including prime and subprime RMBS." (*Id.*) It stated that the range of asset classes listed was "found throughout the entire Multi-Sector CDO portfolio." (*Id.*) The document contained a chart listing MBIA's "Multi-Sector CDOs with U.S. RMBS" as $14.7 billion, compared to "Other CDOs." (CAC ¶ 75.) The $14.7 billion figure allegedly did not include approximately $6 billion in CDOs-squared containing RMBS. (*Id.* ¶ 77.) Another chart within the First Quarter CDO Primer, described as a "summary of MBIA-guaranteed Multi-Sector CDOs that include U.S. RMBS collateral originated from 2004 through the first quarter 2007," listed fifteen CDO transactions with a "total" of about $12 billion. (*Id.* ¶ 76.) MBIA separately listed the $12 billion in RMBS-backed CDOs from after 2004 because CDOs originated after 2004 were considered riskier. (*Id.* ¶ 47.) The summary chart allegedly did not include approximately $5 billion in CDOs-squared

containing RMBS.[4]  (*Id.* ¶ 77.)

Subsequently, MBIA published two updated CDO Primers on July 26, 2007 and October

25, 2007 ("Second Quarter CDO Primer" and "Third Quarter CDO Primer," respectively).  (*Id.*

¶¶ 81, 94.)  The Second Quarter CDO Primer listed the aggregate multi-sector CDO portfolio

exposure as $24.2 billion.  (Trakht Decl. Ex. 6, at 5.)  According to Lead Plaintiff, the Second

and Third Quarter CDO Primers contained statements and charts, similar to those in the First

Quarter CDO Primer, listing the "total" of MBIA's multi-sector CDOs containing RMBS

without including the RMBS-backed CDOs-squared.  (CAC ¶¶ 81-82 (alleging that figures and

charts in the Second Quarter CDO Primer omitted approximately $5-6 billion in CDOs-squared);

*id.* ¶ 94 (alleging that figures and charts in Third Quarter CDO Primer omitted approximately $8-

9 billion in CDOs-squared).)

Lead Plaintiff also alleges that Defendants made material misstatements and omissions

regarding the total RMBS-backed CDO portfolio during a series of conference calls and

presentations with investors and analysts.  On August 2, 2007, MBIA organized an investor

conference call, during which MBIA's Head of Structured Finance Insurance Portfolio

Management, Anthony McKiernan, stated that MBIA's "multi-sector CDO net par out standings

[sic] was [$]24.2 billion" and that out "[o]f the $24.2 [b]illion multisector total, approximately

$15.9 billion of net par contains RMBS collateral."  (CAC ¶ 85; Trakht Decl. Ex. 7, at 14.)  In

response to a question asking for "more detail on the CDO collateral within [MBIA's]

_____

[4] The summary chart listing specific RMBS-backed CDO transactions only listed
transactions from after 2004.  Thus, while Lead Plaintiff alleges that Defendants omitted a total
of approximately $6 billion in RMBS-backed CDOs-squared from the First Quarter CDO Primer,
only approximately $5 billion of those CDOs-squared were from after 2004.  (CAC ¶¶ 75-77.)

multisector CDOs and the general composition of [MBIA's] CDOs squared" (CAC ¶ 109; Trakht
Decl. Ex. 7, at 19), McKeirnan stated that MBIA had approximately $6.1 billion of net exposure
to CDOs-squared and that "22% of the collateral supporting [the CDO-squared] deals [was]
comprised [of] CDOs of ABS," (Trakht Decl. Ex. 7, at 20).  McKiernan did not specifically state
whether or not the outer- or inner-CDOs contained RMBS.  (CAC ¶ 109.)  On August 16, 2007, a
few weeks after the investor call, Morgan Stanley published a report stating that MBIA's RMBS-
related exposure was $15.9 billion, a figure that omitted the CDOs-squared, and that Morgan
Stanley thought was "more modest" than the RMBS exposure of Ambac, one of MBIA's main
competitors.  (*Id.* ¶ 52; Trakht Decl. Ex. 9, at 8.)  The report also stated that "[t]he reason for
MBIA's lower losses . . . is due almost entirely to the lack of mezzanine CDO-squared
transactions."  (Trakht Decl. Ex. 9, at 8.)

On September 4, 2007, Defendant Dunton gave a presentation at a Keefe, Bruyette &
Woods, Inc. ("KBW") conference.  The CAC alleges that Dunton stated that MBIA "had '$15.9
billion' of exposure to 'CDOs that contain some level of RMBS.'"  (CAC ¶ 53 (emphasis
omitted).)  However, the transcript of the conference shows that Dunton actually stated that
MBIA had "written about $24.2 billion of multi-sector CDOs that contain some level of RMBS.
That level of RMBS is indicated by the $15.9 billion" figure.  (Trakht Decl. Ex. 11, at 4.)
Dunton referred to presentation slides, showing that MBIA had $24.2 billion net par outstanding
in multi-sector CDOs (*id.* Ex. 10, at 12), and that the net par outstanding for "CDOs with some
subprime exposures" was $15.9 billion, (*id.* at 15; CAC ¶ 90.)  No mention was made of CDOs-
squared collateralized, at least in part, by RMBS.

On October 25, 2007, Defendant Chaplin participated in a conference call during which,

7

in response to a question about the portfolio referenced in a sensitivity analysis, he responded that "[i]t was all of our CDOs that contain sub prime mortgage collateral . . . I think it's all the CDOs that contain RMBS and as of the second quarter, the size of that portfolio is about $17 billion" and that for the "third quarter . . . the size of that portfolio was, I believe, $22 million. I'm sorry, $19 billion." (CAC ¶ 54; Trakht Decl. Ex. 14, at 11.)  Again, this figure did not include the CDO-squared holdings of MBIA, which by then totaled between $8 and $9 billion. (CAC ¶ 93.)  After this call, Morgan Stanley issued a report noting that MBIA had "$17.2 billion" in exposure to "CDOs with RMBS collateral."  (CAC ¶ 55.)  On November 27, 2007, Chaplin stated at a Bank of America conference that MBIA's exposure to CDOs with RMBS was "[a]bout $19 billion."  (*Id.* ¶ 98.)

Regarding the second and third categories of misstatements, Lead Plaintiff alleges that MBIA's 2006 10-K was misleading because it failed to disclose the risks from the lack of structural protections in some of the CDOs-squared.  (*Id.* ¶ 120.)  Lead Plaintiff also alleges that the First Quarter CDO Primer did not state that MBIA lacked "control rights" over the inner-CDOs or that MBIA was subject to onerous payment obligations, despite stating that the CDOs-squared were "consistent with [MBIA's] zero-loss standard" and "did not represent a material risk."  (*Id.* ¶¶ 78-79.)  Lead Plaintiff further alleges that MBIA representatives on the August 2, 2007 conference call repeatedly emphasized that MBIA had "control rights" over its entire RMBS-backed CDO portfolio and that MBIA was "only covering" timely interest and ultimate principal for the RMBS-backed CDOs.  (*Id.* ¶ 87.)

### 4. Rating Agency Evaluations and Alleged Corrective Disclosures

On December 10, 2007, Fitch Ratings stated that in providing additional commentary on

MBIA's exposure, it would include views on "MBIA's exposure to structured finance collateralized obligations (SF CDOs) backed by subprime RMBS and CDO-squared securities, which totaled $29.9 billion at September 30, 2007." (Trakht Decl. Ex. 18, at 1.)  On December 19, 2007, Standard & Poor's ("S&P") issued a report assigning MBIA a negative outlook.  (CAC ¶ 58.)  S&P was aware of MBIA's CDOs-squared based on information MBIA made available to it, but allegedly did not provide to investors.  (*Id.* ¶¶ 58, 104.)  The report explained that CDOs-squared could pose problems for insurers because insurers may not have control rights over the inner-CDO.  (*Id.* ¶ 58; Trakht Decl. Ex. 20, at 8.)  A chart entitled "RMBS Exposure Information and Stress Test Results" stated that MBIA's total par outstanding at the end of the third quarter of 2007 was approximately $29.7 billion.  (Trakht Decl. Ex. 20, at 10.)  After the S&P report, MBIA's stock fell from $28.04 to $27.02 per share.  (CAC ¶ 58.)

At around 6:30 p.m. on December 19, 2007, MBIA issued a press release stating that it had "supplemented the listing of its exposure to CDOs that include RMBS as of September 30, 2007 to make it consistent with the CDOs that were included in Standard & Poor's analysis." (*Id.* ¶ 59.)  On its website, MBIA updated the summary chart from the CDO Primers that listed specific RMBS-backed CDOs from after 2004 to include an additional section of "CDOs of Multi-Sector High Grade Collateral." (CAC ¶ 60.)  The chart listed six such transactions, representing MBIA's CDOs-squared from 2004 or later, totaling $8.1 billion.  (*Id.*)  This additional section listing CDO-squared transactions had not appeared on any of the charts included in the First, Second, or Third Quarter CDO Primers.  After MBIA's press release, Morgan Stanley issued a report stating that MBIA had "disclosed that it has a massive $8.1 billion of exposure to CDO-squared transactions" and that Morgan Stanley was "shocked that

[MBIA] management withheld this information for as long as it did." (*Id.* ¶ 62.)  The Morgan Stanley report also stated that "MBIA simply did not disclose arguably the riskiest parts of its CDO portfolio to investors: $8.1 billion of CDO-squareds." (*Id.*)

The next day, MBIA's stock dropped from the December 19, 2007 closing price of $27.02 to $19.95 at the end of trading on December 20, 2007, a 26% drop. (*Id.* ¶ 106.) Dow Jones Newswires reported that the "the $8.1 billion exposure in CDO-squareds was new to investors, causing the stock to plunge." (*Id.* ¶ 65.) On December 20, 2007, MBIA issued a press release stating that the "information posted on December 19, 2007 disclose[d] no additional Multi-Sector CDO exposure," because the information "provide[d] detail on the composition of MBIA's $30.6 billion Multi-Sector CDO exposure that had previously been provided in its Operating Supplement." (*Id.* ¶ 107; Trakht Decl. Ex. 23, at 1.) Indeed, MBIA had previously published an "Operating Supplement" on its website for the third quarter of 2007 ("Third Quarter Operating Supplement"), stating that its Multi-Sector CDO exposure was $30.6 billion. (CAC ¶ 108; Trakht Decl. Ex. 12, at 18).[5] MBIA also stated that it had previously discussed its CDO-

---

[5] The Court notes that Defendants submitted the Third Quarter Operating Supplement to this Court, along with Operating Supplements for the first and second quarters of 2007.  The Court will consider the Third Quarter Operating Supplement, which was incorporated by reference in the CAC. (CAC ¶ 108); *see ATSI*, 493 F.3d 87 at 98.  However, the Court will not consider the other two Operating Supplements because these documents were not incorporated into the CAC by reference, were not integral to the CAC, and were not required by law to be filed with the SEC. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Mem.") 10 (stating that Operating Supplements were not required by SEC regulations); *see Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (noting that courts may take judicial notice of "documents required by law to be, and that have been, filed with the SEC"); *see also In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 153-54 (E.D.N.Y. 2008) (declining to take judicial notice of disclosure in SEC filing that "registrant [was] not required by law to disclose").  In any event, the same information that Defendants ask the Court to consider from the First and Second Quarter Operating Supplements — MBIA's disclosure of aggregate multi-sector CDO portfolio exposure of $22.7 billion and $24.2 billion for the first and second quarters, respectively — was contained

squared exposure during the August 2, 2007 conference call and that "MBIA had not previously detailed these transactions because they contain less than 25 percent direct U.S. RMBS collateral."[6]  (CAC ¶ 108; Trakht Decl. Ex. 23, at 1.)

After the December 20, 2007 MBIA press release, Citigroup Global Markets issued a report stating that MBIA's CDOs-squared "ha[d] less than 25% RMBS" and that "[t]he standard disclosures established by all [financial guarantors] was to only identify CDOs of ABS with more than 25% RMBS," which Citigroup believed MBIA did during the August 2, 2007 conference call.  (Trakht Decl. Ex. 24, at 1-2.)  Similarly, Merrill Lynch issued a report stating that "the lack of a previous detailed disclosure on a transaction by transaction basis was the result of a definitional issue . . . as opposed to willful effort by MBIA management to conceal the information."  (*Id.* Ex. 25, at 3.)  Bank of America stated that "concerns over MBIA's disclosure and capital plan were overblown."  (*Id.* Ex. 26, at 1.)[7]

---

in the First and Second Quarter CDO Primers.  Thus, as discussed more fully below, the Court has considered these aggregate totals in analyzing whether Lead Plaintiff has adequately alleged that Defendants made any material misrepresentations or omissions.

[6] It bears noting that during the August 2, 2007 conference call, McKiernan stated that 22% of the $6.1 billion CDO-squared transactions were "comprised [] of ABS."  (Trakht Decl. Ex. 7, at 20.)  He made no mention of any CDO-squared transactions being collateralized by RMBS.  Yet, when MBIA supplemented its CDO summary chart on December 19, 2007, and included, for the first time, its $8.1 billion in CDO-squared transactions, it noted that the ABS collateralization for all but one of the transactions was 0%.  (*Id.* Ex. 21, at 2.)  One transaction from 2006 was listed as containing 4% ABS.  (*Id.*)  In contrast, the listed RMBS collateral varied between 0% and 24%.  (*Id.*)

[7] As explained in more detail below, the Court takes judicial notice of these publicly available reports because they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," *see* Fed. R. Evid. 201(b)(2), but the Court will only consider these reports for the fact of their publication and not for the truth of the matters asserted, *see Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory

On January 9, 2008, the last day of the Class Period, MBIA filed an SEC Form 8-K in which it stated that its total exposure to CDOs-squared was $9 billion.  (CAC ¶¶ 67-68.)  MBIA also stated that the CDO-squared portfolio had suffered $200 million in loss impairments.  (*Id.* ¶ 68.)  The 8-K further stated that $8.1 billion in CDOs-squared lacked structural protections, such as control rights and a limited payout structure.  (*Id.* ¶ 69.)  MBIA also revised the risk factors from the 2006 10-K, adding that the "performance of the securities MBIA insures depends on a wide variety of factors which are outside our control, including . . . the exercise of control or other rights held by other transaction participants."  (*Id.* ¶ 120 (emphasis omitted).)  MBIA's share price fell from an opening price of $15.00 per share on January 9, 2008 to a closing price of $13.40.  (*Id.* ¶ 70.)  In February 2008, Dunton resigned as CEO.  (*Id.*)  In April 2008, Fitch downgraded MBIA, depriving it of its triple-A ratings, and other ratings agencies followed suit. (*Id.*)

B. Procedural Background

Beginning on January 11, 2008, three Plaintiffs filed complaints on behalf of themselves and others similarly situated against MBIA, Dunton, and Chaplin for violations of §10(b) and Rule 10b-5, asserting claims related to the CDOs-squared and the disclosures discussed above.[8]

---

filings contained certain information, without regard to the truth of their contents . . . ." (emphasis in original)); *In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008) ("Judicial notice can be taken of . . . published analyst reports in determining what the market knew.")

[8] The three cases, brought separately by Steven Schmalz, Teamsters Local 807 Labor Management Pension Fund, and Gary Kosseff, were assigned case docket numbers 08-CV-264, 08-CV-1845, and 08-CV-2362, respectively.

Five additional Parties petitioned the Court for appointment as lead counsel.[9]  In a Case

Management Order dated June 30, 2008, the Court consolidated the three pending cases and

appointed TRSO as Lead Plaintiff.[10]  (Dkt. No. 31.)  On October 17, 2008, Lead Plaintiff filed its

CAC.  (Dkt. No. 37.)  Defendants timely moved to dismiss the CAC in its entirety.  The Court

held oral argument on March 5, 2010.

## II. Discussion

### A. Standard of Review

#### 1. Motion to Dismiss

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's

factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor."  *Gonzalez*

*v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008); *see also Ruotolo v. City of New York*,

514 F.3d 184, 188 (2d Cir. 2008) ("We review *de novo* a district court's dismissal of a complaint

pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all

reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)).  "In

adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated

on the face of the complaint, in documents appended to the complaint or incorporated in the

complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr.*

*Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also*

---

[9] The five Parties were the Louisiana Municipal Police Employees' Retirement System, the Tulare County Employees Retirement Association, the Plymouth County Retirement System, the TRSO, and the Massachusetts Laborers' Annuity Fund.

[10] The consolidated action is referred to as *In re MBIA, Inc. Securities Litigation*, and has the case number 08-CV-264.  (Dkt. No. 31.)

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (stating that courts adjudicating 12(b)(6) motions may consider documents attached to the complaint, "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit").  In the motion to dismiss context, however, the court should generally take judicial notice only "to determine what statements [the documents] contain[] . . .[,] not for the truth of the matters asserted."  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).  "The Court need not accept as true any allegations that are contradicted by documents deemed to be part of the complaint, or materials amenable to judicial notice."  *In re Yukos Oil Co. Sec. Litig.*, No. 04-CV-5243, 2006 WL 3026024, at *12 (S.D.N.Y. Oct. 25, 2006).

Following these principles, the Court will consider many of the documents submitted by Defendants, which were incorporated into the CAC by reference and relied upon by Lead Plaintiff, such as the CDO Primers, statements made in investor conference calls, and reports of analysts.  The Court will also take judicial notice, only for the fact of their publication, of statements in MBIA's required SEC disclosures and in news publications and analyst reports that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  *See* Fed. R. Evid. 201(b)(2); *see also Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 424-25 (2d Cir. 2008) (upholding the taking of judicial notice, for the fact of their publication, of "media reports, state court complaints, and regulatory filings"); *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 383 n.3 (S.D.N.Y. 2003) (taking judicial notice, on a motion to dismiss, of newspaper articles for the fact of their publication), *aff'd*, 273 F. Supp. 2d 351 (2d Cir. 2005).

14

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted) (second alteration in original). Instead, the Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. If plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (internal citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original)).

### 2. Securities Fraud Claims

Rule 10b-5 states, in relevant part, that it is "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim for relief under § 10(b) and Rule 10b-5, a plaintiff

must adequately allege (1) that the defendants made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which plaintiffs relied, and (5) that plaintiff's reliance was the proximate cause of his injury.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005); *see also ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (same).  The requisite state of mind, or scienter, in a securities fraud action is an "intent to deceive, manipulate or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (internal quotation marks omitted).

Securities fraud claims brought under § 10(b) and Rule 10b-5 are also subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b).  *See ECA*, 553 F.3d at 196.  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The Second Circuit has established that to state a claim for relief under § 10(b) and Rule 10b-5, Rule 9(b) requires a complainant to:  "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent."  *ATSI*, 493 F.3d at 99.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") further modifies the Rule 12(b)(6) analysis when reviewing a complaint in a securities fraud action.  Under the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *see also ATSI*, 493 F.3d at 99.  The

complaint must also "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  To satisfy the strong

inference requirement "an inference of scienter must be more than merely plausible or reasonable

— it must be cogent and at least as compelling as any opposing inference of nonfraudulent

intent." *Tellabs*, 551 U.S. at 314.  Thus, courts analyzing scienter "must engage in a

comparative evaluation" of "not only inferences urged by the plaintiff, . . . but also competing

inferences rationally drawn from the facts alleged." *Id.*; *see also ATSI*, 493 F.3d at 99 ("[I]n

determining whether the pleaded facts give rise to a strong inference of scienter, the court must

take into account plausible opposing inferences." (internal quotation marks omitted)).  Courts

should consider whether "all of the facts alleged, taken collectively, give rise to a strong

inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the

standard." *Tellabs*, 551 U.S. at 323 (emphasis omitted).

B. Material Misstatements or Omissions

The starting point for any 10b-5 case is the existence of material misstatements or

omissions of fact.  "A statement can [] be misleading, though not technically false, if it amounts

to a half-truth by omitting some material fact." *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F.

Supp. 2d 364, 393 (S.D.N.Y. 2006) (internal quotation marks omitted).  An omission is

actionable under the federal securities laws "'only when the [defendant] is subject to a duty to

disclose the omitted facts.'" *Vacold LLC v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008) (quoting

*ZVI Trading Corp. Employees' Money Purchase Pension Plan & Trust v. Ross* (*In re Time*

*Warner Inc. Sec. Litig.*), 9 F.3d 259, 267 (2d Cir. 1993)).  Such a duty "arises whenever secret

information renders prior public statements materially misleading, not merely when that

information completely negates the public statements." *ZVI Trading*, 9 F.3d at 268.  Of course,

the lack of an independent duty to speak in the first instance becomes irrelevant once a party

chooses to discuss material issues, because upon choosing to speak one "ha[s] a duty to be both

accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see*

*also Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008)

("Once defendants choose to speak . . ., they undertake a duty to speak truthfully and to make

such additional disclosures . . . necessary to avoid rendering the statements misleading." (internal

quotation marks omitted) (second ellipses in original)).

　　　　To fulfill the materiality requirement, "there must be a substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information made available.'" *ECA*, 553 F.3d at 197

(quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)); *see also Halperin v. eBanker*

*USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("The touchstone of the inquiry is not whether

isolated statements within a document were true, but whether defendants' representations or

omissions, considered together and in context, would affect the total mix of information and

thereby mislead a reasonable investor regarding the nature of the securities offered."); *Ganino v.*

*Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) ("At the pleading stage, a plaintiff satisfies

the materiality requirement . . . by alleging a statement or omission that a reasonable investor

would have considered significant in making investment decisions.").  Materiality depends on all

relevant circumstances, and a complaint normally should not be dismissed based on materiality

"unless [the statements or omissions] are so obviously unimportant to a reasonable investor that

reasonable minds could not differ on the question of their importance.'" *ECA*, 553 F.3d at 197

(quoting *Ganino*, 228 F.3d at 162); *see also Halperin*, 295 F.3d at 359 ("[A] complaint fails to state a claim of securities fraud if no reasonable investor could have been misled about the nature of the risk when he invested." (emphasis omitted)).

Defendants argue that MBIA's statements were not materially misleading because:  (1) MBIA's disclosures were not misleading; (2) the truth about MBIA's CDO-squared exposure was known to the market; and (3) MBIA's exposure to CDOs-squared was not material to its overall insurance portfolio.

### 1. Existence of Misstatements or Omissions

Defendants first argue that Lead Plaintiff failed to plead the existence of any misstatements or omissions.  For example, Defendants contend that the CDO Primers' charts and the various statements made during conference calls and presentations were not misleading because MBIA accurately disclosed its CDO-squared exposure by providing the "aggregate exposure" of the multi-sector CDO portfolio for each quarter.  (Defs.' Mem. 23; Trakht Decl. Ex. 4, at 5; *id.* Ex. 6, at 5; *id.* Ex. 12, at 18.)  Defendants also claim that MBIA accurately disclosed the nature and amount of the CDOs-squared during the August 2, 2007 conference call by stating that MBIA had $6.1 billion aggregate exposure in CDOs-squared containing "ABS CDOs." (Defs.' Mem. 22.)

The Court finds that Lead Plaintiff has adequately alleged that the CDO Primer charts were materially misleading.  Even though MBIA provided the aggregate exposure of its multi-sector portfolio in the CDO Primers and Operating Supplements, Lead Plaintiff alleges that the CDO Primers simultaneously differentiated between "Multi-Sector CDOs with RMBS" and "other CDOs."  (CAC ¶ 75; Trakht Decl. Ex. 4, at 6.)  Importantly, the CDO Primers provided

one figure for the aggregate multi-sector CDO exposure and a significantly smaller figure for the

exposure of "Multi-Sector CDOs with RMBS."  (CAC ¶¶ 75, 81, 94, 108; Trakht Decl. Ex. 4, at

5-6 (listing multi-sector portfolio exposure as $22.7 billion and "Multi-Sector CDOs with

RMBS" exposure as $14.7 billion as of first quarter 2007); *id.* Ex. 6, at 5-6 (listing multi-sector

portfolio exposure as $24.2 billion and "Multi-Sector CDOs with RMBS" exposure as $15.9

billion as of second quarter 2007).  Furthermore, the CDO Primers' summary chart listed the

"total" of RMBS-backed CDOs from after 2004 and omitted the CDOs-squared, until MBIA first

added the CDOs-squared to the chart in its December 19, 2007 press release.  (CAC ¶¶ 76-77,

81-82, 94, 105; Trakht Decl. Ex. 4, at 7; *id.* Ex. 6, at 7; *id.* Ex. 13, at unnumbered eighth page; *id.*

Ex. 21, at 2.)  As a result, Lead Plaintiff has adequately alleged that the figures and charts in the

CDO Primers, specifically listing CDOs with RMBS as distinct from the aggregate total of the

multi-sector portfolio, could have affected "the total mix of information and thereby misle[d] a

reasonable investor regarding" the amount of MBIA's RMBS-backed CDO exposure.  *See*

*Ganino*, 228 F.3d at 167-68 (vacating the district court's dismissal when "it cannot be said that

no reasonable investor could have been misled" by defendant's statement that it "had been

compensated for its loans" into thinking defendant's 10-Q did not include fees from the loans

(internal quotation marks and alteration omitted)); *see also S.E.C. v. DiBella*, 587 F.3d 553, 566

(2d Cir. 2009) (finding that "[a] reasonable investor . . . may have viewed the [undisclosed] fee

arrangement . . . as changing the total mix of information"); *S.E.C. v. Pimco Advisors Fund*

*Mgmt. LLC*, 341 F. Supp. 2d 454, 464 (S.D.N.Y. 2004) (finding that even if the undisclosed

transaction "was not strictly prohibited by the alleged disclosures," defendants' statements were

misleading when the "disclosures [] could easily [have] be[en] read" as prohibiting the

undisclosed transaction).

Nor is the Court persuaded that the statements made on the August 2, 2007 call fully disclosed the nature of MBIA's CDO-exposure.  According to Defendants, "ABS CDOs" was a market term known to denote CDOs backed by RMBS.  (Defs.' Mem. 22.)  Contrary to Defendants' argument, MBIA itself defined "ABS" as not necessarily including RMBS when it stated in the CDO Primers that the multi-sector CDO collateral included "asset-backed securities (e.g. securitizations of auto receivables, credit cards, etc.), commercial mortgage-backed securities, CDOs and various types of residential mortgage-backed securities."  (Trakht Decl. Ex. 4, at 5.)  This definition shows that ABS can come in many forms, and does not suggest that RMBS is always contained within an ABS-backed CDO.  Thus, although MBIA discussed its CDOs-squared on the August 2, 2007 call, the discussion did not specify whether the assets backing the inner-CDOs contained RMBS.

Importantly, during the call, McKiernan stated that "[o]f the $24.2 [b]illion multisector total, approximately $15.9 billion of net par contains RMBS collateral."  (CAC ¶ 85 (emphasis omitted); Trakht Decl. Ex. 7, at 14.)  Thus, MBIA again distinguished between multi-sector CDOs with RMBS and mutli-sector CDOs without RMBS, without explaining that the CDOs-squared represented an *additional* $6.1 billion in CDOs containing RMBS.  This distinction was reinforced during Dunton's KBW presentation, in which he used slides stating that MBIA's multi-sector CDO portfolio totaled $24.2 billion (Trakht Decl. Ex. 10, at 12), and that its "Multi-Sector CDOs with some Subprime exposures" was $15.9 billion, (*id.* at 15).[11]  Chaplin repeated

---

[11] Dunton, referring to the slides, stated that MBIA had "written about $24.2 billion of multi-sector CDOs that contain some level of RMBS" and that the $15.9 billion figure represented the RMBS exposure.  (Trakht Decl. Ex., 11 at 4.)  As explained below, the Court

this distinction during the October 25, 2007 conference call, stating that "all the CDOs that

contain RMBS" for the third quarter totaled "$19 billion," omitting the CDOs-squared (CAC ¶

54; Trakht Decl. Ex. 14, at 11), and again at the November 27, 2007 conference, (CAC ¶ 98

(Chaplin stated that MBIA's exposure to CDOs with RMBS was "[a]bout $19 billion")).

Furthermore, when MBIA updated its summary chart to include the CDOs-squared, all but one of

the transactions were listed as containing 0% ABS, with one transaction listed as containing 4%

ABS.  (Trakht Decl. Ex. 21, at 2.)  In contrast, MBIA listed the CDO-squared transactions as

containing between 0% and 24% RMBS.  (*Id.*)  Accordingly, the Court will not decide on a

motion to dismiss the fact-intensive inquiry of what meaning the market ascribed to the term

"ABS."  *See In re Omnicom Group, Inc. Sec. Litig.*, No. 02-CV-4483, 2005 WL 735937, at *7

(S.D.N.Y. Mar. 30, 2005) (concluding that the court could not decide on a motion to dismiss

whether reasonable investors understood a reference to "other companies" in the defendant's 10-

K to refer to the investments at issue in the litigation); *cf. Blackmoss Invs. Inc. v. ACA Capital

Holdings, Inc.*, No. 07-CV-10528, 2010 WL 148617, at *8 (S.D.N.Y. Jan. 14, 2010) (finding no

material misstatement or omission of RMBS risk when defendant stated that a large portion of its

CDOs contained RMBS).  Considering the statements "together and in context as a whole," "it

cannot be said that no reasonable investor could have been misled" by Defendants' allegedly

repeated omission of the CDOs-squared from its total RMBS-backed CDO exposure.  *See

Ganino*, 228 F.3d at 168 (upholding denial of motion to dismiss when "it cannot be said that no

---

does not believe that Dunton's statement, which appears to imply that the entire $24.2 billion
multi-sector portfolio contained some RMBS, sufficiently disclosed the RMBS-content of the
CDOs-squared when his statement was contradicted by his own presentation slides and by
Defendants' many other statements distinguishing between the multi-sector total and a subset of
CDOs containing some level of RMBS.

reasonable investor could have been misled by [defendant's] statement").

  2. Truth-On-The-Market

Defendants similarly argue that even if some misstatements or omissions were made, the statements were not material because the market knew the truth about MBIA's CDOs-squared. (Defs.' Mem. 22-28.)  Defendants argue that in addition to providing the aggregate exposure of the multi-sector portfolio, MBIA also accurately described the collateral mix of the portfolio. MBIA also argues that analysts and third parties were aware of the CDO-squared exposure and that Defendants are not liable simply because a few analysts or investors were confused.  (*Id.* at 24.)

Under the "truth-on-the-market" theory, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino*, 228 F.3d at 167.  Thus, "[a] defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known." *Id.*; *see also Hall*, 580 F. Supp. 2d at 226 ("Under the 'truth-on-the-market' doctrine, information already known on the market is [] immaterial."). However, the Second Circuit has stressed that such "corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino*, 228 F.3d at 167 (internal citation and quotation marks omitted); *see also In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 150 (E.D.N.Y. 2008) (same).  Thus, the "truth-on-the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino*, 228 F.3d at 167 (internal citation omitted); *see also In re Columbia*

*Sec. Litig.*, 155 F.R.D. 466, 482-83 (S.D.N.Y. 1994) ("[D]efendants' burden [of establishing the truth-on-the-market defense is] extremely difficult, perhaps impossible, to meet at the summary judgment stage.").  The facts as alleged here (and as otherwise properly considered by the Court) do not present an exception to this rule.

Defendants assert that the CDO Primers and Operating Supplements provided the aggregate total of the multi-sector portfolio and accurately described its collateral mix by stating that the multi-sector collateral included ABS, CMBS, CDOs, and RMBS, and that this "range of asset classes is found throughout the entire Multi-Sector CDO portfolio."  (Defs.' Mem. 23; Trakht Decl. Ex. 4, at 5; *id.* Ex. 12, at 18.)  Therefore, according to Defendants, MBIA "underscored the presence of RMBS collateral" throughout the multi-sector CDO portfolio, including within the CDOs-squared.  First, the Court is not persuaded that the CDO Primer can be fairly read to mean, as a matter of law, that each of the CDOs or CDOs-squared in the portfolio contained the full range of assets, including RMBS, rather than that the multi-sector portfolio as a whole contained a diverse set of assets.  Second, even if the CDO Primers suggested that all MBIA CDOs contained RMBS, Lead Plaintiff adequately alleges that such information was counteracted by MBIA's contemporaneous statements.  As explained above, MBIA and its officers repeatedly distinguished between the aggregate total of the multi-sector portfolio and a smaller subset of transactions that contained RMBS.  The summary chart purported to list all of MBIA's CDOs containing RMBS, but it omitted the CDOs-squared until they were added on December 19, 2007.  Additionally, Lead Plaintiff alleges that almost immediately after Defendants updated the summary chart, MBIA's stock price dropped (CAC ¶¶ 105-06), and that analysts and news articles stated that MBIA had failed to disclose the CDOs-

squared, (*id.* ¶ 62 (Morgan Stanley analyst stated that "MBIA simply did not disclose arguably the riskiest parts of its CDO portfolio to investors: $8.1 billion of CDO-squareds"; *id.* ¶ 65 (Jones Newswires reported that "the $8.1 billion exposure in CDO-squareds was new to investors")). Considering Defendants' statements specifically differentiating between the multi-sector CDO portfolio as a whole and a subset of multi-sector CDOs containing RMBS, the summary chart omitting the CDOs-squared, and the market reaction after MBIA updated its summary chart, the Court concludes that there are sufficient facts pled to question whether Defendants provided the "truth-on-the-market" with the "degree of intensity and credibility" sufficient to counter-balance the allegedly misleading statements. *See Ganino*, 228 F.3d at 167; *see also In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 288 (S.D.N.Y. 2006) (finding that bad publicity regarding defendants new trading option did not establish truth-on-the-market when counteracted by "authoritative statements from defendants, assuring the market that [the trading option] would catch on"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (considering the "precipitous drop in debt ratings and securities prices" of the defendant company after the alleged corrective disclosure in rejecting truth-on-the-market defense).

Finally, Defendants argue that they are not liable simply because a few analysts or investors were confused. (Defs.' Mem. 24-27.)   Specifically, Defendants point to the KBW moderator's comment that KBW was "comfortable with MBIA's exposure . . . even [to] CDO squared" (Trakht Decl. Ex. 11, at 1), and Fitch's December 10, 2007 press release stating that it would analyze MBIA's exposure to CDOs "backed by subprime RMBS and CDO-squared securities," (Defs.' Mem. 24).  Defendants also point to comments by Bank of America analysts, who stated that "concerns over MBIA's disclosure . . . were overblown" (Trakht Decl. Ex. 26, at 1), a Citgroup analyst's statement that standard disclosures only listed CDOs of ABS "with more

25

than 25% RMBS" (*id.* Ex. 24, at 1), and a Merril Lynch analyst who stated that the sell-off of

MBIA stock was an "overreaction," (*id.* Ex. 25, at 1).

      The Court is not persuaded that these analyst comments show, as a matter of law, that the

market was aware of the true nature of MBIA's CDO-squared exposure.  As Lead Plaintiff points

out, the analyst at KBW did not discuss the collateral content of the CDOs-squared, and the Fitch

report does not specify whether the CDOs-squared contained RMBS.[12]  (Pl.'s Mem. 26-27.)

Other analysts excluded the CDOs-squared in reporting MBIA's exposure to CDOs containing

---

[12] The Court notes that during the KBW conference, Dunton stated that, as of the second quarter of 2007, MBIA had "written about $24.2 billion of multi-sector CDOs that contain some level of RMBS." (Trakht Decl. Ex. 11, at 4.)  Referring to a slide presentation, which stated that MBIA's "Multi-Sector CDOs with some Subprime exposures" had $15.9 billion in net par outstanding (*id.* Ex. 10, at 15), Dunton explained that the "level of RMBS is indicated by the $15.9 billion," (*id.* Ex. 11, at 4).  Arguably, Dunton's statement revealed to the market that the CDOs-squared, which were part of the $24.2 billion figure, contained some level of RMBS. However, Dunton's statement is far from clear because Defendants had stated repeatedly, and continue to maintain, that the $15.9 billion figure reflected the *total CDO* exposure (excluding the CDOs-squared) with *some RMBS*, not the actual RMBS exposure within the CDOs.  (Trakht Decl. Ex. 6, at 6 (listing $15.9 billion as net par exposure of multi-sector CDOs with RMBS); Defs.' Mem. 23-24 n.13 (stating that the RMBS collateral within the CDOs was "substantially less" than the total net par exposure of the multi-sector portfolio).)  Furthermore, after the KBW conference, Chaplin and MBIA allegedly contradicted Dunton by stating that the $15.9 billion number, or its equivalent for the third quarter, represented the total exposure of CDOs containing some RMBS.  (CAC ¶¶ 54, 98; Trakht Decl. Ex. 6, at 6-7; *id.* Ex. 14, at 11.)  Under these circumstances, the Court finds that Dunton's statement was not made with the degree of "intensity and credibility" sufficient to counter-balance the other allegedly misleading statements made by Defendants both before and after Dunton's statement.  *See Ganino*, 228 F.3d at 168 (noting that even if defendant's statements in SEC filings had been factually accurate, the court could not "decide on the present record whether those disclosures were conveyed with sufficient 'intensity and credibility' as to dispel the false impression created by [defendant's] alleged misrepresentations"); *see also Converse Tech.*, 543 F. Supp. 2d at 150-51 (finding that plaintiff adequately alleged that disclosure of problems in defendant's financials "may not have been intense or credible enough to counterbalance effectively" previous misstatements when defendant did not update its financials or provide other information (internal quotation marks omitted)); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (rejecting truth-on-the-market defense because even if news articles and disclaimers "raised some concern in the market about [defendant's] alleged conflicts, such information was counteracted by contemporaneous statements" regarding defendant's objectivity and independence).

RMBS (CAC ¶¶ 52, 55-56; Trakht Decl. Ex. 9, at 8), and Morgan Stanley reported that MBIA

had not disclosed the CDOs-squared, (Trakht Decl. Ex. 22, at 1).  Faced with these conflicting

reports, the Court cannot decide the fact intensive issue of truth-on-the-market on a motion to

dismiss.  *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05-CV-

1898, 2005 WL 2148919, at *8, *12 (S.D.N.Y. Sept. 6, 2005) (finding that analyst reports

regarding aggressive underwriting and underwriting problems did not sufficiently establish truth-

on-the-market to "overcome the representations of 'rigorous underwriting'" made by

defendants); *In re Globalstar Sec. Litig.*, No. 01-CV-1748, 2003 WL 22953163, at *9 (S.D.N.Y.

Dec. 15, 2003) ("The question of whether, and when, the market had received strong enough

information to counteract the allegedly misleading statements is best resolved on a summary

judgment motion or at trial, not [on a motion to dismiss].")[13]

Nor is the Court persuaded that investors could have discovered the truth about the

CDOs-squared through minimal diligence.  Although "an investor may not justifiably rely on a

misrepresentation if, through minimal diligence, the investor should have discovered the truth,"

*Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005) (internal quotation marks

---

[13]   Defendants also argue that the CDO Primer charts summarizing MBIA's multi-sector
CDOs with RMBS were meant only to disclose the largest RMBS-backed transactions.  (Defs.'
Mem. 23-24 n.13, 29-30.)  Although several analysts stated that MBIA disclosed transactions
with 25% or more RMBS collateral (Trakht Decl. Ex. 24, at 1-2; *id.* Ex. 25, at 3), Lead Plaintiff
alleges that several of the undisclosed CDOs-squared contained more than 25% RMBS, (CAC ¶
114). Furthermore, Defendants explicitly excluded certain RMBS-backed transactions from the
charts (Trakht Decl. Ex. 4, at 7 (excluding multi-sector CDOs backed by European ABS),
without explicitly excluding transactions with less RMBS collateral.  Nor do Defendants allege
that MBIA disclosed its alleged policy to investors.  Although Defendants may ultimately prove
at summary judgment or at trial that MBIA followed industry custom in excluding the RMBS-
backed CDOs-squared from its disclosures before December 19, 2007, Lead Plaintiff has pled
sufficient facts for purposes of deciding this motion to allege that reasonable investors (even if
not all investors) would not have been aware that undisclosed RMBS-backed transactions were
excluded based on this supposed practice.

omitted), Defendants do not explain what "minimal diligence" investors could have performed. Lead Plaintiff alleges that, except for the disclosures discussed above, investors did not have access to information about the nature or collateral content of specific MBIA transactions.  (Pl.'s Mem. 27-28.)  Because the Court has already found that Lead Plaintiff has plausibly alleged that MBIA's public statements did not sufficiently disclose the collateral content of the CDOs-squared, Lead Plaintiff has adequately alleged that investors could not have discovered the RMBS content within the CDOs-squared through diligence.  *See Comverse Tech.*, 543 F. Supp. 2d at 151 (rejecting truth-on-the-market defense "because, without an estimate of the expected changes to [defendant's] financial statements, investors had no way to know whether [defendant] was profitable").[14]

### 3. Materiality of CDOs-Squared to MBIA's Overall Portfolio

Defendants argue that Lead Plaintiff has failed to adequately allege that the CDOs-squared were material to MBIA's insured portfolio because the CDOs-squared represented one percent of the $652 billion insured portfolio.  (Defs.' Mem. 29.)  Defendants also argue that the CDOs-squared were backed primarily by corporate collateral, not RMBS, that the RMBS was

---

[14] None of Defendants' cases is to the contrary because, unlike in the instant matter, the investors in those cases had access to important underlying facts, or could have been aware of the facts through minimal diligence.  *See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 270-71 (3d Cir. 2005) (finding truth-on-the-market when disclosure provided all necessary information but required investors to perform simple mathematics to obtain total); *Starr*, 412 F.3d at 109-10 (noting that investors were sent two detailed letters offering share-exchange services without a fee and disclosing defendant's service fee); *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 633 (S.D.N.Y. 2008) (finding that scientific studies relied upon by plaintiffs clearly disclosed conflicting evidence regarding drug efficacy); *White v. H & R Block, Inc.*, No. 02-CV-8965, 2004 WL 1698628, at *12-13 (S.D.N.Y. July 28, 2004) (finding truth-on-the-market when the allegedly concealed information was fully available in court documents, press coverage, and defendant's SEC disclosures).

high grade, and that Lead Plaintiff did not allege that the CDOs-squared performed poorly.  (*Id.* at 29-30.)  As discussed above, materiality is judged by whether a reasonable investor would consider the omitted fact as "significantly alter[ing] the 'total mix' of information," *Basic*, 485 U.S. at 231-32, including facts that "affect the probable future of the company and that may affect the desire of investors to buy, sell, or hold the company's securities," *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (internal quotation marks and brackets omitted).  "The determination of whether an alleged misrepresentation is material necessarily depends on all relevant circumstances." *DiBella*, 587 F.3d at 565 (internal quotation marks and brackets omitted).  The Second Circuit has rejected bright-line numeric tests for judging materiality, instead requiring courts to consider the facts of each case.  *See Ganino*, 228 F.3d at 162 (noting that the Second Circuit has "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation"); *see also Basic*, 485 U.S. at 236 (noting that although "[a] bright-line rule [] is easier to follow," "[a]ny approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive"); *ECA*, 553 F.3d at 204 (analyzing, in the context of alleged misrepresentations in defendant's financial statements, quantitative and qualitative factors of materiality).

Here, Lead Plaintiff has adequately alleged that the CDOs-squared were material, even if they represented a small fraction of MBIA's overall insured portfolio.  Lead Plaintiff alleges that MBIA's success depended on maintaining its triple-A rating (CAC ¶¶ 20-24), that the rating agencies considered MBIA's "capital adequacy," or its ability to pay claims, a primary factor in determining MBIA's credit rating (*id.* ¶ 25), and that sudden losses could "wipe out" MBIA's capital adequacy and destroy its credit rating if MBIA did not have sufficient capital to pay the

losses, (*id.* ¶¶ 25-26).  Specifically, Lead Plaintiff alleges that the CDO-squared exposure was

25% larger than MBIA's capital base.[15]  (*Id.* ¶¶ 25, 61.)  Lead Plaintiff also alleges that CDOs-

squared were risky investments because they were highly leveraged and were multiple steps

removed from the underlying collateral.  (*Id.* ¶¶ 32-33).  Accepting these facts as true, as the

Court must at this stage, Lead Plaintiff has adequately alleged that reasonable investors would

consider the CDOs-squared and their RMBS collateral as "significantly alter[ing] the 'total mix'

of information" because losses in this portfolio could significantly affect MBIA's triple-A ratings

and creditworthiness.  *See In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 975 (D.

Minn. 2009) (finding plaintiff's allegations sufficient to show that exposure to subprime

collateral was material considering, inter alia, "the external market indicators" and "the

importance of the [p]ortfolio to [defendant's] solvency and ability to meet its payment service

obligations"); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp.

2d 348, 360-61 (S.D.N.Y. 2006) (finding positive statements regarding company's risk exposure

materially misleading because they omitted exposure to losses from investments in companies

under investigation).

      Indeed, Defendants' own statements support Lead Plaintiff's allegations that losses in

relatively small segments of the overall portfolio could materially affect MBIA's ability to pay

---

      [15] Defendants' argument that the CDOs-squared were not material because MBIA's total claims-paying resources were larger than its capital base is unavailing.  Defendants argue that MBIA's total claims-paying resources, which included the "capital base, the present value of future premiums, credit facilities, and other items" was $13.6 billion at the end of the second quarter of 2007.  (Defs.' Reply Mem. in Supp. of Mot. to Dismiss ("Defs.' Reply Mem.") 9-10 & n.4.)  Even if true, as Lead Plaintiff acknowledges (CAC ¶ 25), the CDO-squared exposure at this time was more than half of MBIA's total claims-paying resources.  As a result, the Court finds that the CDO-squared exposure posed a material risk to MBIA's financial solvency, even if these transactions would not alone have completely depleted MBIA's claims-paying resources.

claims and maintain its credit rating.  For example, Defendants' SEC disclosures stated that MBIA's ability to attract new business was "largely dependent on [its] triple-A financial strength."  (Trakht Decl. Ex. 2, at 22.)  As a result, an "actual or perceived deterioration in creditworthiness" could require MBIA to reserve more capital, and "an increase in capital charges could reduce the amount of capital available to pay claims and support MBIA['s] [] triple-A ratings."  (*Id.* at 25.)  Furthermore, Defendants do not even dispute Lead Plaintiff's claim that MBIA's exposure to RMBS, whatever the quantity, was important to investors because of the volatility in the housing and secured-transaction markets.  Put another way, the Court cannot say that the alleged misstatements at issue were "so obviously unimportant to a reasonable investor that reasonable minds" might not differ on their importance.  *See ECA*, 553 F.3d at 197 (internal quotation marks omitted).  Considering all of the relevant circumstances, the Court finds that Lead Plaintiff has alleged sufficient facts to show that the CDOs-squared were material to investors.

### 4. Statements Regarding Control Rights and Payment Obligations

Lead Plaintiff alleges that Defendants made material misstatements in MBIA's 2006 10-K by failing to disclose that the CDOs-squared lacked the structural protections of MBIA's traditional guarantees.  (CAC ¶ 120.)  Lead Plaintiff also alleges that the 2007 First Quarter CDO Primer materially misled investors by stating that MBIA's CDO portfolio was in compliance with its "zero loss" underwriting standards, without disclosing the lack of structural protections. (*Id.* ¶¶ 78-79.)  Lead Plaintiff further alleges that MBIA representatives made material misrepresentations during the August 2, 2007 call by emphasizing the importance of the structural protections, but without disclosing that some of the CDOs-squared lacked these protections.  (*Id.* ¶¶ 87-88.)  According to Lead Plaintiff, these statements were materially

misleading because Defendants "recklessly disregarded that the loans . . . were the product of severely deficient underwriting standards" (*id.* ¶ 38), and because the lack of structural protections "exposed [MBIA] to significant risk of loss inconsistent with MBIA's 'zero loss standard,'" (*id.* ¶ 79).

The Court finds that Lead Plaintiff has not alleged sufficient facts to show that these statements were materially misleading at the time they were made, the time frame in which materiality is to be assessed. *See Nokia*, 423 F. Supp. 2d at 392 (noting that to establish securities fraud, plaintiffs must plead "why the alleged false or misleading statements were actually false or misleading when made"). Although Lead Plaintiff alleges that, eventually, MBIA recorded losses on some of its CDOs-squared, Lead Plaintiff has not alleged any facts showing that MBIA did not comply with its underwriting standards when it approved the CDOs-squared. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008) (rejecting plaintiffs' claim that, simply because the CEO and a compliance officer committed fraud, the defendants' statements about its risk management program were materially misleading when plaintiffs failed to plead that the program did not exist, or that it did not have the listed goals); *In re JP Morgan Chase Sec. Litig.*, No. 02-CV-1282, 2007 WL 950132, at *13 (S.D.N.Y. Mar. 29, 2007) (finding alleged misstatements immaterial when plaintiffs failed to plead facts showing that defendant conducted its due diligence improperly or "would have conducted due diligence in a materially different manner" if it had followed proper accounting principles (internal quotation marks omitted)), *aff'd sub nom.*, 553 F.3d 187 (2d Cir. 2009). Furthermore, the CW's general allegation that Dunton was aware of the deteriorating quality of the loans does not show that the loans failed to meet MBIA's underwriting standards at the time of the alleged misrepresentations. Thus, Lead Plaintiff has not pled particularized facts showing how the lack of structural

protections or the quality of the loans failed to meet MBIA's underwriting standards or by how much.  *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("[P]laintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so."); *see also In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 589-90 (S.D.N.Y. 2007) (finding no materially misleading statements when plaintiffs failed to plead with particularity "sufficient facts to support plaintiffs' belief that [defendant's] pricing arrangements with airlines were not long-term").  As a result, Lead Plaintiff has failed to allege that the statements regarding the payment obligations or control rights were materially misleading, and these claims must be dismissed.

C. Scienter

Having sufficiently alleged certain material misrepresentations and omissions by Defendants, Lead Plaintiff must also adequately plead scienter.  To do so, the CAC must allege facts that give rise to a strong inference of an intent to "deceive, manipulate or defraud."  *Tellabs*, 551 U.S. at 319 (internal quotation marks omitted).  That intent can be established either by:  (1) alleging facts showing Defendants had both motive and opportunity to commit fraud; or (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  *See ECA*, 553 F.3d at 198; *Rombach*, 355 F.3d at 176.  A plaintiff alleging motive and opportunity may allege that defendants "'benefitted in a concrete and personal way from the purported fraud,'" *S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000), and not merely the achievement of goals "possessed by virtually all corporate insiders," *id.* at 109 (internal quotation marks omitted).

A plaintiff who cannot show motive may show strong circumstantial evidence of

33

conscious misbehavior or recklessness, but "'the strength of the circumstantial allegations must be correspondingly greater.'" *ECA*, 553 F.3d at 199 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). To state a claim based on recklessness, a plaintiff must allege "conscious recklessness" or "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry*, 573 F.3d at 109 (internal quotation marks and emphasis omitted). To do this, a plaintiff must plausibly show "highly unreasonable" conduct representing "an extreme departure from the standards of ordinary care," such as that "the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (internal quotation marks and emphasis omitted). When a plaintiff alleges that defendants "'knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts.'" *Pfizer*, 538 F. Supp. 2d at 636 (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)). However, "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.* (*Dynex I*), 531 F.3d 190, 196 (2d Cir. 2008) (internal quotation marks and brackets omitted).

To determine whether a strong inference of scienter has been adequately pleaded, the Court must consider the complaint in its entirety and compare the inferences suggested by Lead Plaintiff with "plausible nonculpable explanations." *See Tellabs*, 551 U.S. at 323-24; *see also S. Cherry*, 573 F.3d at 111 (same). The inference that Defendants acted with scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences," but it must be "more than merely 'reasonable' or 'permissible' — it must be cogent and compelling, thus strong in light of other explanations." *See Tellabs*, 551 U.S. at 324 (internal

34

quotation marks omitted).  In sum, the Court must determine whether a "reasonable person [would] deem the inference of scienter at least as strong as any opposing inference."  *Id.* at 326.

### 1. Individual Defendants

Even reading the CAC in the light most favorable to Lead Plaintiff, Lead Plaintiff fails to allege particularized facts sufficient to state a claim based on recklessness against Dunton and Chaplin.  Lead Plaintiff alleges that both Individual Defendants knew of the RMBS collateral within the CDOs-squared.  Specifically, Lead Plaintiff alleges that Dunton, as a member of the Executive Credit Committee, reviewed and approved all of the transactions at issue.  (CAC ¶¶ 38-41, 128.)  Lead Plaintiff also alleges that the CW stated that Dunton received memoranda from MBIA's due diligence group regarding the loan originators and servicers of the CDOs-squared, providing Dunton with information about the quality of the loans.  (*Id.* ¶¶ 39-41.)  Lead Plaintiff further alleges that Dunton and Chaplin sat on committees responsible for monitoring the transactions (*id.* ¶ 38), and that they both signed MBIA's SEC forms and Sarbanes-Oxley certificates, (*id.* ¶¶ 12, 14).

Lead Plaintiff's generalized allegation of Dunton and Chaplin's membership on various corporate committees is insufficient to show that they were personally aware of the RMBS-content in the CDOs-squared.  *See Police & Fire Ret. Sys. v. Safenet, Inc.*, 645 F. Supp. 2d 210, 234 (S.D.N.Y. 2009) ("Courts may not infer scienter 'solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information.'" (quoting *Jefferson Ins. Co. of N.Y. v. Roahana* (*In re Winstar Commc'ns*), Nos. 01-CV-3014, 01-CV-11522, 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006))); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 340 (W.D.N.Y. 2008) ("It is well established that boilerplate allegations that defendants

knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter." (internal quotation marks omitted)).  Lead Plaintiff alleges no facts regarding what reports or information about the CDOs-squared were provided to Chaplin or Dunton because of their committee memberships, thus making their mere membership on these committees insufficient.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) (noting that allegation of committee membership is insufficient to establish scienter without "specific allegations of various reasonably available facts, or red flags, that should have put the officers on notice that the public statements were false." (internal quotation marks omitted)).  Similarly, the allegation that Dunton personally approved the CDOs-squared fails to plead any specific information available to him during the approval process appraising him of the RMBS-content in the CDOs-squared.

The CW's statements also do not support a strong inference of recklessness.  The CW stated that Dunton was given "due diligence reports on loan originators and servicers" that "detailed delinquency rates, loss rates, shifts in underwriting standards, and any changes in the lender's management."  (CAC ¶¶ 39-41.)  These generalized statements do not plead sufficiently particular facts or information available to Dunton in the due diligence reports regarding the CDOs-squared or their RMBS collateral.[16]  For example, Lead Plaintiff does not allege that the

---

[16] The Court notes that after *Tellabs*, the Seventh Circuit held that allegations from confidential witnesses must be discounted, because "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist."  *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 757 (7th Cir. 2007).  Although the Second Circuit has yet to rule on this issue post-*Tellabs*, it has previously held that confidential sources need not "be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *See Novak*, 216 F.3d at 314.  Absent guidance to the contrary, the Court will consider Lead Plaintiff's allegations that are

reports contained information regarding the RMBS-content of the CDOs-squared as opposed to the loan servicers, what this information might have been, or when such reports were given to Dunton. *See ATSI*, 493 F.3d at 106 (declining to find strong inference of scienter from defendants' alleged previous frauds when plaintiffs did not "specify which companies experienced a decline in share price or when they experienced the decline," and failed to allege "with particularity what, if anything, the defendants did to cause the decline"); *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (finding no strong inference of recklessness when plaintiff failed "to allege that [d]efendants had access to information that *specifically* informed them of the alleged flaws" in loss estimate reports (emphasis in original)); *Bausch & Lomb*, 592 F. Supp. 2d at 342 (finding no inference of scienter when two confidential sources did not "specifically state that any [i]ndividual [d]efendant had direct information or access to information of [defendant's] illegal practices"); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 572 (S.D.N.Y. 2007) (finding confidential witness's statement that defendants were aware of "many undisclosed illegalities" insufficient to satisfy heightened securities fraud pleading requirements (internal quotation marks omitted)).  Furthermore, Lead Plaintiff's allegations that Dunton and Chaplin signed MBIA's SEC disclosures and Sarbanes-Oxley certificates are insufficient to support a strong inference of recklessness in the absence of more particularized allegations.  *See In re Bausch & Lomb*, 592 F. Supp. 2d at 341 (finding no inference of scienter when plaintiffs failed to offer "any particularized allegation" that the "CEO

---

based on the CW's information, "without discounting those allegations due *solely* to the anonymity of the" CW.  *See In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 526 & n.18 (S.D.N.Y. 2009) (emphasis in original), *aff'd*, No. 09-CV-1370, 2009 WL 4893719 (2d Cir. Dec. 21, 2009); *see also Ambac Fin. Group, Inc. Sec. Litig.*, No. 08-CV-411, 2010 WL 727227, at *20 n.31 (S.D.N.Y. Feb. 22, 2010) (allowing plaintiffs to "rely on confidential sources to satisfy the pleading requirements of the PSLRA").

and CFO certifications pursuant to the Sarbanes-Oxley Act were not honestly and reasonably

believed to be true when made").  In sum, Lead Plaintiff has failed to plead with particularity

what reports or information concerning the RMBS collateral in the CDOs-squared were available

to Dunton and Chaplin so that "the danger [of misleading investors] was either known . . . or so

obvious that [they] must have been aware of it."  *See S. Cherry*, 573 F.3d at 109, 115 (upholding

dismissal of complaint when plaintiffs failed to plead facts known to the defendant showing

fraudulent conduct (internal quotation marks omitted)).[17]  Therefore, Defendants' Motion to

Dismiss is granted as to Dunton and Chaplin, without prejudice.

    2. MBIA

    Even though Lead Plaintiff does not sufficiently allege scienter for the individually

named Defendants, the Court finds that Lead Plaintiff has alleged particularized facts supporting

---

    [17] Lead Plaintiff also asserts that Dunton, Chaplin, and MBIA had motive and opportunity to commit fraud.  However, the only motives Lead Plaintiff alleges are that Defendants sought to portray MBIA as protected from the housing crisis, to distinguish MBIA from its competitors, and to reassure investors about the company's exposure to RMBS.  (Pl.'s Mem. 40.)  The law is clear that motives "possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating . . . or otherwise sustain the appearance of corporate profitability" are insufficient for pleading motive and opportunity.  *S. Cherry*, 573 F.3d at 109 (internal quotation marks omitted); *see also Dynex I*, 531 F.3d at 196 (noting that plaintiffs may not plead scienter based on motives possessed by all corporate insiders, such as a motive to "sustain the appearance of corporate profitability, or of the success of an investment" (internal quotation marks omitted)); *Ambac*, 2010 WL 727227, at *18 ("[T]he desire to maintain a high corporate credit rating is not enough to plead motive, even though [defendant insurance company's] credit rating was fundamental to its business model.").  Because Lead Plaintiff has asserted no other motives besides a general desire by Defendants to maintain an appearance of corporate profitability and to maintain MBIA's credit-rating, Lead Plaintiff has failed to adequately allege motive and opportunity.  *See Dynex I*, 531 F.3d at 196 (finding motive to "avoid fully disclosing the impaired quality of the collateral" in defendant's investments insufficient to plead scienter (internal quotation marks and brackets omitted)); *Zirkin v. Quanta Capital Holdings Ltd.*, No. 07-CV-851, 2009 WL 185940, at *12 (S.D.N.Y. Jan. 23, 2009) ("A motive to maintain a higher financial rating to protect the viability of the [c]ompany . . . is not enough, under the law of [the Second] Circuit, to sufficiently put forth a claim that a statement contained in an offering document was 'fraudulent' at the time it was made.")

a strong inference of recklessness for MBIA.  As an initial matter, the fact that Lead Plaintiff

failed to allege scienter for the individual Defendants does not preclude a finding of recklessness

against MBIA.  *See Dynex I*, 531 F.3d at 195 ("It is possible to raise the required [scienter]

inference with regard to a corporate defendant without doing so with regard to a specific

individual defendant."); *accord Makor Issues & Rights., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710

(7th Cir. 2008) ("[I]t is possible to draw a strong inference of corporate scienter without being

able to name the individuals who concocted and disseminated the fraud."); *In re IMAX Sec.

Litig.*, 587 F. Supp. 2d 471, 479 n.31 (S.D.N.Y. 2008) ("The failure to allege adequately the

requisite state of mind of an officer or director named as an individual defendant does not

necessarily compel the dismissal of like claims against the corporation.").  All that is required is

that "the pleaded facts [] create a strong inference that someone whose intent could be imputed to

the corporation acted with the requisite scienter."  *Dynex I*, 531 F.3d at 195.

Here, Lead Plaintiff alleges that MBIA officers repeatedly stated that MBIA carefully

reviewed the collateral underlying all of its multi-sector CDOs.  (CAC ¶ 42.)  For example, Lead

Plaintiff alleges that during the August 2, 2007 call, Carl Webb, MBIA's Managing Director and

Head of Real Estate and Secondary Markets, stated, in reference to MBIA's direct RMBS

exposure, that MBIA spends "a lot of time looking at the attributes in the collateral pool,"

including "property type," "loan purpose," and "a lot of detail characteristics."  (*Id.* ¶ 42

(emphasis omitted); Trakht Decl. Ex. 7, at 6-7.)  During the August 2, 2007 call, Patrick Kelly,

MBIA's Managing Director and Head of CDOs and Structured Products, stated that MBIA

carefully reviewed "every transaction or every reference piece of collateral within the

transaction" for its CDOs, including "property type."  (Trakht Decl. Ex. 7, at 9.)  Patrick Kelly

also stated that MBIA used its "RMBS collateral experts" to help review the "underlying asset

39

class[es] and CDO management experience." (*Id.* at 11.)  Lead Plaintiff further alleges that MBIA had a due diligence group that "examined samplings of loans to check loan characterisitics."  (CAC ¶ 40.)

   Importantly, MBIA admits that its officers had knowledge of the RMBS collateral in the CDOs-squared by maintaining that the officers disclosed the RMBS content during the conference calls and presentations.  For example, Defendants argue that Anthony McKiernan, the Head of Structured Finance Insured Portfolio Management, disclosed the RMBS collateral in his answer to an investor question on the CDOs-squared.  (Defs.' Mem. 22.)  Despite this knowledge, McKiernan also stated that MBIA's total RMBS-backed CDO exposure was approximately $16 billion, omitting the CDOs-squared.  (Trakht Decl. Ex. 7, at 14, 17.)  Dunton also discussed slides inaccurately showing that the total MBIA exposure was only $15.9 billion. (*Id.* Ex. 10, at 15; *id.* Ex. 11, at 4.)  Furthermore, MBIA continues to maintain that it fully disclosed the RMBS collateral by providing the aggregate exposure of its multi-sector portfolio in its disclosures.  (Defs.' Mem. 23-24.)  Defendants cannot maintain that its officers repeatedly disclosed the RMBS-content of the CDOs-squared to the market, but that none of its officers were aware of the RMBS backing the CDOs-squared.  *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 460 n.21 (S.D.N.Y. 2005) ("Defendants[] cannot simultaneously argue that the vendor financing arrangements were disclosed to the investing public, but that [defendant's] CEO and CFO were unaware of those commitments.").  Moreover, the fact that MBIA updated the summary chart on December 19, 2007 to include the CDOs-squared supports a strong inference that MBIA's officers knew of the RMBS collateral during the Class Period.  (Trakht Decl. Ex. 21, at 2); *see In re Dynex Capital, Inc. Sec. Litig.* (*Dynex II*), No. 05-CV-1897, 2009 WL 3380621, at *15 (S.D.N.Y. Oct. 19, 2009) (noting that while the restatement of financial

information is not alone enough to allege scienter, such restatements may support an inference of scienter).  Thus, Lead Plaintiff has adequately alleged that MBIA's officers had knowledge of and access to non-public information regarding the RMBS collateral within the CDOs-squared that contradicted their public statements.  This type of specific knowledge supports the strong inference Lead Plaintiff must establish.  *See In re Alstom*, 406 F. Supp. 2d at 456-57 (finding scienter adequately pled when the plaintiffs alleged that "the entity executing the financing arrangements[] had access to information about those arrangements and chose not to disclose them to the public"); *see also Dynex II*, 2009 WL 3380621, at *14 (finding strong inference of scienter based on recklessness when complaint alleged that defendants had access to foreclosure reports and loan documentation that collectively revealed existence of defective loans, which were not disclosed to the market); *Hall*, 580 F. Supp. 2d at 232-33 (finding strong inference of scienter based on recklessness when employees were aware, but did not disclose, problems between the defendant company and its licensor); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 229 (S.D.N.Y. 2008) (finding strong inference of scienter for defendant who had knowledge of undisclosed risk alert document that made earlier statements regarding the company's liquidity materially misleading).

Indeed, Defendants do not dispute that MBIA's officers had knowledge of the RMBS-collateral in the CDOs-squared, focusing instead on whether they had sufficient knowledge of the quality of the RMBS to know that this information was material.  (Defs.' Mem. 35-37.) Although the CAC alleges that the CDOs-squared deteriorated and caused financial losses to MBIA, most of the alleged misstatements and omissions revolve around the *existence* of RMBS collateral in the CDOs-squared, not on the quality or performance of the transactions.  *Cf. In re Duane Reade Inc. Sec. Litig.*, No. 02-CV-6478, 2003 WL 22801416, at *10 (S.D.N.Y. Nov. 25,

2003) (finding no inference of scienter when plaintiffs alleged that defendants had access to sales

data but did not show defendants' awareness that their financial predictions would be false), *aff'd*

*sub nom.*, 107 F. App'x 250 (2d Cir. 2009).[18]

  The case of *In re IMAX Securities Litigation* is instructive.  In *IMAX*, plaintiffs alleged

that the defendant company and individual defendants were reckless in misrepresenting the

company's recognition of theater installation revenues.  587 F. Supp. 2d at 473-75.  The court

held that plaintiffs adequately alleged scienter for all of the defendants when "defendants

undoubtedly appreciated that theater system revenue was of singular importance to the financial

well-being and market perception of the [c]ompany."  *Id.* at 481.  The court noted that the

company "repeatedly highlighted the number" of theater installations "as a barometer of its

financial health."  *Id.*  After also noting that the defendants had specific knowledge of theater

installation progress and accounting, the court found that plaintiffs had adequately pled

recklessness.  *Id.* at 481-83.

  Just as IMAX executives understood the importance of theater revenue to their company,

Lead Plaintiff has adequately alleged that MBIA executives were acutely aware of the importance

of RMBS to MBIA's continued creditworthiness and to concerned investors.  For example, Lead

---

[18] The fact that Lead Plaintiff's allegations center around the existence of the RMBS collateral, rather than whether or not these transactions were "toxic," refutes Defendants' argument that any inference of recklessness is undercut by MBIA wrapping new CDO-squared transactions in the third quarter of 2007.  (Defs.' Reply Mem. 15.)  Lead Plaintiff adequately alleges that investors and analysts were concerned about the risks of CDOs backed by RMBS.  (CAC ¶¶ 36-37, 43-50.)  Indeed, Lead Plaintiff alleges that MBIA held the August 2, 2007 conference call and issued the CDO Primers in an attempt to assuage such investor fears.  (*Id.* ¶¶ 47, 50.)  Despite knowing investors' concerns, Lead Plaintiff alleges, MBIA omitted the RMBS-collateralized CDOs-squared from its disclosures.  Thus, the fact that MBIA entered into new RMBS-backed CDO-squared transactions, which Lead Plaintiff alleges were not disclosed to investors, does little to counter the inference of recklessness.

Plaintiff alleges that MBIA executives, including those who made some of the alleged material misstatements, participated in special conference calls and presentations designed to address investor concerns over MBIA's RMBS-backed CDO portfolio.  (CAC ¶¶ 42, 50-51, 53-54.)  As discussed in detail above, Lead Plaintiff has alleged numerous other specific facts showing that MBIA executives emphasized the importance of MBIA's triple-A ratings and focused on the effects of RMBS collateral on MBIA's liquidity.[19]  Considering all of these allegations, Lead Plaintiff has adequately alleged facts showing "an extreme departure from the standards of ordinary care" such that MBIA officers knew that they misrepresented material information or were otherwise reckless when, despite their knowledge of the RMBS-backed CDOs-squared and of the factors making the CDOs-squared material, they published detailed charts summarizing MBIA's RMBS-backed CDOs and made statements regarding the "total" RMBS-backed CDO exposure, without including the CDOs-squared.  *See S. Cherry*, 573 F.3d at 109 (noting that an extreme departure from the standards of ordinary care may be shown by showing that the danger of misleading investors was "either known to the defendant or so obvious that the defendant must have been aware of it" (internal quotation marks and emphasis omitted)); *see also Scholastic*

---

[19] (CAC ¶ 24 (Dunton stated that "'MBIA's true constant – our north star, if you will – is our commitment to protecting our Triple-A ratings, the keystone of our franchise'"); *id.* ¶ 24 (MBIA's 2006 10-K stated that "'any reduction in [MBIA's] ratings could have a material adverse effect' on the [c]ompany"); *id.* ¶ 42 (MBIA executive stated that after examining the attributes of the collateral pool, "[i]f we're not comfortable with the collateral characteristics, we don't move forward on the deal"); *id.* ¶ 45 (Chaplin stated that MBIA "was not only safe from the housing crisis, but was 'significantly overcapitalized'"); *id.* ¶ 50 (MBIA set up the August 2, 2007 conference call "'to answer questions concerning MBIA's subprime RMBS exposure, CDO exposure and related topics'" and set up an email account to receive investor questions); *id.* ¶ 51 (MBIA executive stated during August 2, 2007 call that MBIA's RMBS exposure was modest); *id.* ¶ 76 (CDO Primers were created because "RMBS of recent vintage were exhibiting sharply rising default rates" and because of rising investor concern); *id.* ¶ 78 (First Quarter CDO Primer stated that MBIA did not expect the CDO portfolio to pose a risk to its ratings).

*Corp.*, 252 F.3d at 76-77 (finding inference of recklessness when "[d]efendants publicly represented that returns were not increasing and failed to adjust revenues despite their knowledge of rapidly rising returns"); *Hall*, 580 F. Supp. 2d at 233-34 (S.D.N.Y. 2008) (finding strong inference of scienter based on recklessness when defendant was aware of the reasons that made the company's financial statements materially misleading); *Lapin*, 506 F. Supp. 2d at 241-42, 249 (dismissing securities fraud claim against individual defendant but denying motion to dismiss claim against corporate defendant when plaintiff adequately alleged that defendant's analysts issued recommendations contrary to their true beliefs).[20]

Turning to the comparative analysis required by *Tellabs*, Defendants argue that a more plausible, non-culpable inference is that MBIA provided extensive disclosures regarding the RMBS collateral, and that any misstatement was the result of a good faith, though mistaken, belief that the statements adequately disclosed the CDOs-squared.  (Defs.' Mem. 38-40.)

---

[20] Defendants make much of the S&P report, arguing that because S&P was able to piece together the aggregate RMBS-backed CDO exposure, Lead Plaintiff has failed to allege an intent to defraud.  This argument does not get Defendants across the goal-line.  First, as Lead Plaintiff points out, the documents do not show what information was provided to S&P or whether S&P was aware of the amount or type of RMBS collateral in the CDOs-squared.  (Trakht Decl. Ex. 20, at 11 (listing MBIA's total exposure to CDOs with RMBS collateral without any details as to the amount or type of RMBS collateral in each transaction).)  Second, the timing of MBIA's detailed disclosure of the CDOs-squared on the heels of the S&P report supports an inference of consciousness of guilt.  *See Alstom*, 406 F. Supp. 2d at 456 & n.14, 457 (noting that "[a] fact finder could reasonably conclude that [defendant's] belated disclosures" of the company's exposure to loan defaults "indicated its consciousness of the impropriety of its actions," especially when corporate officers were aware of the loans' risks); *Pimco Advisors*, 341 F. Supp. 2d at 465 (noting that defendant's belated disclosure of the existence of a transaction violating its market timing policies could support an inference of recklessness).  Specifically, a fact finder could conclude that MBIA's sudden "updating" of the CDO Primer summary chart to include its CDOs-squared after S&P's report shows MBIA's recklessness in omitting this information earlier.  Moreover, the fact that MBIA suddenly decided to include the CDOs-squared on the CDO summary chart undermines Defendants' contention, made for the first time at oral argument, that MBIA omitted the CDOs-squared because they were considered a wholly separate category of security.

44

Although this alternative inference is plausible, the Court finds that the inference of recklessness is at least as plausible. *See Tellabs*, 551 U.S. at 324 ("A complaint will survive . . . if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference . . . ."). Defendants are correct that MBIA's accurate disclosures would cut against an inference of fraud, *see Dynex II*, 2009 WL 3380621, at *16, but Lead Plaintiff has adequately alleged that MBIA's disclosures were materially inaccurate, *see id.* (finding strong inference of scienter despite accurate disclosures when accurate disclosures were consistent with other, misleading disclosures). Furthermore, Lead Plaintiff has alleged sufficient facts, discussed in detail above, showing that MBIA's officers were aware of all of the factors making the existence and collateral content of the CDOs-squared material. Moreover, MBIA's sudden update of the CDO summary chart after S&P's report supports an inference of fraudulent intent. As a result, the Court finds the inference that MBIA's officers knew or likely knew that their statements were materially misleading at least as plausible as an inference that they were not aware of the potential importance of the CDOs-squared to investors. *See Hall*, 580 F. Supp. 2d at 233-34 (finding strong inference of scienter based on recklessness when defendant was aware of the reasons that made the company's financial statements materially misleading); *see also In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (finding innocent inference less compelling when defendants were aware of "how critical maintaining [drug] exclusivity was to the [c]ompany's profitability," but did not disclose a threat to that exclusivity); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 393-94 (S.D.N.Y. 2007) (finding implausible an inference that sophisticated executives actively engaged in the planning of the transactions were ignorant of the transaction's tax consequences).

D. Loss Causation

"Loss causation," which is the securities law equivalent of tort law's "proximate cause,"

"requires that [a] plaintiff adequately allege a causal connection between defendants'

non-disclosures and the subsequent decline in the value of [the implicated] securities." *Emergent*

*Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003); *see also*

*Dura Pharm.*, 544 U.S. at 342 (noting that loss causation requires a plaintiff to show "a causal

connection between the material misrepresentation and the loss"); *In re Omnicom Group, Inc.*

*Sec. Litig.*, — F.3d —, No. 08-CV-612, 2010 WL 774311, at *7 (2d Cir. Mar. 9, 2010) ("'Loss

causation' may [] refer to the requirement that the wrong for which the action was brought is a

but-for cause or cause-in-fact of the losses suffered . . . ."). "In other words, a complaint must

plead that plaintiff's losses were caused by the disclosure of the truth that [d]efendants had

previously allegedly misrepresented." *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F.

Supp. 2d 218, 229 (S.D.N.Y. 2009). Lead Plaintiff cannot simply plead an "artificially inflated

purchase price" to establish loss causation, *see Dura*, 544 U.S. at 347, but "allegations of

significant price drops in response to disclosures of the alleged omissions or misstatements can

establish loss causation." *SafeNet*, 645 F. Supp. 2d at 228; *see also Omnicom*, 2010 WL 774311,

at *8 (noting that a concealed fraud may "cause investors' losses . . . when disclosure of the fraud

is made and the available public information . . . is corrected"); *In re Take-Two Interactive Sec.*

*Litig.*, 551 F. Supp. 2d 247, 282 (S.D.N.Y. 2008) ("In their 'simplest form,' loss causation

allegations connect the diminution in stock prices to a particular corrective disclosure, which

revealed an alleged misstatement's falsity or disclosed that allegedly material information had

been omitted." (internal quotation marks omitted)). Thus, Lead Plaintiff must plead that

Plaintiffs' losses proximately resulted from the marketplace's reaction to the revelation of the

truth about MBIA's RMBS-backed CDOs-squared.

The CAC alleges that after the markets closed on December 19, 2007, MBIA issued a press release to "supplement[] the listing of its exposure to CDOs that include RMBS." (CAC ¶ 59 (emphasis omitted).) The press release contained a chart similar to those in the CDO Primers, with an additional section listing the CDOs-squared and detailing their collateral, including RMBS. (*Id.* ¶ 60.) As a result, Lead Plaintiff alleges, the market was finally apprised of the full extent of MBIA's holdings of CDO-squared investments, and, because of this revelation, MBIA's stock declined by 26% the next day, causing the losses on which, in part, Plaintiffs here sue. (*Id.* ¶ 65.) Based on these allegations, Lead Plaintiff has sufficiently alleged a direct causal connection between MBIA's December 19, 2007 press release supplementing its earlier, alleged misrepresentations and the economic losses suffered when MBIA's stock dropped significantly the next day. *See Varghese v. China Shenghuo Pharm. Holdings, Inc.*, No. 08-CV-7422, 2009 WL 4668579, at *8 (S.D.N.Y. Dec. 9, 2009) (finding allegation that "when [defendant] issued its corrective disclosure on August 20, 2008, its share price fell from $2.33 per share to $1.89 a share" sufficient to plead loss causation); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 252 (S.D.N.Y. 2007) (finding loss causation adequately pled when complaint alleged that defendants issued a series of announcements regarding a back-dating scheme and "that these disclosures led to temporally proximate drops in the price of [defendant's] stock").[21]

_____

[21] To succeed on its claim, Lead Plaintiff must also plead transaction causation. "Transaction causation is akin to reliance, and requires only an allegation that but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 n.1 (2d Cir. 2007) (internal quotation marks omitted). Here, Lead Plaintiff relies on the "fraud-on-the-market" presumption to show transaction causation. (CAC ¶¶ 140-41); *see Basic*, 485 U.S. at 247 ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price,

Defendants argue that no loss causation can be shown when the market did not react to S&P's report, released early in the day on December 19, 2007, analyzing MBIA's RMBS exposure. According to Defendants, the S&P report disclosed the RMBS exposure in the CDOs-squared, and, because the market is presumed efficient, the information was fully absorbed that day with only a marginal drop in the stock price. (Defs.' Mem. 44.) Although the S&P report listed MBIA's total exposure to RMBS as approximately $29.7 billion, it did not detail what portion of MBIA's aggregate RMBS exposure was from CDOs-squared or provide any other details on the CDO-squared transactions. (Trakht Decl. Ex. 20, at 10.) Furthermore, Lead Plaintiff points to Morgan Stanley's reaction to MBIA's December 19, 2007 press release, stating that Morgan Stanley was "shocked that management withheld this information for as long as it did." (CAC ¶ 62 (emphasis omitted); Trakht Decl. Ex. 22, at 1.) As a result, the Court is not persuaded that, as a matter of law, the S&P report fully disclosed the RMBS exposure in the CDOs-squared such that the CAC should be dismissed at this stage. Accordingly, Lead Plaintiff has pled sufficient facts alleging that MBIA's disclosure, which provided substantially more information than the S&P report, was at least a partial corrective disclosure causing Plaintiffs' economic losses. *See Bristol-Myers*, 586 F. Supp. 2d at 165 (finding that defendant's announcement was a partial corrective disclosure and that "a corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events");

---

an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."). Lead Plaintiff alleges that the market for MBIA's stock was efficient because its stock was publicly traded, it filed periodic SEC reports and issued press releases, and it was followed by securities analysts (CAC ¶ 140), and that, as a result, a presumption of reliance arises, (*id.* ¶ 141). Defendants do not attempt to rebut this presumption, and the Court finds that Lead Plaintiff has adequately pled transaction causation at this stage of the litigation.

*see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (noting that as a general matter, "the chain of causation is a matter of proof at trial" (internal quotation marks and ellipses omitted)); *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 365 (S.D.N.Y. 2009) (noting that "causation is fundamentally a factual matter" that includes such factors as "the time between the event and the decline, the prominence of the fraud-related news relative to other news, [and] how new the information [w]as" to the market (internal citations omitted)).[22]

### E. Control Person Liability

In addition to the direct claims of fraud against all Defendants, Lead Plaintiff has asserted that Defendants Dunton and Chaplin are liable for MBIA's alleged § 10(b) and Rule 10b-5 violations as controlling persons under § 20(a) of the 1934 Act.  Although Dunton and Chaplin "cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage."  *SafeNet, Inc.*, 645 F. Supp. 2d at 241.  Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation

---

[22] The Court also rejects Defendants' other arguments.  For example, Defendants argue that intervening events, such as Morgan Stanley's analysis of MBIA's disclosure or the general decline in MBIA's stock because of macroeconomic effects, were the real causes of MBIA's stock drop.  (Defs.' Mem. 42-45.)  Considering that MBIA released its updated summary chart after trading had closed on December 19, 2007 and that its stock priced dropped dramatically the next day, whether and to what extent Morgan Stanley's critiques or a general market decline also affected the stock drop are fact issues that cannot be decided on a motion to dismiss.  *See Emergent*, 343 F.3d at 197 ("[I]f the loss was caused by an intervening event, like a general fall in the price of stocks, the chain of causation will not have been established.  But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."); *Openwave*, 528 F. Supp. 2d at 253 ("[W]hether the [stock] decline was attributable to some other cause, as defendants allege, is a matter for proof at trial.").  Similarly, Defendants' arguments about how to calculate the price drop are not proper issues for a motion to dismiss.  *See Openwave*, 528 F. Supp. 2d at 253 (noting that "whether to measure the price drop . . . by reference to the . . . intra-day high price or the closing price" should not be resolved on the pleadings).

> thereunder shall also be liable jointly and severally with and to the
> same extent as such controlled person to any person to whom such
> controlled person is liable, unless the controlling person acted in
> good faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability [in the Second

Circuit], a plaintiff must show (1) a primary violation by a controlled person, (2) control of the

primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a

culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108 (citing *S.E.C. v.

First Jersey, Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)); *see also Boguslavsky v. Kaplan*, 159 F.3d

715, 720 (2d Cir. 1998) (same).

The control person claims asserted against Defendants Dunton and Chaplin are premised

on the primary violations of § 10(b) by MBIA. Because at least some of those primary liability

claims have been found by the Court sufficient to survive Defendants' Motion to Dismiss, the §

20(a) claims have the requisite primary violation foundation. Defendants do not challenge that

Lead Plaintiff has pled facts sufficient to satisfy the second element of a prima facie claim, that

Defendants Dunton and Chaplin, as CEO and CFO, respectively, of MBIA, possessed control

over the primary violator. *See First Jersey*, 101 F.3d at 1472-73 ("Control over a primary

violator may be established by showing that the defendant possessed 'the power to direct or cause

the direction of the management and policies of a person, whether through the ownership of

voting securities, by contract, or otherwise.'" (quoting 17 C.F.R. § 240.12b-2)). Thus, the

sufficiency of this claim turns on the question of Dunton and Chaplin's "culpable participation."

In *First Jersey*, the Second Circuit held that a prima facie case of liability under § 20(a)

requires a plaintiff to show, inter alia, that "the controlling person was in some meaningful sense

a culpable participant in the fraud perpetrated by the controlled person." 101 F.3d at 1472

50

(internal citations and brackets omitted); *see also Suez Equity Investors, L.P. v.*

*Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) ("Controlling-person liability is a form

of secondary liability, under which a plaintiff may allege a primary § 10(b) violation by a person

controlled by the defendant and culpable participation by the defendant in the perpetration of the

fraud.").  Despite the recent reiteration of the "culpable participation" requirement in *ATSI*, *see*

*ATSI*, 493 F.3d at 108, district courts within the Second Circuit remain split over whether § 20(a)

requires an allegation of "culpable participation" as a separate element.  *Compare In re Moody's*

*Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 517 (S.D.N.Y. 2009) (requiring that the plaintiff plead

that the "alleged control person [] actively participate[d] in some meaningful sense ('culpable

participation') in the fraud perpetrated by that entity"), *Edison Fund*, 551 F. Supp. 2d at 231

("The weight of well-reasoned authority is that to withstand a motion to dismiss a section 20(a)

controlling person liability claim, a plaintiff must allege some level of culpable participation at

least approximating recklessness in the section 10(b) context." (internal quotation marks

omitted)), *and Lapin*, 506 F. Supp. 2d at 248 ("[T]he Second Circuit has spoken and has imposed

a 'culpable participation' requirement to make out a prima facie case [of control person

liability]."), *with In re Parmalat Sec. Litig.*, 497 F. Supp. 2d 526, 532 n.42 (S.D.N.Y. 2007)

(stating that *ATSI*'s reference to "culpable participation" was in dicta and that "culpable

participation need not be alleged" for control person liability), *In re Worldcom, Inc. Sec. Litig.*,

294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003) ("[A] plaintiff must plead only the existence of a

primary violation by a controlled person and the direct or indirect control of the primary violator

by the defendant in order to state a claim under Section 20(a)."), *and In re Initial Pub. Offering*

*Sec. Litig.*, 241 F. Supp. 2d 281, 396 (S.D.N.Y. 2003) (finding scienter "not an essential element

of a Section 20(a) claim . . . [r]ather, a plaintiff need only prove scienter if a defendant presents

the affirmative defense that it acted in good faith").

Having reviewed the relevant cases, the Court declines to depart from its earlier ruling in *Lapin* and continues to find that "culpable participation" is a pleading requirement to state a § 20(a) claim in the Second Circuit, *see Lapin*, 506 F. Supp. 2d at 246, and that such participation must be plead with particularity, *see id.*; *see also Burstyn*, 2002 WL 31191741, at *8 ("Since culpable participation is an element, the PSLRA's heightened pleading requirements apply . . . ."). Thus, to withstand a motion to dismiss, a § 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness. *See In re UBS Auction Rate Sec. Litig.*, Nos. 08-CV-2967, 08-CV-3082, 08-CV-4352, 08-CV-5251, 2009 WL 860812, at *3 (S.D.N.Y. Mar. 30, 2009) (stating that to allege control person liability under § 20(a), plaintiffs must allege "some level of culpable participation at least approximating recklessness" (internal quotation marks omitted)); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00-CV-8058, 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001) ("A plaintiff may plead either conscious misbehavior or recklessness to satisfy the state of mind portion of the culpable participation element.").

For the reasons discussed in detail above, Lead Plaintiff has failed to sufficiently plead particular facts alleging that Dunton and Chaplin acted with the requisite scienter. As a result, Lead Plaintiff has not pled sufficient facts to show culpable participation, and the § 20(a) claims are dismissed, without prejudice. *See Safenet*, 645 F. Supp. 2d at 241 (finding no control person liability when, despite properly pled primary violation, plaintiffs failed to plead that individual defendants "had any 'culpable participation' in the alleged stock-options misrepresentations"); *see also In re Moody's*, 599 F. Supp. 2d at 517 (finding that plaintiff failed to plead control person liability when it failed to allege sufficient facts showing scienter of certain individual

defendants).

### III. Conclusion

For the reasons stated herein, Defendants' Motion to Dismiss is granted in part and denied in part. Lead Plaintiff's claims against Dunton and Chaplin are dismissed without prejudice to amendment. Lead Plaintiff's claims against all Defendants regarding alleged misstatements or omissions involving control rights and payment obligations are also dismissed without prejudice. Defendants' Motion to Dismiss all other claims is denied. Lead Plaintiff is given thirty days from the date of this Opinion and Order to file a Second Consolidated Amended Class Action Complaint. The Clerk of Court is respectfully directed to terminate the pending motion (Dkt. No. 48).

SO ORDERED.

Dated:  March 3l, 2010
        White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

53

Service List (By ECF)

Steven B. Singer, Esq.
Gerald Harlan Silk, Esq.
John James Rizio-Hamilton, Esq.
Kurt Michael Hunciker, Esq.
Mark Lebovitch, Esq.
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
38th Floor
New York, NY 10019

Salvatore Jo Graziano, Esq.
Milberg LLP
One Pennsylvania Plaza
New York, NY 10119

David Avi Rosenfeld, Esq.
Samuel Howard Rudman, Esq.
Coughlin Stoia Geller Rudman & Robbins, LLP
58 South Service Road
Suite 200
Melville, NY 11747

Marvin Lawrence Frank
Murray, Frank & Sailer, LLP, Esq.
275 Madison Avenue, Ste. 801
New York, NY 10016

Robert N. Shwartz, Esq.
Christopher John Hamilton, Esq.
Jeremy Feigelson, Esq.
Tatyana A. Trakht, Esq.
Debevoise & Plimpton, LLP
919 Third Avenue, 31st Floor
New York, NY 10022