**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



---

IN RE MBIA, INC., SECURITIES
LITIGATION

Civil Action No. 08-CV-264-KMK

**JURY TRIAL DEMANDED**

**ECF Case**

---

## SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
Steven B. Singer
Kurt Hunciker
John Rizio-Hamilton
1285 Avenue of the Americas
New York, New York 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Lead Plaintiff the*
*Teachers' Retirement System of*
*Oklahoma and Court-appointed Lead*
*Counsel for the Class*

## TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION ..............................................................1

II.    PARTIES ...........................................................................................6

     A.    Lead Plaintiff ............................................................................6

     B.    Defendants ...............................................................................6

III.   JURISDICTION AND VENUE ..........................................................8

IV.   FACTUAL BACKGROUND ..............................................................9

     A.    Overview of MBIA's Business ..................................................9

     B.    MBIA Takes on Huge Amounts of Exposure to Risky Residential Mortgage-Related Securities ....................................................12

V.    DEFENDANTS' FRAUDULENT SCHEME ......................................14

     A.    As the Housing Market Plummeted and Investors Focused on MBIA's Exposure to Mortgage-Backed Securities, Defendants Assured Investors that They Closely Monitored the Company's Exposure to Those Securities ..................................................14

     B.    Defendants Mislead Investors Regarding MBIA's Exposure to CDOs-squared Backed by RMBS ............................................19

     C.    MBIA Stuns Investors by Admitting Its Exposure to an Additional $8.1 Billion of CDOs-squared Backed by RMBS .....................23

VI.   FALSE AND MISLEADING STATEMENTS......................................30

     A.    2007 First Quarter Statements .................................................30

     B.    2007 Second Quarter Statements.............................................33

     C.    2007 Third Quarter Statements................................................35

     D.    2007 Fourth Quarter Statements .............................................38

VII.  ADDITIONAL SCIENTER ALLEGATIONS......................................47

     A.    Defendants Dunton And Chaplin Personally Reviewed Or Recklessly Disregarded A Plethora Of Internal Documents Disclosing That MBIA's CDOs-squared Contained RMBS ....................47

       1.      MBIA's Own Insurance Policies – Including Those Personally Signed By Defendant Dunton – Identified the RMBS Collateral in the Undisclosed CDOs-Squared ..................47

       2.      Pitchbooks, Collateral Lists, Offering Circulars, and Indentures Provided Detailed Information about the RMBS Collateral in MBIA's Undisclosed CDOs-squared........................52

       3.      Defendants Dunton and Chaplin Received Due Diligence Memos and Related Analyses Stating that the CDOs-squared Contained RMBS...............................................55

       4.      Monthly Reports, Updated Collateral Lists, and Other Surveillance Documents Stated that the CDOs-squared Contained RMBS ...........................................................58

     B.      Numerous Other Facts Support A Strong Inference Of Scienter...............59

VIII.    LOSS CAUSATION..................................................................................62

IX.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE.............................................63

X.      RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ....................................64

XI.     CLAIMS FOR RELIEF ...........................................................................64

COUNT I  (For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants) .............................................................64

COUNT II   (For Violations of Section 20(a) of the Exchange Act Against Defendants Dunton and Chaplin).............................................................67

XII.     CLASS ACTION ALLEGATIONS .....................................................69

PRAYER FOR RELIEF ....................................................................................71

JURY DEMAND ..............................................................................................71

Lead Plaintiff, the Teachers' Retirement System of Oklahoma ("Lead Plaintiff" or "TRSO"), brings this federal securities law class action on behalf of itself and all other persons or entities, other than Defendants and their affiliates as specified below, who purchased or acquired the common stock of MBIA, Inc. between July 2, 2007 and January 9, 2008 (the "Class Period"), and were damaged by the conduct alleged herein. Lead Plaintiff makes the following allegations against Defendants MBIA, Inc. ("MBIA"), Gary C. Dunton ("Dunton") and C. Edward Chaplin ("Chaplin") (collectively, "Defendants"), upon information and belief, based upon all of the facts set forth herein, which were obtained through an investigation made by and through Lead Counsel. Lead Counsel's investigation has included, among other things, a review of MBIA's filings with the United States Securities and Exchange Commission ("SEC"); analyst research reports; investor presentations; news articles concerning MBIA; interviews with MBIA former employees; and the other data and first-hand sources set forth below. Lead Plaintiff believes that a reasonable opportunity for discovery will uncover substantial additional evidentiary support for and confirmation of the allegations set forth herein.

## I.    SUMMARY OF THE ACTION

1.    This is a case about a purportedly conservative insurance company which fundamentally misrepresented its exposure to billions of dollars of the most toxic securities in the market: collateralized debt obligations ("CDOs") containing residential mortgage-backed securities ("RMBS").

2.    MBIA is a financial insurance company whose ability to maintain its triple-A credit rating, and its reputation for conservative risk management, were critical to its success. Accordingly, throughout the Class Period, the Company affirmatively assured investors that its exposure to mortgage-backed securities was limited, and that MBIA was more conservative in

1

this regard than its principal competitors. These representations were highly material to investors because, throughout the Class Period, the U.S. housing market was declining precipitously, causing investors to directly question whether the collapse would harm MBIA. Indeed, to address investor concerns, during the Class Period MBIA held a special conference call solely to detail the Company's mortgage-related exposures, and regularly issued detailed charts which purported to disclose the Company's "total exposure" to CDOs backed by RMBS. Analysts relied heavily on the Company's assurances and disclosures, noting that MBIA's exposure to mortgage-backed CDOs was "modest," and that the Company's representations "calmed investor concerns" and "countered market rumors regarding its risk disclosures."

3.    The market was shocked when, after the close of trading on December 19, 2007, MBIA disclosed for the first time that it faced an additional $8.1 billion of exposure from insuring the riskiest and most toxic CDOs in the marketplace – namely, CDOs comprised of other CDOs (so-called "CDO-squared securities"), whose underlying collateral included RMBS. Investors immediately abandoned the Company, recognizing that the Company had grossly misrepresented its exposure to CDOs backed by RMBS. MBIA's stock lost more than a quarter of its value in a single day, falling from $27.02 to $19.95 on December 20, on the stock's highest trading volume of the year, wiping out almost $900 million of market capitalization.

4.    Securities analysts and financial commentators excoriated the Company for its failure to disclose its massive exposure to these CDO-squared securities, noting that they constituted the riskiest part of the Company's entire portfolio. For example, Morgan Stanley's Ken Zerbe, one of the leading analysts covering the bond insurers, wrote that "we are shocked that management withheld this information as long as it did" and that "MBIA simply did not

disclose arguably the riskiest parts of its CDO portfolio to investors: $8.1 billion of CDO-squareds." Similarly, Standard & Poor's ("S&P") equity research analyst Catherine Seifert wrote: "We share the market's dismay that this revelation changes the risk profile of MBIA as compared with its financial guaranty peers." Robert Haines, an analyst at research firm CreditSights, said that the new disclosure undermined his "confidence about how upfront the company is being and has been." And the *Wall Street Journal*'s "MarketBeat" internet site reported that "[t]he actual behavior of such [financial insurers] has proven that they are not transparent, that they hold or insure a mass of skeletons and toxic waste securities and they have been dishonest in hiding from investors the toxic waste that they hold and insure."

5.  The truth about MBIA's portfolio emerged only because the credit rating agencies, which had access to non-public information about the Company's entire CDO portfolio, revealed that they were going to downgrade the Company precisely because of the additional $8.1 billion of exposure that the Company had been concealing from investors. Specifically, on the morning of December 19, 2007, S&P placed the Company on ratings watch "negative" – the last step before a rating downgrade – and issued a report indicating that MBIA's exposure to CDOs backed by RMBS was materially larger than MBIA had previously admitted to investors. Faced with this report, the Company was forced to "supplement" its prior disclosures by detailing the additional $8.1 billion of CDOs-squared backed by RMBS.

6.  The $8.1 billion in exposure that was disclosed for the first time on December 19, 2007 represented <u>nearly 50%</u> of the $17 billion in exposure to CDOs containing RMBS collateral that the Company had previously disclosed. Moreover, that $8.1 billion was 24% larger than the Company's capital base (the amount of readily accessible capital that the

Company maintained to pay claims), and constituted 60% of the Company's total claims-paying resources of approximately $13.6 billion as of the 2007 second quarter.

7.    Less than three weeks later, on January 9, 2008, the Company made a series of admissions that revealed the depth of the Company's problems in its CDO-squared portfolio and caused its stock price to fall again.  Defendants "supplemented" the Company's prior disclosures concerning the Company's exposure to RMBS-backed CDOs-squared and disclosed for the first time that this exposure was actually $9 billion, or $900 million more than had been disclosed on December 19.  In addition, the Company confirmed investors' fears about the toxic nature of this exposure and the threat it posed to the Company's credit rating by reporting that these previously-hidden transactions had already suffered $200 million of losses. The Company further announced that the SEC had commenced an inquiry into MBIA's "disclosures regarding MBIA's CDO exposure."  MBIA's stock price immediately fell to $13.40, or less than half the price at which it was trading before the December 19 disclosure.

8.    The fraud described herein has continued to have a devastating impact on the Company.  In February 2008, MBIA replaced its CEO, Defendant Gary Dunton, saying he had "resigned."  Shortly thereafter, the credit rating agencies downgraded the Company, leaving MBIA's business fundamentally impaired.  By year-end 2008, MBIA had suffered more than $440 million in impairments and approximately $1.8 billion in write-downs on its CDO-squared portfolio alone.  These losses were so severe that MBIA was forced to split its insurance operations into two and quarantine its CDOs-squared and other RMBS-related exposures in a separate operating subsidiary to keep the losses in that portfolio from destabilizing the entire Company.

9.     On March 31, 2010, the Court issued an Order sustaining Lead Plaintiff's claims against MBIA for failing to disclose its massive exposure to CDOs-squared containing RMBS, and dismissing those claims against Defendants Dunton and Chaplin on the ground that Lead Plaintiff had failed to "plead any specific information available to" those Defendants apprising them "of the RMBS content in the CDOs-squared." *In re MBIA, Inc. Sec. Litig.*, -- F. Supp. 2d --, 2010 WL 1253925, at *17, 19-20, 24 (S.D.N.Y. Mar. 31, 2010).  As shown by the new facts alleged herein, Defendants Dunton and Chaplin reviewed, approved and monitored the Company's CDO-squared transactions, and a wealth of information was available to them which explicitly stated that these undisclosed exposures contained hundreds of millions of dollars of RMBS.

10.     For example, MBIA's own insurance policies for the CDO-squared transactions – certain of which Dunton personally <u>signed</u> – disclosed the total amount of "Residential Mortgage Backed Securities" in the transaction, and identified the name and amount of each piece of RMBS collateral backing the CDOs-squared.  *See* ¶¶ 128-39.

11.     Further, in the Company's own court filings, MBIA has acknowledged that it received "key transaction documents" known as Pitchbooks in connection with each CDO-squared transaction.   These Pitchbooks, which were available to Defendants Dunton and Chaplin, explicitly disclosed that the Company's CDOs-squared contained "RMBS Asset Classes," and provided detailed descriptions of the ratings stability, default rates, and loss severity of the "RMBS securities" within each CDO-squared.  *See* ¶¶ 140-44.

12.     Moreover, in connection with each CDO-squared transaction, Defendants Dunton and Chaplin received Due Diligence Reports and oral presentations stating that the transaction contained RMBS, setting forth the maximum percentage of allowable RMBS in the collateral

pool, and providing detailed analyses of the credit quality and expected cash flow of the RMBS. *See* ¶¶ 149-54.

13.    These documents and presentations, as well as numerous others described herein, provided Defendants Dunton and Chaplin with an array of detailed information concerning the RMBS collateral in the Company's undisclosed CDO-squared transactions – information which Defendants knew or, at minimum, were reckless in disregarding.

## II.    PARTIES

### A.    Lead Plaintiff

14.    By Order dated June 30, 2008, the Hon. Kenneth M. Karas appointed TRSO to serve as Lead Plaintiff in this consolidated class action.  TRSO provides retirement and disability benefits to Oklahoma's active and retired public school teachers, administrators, and support staff, serving approximately 138,000 members statewide.  As set forth in its certification on file with the Court, a copy of which is attached hereto as Exhibit A, Lead Plaintiff purchased MBIA common stock during the Class Period and suffered damages resulting from the conduct complained of herein.

### B.    Defendants

15.    MBIA is a Connecticut holding corporation headquartered at 113 King Street, Armonk, New York 10504.  MBIA principally operates through its insurance subsidiary, MBIA Insurance Corporation (referred to collectively with MBIA, Inc. as "MBIA" or the "Company"), and is or was the country's largest insurer of municipal and structured finance bonds, including residential mortgage-backed securities and collateralized debt obligations. MBIA actively trades on the New York Stock Exchange under the ticker symbol MBI and, as of July 30, 2007, had 125,581,825 shares of common stock outstanding.

16.    Defendant Gary C. Dunton was MBIA's Chief Executive Officer ("CEO"), President, and Chairman during the Class Period.  He served as CEO from May 2004 until his resignation in February 2008.  Dunton also served as the Company's Chairman from May 2007, Chief Operating Officer from 2000 and the Company's President and a Director from 1999.  He is a Certified Financial Analyst and a chartered Property Casualty Underwriter. Beginning in February 2007 and continuing through the Class Period, Dunton also served as President of MBIA Insurance Corporation.  In that position, Dunton was "responsible for all new financial guarantee insurance business," according to the Company's February 16, 2007 press release announcing Dunton's appointment.

17.    Dunton signed each MBIA Form 10-Q issued during the Class Period, and the Sarbanes-Oxley certifications that accompanied those SEC filings.  As a controlling officer of MBIA, Dunton participated in the creation of and/or reviewed and authorized the Company's press releases, including the releases dated December 19, 2007 and December 20, 2007, and its website disclosures.  Dunton also directly made false and misleading statements as alleged herein during a September 4, 2007 Keefe, Bruyette & Woods Inc. investor conference.

18.    Since June 2006, Defendant C. Edward Chaplin has been MBIA's Chief Financial Officer, Vice President and a member of its Executive Policy Committee.  He also has served since that time as Vice Chairman and Chief Financial Officer of MBIA Insurance Corporation. Chaplin is directly responsible for MBIA's finance, treasury, investor relations, and relationships with the credit ratings agencies.  He previously served as an MBIA director from December 2002 to May 2006.

19.    Chaplin signed each MBIA Form 10-Q issued during the Class Period, and the Sarbanes-Oxley certifications that accompanied those SEC filings.  As a controlling officer of

MBIA, Chaplin participated in the creation of and/or reviewed and authorized the Company's press releases, including the releases dated December 19, 2007 and December 20, 2007, and its website disclosures.  Chaplin chaired the Company's August 2, 2007 conference call during which numerous false statements were made, as alleged herein, by MBIA's top officers. Chaplin also made false and misleading statements as alleged herein during MBIA investor conference calls on July 26, 2007 and October 25, 2007, and at a November 27, 2007 Bank of America Mini-Conference.

20.    Defendants Dunton and Chaplin are referred to herein collectively as the "Officer Defendants."  As set forth more fully below, each Defendant made false and misleading statements throughout the Class Period.  The Officer Defendants each reviewed, authorized, and disseminated, or approved the dissemination of, each of the false and misleading statements specified below.  As officers and directors of a publicly-held company whose shares are registered with the SEC pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"), traded on the New York Stock Exchange, and governed by the federal securities laws, the Officer Defendants each had a duty to disseminate promptly accurate information with respect to MBIA's business, operations, financial statements and internal controls, and to correct any previously-issued statements that had become materially misstated or untrue, so that the market price of MBIA's publicly-traded common stock would be based upon accurate information.

III.    **JURISDICTION AND VENUE**

21.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

22.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

23.    Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c) and (d).  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this district.  During the Class Period, MBIA's corporate headquarters was located at 113 King Street, Armonk, New York 10504.

24.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges.

## IV.    FACTUAL BACKGROUND

### A.    Overview of MBIA's Business

25.    At the beginning of the Class Period, MBIA was the nation's largest financial insurance company, insuring nearly $1 trillion in municipal bonds and other debt instruments. The Company's business is quite simple: a bond issuer, often a municipality whose independent debt ratings are below investment grade (and whose stand-alone borrowing costs reflect below investment grade interest rates), pays a premium to have its bonds insured by a triple-A rated guarantor like MBIA.

26.    In industry parlance, MBIA "wraps" the bond issue with its own triple-A rated guarantee by agreeing to make all principal and interest payments in the event the issuer cannot meet its obligations.  This insurance or guarantee allows the bonds to be sold based on MBIA's triple-A rating rather than the bond issuer's rating, thus lowering the issuer's interest expense.

9

27.    MBIA then recognizes the insurance premium as income over the life of the insurance.  Since municipal bonds rarely default – a recent study by the Fitch Ratings agency ("Fitch") concluded that only .24% of municipal bonds default – MBIA has reported steady and predictable earnings.  Market analysts have highlighted these attributes when recommending the stock.

28.    Because MBIA's stock-in-trade is the sale of its triple-A credit ratings to enhance the ratings of bond issuers, the Company's ability to maintain its triple-A ratings was essential to its business.  In effect, the only "product" that MBIA sells is the lower interest expense it can offer by virtue of its credit rating.  Defendants, as well as investors, have long understood that losing the Company's triple-A rating would seriously impair MBIA's ability to generate business.

29.    Indeed, in a letter to shareholders included in MBIA's Annual Report for 2004, Defendant Dunton wrote that, "MBIA's true constant – our north star, if you will – is our commitment to protecting our Triple-A ratings, the keystone of our franchise."  An April 12, 2005 *New York Times* article quoted Mark McCray, "who oversees a $13.9 billion municipal bond portfolio at Pimco," as stating that, "MBIA needs to protect that rating at all costs.  If they lose that, they are toast."  Similarly, a December 1, 2007 *New York Times* article quoted Defendant Dunton as stating that, "Our triple-A rating is a fundamental driver of our business model."  MBIA's 2006 Form 10-K noted specifically that "any reduction in these ratings could have a material adverse effect" on the Company.

30.    Of all the criteria examined by the rating agencies in securing MBIA's triple-A rating, the Company's capital adequacy – its capacity to pay claims if needed – was the primary consideration.  At the start of the Class Period, MBIA insured nearly $1 trillion in

obligations, yet MBIA's capital base (which included readily accessible capital to pay claims) was only $6.55 billion, and its total claims paying resources (which included the capital base, the present value of future premiums, and credit facilities, among other things) were only $13.6 billion.  Therefore, the Company had a razor-thin margin for error, as losses in the riskiest "tail" of MBIA's overall portfolio were more than enough to wipe out MBIA's capital and destroy its triple-A ratings.  Even if over 90% of MBIA's insured portfolio were comprised of the safest municipal bond obligations (and as described below, municipal bonds represented a far lower percentage during the Class Period), if the remaining 10% of the Company's insured portfolio were risky or unstable securities, MBIA's capital base would face a very significant risk of evaporation due to losses.

31.    In other words, MBIA's business necessarily left it virtually no room for error in accumulating risks and losses, and a sudden increase in risk or loss would predictably cause investors to flee.  As a result, it was imperative for MBIA to fully inform investors of the riskiest "tails" of its portfolio.  Since the riskiest portions of the Company's portfolio were sufficient to wipe out the Company's capital even if the "average" risk exposure remained constant and safe, investors focused on understanding these risks.

32.    Financial analysts historically considered MBIA to be a safe investment because of its conservative underwriting and track record of a very low percentage of defaults.  In quarterly investor presentations during the Class Period, MBIA touted its "No-Loss Underwriting" model, under which it claimed that "[e]ach transaction guaranteed by MBIA needs to pass a rigorous underwriting proving no losses will arise under the worst probable case scenario."

33.    The importance to MBIA of preserving its credit rating and avoiding excessive risk at all costs conflicted with its efforts to increase its income.  In recent years, MBIA's safe and stable municipal bond insurance business became a diminishing source of growth.  A June 19, 2003 *Bond Buyer* article quoted a Moody's officer stating that the financial guarantors have "taken the muni market about as far as it can go.  When you have penetration like that, it's hard to do more business and maintain reasonable premium rates."  As a result, MBIA turned increasingly to insuring riskier structured finance business, as described below.

**B.    MBIA Takes on Huge Amounts of Exposure to Risky Residential Mortgage-Related Securities**

34.    By the beginning of the Class Period, MBIA had shifted away from the safe business of municipal bond insurance to concentrate on insuring securities backed by residential mortgages.  The three kinds of mortgage-backed securities that MBIA insured were residential mortgage backed securities ("RMBS"), collateralized debt obligations ("CDOs"), and CDOs-squared.  All of these securities are generally known as "structured finance" securities because they are based on a pool of underlying assets that produces a cash flow, which is then distributed to investors in a structured manner.

35.    An RMBS is a debt security whose cash flow comes directly from a pool of residential mortgages.  Investment banks create an RMBS by purchasing thousands of mortgages, pooling them together, and then selling securities that entitle the purchaser to a specified amount of income, which is paid out of the cash generated as individuals make payments on the underlying mortgages.  RMBS securities were supposed to obtain credit ratings based on the risk characteristics of the structure of the trust that issued the RMBS and the quality of the underlying mortgage collateral.

36.    A CDO works similarly to an RMBS, except that instead of pooling mortgages, the CDO pools a variety of securities as its underlying collateral, often including RMBS.  An investment bank creates a CDO by purchasing a variety of securities, such as RMBS, pooling them together, and then selling securities that entitle the purchaser to a certain portion of the income generated by the underlying pool of securities.  The securities issued by the investment bank are divided into "senior" and "junior" tranches, and the senior securities are entitled to be paid first from the cash flow generated by the CDO's underlying assets.  Because senior securities are the first to be paid, they often receive high debt ratings even though the CDO's underlying collateral has a lower rating.  Since a CDO's income comes from other structured finance securities, it is multiple steps removed from the underlying cash-producing assets, like mortgages, credit cards, or airplane leases.

37.    A CDO-squared is structured like a CDO, except that much of the underlying collateral consists of securities issued by *other* CDOs.  Typically, the collateral pool supporting a CDO-squared consists mainly of other CDOs (which are called "inner CDOs"), along with various asset backed securities ("ABS"), which can include RMBS or other kinds of structured finance securities.  Since a CDO-squared is backed by other CDOs, it is at least twice removed from the assets and borrowers that generate the underlying cash flows.  Thus, CDO-squared securities are considered to be especially risky.

38.    CDO-squared securities are also extremely risky because they concentrate mortgage risk to a unique degree.  For example, a CDO-squared often contains RMBS and inner CDOs that are supported by the <u>same</u> pool of mortgages.  Accordingly, the CDO-squared is a "double-down" bet that those underlying mortgages will perform well.  When the underlying mortgage pool suffers higher-than-expected defaults, the losses to the CDO-squared

multiply.  The $8.1 billion of exposure that MBIA concealed from investors consisted entirely of CDOs-squared that were ultimately supported in part by residential mortgages.

39.  In the years just before the Class Period, MBIA concentrated heavily on insuring structured finance securities and especially on insuring the three kinds of mortgage-related securities described above.  In 2004, 2005, and 2006 structured finance accounted for 44%, 42%, and 54%, respectively, of the new business that the Company wrote.  This emphasis grew throughout the Class Period, as structured finance insurance accounted for 66% of MBIA's new business through the first three quarters of 2007, most of which was driven by insurance of the mortgage-backed securities described above.

40.  By the beginning of the Class Period, structured finance insurance accounted for approximately 32% of MBIA's entire insurance portfolio.  More specifically, MBIA's disclosed net exposure to U.S. mortgage-backed securities was approximately $48.3 billion – or 7.4 times greater than the Company's capital base and approximately 3.6 times greater than all of the Company's claims-paying resources.  Consequently, even a partial default of the Company's mortgage-backed exposures was sufficient to decimate MBIA's capital base and claims-paying resources, and thus destroy the fundamental driver of its business model: its triple-A rating.

## V.    DEFENDANTS' FRAUDULENT SCHEME

### A.    As the Housing Market Plummeted and Investors Focused on MBIA's Exposure to Mortgage-Backed Securities, Defendants Assured Investors that They Closely Monitored the Company's Exposure to Those Securities

41.  By July of 2007, America's housing market was crashing – home sales were on the decline, interest rates had increased, and default and delinquency rates were spiking.  As illustrated in the chart below, U.S. housing prices simply collapsed in late 2006 and throughout 2007:

14



42.    The root cause of this collapse was millions of risky mortgage loans made to unqualified borrowers who were defaulting in record numbers.  In an S&P report for the third quarter of 2006, S&P noted that mortgage lenders were experiencing rising delinquencies and early payment defaults that caused them to tighten their underwriting standards. Similarly, in the first quarter of 2007, Moody's noted that "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters."

43.    As described more fully below at ¶¶ 126-64, Defendants knew or recklessly disregarded that MBIA's CDOs-squared contained RMBS.  Indeed, MBIA publicly touted Defendants Dunton's and Chaplin's personal participation in MBIA's deal approval and surveillance processes, which afforded them direct knowledge of the collateral backing MBIA's CDOs-squared.  Specifically, throughout his tenure as CEO, Defendant Dunton was a

member of the Executive Credit Committee ("ECC"), which, according to the Company's 2007 Form 10-K, "reviewed for approval" all "[l]arger, complex, or unique" transactions, which included all of the Company's undisclosed CDOs-squared.  Indeed, according to the Company's Forms 10-K for 2004 and 2005 (when approximately $3 billion of the Company's undisclosed CDO-squared were approved), the ECC's review of MBIA's "large[]" and "complex" transactions ensured that such transactions were "reviewed and approved at <u>MBIA Corp.'s most senior level</u>."  (Emphasis added.)

44.    Dunton was also a member of the "Loss Reserve Committee," which was responsible for reviewing all transactions, including the Company's CDOs, for impairment and establishing a corresponding loss reserve, if necessary.  According to the 2007 Form 10-K, in order to calculate whether a reserve was required for a transaction, the Loss Reserve Committee was required to assess the collateral contained within that transaction.  Specifically, the Loss Reserve Committee reviewed and assessed "the projected cash flow or market value of any assets that support the insured obligation and the historical and projected loss rates on such assets," as well as "the salvage values of specific collateral."  Dunton was also a member of the "Risk Oversight Committee," which was "responsible for overall risk policies and the risk management framework and provides a consultation role on a broad variety of risk issues across all MBIA businesses, including remediation" of troubled transactions.

45.    Defendant Chaplin chaired the Loss Reserve Committee and was a member of the Risk Oversight Committee.  Chaplin also regularly attended ECC meetings where the Company's CDO transactions were approved, as described further below at ¶¶ 151, 153.

46.    In their roles approving and monitoring the Company's CDOs-squared, Defendants Dunton and Chaplin reviewed or recklessly disregarded numerous documents and

other information available to them which expressly stated that these transactions contained hundreds of millions of dollars of RMBS, as described in great detail below at ¶¶ 127-59.

47.    A former MBIA employee confirmed and further detailed Defendant Dunton's direct knowledge of the poor quality of the loans that were backing the Company's insured RMBS and CDOs.  CW 1, who was a transactor for MBIA's Structured Finance New Business department from 1998 until March 2007, was responsible for generating new structured finance business and then guiding the proposed transaction through the credit review and approval process.    CW 1 stated that Defendant Dunton reviewed due diligence reports on loan originators and servicers that produced and serviced the loans that were securitized and ultimately insured by MBIA.

48.    CW 1 stated that the Company consistently conducted due diligence on lenders: "They had a dedicated group that did nothing but visit loan servicers around the country."  The MBIA due diligence group also personally examined samplings of loans to check loan characteristics and documentation levels.  CW 1 added that the due diligence group put together memos that the ECC reviewed for each transaction over $250 million – including all of the insured transactions relevant to this case.

49.    According to CW 1, the memos that the due diligence group prepared for Defendant Dunton detailed delinquency rates, loss rates, shifts in underwriting standards, and any changes in the lender's management.  Moreover, since the ECC required a "current servicer report" for each transaction, these reports were updated each time a loan originator or servicer presented a new proposed transaction.  CW 1 stated that these reports "definitely" provided sufficient information for Dunton to see the deteriorating quality of the loans MBIA was insuring through CDOs backed by RMBS.

17

50.    Indeed, Carl Webb, an MBIA Managing Director and Head of Real Estate and Secondary Markets, further confirmed that all Defendants paid careful attention to the quality of the loans backing the Company's mortgage-related portfolio.  As Webb stated during an August 2, 2007 conference call scheduled specifically to address the Company's mortgage-backed exposures:

> [W]e spend a lot of time looking at the attributes in the collateral pool.  If we're not comfortable with the collateral characteristics, we don't move forward on the deal. I mean we look at a number of different things…. The product types.  The FICO score.  The property type.  Loan purpose.  Affordability.  First time home ownership.  We look at a lot of detail characteristics. We're not comfortable, we don't move on.  [Emphasis added.]

51.    The poor quality loans MBIA was insuring, together with declining home prices, created a substantial risk of increased losses in the Company's mortgage-related portfolio. Thus, by the beginning of the Class Period, investors and analysts were focusing intently on those exposures and their potential impact on the Company.  Fitch, for example, issued a March 14, 2007 report noting that, "[a]s a result of noticeable deterioration in the subprime mortgage market in the past few quarters, Fitch Ratings has begun to receive an increased level of inquiries related to investor concerns over the nature of these exposures and the potential ramifications that they can present to the financial guaranty industry."

52.    Accordingly, given the heightened level of investor concern on these very topics, it was crucial that Defendants truthfully disclose all of MBIA's mortgage-related exposures. Rather than do so – which would have jeopardized the Company's triple-A credit ratings – Defendants embarked on a fraudulent scheme to conceal the fact that MBIA had insured – and was liable for – billions of dollars of CDOs-squared backed by residential mortgages.

**B.**   **Defendants Mislead Investors Regarding MBIA's Exposure to CDOs-squared Backed by RMBS**

53.    In the months leading to the start of the Class Period, analysts and investors grew increasingly concerned over the Company's exposure to CDOs backed by RMBS, and began directly questioning Defendants about the size and quality of the Company's exposures to those securities.  In response to these questions, Defendant Chaplin consistently told investors that the Company's mortgage-related exposures were "prudent" in scope and "super triple-A" in quality, and Defendants Dunton and Chaplin stated that the Company's mortgage-related portfolio had "significantly improved" and that the Company was continuing to adhere to its "no loss" underwriting.  As a result, Defendant Chaplin claimed that the Company was not only safe from the housing crisis, but was "significantly overcapitalized."

54.    Analysts relied on these statements to conclude that the Company's portfolio of CDOs backed by RMBS was limited and well-protected.  For example, in March 2007, Fox-Pitt, Kelton ("Fox-Pitt") published an analyst report stating that the Company had only "modest exposure to the subprime mortgage space."

55.    Nevertheless, concerns over the Company's exposure to CDOs backed by RMBS continued to grow as the housing market deteriorated.  Accordingly, on July 2, 2007, the first day of the Class Period, Defendants issued charts that purported to disclose the Company's "total" exposure to CDOs backed by RMBS as of the first quarter.  Indicating just how important this information was to investors, throughout the Class Period the Company issued charts that set forth both its total exposure to CDOs backed by RMBS, and its exposure to CDOs backed by RMBS that had been insured since 2004.  The Company disclosed the post-2004 exposure separately because RMBS of recent years were considered by investors to be riskier than older RMBS.  The July 2, 2007 charts stated that MBIA had total exposure to

$14.7 billion of CDOs with RMBS, and exposure to $12 billion of CDOs with RMBS originated since 2004.

56.    Shortly thereafter, Fox-Pitt issued another report upgrading MBIA to "outperform" and concluding that "the current subprime fears are overdone" with respect to the Company because, "MBIA in particular has been cautious on mortgage exposure over the past few years, and has been cautious on insuring CDOs . . . ."

57.    However, the financial press continued to highlight the risky nature of mortgage-related exposures.  For example, in July of 2007, *Barron's* published an articled titled "Garbage In, Carnage Out," in which it noted that, because of heightened default rates for mortgages from 2005 and 2006, CDOs and CDOs-squared backed by RMBS had already caused a variety of large funds to suffer billions in losses or go out of business altogether:

> The past two years also has seen explosive growth in mezzanine CDO-squared, or CDOs constructed from the lower slices of existing CDOs, and thus twice removed from the underlying MBS collateral.  Some 80% of these structures likewise boast triple-A ratings, <u>even though some industry insiders say the value of the instruments would be wiped out, from the triple-A tranches on down, if the underlying collateral suffered losses of around 5%</u>.
>
> *            *            *
>
> <u>Menacing signs already have surfaced.</u>  Last month Bear Stearns (ticker: BSC) was forced to bail out, to the tune of $1.6 billion, an internally managed hedge fund invested in subprime CDOs.  A British investment fund, Caliber Global Investment, said it would shut down because of heavy losses in subprime paper issued in 2005.  And margin calls on subprime-CDO collateral put the mid-sized California broker-dealer Brookstreet Securities out of business.  [Emphasis added.]

58.    Thus, investors' concerns over the Company's exposure to mortgage-backed CDOs continued to grow during the summer of 2007.  In response to these ongoing concerns, MBIA scheduled an extraordinary conference call for August 2, 2007 "to answer questions concerning MBIA's subprime RMBS exposure, CDO exposure and related topics."  Interest

20

was so intense that the Company set up a special email account to receive questions in advance. That email account was flooded with hundreds of questions from investors, which MBIA pre-screened and answered according to its own selection. The call lasted for hours.

59. During the August 2 call, Defendants made a series of statements designed to create the impression that MBIA's exposure to RMBS was de minimis. For example, MBIA's head of investor relations, Greg Diamond, summarized MBIA's exposure to RMBS by stating that MBIA had "very limited participation in that space," and that "there is very de minimis exposure associated with the CDOs that is collateral for the CDOs that we've crafted." (Emphasis added). Similarly, MBIA informed investors that the total amount of CDOs insured by the Company with some exposure to RMBS was only $15.9 billion as of the second quarter – an amount which the Company termed "modest."

60. Rating agencies, analysts, and investors directly relied on Defendants' misrepresentations that the Company possessed only $15.9 billion of exposure to CDOs backed by RMBS, and therefore had a modest risk profile that posed no threat to its triple-A ratings. For example, on the same day as MBIA's August 2, 2007 conference call, S&P published a report titled "U.S. Bond Insurers Withstand Subprime Stress" in which S&P reported that MBIA had only $15.87 billion of "exposure to CDOs with subprime collateral." Similarly, on August 16, 2007, Ken Zerbe of Morgan Stanley published a report stating that MBIA's exposure to "RMBS-related CDO[s]" was $15.9 billion, which he specifically noted was "more modest" than its chief competitor's $29 billion exposure to the same asset class. And CreditSights issued a report stating that, "[w]ith the market currently in panic mode regarding" the Company's mortgage-related exposures, the August 2 call had "at the very least . . . served

21

to clear up some of the investors' misconceptions" and had "calm[ed] investor concerns and counter[ed] market rumors regarding [the Company's] risk exposures."

61.    Thereafter and throughout the Class Period, Defendants continued to materially misrepresent the Company's exposure to CDOs backed by RMBS.  For example, on September 4, 2007, Defendant Dunton gave a presentation at a Keefe, Bruyette & Woods Insurance Conference, where he again stated that the Company had "$15.9 billion" of exposure to "CDOs that contain <u>some level of RMBS</u>."  (Emphasis added.)  Further, on October 25, 2007, the Company held a conference call to discuss its third quarter results.  During that call, Defendant Chaplin specifically directed analysts to a chart that purportedly "<u>updated and supplemented all the prior disclosures that we have made about our risk profile</u> in the US subprime RMBS market both through the direct insurance of subprime RMBS, as well as the inclusion of subprime RMBS in our insured CDOs."  (Emphasis added.)  In these charts, MBIA stated that as of the third quarter, its exposure to mortgage-backed CDOs originated in or after 2004 was $17.194 billion.

62.    Significantly, on that conference call, Defendant Chaplin made clear that the Company's disclosures reflected "all" of MBIA's mortgage-backed CDO exposure.  Indeed, when William Blair analyst Mark Lane pressed the issue as directly as possible, asking Chaplin if the disclosures reflected the Company's "total" exposure to mortgage-backed CDOs, Chaplin directly and unambiguously stated that the disclosures included "<u>all</u>" of the Company's mortgage-backed CDOs:

> <u>It was all of our CDOs that contain subprime mortgage collateral.</u>   In fact, that portfolio – I think it is <u>all the CDOs that contain RMBS</u> and as of the [third] quarter, the size of that portfolio is about $17 billion.  [Emphasis added.]

63.    Investors and analysts again relied on MBIA's materially false characterization of its RMBS-backed CDO exposure to conclude that the Company was not at risk from the

mortgage crisis.  Ken Zerbe of Morgan Stanley issued a November 2, 2007 report in which he expressly noted that MBIA had only "$17.2 billion" in exposure to "CDOs with RMBS collateral" and, accordingly, that MBIA had taken a "conservative approach to the mortgage meltdown" by compiling a limited, "lower risk CDO portfolio."  Significantly, Zerbe further noted that MBIA was "better positioned" than its competitors precisely because its exposure to CDOs containing RMBS was more limited:

> Over the last several months, MBIA had been demonstrating that it was taking a more conservative approach to the mortgage meltdown by avoiding problem areas – specifically subprime and CDOs backed by subprime…. [W]e believe MBIA would be better positioned than Ambac [its chief competitor] given its relatively lower risk CDO portfolio.

64.    Similarly, an October 26 report by Fox-Pitt stated that "MBIA has relatively less mortgage exposure than the others [insurance companies]."  Likewise, a William Blair report issued on December 11, 2007 stated that the Company had only $17.2 billion of CDOs "with any exposure to RMBS collateral."  (Emphasis added.)

65.    In reality, as alleged herein, the Company had materially understated its exposure to CDOs supported by RMBS.  Indeed, the Company's true residential mortgage-related CDO exposure since 2004 was not $17.2 billion but more than $25 billion – or almost 50% greater than what the market had been led to believe.  In repeatedly detailing its mortgage exposure, the Company failed to disclose the riskiest part of its portfolio – the fact that, since 2004, it had insured an additional $8.1 billion of CDOs-squared backed by RMBS.

C.    **MBIA Stuns Investors by Admitting Its Exposure to an Additional $8.1 Billion of CDOs-squared Backed by RMBS**

66.    On December 19, 2007, S&P issued a report that forced MBIA to admit that its prior statements regarding its exposure to RMBS were false.  In that report, entitled "Detailed Results of Subprime Stress Test of Financial Guarantors," S&P placed MBIA on negative

outlook – indicating that it was going to downgrade the Company – based on concerns about large-scale losses in the Company's mortgage-related portfolio, largely stemming from the exact exposures that MBIA was concealing. Contained within the S&P report was an analysis of information that MBIA had provided to S&P (but not to investors) showing that the Company's total exposure to RMBS-backed CDOs was substantially greater than previously disclosed. S&P specifically noted that the Company's CDO-squared exposures posed a special "event of default risk" for MBIA and therefore received "a heightened level of focus." As a result of these risks, S&P stated that MBIA would need a capital infusion to cover a shortfall of at least $381 million to $431 million. This intra-day disclosure, which did not expressly detail MBIA's hidden exposure, caused the Company's stock to fall from $28.04 to $27.02.

67.    S&P's disclosure of a materially higher amount of RMBS-backed CDO exposure forced MBIA's hand. At 6:38 p.m. on the evening of December 19, MBIA issued a press release informing investors that the Company had "supplemented the listing of its exposure to CDOs that include RMBS as of September 30, 2007 to make it consistent with the CDOs that were included in Standard & Poor's analysis and the listing has been posted on its Web site." (Emphasis added.)

68.    Defendants' press release linked to the chart set forth below. As noted above in ¶ 55, the Company had previously reported its exposure to CDOs containing RMBS collateral in, among other ways, charts purporting to set forth that exposure. Indeed, as of the end of the third quarter, the Company had disclosed approximately $17.2 billion in exposure to post-2004 CDOs containing RMBS, broken out in two categories, called "CDOs of High-Grade U.S. ABS Containing RMBS Collateral" and "CDOs of Mezzanine U.S. ABS Containing RMBS Collateral." However, after S&P issued its report, the Company "supplemented" the chart to

include <u>an entirely new category</u> of CDOs backed by RMBS, called "CDOs of Multi-sector High Grade Collateral."  This new category disclosed over $8.1 billion of entirely new RMBS exposure through CDOs-squared – the riskiest securities in the marketplace.  Further compounding this risk, over $5.1 billion of these CDOs-squared had been issued in 2006 and 2007, at a time when it was clear that the housing market was deteriorating and foreclosures were rising.  Set forth on the following page is the chart the Company issued on December 19, 2007, with the newly-disclosed information highlighted:

| Year issued | Net Pa ($ mil) | Collateral as a % of Total Pool | | | | | | | Ratings | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | RMBS | (Sub-prime) | ABS | CMBS | Corp | CDO | Total | *Original Base AAA/Aaa Subordination | Current Subordination Below MBIA |
| **CDOs of High-Grade U.S ABS containing RMBS Collateral** | | | | | | | | | | |
| 2004 | 656 | 59% | (41%) | 12% | 2% | 0% | 27% | 100% | 5.0% | 12.5% |
| 2004 | 653 | 59% | (20%) | 11% | 6% | 0% | 24% | 100% | 6.3% | 13.1% |
| 2005 | 600 | 79% | (34%) | 1% | 1% | 0% | 20% | 100% | 8.8% | 20.1% |
| 2006 | 1,118 | 76% | (20%) | 0% | 0% | 0% | 24% | 100% | 7.0% | 14.3% |
| 2006 | 828 | 72% | (37%) | 2% | 14% | 0% | 12% | 100% | 6.0% | 12.0% |
| 2006 | 601 | 72% | (24%) | 0% | 11% | 0% | 17% | 100% | 5.1% | 14.0% |
| 2006 | 723 | 99% | (34%) | 0% | 1% | 0% | 0% | 100% | 5.4% | 13.5% |
| 2007 | 1,190 | 70% | (25%) | 0% | 7% | 0% | 23% | 100% | 7.0% | 13.9% |
| 2007 | 1,203 | 72% | (16%) | 0% | 1% | 0% | 26% | 100% | 3.9% | 14.0% |
| 2007 | 1,684 | 53% | (51%) | 0% | 19% | 0% | 28% | 100% | 4.5% | 14.2% |
| 2007 | 1,177 | 70% | (46%) | 0% | 0% | 0% | 30% | 100% | 4.3% | 13.7% |
| 2007 | 950 | 74% | (54%) | 1% | 1% | 0% | 24% | 100% | 9.4% | 16.0% |
| 2007 | 896 | 52% | (27%) | 0% | 25% | 0% | 23% | 100% | 5.8% | 13.2% |
| 2007 | 563 | 70% | (29%) | 0% | 0% | 0% | 30% | 100% | 13.0% | 50.0% |
| 2007 | 469 | 69% | (31%) | 2% | 0% | 0% | 29% | 100% | 4.7% | 50.0% |
| 2007 | 450 | 70% | (18%) | 0% | 0% | 0% | 30% | 100% | 4.8% | 60.0% |
| 2007 | 1,015 | 70% | (66%) | 0% | 0% | 0% | 30% | 100% | 3.8% | 50.3% |
| 2007 | 563 | 69% | (21%) | 0% | 0% | 0% | 31% | 100% | 3.0% | 50.0% |
| 2007 | 413 | 71% | (10%) | 0% | 0% | 0% | 29% | 100% | 4.1% | 50.0% |
| 2007 | 375 | 63% | (7%) | 0% | 8% | 0% | 29% | 100% | 4.5% | 50.0% |
| Sub-total | 16,126 | | | | | | | | | |
| **CDOs of Mezzanine U.S. ABS containing RMBS Collateral** | | | | | | | | | | |
| 2004 | 198 | 84% | (31%) | 0% | 7% | 0% | 9% | 100% | 21.0% | 27.2% |
| 2004 | 179 | 79% | (57%) | 8% | 12% | 0% | 1% | 100% | 22.0% | 30.6% |
| 2004 | 218 | 75% | (42%) | 4% | 12% | 0% | 10% | 100% | 20.0% | 26.9% |
| 2007 | 473 | 92% | (42%) | 0% | 3% | 0% | 6% | 100% | 22.2% | 36.7% |
| Sub-total | 1,068 | | | | | | | | | |
| ***CDOs of Multi-sector High Grade Collateral** | | | | | | | | | | |
| 2004 | 1,350 | 0% | (0%) | 0% | 0% | 0% | 100% | 100% | 3.5% | 10.0% |
| 2005 | 1,430 | 20% | (20%) | 0% | 0% | 0% | 80% | 100% | 3.9% | 10.0% |
| 2006 | 1,115 | 24% | (22%) | 0% | 0% | 0% | 76% | 100% | 4.1% | 10.0% |
| 2006 | 1,077 | 21% | (21%) | 4% | 0% | 0% | 75% | 100% | 8.4% | 13.0% |
| 2007 | 990 | 22% | (15%) | 0% | 0% | 0% | 78% | 100% | 4.3% | 15.0% |
| 2007 | 2,175 | 0% | (0%) | 0% | 0% | 0% | 100% | 100% | 3.0% | 13.0% |
| Sub-total | 8,137 | | | | | | | | | |
| **Total** | 25,331 | | | | | | | | | |
| | 2,911 | Multi-Sector CDOs insured prior to 2004 | | | | | | | | |
| | 741 | Multi-Sector CDOs with European Mezzanine & Other Collateral | | | | | | | | |
| | 1,623 | Multi-Sector CDOs insured in the Secondary Market (prior to 2004) | | | | | | | | |
| Grand total | 30,606 | Total Multi-Sector CDOs Net Par Insured | | | | | | | | |

69. The $8.1 billion of newly-disclosed exposure <u>alone</u> was large enough to wipe out

MBIA's entire capital base, effectively rendering the insurer insolvent upon default. With this

disclosure, investors learned for the first time that Defendants had placed the Company's triple-A rating in serious jeopardy.

70.    Analysts and financial commentators immediately questioned how Defendants could have failed to disclose this information.  For example, Ken Zerbe of Morgan Stanley, who had recently published his view that MBIA was <u>less risky</u> than its chief competitor because of its supposedly smaller exposure to RMBS-backed CDOs, immediately published an analyst report stating that he was "shocked" the Company had hid "the riskiest part of its CDO portfolio" and concluding that the "massive" revelation "completely changes" the Company's risk profile.  His report stated in part:

> MBIA published an updated list of its CDO exposures.  It disclosed that it has a <u>massive</u> $8.1 billion of exposure to CDO-squared transactions (where the underlying collateral is more than 75% CDOs and the remainder is mostly RMBS).  Of the total, $5.1 billion was written in 2006 and 2007.  <u>We are shocked that management withheld this information for as long as it did.</u>
>
> * * *
>
> **Recent Rating Actions Make More Sense Now:** We had originally questioned how Moody's and S&P could have taken a more negative view of MBIA than Ambac, given our analysis suggested Ambac had a more risky portfolio. Now we know – <u>MBIA simply did not disclose arguably the riskiest parts of its CDO portfolio to investors: $8.1 billion of CDO-squareds.</u>  [Emphasis added].

71.    Other analysts concluded that Defendants' failure to disclose this $8.1 billion exposure, despite repeated investor questions on this specific topic, raised doubts about Defendants' honesty and radically altered their view of the Company.  A December 21, 2007 *New York Times* article quoted Robert Haines of CreditSights as stating that the new disclosure undermined his "confidence about how upfront the company is being and has been." Similarly, a December 20 *Dow Jones Newswires* article quoted Gary Pollack, head of fixed-income trading and research at Deutsche Bank Private Wealth Management, as stating that "[t]he exposure showed that MBIA [was] 'not as conservative as underwriting as the Street and

27

the market were led to believe.'"  Likewise, analyst Andrew Wessel of JPMorgan stated in a December 20 report that "we had been under the assumption that [MBIA] had a higher quality CDO portfolio than average in its peer group.  Following last night's release, we no longer hold that view."  And a December 20 *BusinessWeek* article quoted S&P equity analyst Catherine Seifert, who wrote: "We share the market's dismay that this revelation changes the risk profile of MBIA as compared with its financial guaranty peers."

72.    The financial press also heavily criticized Defendants for their failure to disclose MBIA's most risky exposure.  The *Wall Street Journal*'s "MarketBeat" site posted an article entitled "MBIA Tanks on CDO Disclosure," which noted that MBIA had "casually updated its list of exposure to various types of collateralized debt obligations yesterday in a release, detailing, among other things, exposure to $8.1 billion in some truly risky paper."  The article quoted economist Nouriel Roubini as stating that MBIA's new disclosure "has proven that [financial guarantors] are not transparent, that they hold or insure a mass of skeletons and toxic waste securities and <u>they have been dishonest in hiding from investors the toxic waste that they hold and insure.</u>" (Emphasis added).

73.    In response to the Company's December 19 disclosure, MBIA's stock price plummeted more than 26% on December 20, from $27.02 per share at the close on December 19, to close at $19.95 on December 20, on its highest volume of the year.  *Dow Jones Newswires* reported on December 20 that "the $8.1 billion exposure in CDO-squareds was new to investors, causing the stock to plunge and the cost of protecting MBIA to soar."

74.    On December 20, Fitch placed MBIA on ratings watch negative – indicating that it too was going to downgrade the Company – again because of the precise exposures that MBIA had been concealing.  Specifically, Fitch conducted "an updated assessment of each of

MBIA's exposure to SF [structured finance] CDO and CDO squared transactions" and concluded that the Company's "capital adequacy" fell below guidelines for a triple-A rating by "about $1 billion."

75.    On January 9, 2008, investors' fears about the Company's exposure to CDOs-squared were realized.  That day, MBIA issued a press release and a Form 8-K revealing how large and troubled its CDO-squared portfolio actually was.  Specifically, MBIA stated that its total exposure to CDO-squared securities, including those originated before 2004, was actually $9 billion, or $900 million more than had been disclosed on December 19.  The Company also disclosed that its CDO-squared portfolio had already suffered $200 million of loss impairments – further confirming the toxic nature of those securities and the threat they posed to the Company's triple-A ratings.

76.    On January 9, 2008, MBIA's share price tumbled further, declining from an opening price of $15.00 to a closing price of $13.40, on high trading volume – closing at less than half of the Company's share price before its December 19 disclosure.  The following month, the Company issued a press release announcing that Defendant Dunton had "resigned." In April, Fitch downgraded MBIA, depriving it of its triple-A rating.  The other major rating agencies followed suit shortly thereafter, permanently impairing the Company's business.

77.    MBIA continued to report highly material losses due to its CDO-squared portfolio throughout 2008.  By year-end 2008, MBIA had reported more than $440 million in impairments and approximately $1.8 billion in write-downs on its CDO-squared.  These and other ongoing losses in its RMBS-related exposures threatened to erode the Company's capital base so significantly that MBIA would not be able to write any new business.  Thus, on February 18, 2009, MBIA announced that it would split its insurance operations in two and

create a separate entity to house its RMBS-related exposures for the purpose of preventing losses in that portfolio from destroying the Company as a whole – a step that MBIA characterized as "essential" to its ability to "stabilize its business."  While this extraordinary reorganization allowed MBIA to stave off bankruptcy, the Company's stock has never recovered.

## VI.    FALSE AND MISLEADING STATEMENTS

78.    As summarized above, Defendants knowingly or recklessly misrepresented MBIA's exposure to CDOs containing RMBS by failing to disclose the fact that the Company had exposure to as much as $8.1 billion of CDOs-squared backed by RMBS insured since 2004, and $9 billion of such exposure including pre-2004 transactions.  Defendants' specific misrepresentations and omissions are further detailed below.

### A.    2007 First Quarter Statements

79.    As the country's housing market deteriorated during the summer of 2007, investors made detailed inquiries into MBIA's exposures to RMBS generally, and to CDOs backed by RMBS specifically.  In response, Defendants made specific misrepresentations regarding the total amount of MBIA's exposure to RMBS-backed CDOs.  On or about July 2, 2007, MBIA posted on its website a document entitled "MBIA's CDO Strategy, Portfolio Analysis and Subprime Exposure" (the "First Quarter 2007 CDO Disclosure").  The First Quarter 2007 CDO Disclosure reported that, as of the end of the first quarter of 2007, MBIA's "total" CDO exposure included $14.7 billion of "Multi-Sector CDOs with RMBS" (emphasis added), as shown below:



Multi-Sector CDOs with U.S. RMBS as a Percentage
of the Total MBIA CDO Portfolio (net par as of 3/31/07)



Multi-Sector CDOs with U.S. RMBS Collateral
(net par of $14.7 Billion as of 3/31/07)

80.    The First Quarter 2007 CDO Disclosure also contained a chart purporting to show

all of MBIA's CDOs "that include U.S. RMBS collateral originated from 2004 through first

quarter 2007 (as of 3/31/07)."  MBIA provided this chart because it knew that investors were

particularly concerned about the Company's exposure to RMBS collateral originated in recent

years.   Indeed, RMBS of recent vintage were exhibiting sharply rising default rates, as

described above.  To allay investor concerns over its exposure to these securities, MBIA's First

Quarter 2007 CDO Disclosure set forth the following chart, which falsely stated that MBIA's

CDO portfolio was exposed to $12.011 billion of RMBS-backed CDOs originated from 2004

through the first quarter of 2007:

31

Below is a summary of MBIA-guaranteed Multi-Sector CDOs that include U.S. RMBS collateral originated from 2004 through first quarter 2007 (as of 3/31/07):

| Year issued | Net Pa ($ mil) | Collateral as a % of Total Pool | | | | | | | Ratings | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | RMBS | ABS | CMBS | Corp | CDO | Total | Subprime RMBS | Moody's / S&P | *AAA/Aaa Subordination | Current Subordination Below MBIA |
| **CDOs of High-Grade U.S ABS containing RMBS Collateral** | | | | | | | | | | | |
| 2004 | 656 | 59% | 12% | 2% | 0% | 27% | 100% | 41% | Aaa/AAA | 5.0% | 12.5% |
| 2004 | 653 | 58% | 8% | 5% | 5% | 24% | 100% | 20% | Aaa/AAA | 6.3% | 13.9% |
| 2005 | 600 | 79% | 1% | 1% | 0% | 20% | 100% | 34% | Aaa/AAA | 8.8% | 20.0% |
| 2006 | 1,123 | 76% | 0% | 0% | 0% | 24% | 100% | 19% | Aaa/AAA | 7.0% | 14.1% |
| 2006 | 828 | 71% | 5% | 13% | 0% | 12% | 100% | 51% | Aaa/AAA | 6.0% | 12.0% |
| 2006 | 641 | 72% | 0% | 11% | 0% | 18% | 100% | 24% | Aaa/AAA | 5.1% | 13.5% |
| 2006 | 723 | 99% | 0% | 1% | 0% | 0% | 100% | 34% | Aaa/AAA | 5.4% | 13.0% |
| 2007 | 1,290 | 76% | 0% | 2% | 0% | 22% | 100% | 27% | Aaa/AAA | 7.0% | 14.0% |
| 2007 | 1,294 | 78% | 0% | 0% | 0% | 22% | 100% | 13% | Aaa/AAA | 3.9% | 13.7% |
| 2007 | 1,800 | 50% | 0% | 32% | 0% | 18% | 100% | 24% | Aaa/AAA | 4.5% | 14.0% |
| 2007 | 1,177 | 70% | 0% | 0% | 0% | 30% | 100% | 46% | Aaa/AAA | 4.3% | 13.5% |
| Sub-total | 10,785 | | | | | | | | | | |
| **\*\*CDOs of Mezzanine U.S. ABS containing RMBS Collateral** | | | | | | | | | | | |
| 2004 | 199 | 84% | 0% | 6% | 0% | 9% | 100% | 16% | Aaa/AAA | 21.0% | 23.4% |
| 2004 | 179 | 80% | 8% | 11% | 0% | 1% | 100% | 57% | Aaa/AAA | 22.0% | 30.7% |
| 2004 | 218 | 74% | 5% | 11% | 0% | 10% | 100% | 43% | Aaa/AAA | 20.0% | 26.9% |
| 2007 | 630 | 97% | 0% | 1% | 0% | 2% | 100% | 58% | Aaa/AAA | 22.2% | 37.0% |
| Sub-total | 1,226 | | | | | | | | | | |
| Total | 12,011 | | | | | | | | | | |

*MBIA effectively benefits from two sources of credit enhancement. First, the credit enhancement on the underlying high grade or mezzanine collateral must be eroded completely before the credit enhancement on the CDO is eroded. Second, the generally triple-A or super-triple-A credit enhancement that must be eroded completely before a claim would be made on MBIA's policy.*

*\*\*The chart above does not include two Multi-Sector CDOs with European Mezzanine ABS assets, which closed in 2005 and 2006.*

81.   Both the $14.7 billion and $12.011 billion figures identified above were materially false and misleading. As of the 2007 first quarter, MBIA's true exposure to CDOs backed by RMBS was approximately $20.7 billion, rather than $14.7 billion. Further, MBIA's exposure to CDOs backed by RMBS issued since 2004 was approximately $17 billion, not $12.011 billion. In addition, the billions of RMBS exposure omitted from the above charts consisted entirely of CDOs-squared – the riskiest securities in MBIA's entire portfolio.

82.   Defendants' misrepresentations about MBIA's CDO portfolio assured investors that its exposures were limited and well-protected.   For example, a Fox-Pitt research analyst issued a favorable report on July 23, 2007, reflecting MBIA's representations about careful underwriting, and upgraded MBIA's stock to "outperform."  The report stated that "MBIA in particular has been cautious on mortgage exposure over the past few years, and has been cautious on insuring CDOs unless they are well above the triple-A attachment point.  We do not believe losses from this area should be material."

### B.    2007 Second Quarter Statements

83.   On July 26, 2007, Defendants made a series of misrepresentations concerning the Company's exposure to CDOs backed by RMBS.  For example, in connection with a July 26, 2007 conference call, MBIA posted on its website an updated document entitled "MBIA's CDO Strategy, Portfolio Analysis and Subprime Exposure"  (the "Second Quarter 2007 CDO Disclosure").  This document included updated charts purporting to show MBIA's exposure to CDOs with RMBS as of the end of the second quarter of 2007, substantially in the same form as the charts alleged at ¶¶ 79-80.   These charts showed that (a) MBIA's total exposure to "CDOs with RMBS" was $15.9 billion, and (b) MBIA's total exposure to "CDOs that include U.S. RMBS collateral originated from 2004 through second quarter 2007" was $13.591 billion.  Indicating to investors that this disclosure was meant to be comprehensive, Defendants set forth in a footnote that the chart excluded two CDOs "with European Mezzanine assets."

84.   Both the $15.9 billion and $13.591 billion figures identified in the charts included in this presentation were materially false and misleading.  In truth, MBIA's exposure to CDOs with RMBS was approximately $22 billion, not $15.9 billion.  Further, the Company's exposure to CDOs with RMBS originated since 2004 was approximately $18.591 billion, not

$13.591 billion. Moreover, the billions of RMBS exposure that these charts omitted consisted entirely of CDO-squared securities – the riskiest securities in MBIA's entire portfolio.

85.    In response to growing market concern over the Company's RMBS-related exposures, on August 2, 2007, MBIA held an extraordinary investor conference call to detail the issue, during which several of MBIA's top officers made presentations. During this call, MBIA made a series of materially false and misleading statements regarding its exposure to RMBS-backed CDOs.

86.    Specifically, in both oral and written statements, the Company repeatedly represented on the call that its total exposure to CDOs containing RMBS was $15.9 billion. For example, MBIA published a book of slides called "MBIA's Selective Approach to Subprime RMBS and Multi-Sector CDOs," which represented that MBIA had exposure to $15.9 billion of "CDOs containing RMBS" as of the 2007 second quarter.

87.    Similarly, during the call, Anthony McKiernan, an MBIA Managing Director and Head of Structured Finance Insurance Portfolio Management, stated that, as of the end of the second quarter of 2007, "[o]f the $24.2 million [sic] multisector [CDO] total, underlined approximately $15.9 billion of net par contains RMBS collateral." (Emphasis added.) Following an analyst question later in the presentation asking him to state "MBIA's exposure to multisector CDOs with U.S. RMBS collateral," McKiernan repeated that "we've got $15.9 billion in net par exposure that consists of multisector CDOs with U.S. RMBS collateral, as of 6/30/07."

88.    These statements were materially false and misleading because, in truth, MBIA had approximately $22 billion of exposure to CDOs containing RMBS. Further, the billions of dollars of exposure that Defendants omitted from the statements described above consisted entirely of CDOs-squared, the riskiest securities in MBIA's portfolio.

89.    Investors and analysts relied on these false statements, noting that MBIA's exposure to RMBS-backed CDOs was modest, and far less than its principal competitor's exposure.  For example, following MBIA's August 2, 2007 conference call, S&P published a report entitled "U.S. Bond Insurers Withstand Subprime Stress" in which S&P reported – consistent with Defendants' misrepresentations described above – that MBIA had $15.870 billion of "exposure to CDOs with subprime collateral."  On August 16, 2007, Ken Zerbe of Morgan Stanley published a report directly comparing MBIA's exposure to that of its chief competitor, and concluding that MBIA's portfolio was much safer:

> In Exhibits 10 and 11, we list each individual RMBS-related CDO exposure for both Ambac and MBIA. Ambac's exposure totals over $29 billion, including $2.5 billion of mezzanine CDO-squareds, while MBIA's exposure is a more modest $15.7 billion.

90.    On September 4, 2007, Defendant Dunton gave a presentation at a Keefe, Bruyette & Woods Insurance Conference, where he again materially misrepresented the extent of the Company's exposure to CDOs backed by RMBS.  Specifically, he presented slides stating that MBIA had "$15.9 billion" of exposure to "CDOs with some Subprime exposures," and he also stated that the Company had "$15.9 billion" of exposure to "CDOs that contain some level of RMBS."

### C.    2007 Third Quarter Statements

91.    During the third quarter of 2007, MBIA insured two additional extremely large CDOs-squared containing RMBS. Collectively, these CDOs added an additional approximately $3.3 billion in exposure to MBIA's portfolio, at a time when the housing market was cratering.  Given the size of these deals, and the Company's representations that Defendants Dunton and Chaplin reviewed all large or complex transactions, it is clear that these two Defendants were directly involved in approving these highly risky transactions.

Indeed, as set forth below at ¶¶ 128-35, Defendant Dunton was responsible for personally signing the insurance policies for these two transactions on behalf of MBIA. Nevertheless, despite the obvious importance of these deals to the Company, and the attention that investors were devoting to the Company's RMBS exposure, Defendants Dunton and Chaplin did not disclose these transactions to investors. Instead, when the Company disclosed its "total" exposure to CDOs containing RMBS in October 2007, Defendants deliberately failed to inform investors that they had materially increased the Company's exposure by more than $3 billion in the third quarter, and in fact continued to grossly misrepresent MBIA's exposure to these toxic securities.

92. On October 25, 2007, MBIA held a conference call chaired by Defendant Chaplin, during which he stated that, as of September 30, 2007, the Company had approximately $19 billion of exposure to RMBS-backed CDOs. Defendant Chaplin specifically stated that this figure included "all" of the Company's mortgage-backed CDOs:

> Okay. It was <u>all</u> of our CDOs that contain subprime mortgage collateral. In fact, that portfolio – I think <u>it is all the CDOs that contain RMBS and as of the [third] quarter, the size of that portfolio is about $17 billion</u>. . . . I am sorry. <u>$19 billion.</u> [Emphasis added.]

93. The above statements were materially false and misleading because, in reality, MBIA had exposure to approximately $28 billion of CDOs with RMBS, not $19 billion. Additionally, the $9 billion of RMBS exposure that Defendant Chaplin omitted consisted entirely of CDOs-squared, the riskiest securities in MBIA's portfolio.

94. On or about October 25, 2007, MBIA also posted on its website an updated document entitled "MBIA's CDO Strategy" (the "Third Quarter 2007 CDO Disclosure"). The Third Quarter 2007 CDO Disclosure included a chart purporting to show MBIA's exposure to RMBS-backed CDOs as of the end of the third quarter of 2007, substantially in the same form

as the charts alleged above at ¶¶ 79-80.  The Third Quarter 2007 CDO disclosure reflected that MBIA had a total of approximately $17.194 of CDOs containing RMBS collateral which had been originated since 2004.  This number was materially false and misleading because MBIA had total exposure to approximately $25.3 billion of CDOs with RMBS which had been insured since 2004.  The $8.1 billion of RMBS exposure that this chart omitted consisted entirely of CDOs-squared, the riskiest securities in MBIA's portfolio.

95.    On this call, Chaplin also noted that the Company had taken a $342 million write-down on its CDO portfolio, but maintained this was merely a temporary fluctuation in value that would recover, saying, "We don't foresee any actual losses on that portfolio so we would expect this mark-to-market loss to reverse itself over time."  Nevertheless, in response to the Company's disclosure about the weakness of its CDO portfolio, MBIA's stock price fell from a closing price of $55.19 on October 24 to $46.99 on October 25, on extraordinarily heavy trading volume.

96.    While the stock fell, investors and market analysts took comfort from MBIA's materially false statements regarding its RMBS-backed CDO exposure to conclude that the Company was "conservative," had "avoid[ed] problem areas," and that "investors looking out one year will be rewarded" accordingly.  For example, an October 26 report by Fox-Pitt stated that "MBIA has relatively less mortgage exposure than the others [financial insurance companies]" and that therefore, "[a]lthough there is considerable turmoil in the market and the stock, we believe investors looking one year out will be rewarded."  Similarly, Ken Zerbe of Morgan Stanley issued a November 2, 2007 report detailing his conclusion that MBIA had better navigated its RMBS risk than its chief competitor, Ambac.  He wrote: "Over the last several months, MBIA had been demonstrating that it was taking a more conservative

approach to the mortgage meltdown by avoiding problem areas – specifically subprime and CDOs backed by subprime. . . .  [W]e believe MBIA would be better positioned than Ambac given its relatively lower risk CDO portfolio."  Zerbe expressly noted that MBIA had only "$17.2 billion" in exposure to "CDOs with RMBS collateral."

### D.    2007 Fourth Quarter Statements

97.    During the fourth quarter, market observers began to raise questions about the Company's capital adequacy and rating agencies began to closely review the Company's exposure to RMBS.  During the course of their reviews of the Company, the rating agencies received non-public information about the Company's portfolio, including its exposure to $8.1 billion of CDOs-squared with RMBS insured since 2004.  Based on that information, the rating agencies issued reports recognizing capital shortfalls at MBIA and indicating that downgrades would occur, which eventually forced the Company to acknowledge that it had misrepresented its exposure to CDOs with RMBS.  However, until a December 19 report by S&P forced the Company to disclose its full exposure, Defendants continued to misrepresent the Company's exposure to CDOs backed by RMBS.

98.    For example, as late as November 27, 2007, Defendant Chaplin spoke at a Bank of America Mini-Conference, where he stated that the Company had exposure to "[a]bout $19 billion" of CDOs with RMBS.  This statement was materially false and misleading because, in truth, MBIA had approximately $28 billion of exposure to CDOs backed by RMBS.

99.    On December 5, 2007, Moody's issued a report in which it updated its loss estimates to account for the impact of continued mortgage deterioration on the Company's full CDO and RMBS portfolios, including the undisclosed CDOs-squared.  Based on its analysis of the Company's full RMBS exposure, Moody's concluded that MBIA was "somewhat likely" to suffer a capital shortfall.

100.  Following this news, MBIA's stock price fell from $33.10 to a close of $27.42 – a seven-year low – on extremely high volume of more than 29 million shares traded.  Analyst Rob Haines of CreditSights stated, "Clearly it's not a good development for the company.  . . . The agencies have better visibility about the compan[y] and maybe they've seen something that's troubling . . . ."  (Emphasis added).

101.  In response to this and other ongoing rating agency reviews, the Company was forced to seek additional capital to preserve its triple-A ratings.  On December 10, 2007, the Company announced that it would receive up to $1 billion in capital from the private equity firm Warburg Pincus.  At the end of the press release announcing that investment, the Company announced that, in the fourth quarter, it would establish reserves of between $500 and $800 million to cover expected losses on its RMBS portfolio.  The Company further announced that, as of October 31, 2007, its CDO portfolio had suffered a mark-to-market loss of $850 million, but added that this change in value was "not predicative of future claims" and "will net to zero over the remaining life of the" insured CDOs.

102.  The market initially responded favorably to the news of the Warburg Pincus investment, but the stock declined as MBIA's troubles came into focus.  A December 10, 2007 Briefing.com article noted that while MBIA "warned that its mark-to-market losses will be greater in the fourth quarter than in the third quarter . . . [i]nvestors concentrated on the indication that private equity firm Warburg Pincus is going to bolster the company's capital position with a $1 billion investment."  However, over the next few days, as the market digested the negative news about the Company's troubled CDO portfolio, MBIA's common stock steadily fell from $33.95 per share to close at $27.60 on December 14.

103. After the close of trading on December 14, 2007, Moody's issued a report in which it placed MBIA on negative outlook, indicating that the Company could be downgraded imminently. Moody's put MBIA on negative outlook based upon a capital shortfall resulting from "higher expected losses" in the Company's mortgage-related portfolio, including its "collateralized debt obligations of asset backed securities (ABS CDOs) that include RMBS," such as the $8.1 billion of CDOs-squared insured since 2004, which the Company had not disclosed to investors, but of which Moody's was aware.

104. Two weeks later, on December 19, 2007, S&P issued a report in which it placed MBIA on negative outlook, which signaled that it was going to downgrade the Company, due to large losses stemming from the Company's undisclosed CDO-squared exposure, as noted above at ¶ 66.

105. S&P's disclosure of a materially higher amount of RMBS-backed CDO exposure forced MBIA to disclose the $8.1 billion in CDOs-squared it had been concealing from investors. After the close of trading on December 19, MBIA issued the press release and chart described above at ¶¶ 67-69. Notably, the chart added a third category of CDO exposure that had not appeared on any of the charts that the Company had issued previously. This category, entitled "CDOs of Multi-sector High Grade Collateral," disclosed over $8.1 billion of entirely new RMBS exposure through CDOs-squared insured since 2004 – the riskiest securities in the marketplace.

106. In response to this disclosure, on December 20, 2007, MBIA's stock plummeted more than 26%, falling from a closing price of $27.02 on December 19 to a closing price of $19.95. As noted above in ¶¶ 70-72, analysts and the financial press heavily criticized

Defendants – and questioned their integrity – for failing to disclose the riskiest part of the Company's portfolio.

107. Faced with this reaction, on December 20, MBIA issued a press release in which it falsely claimed that it had previously disclosed the $8.1 billion of exposure to CDO-squared with RMBS. Specifically, in the press release, MBIA claimed that its December 19 chart "discloses no additional Multi-Sector CDO exposure" because it merely "provides detail on the composition of MBIA's $30.6 billion Multi-Sector CDO exposure that had previously been provided in its Operating Supplement." The Company also claimed that it had "discussed its exposure to CDO transactions with inner CDOs ('CDO-Squared') during a conference call for investors on August 2, 2007." As demonstrated by the market's reaction to the Company's December 19 disclosure, as well as the points discussed below, the Company's claim that it had previously disclosed this information was false.

108. First, the Company's third quarter Operating Supplement merely stated that MBIA had insured $30.6 billion of "Multi-Sector CDOs." Significantly, the Operating Supplement failed to disclose how much of that total contained RMBS. This was a significant omission because, on numerous occasions, the Company informed investors that only between $14.7 and $19 billion of its multi-sector CDOs contained RMBS, which is why analysts consistently repeated those figures throughout the Class Period. In other words, investors were not concerned about multi-sector CDOs backed strictly by corporate loans or other adequately performing collateral. The area of concern for investors – and the category that Defendants fraudulently concealed – was CDOs linked to residential mortgages.

109. Second, the Company did not disclose its full exposure to RMBS-backed CDOs on the August 2 call. The only time that CDOs-squared were mentioned during that call was

when one question specifically asked for "more detail on the CDO collateral within your multisector CDOs and the general composition of your CDOs squared." In response, Anthony McKiernan, the Company's Head of Structured Finance Insurance Portfolio Management, stated that MBIA had approximately $6.1 billion of net exposure to CDOs-squared. Significantly, however, though RMBS was the principal focus of the call, and even though the questioner specifically asked for "detail" on the "composition" of the Company's CDOs-squared, McKiernan did not disclose that any of these CDOs-squared contained RMBS. This was particularly significant, because on the call the Company repeatedly represented that its total exposure to RMBS-backed CDOs was $15.9 billion – a number that understated MBIA's true exposure by billions.

110. Third, the Company knew that the market understood that its total exposure to RMBS-backed CDOs was between $14.7 and $19 billion. Indeed, during the Class Period the Company was extremely focused on communicating its RMBS exposure to analysts, as evidenced by the extraordinary conference call the Company held specifically to discuss its RMBS exposure. Defendants obviously were aware of the analyst reports discussed herein, and knew what the analysts were saying about the Company's RMBS exposure, yet never bothered to correct the analysts' "misimpressions." If the Company had truly disclosed this additional $8.1 billion in exposure, then, at some point before December 19, the Company would have informed the analysts that their reports were wildly inaccurate. However, rather than correct the analysts, the Company continued to misrepresent the amount of its CDO exposure. The fact that the Company allowed the analysts to continue to misstate its exposure not only belies its assertions that it previously disclosed the information, but is powerful evidence of Defendants' scienter.

42

111. Fourth, while the Company tried to convince the market that it had previously disclosed its full exposure to CDOs with RMBS, its own press release directly belied that assertion.  Indeed, in that press release, the Company admitted that it "had not previously detailed" the $8.1 billion of CDOs-squared.

112. The Company also sought to justify its failure to disclose this exposure by claiming that it did not disclose CDO transactions with "less than 25 percent direct U.S. RMBS collateral."  This second attempt at an excuse, however, was similarly false for several reasons.

113. First, MBIA never once qualified its prior disclosures by stating that they reflected only exposure where RMBS comprised 25% or more of the underlying CDO collateral.  In fact, through the Class Period, on multiple occasions, as described above at ¶¶ 55, 59, 61-62, 79-80, 83, 86-87, 90, 92, 94, and 98, MBIA affirmatively represented that its reported RMBS-backed CDO exposures reflected its "total" such exposure.

114. Second, at least three of the six concealed CDOs-squared included more than 25% RMBS when accounting for the inner CDO collateral.  Three of the CDOs-squared disclosed for the first time on December 19 contained between 21% and 24% RMBS collateral in the outer CDO.  As MBIA admitted on May 12, 2008, an additional 21% to 40% of the collateral was inner CDOs that consisted "largely" of "mezzanine [i.e., low-grade] tranches with 2006-2007 RMBS collateral."  When accounting for this 2006-2007 low-grade RMBS collateral in the inner CDOs, these three CDOs-squared had total RMBS exposure well above the Company's stated 25% benchmark.

115. Third, the insured CDOs-squared that Defendants concealed were among the Company's largest insured CDOs.  The six concealed CDOs-squared included MBIA's largest insured CDO transaction at $2.175 billion, as well as its third and fourth largest insured CDO

transactions, valued at $1.430 billion and $1.350 billion as of December 19, 2007, respectively. There is no legitimate reason why Defendants disclosed some of MBIA's RMBS-backed CDO exposures to concerned investors, yet concealed its largest such exposures without ever mentioning the exclusion.

116. Fourth, when MBIA wanted to exclude certain categories of CDOs from its disclosures, it did so explicitly and clearly.  For example, the Second Quarter 2007 CDO Disclosure plainly stated that its $15.9 billion total of exposure to RMBS-backed CDOs excluded $1.7 billon of secondary market CDOs.  Also, that disclosure stated that it "does not include two Multi-Sector CDOs with European Mezzanine ABS assets, which closed in 2005 and 2006."  MBIA thus led investors to believe that its totals for CDOs with RMBS were complete, with the specific exception of those exposures that MBIA expressly excluded.

117. Fifth, as noted above, during the Class Period investors became increasingly concerned about MBIA's mortgage-related exposures and repeatedly pressed Defendants for detail concerning those exposures.  The insured CDOs-squared that Defendants concealed were the riskiest mortgage-related exposures in the Company's entire portfolio and eclipsed MBIA's entire capital base.  In an environment where investors and analysts were deeply concerned over mortgage-related exposure, the concealment of the Company's riskiest mortgage-related exposures constituted reckless conduct at the least.

118. On January 9, 2008, investor fear about MBIA's RMBS exposures was realized. On that day, MBIA issued a press release and Form 8-K, with attached "Supplemental Information," containing a series of disclosures that drove its stock price down even further by revealing the full scope and weakness of its CDO-squared portfolio.  MBIA stated that its total exposure to CDO-squared securities (including those originated before 2004) was $9 billion,

44

$900 million more than had been previously disclosed. Further, MBIA announced $200 million of losses on three of the CDO-squared transactions with RMBS that Defendants had concealed from investors until December 19. While the Company announced an estimated $3.3 billion mark-to-market write-down on its overall CDO exposures, the $200 million of impairment to the CDOs-squared was the only portion of the write-down that constituted a permanent loss on the Company's CDO portfolio. This impairment confirmed that Defendants had concealed from investors the riskiest portion of MBIA's CDO portfolio, and the only portion that was (at the time) actually impaired.

119. The Company also revealed that the New York Insurance Department and SEC had begun inquiries into the fraud alleged herein by requesting information concerning the Company's "disclosures regarding MBIA's CDO exposure" and its "announcement of preliminary loss reserve estimates on December 10, 2007 related to MBIA's residential mortgage-backed securities exposure."

120. In response to this news, MBIA's common stock fell from an opening price of $15.00 per share on January 9, 2008 to close at $13.40, a decline of 10.6%.

121. In the wake of these disclosures, on February 19, 2008, MBIA issued a press release announcing that Defendant Dunton had "resigned" as CEO for unspecified reasons.

122. The Company has been substantially impaired as a result of the exposure to CDOs-squared backed by RMBS that it concealed throughout the Class Period. On May 12, 2008, the Company announced that its CDO-squared portfolio had suffered another $232 million of losses in the first quarter of 2008, for a total of $432 million in permanent impairments. By the end of 2008, MBIA had suffered more than $440 in permanent impairments and approximately $1.8 billion in write-downs on its CDOs-squared alone. As

noted above, these and other ongoing losses in the Company's RMBS-related exposures were so severe that the Company was forced to split its insurance operations in two in order to stabilize its business.

123. In addition, all three major rating agencies have now downgraded the Company, substantially impairing its ability to generate business. On April 4, 2008, Fitch became the first rating agency to downgrade MBIA to double-A. On June 6, 2008, S&P downgraded the Company to double-A, and on June 19, 2008, Moody's downgraded MBIA two full notches to Aa2.

124. On January 21, 2010, MBIA revealed that its previously-undisclosed CDOs-squared were impaired by nearly half a billion dollars even before the start of the Class Period – thus confirming that these exposures materially jeopardized the Company's financial condition throughout the entire Class Period. Specifically, in a complaint filed in *MBIA Ins. Corp. v. Royal Bank of Canada*, Index No. 12238/09 (N.Y. Supr. May 22, 2009) (the "RBC Action"), MBIA acknowledged that at least three of its undisclosed CDOs-squared, known as Logan CDO I, II and III ("Logan I, II, and III," respectively), contained "embedded losses" totaling $445 million before the Class Period began. MBIA stated that Logan I and II had suffered $175 million in embedded losses by no later than March 31, 2007, and Logan III had suffered $270 million of embedded losses by no later than June 21, 2007. MBIA stated that these "significant losses" were caused by "particularly pronounced" deterioration in the underlying RMBS collateral that had occurred long before the start of the Class Period, and rendered the RMBS "akin to a pool of junk bonds" by the time the Class Period commenced. (Emphasis added.)

125. The inquiries by the SEC and the New York Insurance Department are ongoing. The Company's stock has never recovered from the fraud alleged herein, and now trades at approximately $10 per share.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

126. As alleged above and further detailed below, numerous facts give rise to the strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that their statements set forth above were materially false and misleading.

### A.    Defendants Dunton And Chaplin Personally Reviewed Or Recklessly Disregarded A Plethora Of Internal Documents Disclosing That MBIA's CDOs-squared Contained RMBS

127. On March 31, 2010, this Court issued an Order sustaining Lead Plaintiff's claims against MBIA for failing to disclose its exposure to RMBS-backed CDOs-squared, and dismissing Lead Plaintiff's claims against Defendants Dunton and Chaplin on the ground that the Complaint filed on October 17, 2008 failed "to plead any specific information available to" Defendants Dunton and Chaplin "appraising [them] of the RMBS content in the CDOs-squared." *In re MBIA, Inc. Sec. Litig.*, -- F. Supp. 2d --, 2010 WL 1253925, at *17, 19-20, 24 (S.D.N.Y. Mar. 31, 2010). As noted above at ¶¶ 10-13, 43-50 and described further herein, extensive documents and other information were available to Defendants Dunton and Chaplin which expressly disclosed that the CDOs-squared that MBIA failed to disclose until December 19, 2007 contained hundreds of millions of dollars worth of RMBS collateral.

### 1.    MBIA's Own Insurance Policies – Including Those Personally Signed By Defendant Dunton – Identified the RMBS Collateral in the Undisclosed CDOs-Squared

128. The insurance policies for the undisclosed CDOs-squared – including those which Defendant Dunton personally signed during the Class Period – explicitly set forth the total amount of RMBS collateral in those CDOs-squared and identified each RMBS security in the

collateral pool. MBIA's structured finance insurance policies were required to be signed by the President of MBIA Insurance Corporation, a position which Defendant Dunton assumed in February 2007. Accordingly, in his capacity as President of MBIA Insurance Corporation, Defendant Dunton was responsible for signing the "Financial Guarantee Insurance Policies" covering all CDO-squared transactions that the Company entered into after February 2007. These policies included at least two of the Company's largest undisclosed CDO-squared transactions, known as Logan III and Menton IV, totaling more than $3.3 billion.

129. For example, on July 5, 2007, three days after the Class Period began, <u>Defendant Dunton personally signed</u> the $1.275 billion "Financial Guaranty Insurance Policy" for Logan III (the "Logan III Policy"). Logan III was one of the CDOs-squared whose existence Defendants concealed from investors until December 19. Dunton's signature on the Logan III Policy is reproduced below:



In Witness Whereof, MBIA has caused this Policy to be executed in facsimile on its behalf by its duly authorized officer, this 5th day of July, 2007.

MBIA INSURANCE CORPORATION

By: _____
   President

By: _____
   Assistant Secretary

130. Attached as Exhibit C and expressly incorporated into the Logan III Policy was a document called the "Confirmation." As MBIA admitted in its complaint filed in the RBC

Action, the Confirmation was a "key transaction document" because it "<u>listed and described</u> <u>each of the assets referenced in the Logan III collateral pool</u>."  (Emphasis added.)

131.  Significantly, attached as Annex I to the Confirmation was a table that identified each RMBS security collateralizing Logan III.  This table expressly stated that Logan III contained at least 11 different types of RMBS securities collateralized by residential mortgages totaling more than $200 million, including $33.5 million of securities issued by "Soundview <u>Home Equity Loan</u> Trust;" $23.9 million of securities issued by "First Franklin <u>Mortgage Loan</u> Trust;" $21.25 million of securities issued by "Structured Asset Securities Corporation <u>Mortgage Loan Trust</u>;" and $21 million of "C-BASS <u>Mortgage Loan</u> Asset-Backed Certificates," among others.  (Emphasis added.)

132.  Indeed, given the wide array of RMBS exposures contained in Logan III, the Policy and Confirmation set forth numerous definitions of the various types of RMBS collateral included in the transaction, such as "Alt-A RMBS" (which were backed by a type of mortgage loan that does not require the borrower to document his income); "Home Equity Loan Securities" (which were backed by second mortgages); "Mid-Prime RMBS" (which were backed by loans of mediocre credit quality); "Option ARMs" (which were backed by adjustable rate mortgages); "Prime RMBS" (which were backed by loans of purportedly higher credit quality); and "Prime RMBS (Jumbo)" (which were backed by larger mortgage loans).

133.  Annex 3 to the Confirmation also put Defendants Dunton and Chaplin on notice that this undisclosed CDO-squared contained substantial amounts of RMBS.  Annex 3 specifically stated that the "Aggregate of all Reference Obligations which are <u>Residential</u> <u>Mortgage Backed Securities</u>" in Logan III's collateral pool were permitted to equal "$375,000,000," or "25.0%," of Logan III's total collateral.  (Emphasis added.)

134.  The Policy further disclosed that, in addition to the hundreds of millions of dollars of direct RMBS exposure described above, Logan III contained material amounts of securities issued by other CDOs (so-called "inner-CDOs") that were themselves backed by significant amounts of RMBS.  Specifically, Annex I stated that Logan III contained more than $110 million of securities issued by inner CDOs called Sagittarius, Broderick 2, and Broderick 3, each of which MBIA separately insured.  Defendants knew that these inner CDOs contained RMBS, because Defendants had repeatedly included these exposures in the Company's quarterly CDO disclosures, which purportedly set forth MBIA's total exposure to "CDOs with RMBS Collateral" (although they did not disclose the names of these transactions in those charts).  Moreover, the Pitchbooks for Broderick 2 and 3 stated that 75% of Broderick 2's collateral and 72% of Broderick 3's collateral consisted of "RMBS" securities – further apprising Defendants Dunton and Chaplin that these inner CDO securities enhanced Logan III's RMBS exposure by an additional $110 million.

135.  As President of MBIA Insurance Corporation, Defendant Dunton also would have been responsible for signing the Financial Guarantee Insurance Policy for a $2.1 billion CDO-squared called "Menton CDO IV" ("Menton IV"), which MBIA entered into during the third quarter of 2007.  Menton IV was one of the six CDO-squareds that Defendants admitted, on December 19, 2007, contained material amounts of RMBS.  As a result, Defendant Dunton either knew, or was reckless in not knowing, that a multi-billion dollar Policy he was responsible for signing covered a transaction with material amounts of RMBS exposure.  Moreover, as set forth below at ¶¶ 140-59, Dunton would have received numerous other documents which would have explicitly informed him that Menton IV had material amounts of RMBS exposure.

50

136. The insurance policies and related confirmations for the Company's other undisclosed CDOs-squared also explicitly stated that these transactions contained substantial amounts of RMBS collateral. For example, Annex 3 to the Confirmation attached to the September 26, 2005 Financial Guaranty Insurance Policy for a $1.8 billion CDO-squared known as Logan I made clear that this transaction contained up to "$400,000,000" of "ABS Type Residential Securities," or "20.0%" of Logan I's total collateral pool. (Emphasis added.) The Confirmation further defined ABS Type Residential Securities to mean "Home Equity Loan Securities," "Residential A Mortgage Securities," and "Residential B/C Mortgage Securities."

137. On November 27, 2007, MBIA Insurance Corporation received an Amended and Restated Confirmation for Logan I, which further confirmed and reiterated that Logan I contained hundreds of millions of dollars worth of RMBS collateral. Indeed, Annex I to that Confirmation identified every RMBS security in the collateral pool, including $27 million of securities issued by "New Century Home Equity Loan Trust," $21 million of securities issued by "Carrington Mortgage Loan Trust," and $17 million of securities issued by "NovaStar Mortgage Funding Trust." That Confirmation was faxed directly to MBIA's corporate headquarters located at 113 King Street in Armonk, New York. That same day, Defendant Chaplin told investors at a conference sponsored by Bank of America that the Company's total exposure to CDOs with RMBS was "about $19 billion" – an amount which understated the exposure by approximately $9 billion, and did not include the exposure included in Logan I.

138. In addition, the May 4, 2006 Financial Guaranty Insurance Policy and Confirmation for a $1.35 billion CDO-squared known as Logan II – the existence of which was also not disclosed to investors until December 19, 2007 – stated that this CDO-squared

contained up to more than half a billion dollars of RMBS collateral.  Annex I to that Policy disclosed that Logan II's collateral included a wide array of RMBS collateral, including $30 million of securities issued by "New Century Home Equity Loan Trust," $22.5 million of securities issued by "Merrill Lynch Mortgage Investors, Inc.," and $15 million of securities issued by "Fremont Home Loan Trust."  Moreover, Annex 3 to that Policy stated that up to "$525,000,000," or "35.0%," of Logan II's collateral consisted of "Residential Mortgage Backed Securities."

139.  Accordingly, the Company's own insurance contracts – which were available to Defendants Dunton and Chaplin, and were in fact signed by Defendant Dunton after February 2007 – fully disclosed that the CDOs-squared contained material amounts of RMBS.

      **2.**       **Pitchbooks, Collateral Lists, Offering Circulars, and Indentures Provided Detailed Information about the RMBS Collateral in MBIA's Undisclosed CDOs-squared**

140.  In connection with each CDO-squared transaction, MBIA engaged in a lengthy negotiation process during which numerous documents disclosing that MBIA's CDOs-squared contained RMBS were readily available to Defendants Dunton and Chaplin, who were responsible for reviewing and approving the CDO-squared transactions.  As MBIA acknowledged in its complaint in the RBC Action, MBIA "negotiated over the course of several months and had numerous face-to-face and telephonic discussions as well as email communications <u>regarding the structure, nature, and terms of the Logan transactions, including the criteria by which assets would be selected for inclusion in the CDOs' collateral pool</u>." (Emphasis added.)  According to MBIA's complaint, the documents made available to MBIA's senior executives during this process included "deal documents, Pitchbooks, collateral lists, modeling analyses, rating agency letters, and other marketing materials … which memorialized the terms of the negotiations for each of the" CDOs-squared.

141. Indeed, in connection with each undisclosed CDO-squared, MBIA received a "Preliminary Investor Presentation," commonly referred to as a "Pitchbook." In its complaint in the RBC Action, MBIA admitted that the Pitchbooks were one of the "key transaction documents" for each CDO-squared because they contained detailed explanations of the type and quality of the underlying RMBS collateral. According to MBIA's complaint, the Pitchbooks disclosed "the credit quality of the collateral," "the collateral selection and management process" and "the historical default rates and other performance metrics of comparable securities."

142. In fact, the Pitchbooks contained a transaction summary which explicitly identified the type of securities included in the CDO's collateral pool, including the underlying RMBS. The Pitchbooks also provided a representative collateral portfolio, which expressly stated that the CDO contained RMBS and disclosed how much of the total collateral pool consisted of RMBS. The Pitchbooks further provided charts and other disclosures reflecting the historical default rates for RMBS that were of comparable quality to the RMBS included in the CDO.

143. As MBIA admitted, the detailed disclosures in the Pitchbooks for the three Logan CDOs-squared explicitly stated that these deals, totaling over $4.4 billion, each contained large amounts of RMBS collateral. MBIA further acknowledged that the Pitchbooks disclosed that these three CDO-squared transactions were "highly complex structures that included hundreds of RMBS and CDO securities. Further, each RMBS was composed of thousands of mortgages, and each inner CDO security was composed of hundreds of tranches of other RMBS and CDOs (each of which was composed of yet more mortgage loans and other securities)." (Emphasis added.)

144. Indeed, the Logan III Pitchbook, dated April 18, 2007 – one of the "key" documents for the $1.275 billion contract that Dunton personally signed – contained an entire section setting forth detailed representations concerning the nature, quality, and performance of the type of "High Grade CDO & RMBS Asset Classes" backing all three Logan CDOs. (Emphasis added.)  The Logan III Pitchbook explicitly described the ratings stability, default rates, and loss severity of the "RMBS securities" contained in all three Logan transactions, and made detailed disclosures concerning the presence of "home equity loan" RMBS in the Logan deals, according to MBIA's own complaint in the RBC Action.

145. In addition to the Pitchbooks, MBIA's senior executives received several other documents in connection with each undisclosed CDO-squared transaction which stated that these transactions contained RMBS.  For example, MBIA received a "Collateral List" or "Portfolio Spreadsheet" for each undisclosed CDO-squared.  Similar to Annex I of the Confirmations described above, the Collateral Lists set forth each security to be included in the CDO and specifically identified those securities which consisted of RMBS.  As MBIA admitted in its complaint in the RBC Action, it repeatedly received "Collateral Lists" setting forth the names of the RMBS collateral in each of the Logan CDOs-squared, described above at ¶¶ 131, 136, 138.

146. Moreover, MBIA's senior officers were provided with an "Offering Circular" in connection with each CDO transaction.  The Offering Circular described the collateral to be included in the CDO, including the RMBS, and the potential risks inherent in those assets.  Thus, the Offering Circulars for each of the Company's CDOs-squared disclosed that these transactions included RMBS collateral and set forth the risks specific to that collateral.

147. In addition, MBIA also received an "Indenture" for each CDO-squared transaction that Defendants Dunton and Chaplin were asked to approve. The Indenture set forth, among other things, the terms governing what kinds of collateral could be added to or removed from the collateral pool after the CDO closed. Attached to the Indenture was a chart identifying each collateral security included in the CDO as of the CDO's closing date, thus plainly disclosing whether any given CDO-squared transaction contained RMBS.

148. In sum, during the extensive negotiation process for each CDO-squared, numerous documents were available to Defendants Dunton and Chaplin which explicitly disclosed the total amount of RMBS collateral in the transaction, identified each piece of RMBS collateral, and described the credit quality and risks of such collateral in detail.

### 3. Defendants Dunton and Chaplin Received Due Diligence Memos and Related Analyses Stating that the CDOs-squared Contained RMBS

149. In connection with each undisclosed CDO-squared, Defendants Dunton and Chaplin personally received written and oral Due Diligence Reports which explicitly provided the amount and expected performance of the RMBS collateral in the transaction.

150. For each CDO transaction, MBIA generated numerous detailed analyses of each piece of underlying RMBS collateral. MBIA stated in its complaint in the RBC Action that its standard due diligence for each CDO transaction included: "(a) a portfolio analysis that focused on the sector distribution and credit ratings of the collateral; [and] (b) a cash flow analysis that took into account default rates of the collateral." Indeed, in its quarterly CDO disclosures, MBIA further explained that its "rigorous analysis of each piece of the underlying collateral" consisted of: (a) "several analyses of the collateral pool to ascertain its overall credit quality and also to identify collateral with characteristics outside of norms for its asset class;" and (b) an analysis of the "quality of seller/servicer, composition of the underlying receivables

55

backing each bond, historical performance of the asset class and underwriting trends in each asset class." (Emphasis added throughout.) All of these analyses – each of which disclosed the existence of RMBS collateral in the CDOs-squared – were available to Defendants Dunton and Chaplin.

151. Moreover, once MBIA's due diligence was complete, MBIA's senior executives summarized the contents of all the above-described documents and the results of the above-described analyses in a "Due Diligence Memo" which plainly disclosed that the CDOs-squared contained RMBS. These Due Diligence Memos were submitted to Dunton, Chaplin, and the ECC in order to obtain their approval of the CDO transaction, according to CW 2. CW 2 held the positions of CDO Transactor at MBIA from 1996 to 2000, and Director, Risk Management at MBIA from 2002 until March 2008. CW 2 reported to Phil Sullivan, a Managing Director in MBIA's Structured Finance department. CW 2 made oral and written presentations to Dunton, Chaplin and the ECC to obtain approval for the Company's CDO transactions. CW 2 reported that Dunton was a voting member of the ECC, and as such received the Due Diligence Memos. CW 2 further reported that Chaplin regularly sat in on the ECC's meetings and also received the Due Diligence Memos. CW 2 stated that the Due Diligence Memos for the Company's CDOs-squared set forth the amount, type and value of the RMBS collateral in the CDO-squared. If the specific pieces of RMBS collateral had not yet been selected, then the Due Diligence Memo set forth the terms governing the maximum allowable percentage of RMBS.

152. CW 2 further reported that the Due Diligence Reports contained a risk analysis of the transaction, which modeled the risks and performance of the transaction under stress scenarios based on the presence of the RMBS and other collateral. In addition, the Due Diligence Memos contained an analysis of the historical performance of RMBS that were

similar to the RMBS contained within the proposed CDO. CW 2 stated that all of this information was formally presented to the ECC in both oral and written form, and then the ECC would either approve or decline the transaction, with a formal record kept of each vote.

153. CW 3 further confirmed that, in connection with each transaction that Defendants Dunton and Chaplin reviewed during ECC meetings, they received Due Diligence Memos and other information which disclosed whether the underlying collateral included RMBS. CW 3 was a senior officer of MBIA who worked for the Company for 23 years, and was a Managing Director and Head of Global Pricing and Public Finance Secondary Markets during the Class Period. CW 3 stated that Dunton was a voting member of the ECC and that Chaplin attended ECC meetings as well. In connection with each transaction that Defendants Dunton and Chaplin reviewed and approved, CW 3 stated that they would receive a formal oral presentation disclosing what kind of securities were in the collateral pool. CW 3 also stated that Defendants Dunton and Chaplin received a package containing a credit analysis of the transaction; information concerning the characteristics of the underlying collateral pool, including what kinds of securities were in the collateral pool, and the credit scores of the mortgage loans backing the transaction; an Offering Circular, which also disclosed the existence of RMBS collateral in the transaction, as described above at ¶ 146; and a prospectus.

154. Accordingly, when deciding whether to approve the CDOs-squared at issue in this case, Defendants Dunton and Chaplin personally received Due Diligence Memos and other information explicitly informing them of the amount and credit quality of the RMBS collateral, and containing several detailed analyses which modeled the expected performance of that RMBS collateral under various market scenarios.

**4.      Monthly Reports, Updated Collateral Lists, and Other Surveillance Documents Stated that the CDOs-squared Contained RMBS**

155. After the ECC approved each of the Company's undisclosed CDO-squared, MBIA's senior executives conducted ongoing surveillance of the RMBS collateral in these transactions.  In connection with this ongoing surveillance, numerous additional documents were available to Defendants Dunton and Chaplin which set forth the identity, amount, and performance of the RMBS collateral supporting the CDO-squared.

156. For example, with respect to the three Logan CDOs-squared, MBIA received updated versions of Annex I throughout the Class Period.  As MBIA admitted in its complaint in the RBC Action, MBIA received these updated Annexes as late as "September 17, 2007," and they disclosed the identity and credit quality of "each security in the collateral pool."

157. In addition, MBIA's senior executives received "Monthly Reports" which explicitly stated that the CDOs-squared contained RMBS.   Annex 4 to the Logan Confirmations provided that each month MBIA would receive a Monthly Report that specifically identified each piece of collateral in the CDO, any changes that had been made to the collateral pool, and, with respect to all RMBS, the "name of the mortgage originator," and the "top five residential ABS type securities."   (Emphasis added.)   Similarly, the Logan Confirmations required the issuer of these CDOs-squared to deliver to MBIA "the current market value of each of the Reference Obligations, if available, on a quarterly basis."

158. As McKiernan stated on the August 2 call, chaired by Defendant Chaplin, the reports described above in ¶¶ 156-57 were of "paramount importance" to MBIA because they allowed MBIA's senior executives to track the performance of the RMBS collateral inside the CDOs, and this performance determined whether and when MBIA would suffer any losses:

> [W]e look at the underlying collateral on a regular basis. What we will do is we receive monthly reporting, obviously, on every transaction that we've entered

<u>into</u>. … When we look at the collateral itself, depending upon the type of deal it is, and obviously for this call, we've been focusing on our multisector CDOs, and sub-prime in particular, but obviously, for any type of collateral that we look at, <u>what is paramount important is that we know what collateral, or what individual pieces of collateral we have throughout the portfolio, whether it is in a CDO or in another part of the company</u>. … [W]e will look at the pieces of collateral and walk through the different attributes of the transactions, and <u>look at the performance to date of the individual pieces of collateral</u>…. [Emphasis added.]

159. Accordingly, following Defendants' decision to approve the CDOs-squared at issue in this case, numerous surveillance documents were available to them which identified each piece of RMBS collateral in the CDOs-squared, set forth the performance of that collateral, and were of "paramount importance" to the Company for precisely this reason.

### B.      Numerous Other Facts Support A Strong Inference Of Scienter

160. Numerous other facts contribute to the strong inference that Defendants Dunton and Chaplin knew or recklessly disregarded that the concealed CDOs-squared contained RMBS.  First, the size of the concealed exposure raises a strong inference of scienter.  As noted above, the six concealed CDOs-squared included MBIA's largest insured CDO transaction at $2.175 billion, as well as its third and fourth largest insured CDO transactions, valued at $1.430 billion and $1.350 billion as of December 19, 2007, respectively.  Further, in the aggregate, the $8.1 billion of concealed exposure substantially exceeded MBIA's capital base of $6.55 billion – which was the bedrock of its triple-A rating.  As the housing market crashed, Defendants Dunton and Chaplin were aware of or were reckless in not knowing about three of the Company's four largest mortgage-related liabilities.  For the same reason, Defendants knew about an entire class of mortgage-related exposure that was, by itself, large enough to destroy MBIA's triple-A rating, the fundamental driver of the Company's business model.

161. Second, the concealed CDOs-squared were the riskiest securities in the Company's entire portfolio. While this fact alone supports a compelling inference that Defendants Dunton and Chaplin knew of these exposures, Defendants Dunton and Chaplin also were responsible for monitoring the Company's risky exposures through their positions as members of the Company's Risk Oversight Committee, as set forth above in ¶¶ 44-45. Thus, as the risk of default increased throughout 2007 and ultimately materialized, Defendants Dunton and Chaplin monitored the Company's insured CDOs-squared and, consequently, were aware that the Company had not disclosed them to investors. Indeed, the Company admitted that its CDOs-squared were permanently impaired on January 9 – just three weeks after the Company was forced to disclose this exposure. As members of the Risk Oversight Committee, Defendants Dunton and Chaplin were aware of these growing risks throughout the Class Period.

162. In fact, as the housing market collapsed before and during the Class Period, Defendant Chaplin repeatedly assured investors that he was discharging his responsibility to closely monitor the Company's RMBS-related exposures, and that he possessed detailed knowledge of those exposures. For example, on an April 26, 2007 call, Chaplin was asked whether the collapsing housing market would cause MBIA to increase the reserves for its CDOs, and responded that his review of the "underlying credit quality" of the collateral justified the low reserve levels, stating "frankly, we think we've assembled a surveillance function that is the best in the business and have spent a couple of years really working these transactions hard." Similarly, on a July 26, 2007 conference call, Defendant Chaplin assured investors that the RMBS collateral in the Company's CDOs was sound, stating that "[w]e gain additional comfort by involving all of our relevant credit and surveillance experts to review the

60

pieces of collateral in these deals." Further, on an October 25, 2007 conference call, Defendant Chaplin stated that he continued to keep close watch on the Company's RMBS collateral, stating that "[w]e remain very comfortable with our subprime RMBS-related exposures. … Having said that, we are carefully surveilling all of our credits in the housing sector, including prime RMBS." (Emphasis added throughout.) Accordingly, Defendant Chaplin himself repeatedly assured investors that he closely monitored the RMBS collateral in the Company's CDO exposures and therefore possessed personal knowledge of that collateral.

163. Third, the Company's total exposure to CDOs backed by RMBS was the subject of greatest importance to investors and the Company throughout 2007. Investors and the Company were so focused on this subject that the Company held a special conference call to address it on August 2. Investors specifically and repeatedly questioned Defendants Dunton and Chaplin on the precise subject of the Company's exposures to CDOs backed by RMBS. The fact that these Defendants repeatedly misrepresented the Company's exposure in response to these specific questions – and did so by excluding at least $8.1 billion of the riskiest RMBS-backed exposure – is highly indicative of their intent to deceive.

164. Fourth, Defendants' own actions on December 20 further establish their guilty state of mind. As noted above, on that day Defendants acknowledged that they "had not previously detailed" the $8.1 billion of CDOs-squared, and sought to justify that failure by claiming that they did not disclose CDO transactions with "less than 25 percent direct U.S. RMBS collateral." As set forth above at ¶¶ 107-17, this was a completely contrived excuse that, even in hindsight, provided no basis to justify Defendants' misrepresentations. The timing and nature of Defendants' stated excuse is itself indicative of fraud.

## VIII.  LOSS CAUSATION

165.  Defendants' unlawful conduct alleged herein directly caused the losses incurred by Lead Plaintiff and the Class.  Throughout the Class Period, the prices of MBIA common stock were artificially inflated as a direct result of Defendants' false and misleading statements and omissions.  The false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts and the investing public.  The Company's true condition became known by investors and the market through a series of partial corrective disclosures.  By making contemporaneous misstatements, the Company and its management mitigated the impact of those corrective disclosures and prevented the full truth about MBIA from being revealed at once.

166.  As the true facts became known and/or the materialization of the risks that had been fraudulently concealed by Defendants occurred, the price of MBIA common stock declined as the artificial inflation was removed from the market price of the common stock, causing substantial damage to Lead Plaintiff and the members of the Class.

167.  After reaching a Class Period closing high of $67.78 on October 5, 2007, the corrective disclosures alleged herein, and others that may be learned through discovery, caused MBIA's stock to decline to a closing price of $13.40 on January 9, 2008, the last day of the Class Period.  The price declines directly and proximately resulting from the above-discussed disclosures were not caused by industry news, randomness, or by MBIA-related information unconnected to the alleged fraud.  Each of the above referenced disclosures partially corrected the false and misleading information previously made available to the market by Defendants' wrongful course of conduct.

## IX.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

168.  The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

169.  None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about current exposure to mortgage-backed CDOs.

170.  To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the Company's CDO-related RMBS exposure. Given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by MBIA were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

171. To the extent that the statutory safe harbor may apply to any of these false statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker actually knew the statement was false or the statement was authorized and/or approved by an executive officer of MBIA who actually knew that the statement was false.

## X.    RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

172.    At all relevant times, the market for MBIA's common stock was an efficient market for the following reasons, among others:

a.    The Company's common stock was actively traded on the New York Stock Exchange, a highly efficient market;

b.    As a regulated issuer, the Company filed periodic public reports with the SEC;

c.    MBIA was followed by numerous securities analysts, who issued a significant number of reports concerning MBIA during the Class Period; and

d.    MBIA communicated with public investors via established market communication mechanisms, including the regular issuance of press releases through the *Business Wire* news service, and conference calls with analysts and investors.

173.    As a result, the market for MBIA's common stock promptly digested current information with respect to MBIA from all publicly-available sources and reflected such information in the price of the Company's common stock.   Under these circumstances, all purchasers of the Company's publicly traded common stock during the Class Period suffered similar injury through their purchase of the publicly-traded common stock of MBIA at artificially inflated prices, and a presumption of reliance applies.

## XI.    CLAIMS FOR RELIEF

### COUNT I

### (For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants)

174.  Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

175.  During the Class Period, Defendants MBIA, Dunton, and Chaplin disseminated or approved the false statements specified below, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

176.  These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of MBIA common stock during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to, the understatement of the Company's exposure to CDOs backed by RMBS and the omission of billions in exposure to CDOs-squared backed by RMBS.

177.  These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of MBIA common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, MBIA's exposure to RMBS-backed CDOs; (b) artificially inflate and maintain the market price of MBIA common stock; and (c) cause Lead Plaintiff and other members of the

Class to purchase MBIA common stock at artificially inflated prices and suffer losses when the true facts became known.

178. Defendant MBIA is liable for all materially false and misleading statements made during the Class Period, as alleged above, including the false and misleading statements in:

a.    MBIA's First Quarter 2007 CDO Disclosure;

b.    MBIA's Second Quarter 2007 CDO Disclosure;

c.    MBIA's Selective Approach to Subprime RMBS and Multi-Sector CDOs;

d.    MBIA's Third Quarter 2007 CDO Disclosure; and

e.    MBIA's Press Release issued on December 20, 2007.

179. MBIA is further liable for the false and misleading statements made in press releases, website postings, and during conference calls with investors and analysts, as alleged above, as the maker of such statements and under the principle of respondeat superior.

180. Defendants Dunton and Chaplin are liable for the false and misleading statements they made, as set forth above, including:

a.    Defendant Dunton's false statements during a Keefe, Bruyette & Woods Insurance Conference on September 4, 2007, and the other statements for which he was responsible, including those made in press releases, website postings, and during and in connection with conference calls with analysts from July 2, 2007 through January 9, 2008; and

b.    Defendant Chaplin's false statements during a November 27, 2007 Bank of America Mini-Conference and during and in connection with conference calls with analysts from July 2, 2007 through January 9, 2008, and the other statements for which he was directly responsible, including those made in press releases and website postings.

181. As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

66

Specifically, these Defendants knew or recklessly disregarded that MBIA's statements of its exposure to RMBS-backed CDOs were materially false in that they omitted at least $8.1 billion of CDO-squared securities supported by RMBS.

182.  The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at MBIA, which resulted in the enormous understatements of the Company's riskiest liability and the failure to disclose a material threat to the Company's triple-A ratings, establish a strong inference that MBIA, Dunton, and Chaplin acted with scienter in making the materially false and misleading statements set forth above during the Class Period.

183.  Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for MBIA common stock, which inflation was removed from the stock when the true facts became known.  Lead Plaintiff and the Class would not have purchased MBIA common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

184.  As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of MBIA common stock during the Class Period.

## COUNT II

### (For Violations of Section 20(a) of the Exchange Act Against Defendants Dunton and Chaplin)

185.  Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

186. This Count is asserted against Defendants Dunton and Chaplin for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

187. During their tenures as officers and/or directors of MBIA, each of these Defendants was a controlling person of MBIA within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of MBIA, these Defendants had the power and authority to cause MBIA to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by MBIA during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

188. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Dunton and Chaplin had direct involvement in the day-to-day operations of the Company, in reviewing and managing its RMBS-related exposures, and in its accounting and reporting functions.  Each of these Defendants signed the Company's SEC filings during the Class Period, and was also directly involved in providing false information and certifying and/or approving the false statements disseminated by MBIA during the Class Period.  As a result of the foregoing, Defendants Dunton and Chaplin, as a group and individually, were controlling persons of MBIA within the meaning of Section 20(a) of the Exchange Act.

189. By reason of their positions as officers and/or directors of MBIA as described above, Defendants Dunton and Chaplin are all "control persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and

activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein.

190.  As set forth above, MBIA violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of MBIA and as a result of their own aforementioned conduct, Dunton and Chaplin are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired MBIA common stock.  Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of MBIA, each of these Defendants was culpable for the material misstatements and omissions made by MBIA, including such misstatements as the Company's CDO disclosures referenced above.

191.  As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of MBIA common stock.

## XII.    CLASS ACTION ALLEGATIONS

192.  Lead Plaintiff brings this action on behalf of itself and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities, other than Defendants and their affiliates, who: (i) purchased or otherwise acquired MBIA common stock during the period from July 2, 2007, through and including January 9, 2008 and, who, upon disclosure of certain facts alleged herein, were injured thereby.

193. The members of the Class are so numerous that joiner of all members is impracticable.  As of July 30, 2007, MBIA had 125,581,825 shares of common stock

outstanding. Throughout the Class Period, MBIA common stock was actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes that Class members number in the thousands.

194. Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and the other members of the Class purchased or sold MBIA common stock in the market, and sustained damages as a result of Defendants' conduct complained of herein.

195. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that are adverse or antagonistic to the Class.

196. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

197. Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

     a.     whether the federal securities laws were violated by Defendants' conduct as alleged herein;

     b.     whether the CDO disclosures and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

     c.     whether and to what extent the market prices of MBIA common stock were artificially inflated during the Class Period due to the non-disclosures and/or misstatements complained of herein;

     d.     whether Defendants acted with scienter;

    e.       whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

    f.       whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

    198.  The names and addresses of those persons and entities who purchased or sold MBIA common stock during the Class Period are available from the Company's transfer agent(s).  Notice may be provided to such class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for judgment as follows:

    A.      Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

    B.      Awarding Lead Plaintiff and the members of the Class damages, including interest;

    C.      Awarding Lead Plaintiff's counsel reasonable costs and attorneys' fees; and

    D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

    199.       Pursuant to Fed. R. Civ. P. 38(b), Lead Plaintiff hereby demands a trial by jury in this action of all issues so triable.

71

Dated:      April 30, 2010                    Respectfully submitted,
            New York, New York

                                              **BERNSTEIN LITOWITZ BERGER
                                              & GROSSMANN LLP**


                                              _____
                                              Steven B. Singer (SS-5212)
                                              Steven@blbglaw.com
                                              Kurt Hunciker (KH-4190)
                                              Kurt@blbglaw.com
                                              John Rizio-Hamilton (JR-0130)
                                              Johnr@blbglaw.com
                                              1285 Avenue of the Americas, 38th Floor
                                              New York, New York 10019
                                              Telephone: 212-554-1400
                                              Facsimile:  212-554-1444

Exhibit A

CERTIFICATION OF OKLAHOMA TEACHERS
PURSUANT TO FEDERAL SECURITIES LAWS

Tommy Beavers, Executive Director of the Teachers' Retirement System of Oklahoma ("Oklahoma Teachers") declares, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed the first filed complaint in this matter.  Oklahoma Teachers has retained Bernstein Litowitz Berger & Grossmann LLP to serve as counsel in this matter.

2.    Oklahoma Teachers did not purchase the security that is the subject of this action at the direction of Oklahoma Teachers' counsel or in order to participate in this private action.

3.    Oklahoma Teachers is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Oklahoma Teachers' transactions in MBIA Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5.    Oklahoma Teachers has sought to serve and was appointed as a representative party on behalf of a class in the following actions filed under the federal securities laws during the three years preceding the date of this Certification:

*In re Delphi Corp. Securities Litigation*
*In re Connetics Securities Litigation*

6.    Oklahoma Teachers is currently seeking to serve as a representative party in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

*Greenberg v. American Home Mortgage Investment Corp. et al*

7.    Oklahoma Teachers will not accept any payment for serving as a representative party on behalf of the class beyond Oklahoma Teachers' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10 day of March 2008.

Tommy Beavers
Executive Director
Teachers' Retirement System of Oklahoma

Teachers' Retirement System of Oklahoma
Transactions in MBIA Inc.

| Transaction Type | Transaction Date | Number of Shares | Price Per Share |
|---|---|---|---|
| 07/24/2007 | Buy | 9,300 | 57.6730 |
| 07/24/2007 | Buy | 6,200 | 57.5694 |
| 07/24/2007 | Buy | 1,100 | 57.6802 |
| 07/24/2007 | Buy | 400 | 57.7018 |
| 07/25/2007 | Buy | 15,000 | 58.5383 |
| 07/26/2007 | Buy | 10,000 | 59.0444 |
| 07/27/2007 | Buy | 6,400 | 57.9989 |
| 07/30/2007 | Buy | 5,600 | 58.7533 |
| 07/30/2007 | Buy | 600 | 59.2945 |
| 07/31/2007 | Buy | 7,900 | 57.5963 |
| 08/07/2007 | Buy | 5,500 | 58.3537 |
| 08/08/2007 | Buy | 7,000 | 60.5601 |
| 10/11/2007 | Buy | 6,500 | 67.0000 |
| 10/22/2007 | Buy | 7,000 | 58.0000 |
| 10/25/2007 | Buy | 9,200 | 55.0888 |
| 10/25/2007 | Buy | 8,500 | 51.4300 |
| 10/25/2007 | Buy | 8,300 | 51.8590 |
| 10/25/2007 | Buy | 3,100 | 55.5625 |
| 10/25/2007 | Buy | 3,100 | 55.1550 |
| 10/25/2007 | Buy | 800 | 55.7929 |
| 10/26/2007 | Buy | 9,600 | 45.7381 |
| 11/05/2007 | Buy | 4,500 | 34.8927 |
| 11/09/2007 | Buy | 7,900 | 33.8896 |
| 11/12/2007 | Buy | 4,000 | 35.3496 |
| 11/21/2007 | Buy | 1,500 | 33.5906 |
| 11/27/2007 | Buy | 8,200 | 30.0644 |
| 11/30/2007 | Buy | 2,100 | 36.3177 |
| 12/04/2007 | Buy | 1,800 | 32.5789 |
| 12/04/2007 | Buy | 1,400 | 33.2603 |
| 12/05/2007 | Buy | 700 | 33.8157 |
| 12/07/2007 | Buy | 7,000 | 29.8740 |
| 12/10/2007 | Sell | (10,300) | 36.0008 |
| 12/19/2007 | Buy | 8,700 | 28.1165 |
| 12/19/2007 | Buy | 5,400 | 28.0850 |
| 12/20/2007 | Buy | 6,400 | 20.6878 |
| 12/20/2007 | Buy | 2,500 | 20.5828 |
| 01/08/2008 | Sell | (10,300) | 16.5281 |